**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**BIG STONE GAP DIVISION**

CLERKS OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED
1/8/2021
JULIA C. DUDLEY, CLERK
BY: LOTTIE LUNSFORD
    DEPUTY CLERK

| | |
|---|---|
| THE CLINCH COALITION, ALLIANCE FOR THE SHENANDOAH VALLEY, CHATTOOGA CONSERVANCY, CHEROKEE FOREST VOICES, DEFENDERS OF WILDLIFE, GEORGIA FORESTWATCH, MOUNTAINTRUE, VIRGINIA WILDERNESS COMMITTEE, and WILD VIRGINIA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES FOREST SERVICE and JAMES E. HUBBARD IN HIS OFFICIAL CAPACITY AS UNDER SECRETARY FOR NATURAL RESOURCES AND ENVIRONMENT OF THE UNITED STATES DEPARTMENT OF AGRICULTURE, and THE COUNCIL ON ENVIRONMENTAL QUALITY and MARY NEUMAYR IN HER OFFICIAL CAPACITY AS CHAIR OF THE COUNCIL ON ENVIRONMENTAL QUALITY, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Case No. __2:21CV00003__

**COMPLAINT**

## INTRODUCTION

1.     On November 19, 2020, the United States Forest Service ("Forest Service" or "the agency") finalized a rule to bypass the fundamental requirements of the National Environmental Policy Act ("NEPA") for a host of actions that will cause significant harm to publicly owned national forests across the country and to members of the public who use those lands (the "Final Rule"). The agency's stated goal for this rulemaking was to "increase the pace and scale of forest and grassland

management operations on the ground," 84 Fed. Reg. 27,544, 27,550 (June 13, 2019), by "reduc[ing] costs and time spent on environmental analysis," 85 Fed. Reg. 73,620, 73,629 (Nov. 19, 2019).

2.      NEPA requires every federal agency action with significant environmental impacts to first be analyzed in an Environmental Impact Statement ("EIS") describing the project's impacts in detail and comparing them to the impacts of alternatives. If the significance of the impacts is uncertain or if there are "unresolved conflicts" over alternative uses of agency resources, the Forest Service may first prepare an abbreviated but similar document known as an Environmental Assessment ("EA"), which also describes impacts and alternatives. The EA is used to determine whether preparation of a full EIS is necessary and to consider alternatives. As part of the EA process, the agency often makes changes to projects or commits to mitigation to avoid significant impacts and thereby avoid the need to prepare an EIS. An EIS or EA must be vetted by the public before a decision is made.

3.      Forest Service actions include where to conduct logging operations, build roads, or authorize private uses of national forest lands. The Forest Service may avoid preparing an EIS or EA for its actions only when they fall within a categorical exclusion ("CE"). CEs are intended for small, insignificant, and routine actions that categorically do not have significant impacts no matter where they occur. Unlike projects authorized using an EIS or EA, CEs do not require that site-specific analysis of impacts be made available to the public for comment or that the agency consider alternatives. By creating or expanding CEs, an agency therefore removes procedural safeguards from entire classes of action.

4.      The Final Rule includes a number of new and expanded CEs, including three challenged here: a CE for commercial logging projects up to 2,800 acres (4-3/8 square miles) and construction of up to three miles of logging roads ("CE 25"); a separate CE covering up to two miles of permanent road construction for any purpose ("CE 24"); and an expanded CE that allows "special use" authorizations for private uses affecting up to 20 acres of national forest lands, including

permanent impacts such as a four-mile right-of-way for a pipeline or other utility ("CE 3"). These acreage and mileage limits apply only to a single decision; the CEs can and will be used again and again to authorize successive projects. For example, multiple CE 25 projects could take place in the same general area over time or be ongoing on a single national forest at any given time, so long as each individual project did not exceed 2,800 acres.

5.     Because the scale of logging projects in the Southern Appalachian national forests of Virginia, Tennessee, North Carolina, and Georgia is much smaller than that allowed under CE 25, the Final Rule would effectively allow the Forest Service to implement its entire logging program on these forests without site-specific analysis to inform public comment or consideration of alternatives. Moreover, the Forest Service is required by Executive Order and Secretarial Memorandum to use these and other CEs whenever they are available. *See* Exhibit 1.

6.     Logging, roads, and utility rights-of-way can cause significant harm to unroaded backcountry areas, old-growth forests, steep slopes susceptible to erosion, downstream waters, rare and exemplary habitats, areas with plant communities vulnerable to displacement by non-native invasive species, and scenic viewsheds, among other ecologically and socially important resources. These are inherently site-specific resources, which means that the choice between alternative locations for a proposed action will often be environmentally consequential: while a logging project may cause little harm at one site, it could destroy important, sensitive resources at another site. Site-specific choices are especially consequential because successive projects impact the same resources again and again over time.

7.     The procedural safeguards of the NEPA process, and the EA process in particular, have allowed the public to help the Forest Service avoid and minimize harms that otherwise would have been significant. Without these safeguards, significant impacts will occur without first being disclosed or analyzed in the NEPA process.

8.     To justify its new CEs, the Forest Service relies on a sample of projects for which it previously found that there would be no significant impacts. Because the agency determined that the handful of projects it reviewed did not have significant impacts, it concluded that similarly sized actions on any national forest in the country also would not have significant impacts. However, the agency ignored public comments showing that the same actions at the same scales have caused and will cause significant impacts in other locations. The agency also ignored extensive data and analysis showing that past projects have avoided causing significant harm because of the procedural safeguards of the EA process—precisely the safeguards that the agency has now removed. And, equally troubling, the Forest Service ignored regional differences showing that much smaller projects cause significant impacts in national forests in some parts of the country, like the Southern Appalachians.

9.     In addition to ignoring relevant data and analysis and drawing conclusions contrary to the record, the Forest Service failed to allow the public to comment on elements of the Final Rule as required by law. It also failed to conduct an analysis under NEPA to disclose the negative impacts of and consider alternatives to the rulemaking itself. Further, the Final Rule is inconsistent with the NEPA statute and was promulgated in reliance on illegal provisions of the Council on Environmental Quality's ("CEQ's") newly adopted framework NEPA regulations. By categorically excluding actions with individually and cumulatively significant impacts from site-specific analysis, informed public input, and consideration of alternatives, the Forest Service's new CEs are arbitrary and capricious and contrary to law and must be vacated.

10.     Because the Final Rule is already in effect, the loss of NEPA's procedural safeguards immediately harms the Plaintiffs in this matter ("Conservation Groups"). Even before future projects are implemented and, indeed, before they are even formally proposed, interested members of the public are forced to choose between losing any opportunity to offer informed, site-specific input, on

the one hand, and devoting their own time and resources to gather information about project areas and potentially affected resources on an impossibly short timeframe, on the other.

11.     Conservation Groups bring this challenge to prevent harm to the places in the national forests in which they have ecological, aesthetic, economic, scientific, recreational, and spiritual interests, and to prevent further harm to their organizations and their ability to carry out their missions.

## JURISDICTION AND VENUE

12.     This action is brought pursuant to the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, which waive Defendants' sovereign immunity regarding Conservation Groups' claims. 5 U.S.C. § 702; *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019). This Court has jurisdiction over Conservation Groups' claims under 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief requested pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201–2202.

13.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Defendants Forest Service and CEQ are agencies of the United States, Defendants James Hubbard and Mary Neumayr are officers or employees of the United States acting in their official capacities, no real property is involved in this action, and The Clinch Coalition, Alliance for the Shenandoah Valley, Virginia Wilderness Committee, and Wild Virginia are headquartered within the District.

## PARTIES

### Plaintiff Conservation Groups

14.     All of the Conservation Groups, as part of their core missions, work to protect publicly owned national forests from harm, whether that harm is threatened by a private industry, such as a pipeline operator seeking to cross national forest lands, or by the Forest Service's own proposals to sell timber or construct roads.

15.     Conservation Groups rely on the information and analysis made available by NEPA to understand the likely harms of proposed actions, to critique errors in the Forest Service's understanding or judgment, to provide information about harms that the Forest Service is not aware of or has overlooked, to inform other members of the public that their interests may be affected, to provide feedback about public preferences and values with respect to specific areas of the forests, to offer alternatives that may accomplish the Forest Service's goals with less harm, and ultimately to assist the Forest Service to avoid causing significant harms to the national forests and the people who use and depend on them for recreational, spiritual, economic, and aesthetic benefits.

16.     Conservation Groups' collective efforts, made possible by the NEPA process, have been effective at helping the Forest Service avoid significant harms. Because of informed, site-specific public input, the Forest Service has abandoned efforts to log old-growth forests, unroaded and undeveloped areas, and rare and exemplary habitats, along with many other ecologically, socially, and culturally important areas that are valued by Conservation Groups' members.

17.     By removing NEPA's procedural safeguards for consequential site-specific decisions, the Final Rule will cause significant harms to the national forests in which Conservation Groups have concrete interests—harms that otherwise could have been prevented or lessened by public involvement and accountability. Conservation Groups have also been injured by the Forest Service's refusal to conduct a NEPA analysis disclosing the harmful impacts of the Final Rule, or to weigh the Final Rule's impacts against those of the alternatives that Conservation Groups put forward during the development of the Final Rule.

**The Clinch Coalition**

18.     The Clinch Coalition is a nonprofit organization founded in 1998 to protect and preserve the Jefferson National Forest, including its wildlife, watersheds, and surrounding communities. The Clinch Coalition is particularly focused on protecting and preserving the natural heritage, unique ecosystems, and environmental integrity of High Knob and the Clinch Ranger

District of the Jefferson National Forest, and other extraordinary areas in the region. The Clinch Coalition works to protect specific forest resources, including old-growth forests, rare ecosystems and forest types, rare native plants and animals, roadless areas, water quality, and opportunities for recreation.

19.    The Clinch Coalition, which is headquartered in Scott County, Virginia, and works in Wise County, Virginia, has approximately 400 members. Many of The Clinch Coalition's members live in close proximity to the Jefferson National Forest. These members visit the national forest to hike, observe nature, take photographs, and seek solitude, among other activities.

20.    The Clinch Coalition maintains a "forest watch" program, the purpose of which is to monitor Forest Service actions in order to hold the agency accountable for management decisions on the Jefferson National Forest and provide feedback. The Clinch Coalition also engages in community outreach to increase awareness of issues related to the environment and stewardship of the Forest; this includes producing newsletters, hosting educational programs, and leading guided hikes.

21.    The Clinch Coalition actively participates in the public process for making land management decisions on the Jefferson National Forest, including participating in the NEPA process for projects on the Forest. The Clinch Coalition's participation in the NEPA process typically consists of reviewing and offering comments on project proposals, known as "scoping" notices, including identification of issues that deserve special attention and analysis in an EA or EIS and potential alternatives for further consideration; attending public meetings; conducting site visits and surveys in project areas; communicating with members and the public about ongoing projects; reviewing draft EAs and critiquing them in public comments; and participating in the Forest Service's pre-decisional administrative objection process when necessary. The pre-decisional administrative objection process is the final in-agency opportunity for the public to object to portions of Forest Service projects before they are finalized, and it is offered for projects that receive an EA or EIS, but not a CE.

22.     The Clinch Coalition uses the information and impacts analysis provided by the Forest Service in EAs to prioritize on-the-ground surveys and to verify the condition of discrete areas ("stands") that the Forest Service has prescribed for logging or burning, to locate rare species and sensitive resources like old growth, to critique the Forest Service's analysis and conclusions, and to develop recommendations for alternatives or mitigation strategies for the Forest Service to consider. The Clinch Coalition's analysis, research, and advocacy during the EA process can and do lead the Forest Service to make changes to projects which have the effect of protecting important forest resources from unnecessary harm, including dropping stands and adding mitigation measures. The Clinch Coalition will continue to monitor Forest Service project proposals and advocate for the interests of its members though the NEPA process.

23.     For example, The Clinch Coalition was involved in the NEPA process for the Nettle Patch Vegetation Management Project and is currently involved in the High Knob Viewshed and Habitat Improvement Project and the Eastern Divide Insect and Disease Phase II project. For each of these projects, The Clinch Coalition relied on information and analysis provided in draft EAs to develop feedback to the Forest Service. The Forest Service used this and other public feedback to make important improvements to its environmental analyses and project designs. For the since-completed NEPA process for the Nettle Patch Vegetation Management Project, the resulting project improvements mean that the Forest Service will avoid some of the potential harms to forest resources that members of The The Clinch Coalition value, such as rare green salamander habitat, old growth, and water quality.

24.     These and other similar improvements to Forest Service projects that The Clinch Coalition has helped bring about were made possible by the information, analysis, and opportunity for public comment that the Forest Service provided to the public in the EA process.

25.     The Clinch Coalition is concerned because implementation of the Final Rule will allow the Forest Service to implement much if not all of its timber sale program on the Jefferson

National Forest without ever completing an EA or otherwise providing site-specific analysis to the public and considering alternatives to its proposals. In fact, all projects on the Jefferson National Forest in recent years have involved less logging thanallowed for by the 2,800-acre threshold of the new CE under the Final Rule, including projects that avoided significant harms only because of informed public input.

26.    Without the EA process, The Clinch Coalition and other members of the public will be unable to effectively assist the Forest Service in making improvements to projects that are needed to avoid unnecessary—and often significant—environmental harm.

27.    The Clinch Coalition is concerned that without the information, analysis, and opportunities for public comment provided by the EA process, Forest Service projects are more likely to move forward based on incorrect information and flawed assumptions, causing an increased risk of environmental harm in places where The Clinch Coalition members make their livings, recreate, appreciate the beauty of the Forest, and seek solitude.

28.    The Clinch Coalition is also concerned that the under the Final Rule, the Forest Service will no longer consider cumulative impacts of projects that, over time, have profound impacts. More specifically, The Clinch Coalition is concerned that successive logging projects and road construction in individual watersheds will now be undertaken without the agency ever being required to analyze and disclose the cumulative impacts of doing this. The Forest Service's failure to consider cumulative impacts in that case would increase the risk of erosion and sedimentation into waters that are already impaired, such as the Clinch River.

29.    The Final Rule's requirements that the 2,800-acre logging CE be limited to "restoration" projects that are developed or refined through "collaboration" does not in any way diminish this risk of harm to the interests of The Clinch Coalition's members. Restoration projects are often difficult to distinguish from business-as-usual logging. And even Forest Service projects on the Jefferson National Forest truly intended to restore natural forests and processes can be based on

flawed information or uninformed decision-making, with the result that restoration efforts fail and forest resources are instead harmed.

30.    The Clinch Coalition has participated in the NEPA process for a number of timber projects on the Jefferson National Forest, some of which were ostensibly intended as "collaborative" projects. Collaborative processes vary significantly project by project; there is no requirement that information comparable to that provided in an EA be provided to participants or that the Forest Service entertain alternatives. Collaborative processes also exclude input from members of the public who are not able to attend the many meetings and calls that are necessary for collaboration with the Forest Service, particularly when meetings occur during a work day or immediately afterward.

31.    The Clinch Coalition has already been harmed by the Forest Service's promulgation of the Final Rule, and these harms will multiply as the Final Rule is implemented. For projects that may now be authorized under the new and expanded CEs, The Clinch Coalition must attempt to gather, by alternative means, the information and analysis that the Forest Service would have otherwise been required to disclose in an EA. Without this information, The Clinch Coalition cannot achieve its organizational mission of protecting forest resources. In order to timely gather needed information that is no longer required to be provided under NEPA, The Clinch Coalition has already filed a Freedom of Information Act ("FOIA") request seeking basic information related to upcoming projects. The Clinch Coalition will likely file many more FOIA requests for ongoing and future projects in an attempt to make up for the loss of information from EAs. In addition to this new burden, The Clinch Coalition must now shift scarce organizational resources, when possible, to trying to gather and analyze information to identify damaging impacts to important resources under development, because protecting these resources is important to The Clinch Coalition's members. This type of analysis is information that would otherwise be disclosed in an EA. Furthermore, The Clinch Coalition will now be forced to commit to time-consuming collaborative processes that may

not provide a meaningful opportunity for input, or else risk missing its only opportunity to influence a project's direction and avoid or lessen harm to The Clinch Coalition's members.

32.     The Clinch Coalition must do all of these things in order to gather and respond to information about project details and impacts that the Forest Service is required to disclose in an EA. Due to resource constraints, these additional efforts may be very limited and will come at the expense of other areas of The Clinch Coalition's mission-driven work. Even with its best efforts, The Clinch Coalition will not be able to fully make up for the loss of information in an EA.

33.     In each of these ways, The Clinch Coalition and its members have and will continue to suffer imminent, concrete, and particularized injuries to interests that are germane to its organizational mission now that the Final Rule has taken effect.

34.     The injury to The Clinch Coalition and its members would be redressed by an order from this Court vacating the Final Rule.

**Alliance for the Shenandoah Valley**

35.     Plaintiff Alliance for the Shenandoah Valley ("ASV") is a nonprofit corporation founded in 2018 by the merger of four conservation organizations: The Community Alliance for Preservation, Augusta County Alliance, Shenandoah Forum, and Shenandoah Valley Network. A fifth organization, Scenic 340, joined ASV in 2019. ASV's mission is to maintain healthy and productive rural landscapes and communities, protect and restore natural resources, and strengthen and sustain the Shenandoah Valley's regional agricultural economy. ASV also works to ensure the Shenandoah Valley's rural character, scenic beauty, clean water, and vibrant communities are protected by providing accurate and timely information to community members and decisionmakers. ASV's work is focused on the Shenandoah Valley region, which includes the George Washington National Forest.

36.     ASV is headquartered in New Market, Virginia, and it has more than 2,000 supporters and more than 500 active donors. ASV has members throughout the region who are

interested in a Shenandoah Valley that is sustained by rural landscapes, clean streams and rivers, and thriving communities. The George Washington National Forest provides drinking water for more than 260,000 local residents, including the cities of Staunton and Harrisonburg, and supports the headwaters of drinking water supplies for 4.5 million people downstream. The Forest also forms a critical component of the Shenandoah Valley's environmental, economic, and recreational resources, as members of ASV and generations of Shenandoah Valley residents and visitors have enjoyed hunting, hiking, mountain biking, trout fishing, and getting away in this treasured resource.

37.     To accomplish its mission, ASV engages in a variety of activities, including monitoring Forest Service management activities and commenting on proposed activities; enhancing public awareness of, and interest in, issues affecting the George Washington National Forest and the surrounding area; and providing leadership and a coordinating role in submitting community input to decisionmakers on projects that impact the region, including Forest Service projects.

38.     A robust NEPA process is essential to ASV's organizational activities. ASV relies on the NEPA process to learn about and engage in Forest Service actions that affect the George Washington National Forest, which it then relays to its members and the general public. For example, ASV uses information obtained during the NEPA process to inform its members about impacts from energy development projects in the region. ASV also participates directly in the NEPA decision-making process by offering public comments, critiques, and additional information based on the Forest Service's draft EAs.

39.     ASV has used the opportunities and information provided by the NEPA process to be involved with Forest Service projects within the George Washington National Forest that were changed for the better during the process. These changes would not have occurred without transparent information provided to the general public through the NEPA process, creating the opportunity for informed public comment.

12

40.     ASV is concerned that the Final Rule will effectively eliminate meaningful public participation in energy projects and other projects affecting the George Washington National Forest and the Shenandoah Valley. One new CE in the Final Rule will dramatically expand the Forest Service's ability to issue special-use permits, including for energy development projects, without requiring NEPA analysis or giving the public an opportunity to comment on an EA as part of that analysis. Another new CE for logging projects up to 2,800 acres in size will apply to many, if not all, timber projects proposed by the Forest Service within the George Washington National Forest, affecting the viewsheds, species, and watersheds ASV works to protect.

41.     Without the information and analysis provided by the EA process, ASV will be unable to adequately inform its members regarding the risks of particular projects impacting places and resources important to them. ASV will also lack the information necessary to craft informed public comments that otherwise would prompt the Forest Service to fully consider the impacts of its actions on the environment and to make appropriate changes. As a result, the Forest Service is more likely to move forward with flawed projects that impact the areas of the George Washington National Forest important to ASV and its members.

42.     With respect to the 2,800-acre timber harvest CE specifically, the vague requirement that projects be developed or refined through a "collaborative" process does not diminish the risk of harm to the interests of ASV and its members. Occasionally, collaborative activities can be an effective way to provide input, especially Forest Service–sponsored field trips in which meeting participants try to reach a consensus. But "good" collaboration requires a huge commitment of time and resources. ASV is a small organization, and participating in collaboration would create additional demands on organizational capacity to engage in the substitute collaborative process. To manage the time and resource needs of collaboration, ASV would have to fund expenditures outside its ordinary budget and may even need to hire an additional staff member, which ASV likely cannot do.

43.     Additionally, ASV does not engage with the Forest Service on projects as frequently as other groups primarily or exclusively focused on public lands, and it is likely that ASV and other groups with a similarly limited level of participation will be excluded from collaborative processes altogether. At the very least, ASV will be forced to devote additional time and resources to tracking projects in order to know that collaboration opportunities may be upcoming and attempt to gain a seat at the table. This requires ASV to choose now between acquiescing to the burden of collaboration as a substitute for the NEPA process or foregoing its right to informed, meaningful participation in land management decisions for logging projects.

44.     In order to understand what is at stake from Forest Service proposals, ASV will not be able to rely on Forest Service EA analyses and will instead be forced to offer input in the dark or to gather information on its own. This is a tremendous hardship for a small organization like ASV, because it requires ASV to find time and financial capacity to gather the information to which it is entitled under NEPA, but which the Forest Service will no longer provide in an EA. Relatedly, the Final Rule impairs ASV's ability to timely inform and seek input from its members about Forest Service actions that affect the Shenandoah Valley and the George Washington National Forest.

45.     In each of these ways, ASV and its members will suffer imminent, concrete, and particularized injuries to interests that are germane to its organizational mission now that the Final Rule has taken effect.

46.     The injury to ASV and its members would be redressed by an order from this Court vacating the Final Rule.

**Chattooga Conservancy**

47.     Plaintiff Chattooga Conservancy is a nonprofit organization founded in 1994 to protect and restore the Chattooga River Watershed; to educate and empower citizens to practice good stewardship on public and private land; and to ensure the viability of native species within the Watershed. Chattooga Conservancy's mission is specific to the lands within the Chattooga River

14

Watershed, approximately 70% of which are located on national forest lands in the Nantahala National Forest in North Carolina, the Sumter National Forest in South Carolina, and the Chattahoochee National Forest in Georgia.

48.     Chattooga Conservancy is based in Mountain Rest, South Carolina, and has approximately 650 members. Most of Chattooga Conservancy's members live in Georgia and South Carolina. These members run and patronize businesses that rely on the health and beauty of the national forests to attract visitors, and they visit the national forests themselves to hike, kayak, observe nature, take photographs, and seek solitude.

49.     Chattooga Conservancy actively participates in Forest Service NEPA processes for land management decisions on the Nantahala, Sumter, and Chattahoochee National Forests. Chattooga Conservancy's participation in the NEPA process includes hosting and attending public meetings and field trips, communicating with its members and the public through newsletters and social media, reviewing draft EAs, critiquing draft EAs in public comments, and participating in the Forest Service's pre-decisional administrative objection process.

50.     Chattooga Conservancy uses the information and impacts analysis provided by the Forest Service in EAs to conduct on-the-ground surveys in order to verify the condition of stands the Forest Service has prescribed for logging or burning, to locate rare species and sensitive resources like old growth and aquatic resources, to critique the Forest Service's analysis and conclusions, and to develop recommendations for alternatives or mitigation strategies for the Forest Service to consider.

51.     Chattooga Conservancy's analysis, research, and advocacy during the EA process can and do lead the Forest Service to make changes to projects which have the effect of protecting important forest resources from unnecessary harm. For example, in the recent Compartment 48 Timber Sale Project on the Sumter National Forest and the Warwoman Project on the Chattahoochee National Forest, informed, site-specific public input from Chattooga Conservancy and other members

15

of the public resulted in avoiding some of the potential harms to forest resources that Chattooga Conservancy members value, such as roadless areas and water quality. Without the information and analysis provided by the EAs for these projects, Chattooga Conservancy would not have known how the agency initially planned to access timber, what impacts to forest resources would result from different approaches, and how to hold the agency accountable for overlooked harms or poor judgment.

52.     Chattooga Conservancy is currently involved with other ongoing projects and hopes to be able to provide informed input and participate in decision-making for any consequential project in the Chattooga River Watershed. Chattooga Conservancy is concerned because implementation of the Final Rule will allow the Forest Service to implement its entire timber program on the Sumter, Nantahala, and Chattahoochee National Forests without ever completing an EA, and it will thereby eliminate the ability of Chattooga Conservancy and other members of the public to assist the Forest Service in making improvements to projects to avoid unnecessary environmental harm. Nearly every timber project on the Chattahoochee, Sumter, and Nantahala National Forests in recent years has been smaller than the threshold for the 2,800-acre timber harvest CE created by the Final Rule.

53.     Chattooga Conservancy is concerned because without the information, analysis, and opportunities for public comment provided by the EA process, Forest Service projects will move forward without the fully informed, site-specific analysis that protects against unnecessary and significant impacts. This in turn will lead to an increased risk of environmental harm in places where Chattooga Conservancy members recreate, fish, and seek solitude.

54.     The Final Rule's limitation on the 2,800-acre timber harvest CE for "restoration" projects that are developed or refined through "collaboration" does not protect against significant harms in the Chattooga River Watershed. The Forest Service has characterized even the most controversial and harmful projects in the Chattooga River Watershed as restoration. Even where projects have some beneficial purposes, the tools that the Forest Service uses are inherently

damaging. And restoration can still be based on flawed information or uninformed decision-making, with the result that restoration efforts fail and forest resources are instead harmed.

55.     Likewise, the Forest Service often uses "collaborative" processes for its projects in the Chatooga River Watershed without providing participants with site-specific information or a meaningful chance to provide input. Chattooga Conservancy has participated in multiple collaborative processes for projects within the Watershed, such as the Foothills Landscape Project. Participation in collaboration for this project has been a time- and resource-intensive commitment. Many of Chattooga Conservancy's members have been unable to attend the numerous public meetings and workshops, which have been scattered across northern Georgia during weekdays. And none of those meetings provided Chattooga Conservancy with the ability to understand what the project's site-specific impacts would be, to provide informed feedback on the agency's assumptions, or to suggest different places for timber harvest.

56.     Chattooga Conservancy is also concerned because, by authorizing the Forest Service to use CEs for virtually all logging projects on the national forests in the Chattooga River Watershed, the Final Rule will severely impair Chattooga Conservancy's ability to carry out its mission of educating its members and the public about Forest Service projects that could impact the Watershed. Without the information provided by EAs, Chattooga Conservancy's members will be unable to fully understand what the Forest Service is proposing to do, where, and how. Chattooga Conservancy and its members rely on the information and analysis provided in EAs to analyze and understand the potential impacts of a project to specific places on the forests and their ability to enjoy these places for recreation, sustenance, appreciation of nature, and as a place to make their livelihoods.

57.     Chattooga Conservancy has already been harmed by the Final Rule, and this harm will be ongoing as the Final Rule is implemented. Chattooga Conservancy has been forced to make internal organizational changes in an attempt to limit the damage to its interests caused by the probable loss of the EA process for most Forest Service projects in the Watershed. Chattooga

Conservancy has begun to divert its limited staff and financial resources to the work of repeatedly requesting information about upcoming projects directly from Forest Service. Without the information, analysis, and opportunities for public comment provided by the EA process, Chattooga Conservancy must seek other ways of gathering information about projects and providing feedback to the Forest Service.

58.    As the Final Rule is implemented, Chattooga Conservancy will be forced to spend significantly more time researching, surveying, conducting its own analyses of impacts to forest resources, and committing, when possible, to collaborative processes that may or may not provide a meaningful opportunity for input—all in order to acquire information about project details and environmental effects that the Forest Service otherwise would have been required to disclose in an EA. These additional efforts will force Chattooga Conservancy to abandon other areas of its mission-driven work, including direct stewardship activities on the Watershed, like organizing trash clean-ups and water sampling. Even with these reallocations of staff and volunteer resources, Chattooga Conservancy will not be able to make up for the loss of information in an EA—at best, these mitigating measures can only decrease the harm caused by the Final Rule. Chattooga Conservancy has only two full-time staff; these staff do not have the time, resources, or training to undertake the same kind of analysis that is found in an EA.

59.    In each of these ways, Chattooga Conservancy and its members have and will continue to suffer imminent, concrete, and particularized injuries to interests that are germane to its organizational mission now that the Final Rule has taken effect.

60.    The injury to Chattooga Conservancy and its members would be redressed by an order from this Court vacating the Final Rule.

### Cherokee Forest Voices

61.    Plaintiff Cherokee Forest Voices ("CFV") is an organization founded in the mid-1980s and incorporated as a 501(c)(3) nonprofit in 1999, with the goal of restoring and preserving

biodiversity in the Cherokee National Forest; improving protections for fish, wildlife, plants, soil, and water resources; increasing the amount of designated wilderness area; creating opportunities for nature-oriented recreation; and protecting scenic values. CFV's mission is specific to the Cherokee National Forest, and its work is primarily focused on on-the-ground protection and restoration of ecologically sensitive and undeveloped areas with backcountry or wilderness values—dubbed Mountain Treasure areas—as well as old-growth groves, critical aquatic habitat, and wilderness-study areas.

62.    CFV is based out of Johnson City, Tennessee, and has approximately 200 individual members and 6 organizational members. Many of CFV's members live in and near the Cherokee National Forest along the North Carolina–Tennessee border. Some members own or patronize businesses that depend on an ecologically vibrant and protected Cherokee National Forest to attract visitors and customers; many members frequently visit the forest to hike, backpack, fish, camp, bird watch, kayak, whitewater raft, take photographs, and enjoy true wilderness experiences.

63.    To accomplish its mission, CFV engages in a variety of activities, including monitoring Forest Service management activities and commenting on proposed activities; enhancing public awareness of, and interest in, forest-related issues; sponsoring or promoting activities designed to increase citizen participation in the forest management process; and cooperating with other groups throughout the region who share common interests and concerns regarding the Cherokee National Forest.

64.    A robust NEPA process is key to all of these organizational activities. CFV relies on the NEPA process to provide information regarding projects in the Cherokee, which it then relays to its members and the general public. For example, CFV uses information obtained during the NEPA process to inform its members about projects impacting Mountain Treasure areas, old growth, wildlife, invasive plants, steep slopes and erosion, water quality, scenery, and recreation. CFV also participates directly in the NEPA decision-making process by offering public comments, critiques,

19

and additional information based on the Forest Service's draft EAs, and filing pre-decisional administrative objections if problems are not corrected.

65.     Many proposed Forest Service projects within the Cherokee National Forest were changed for the better during the EA process because of CFV's involvement and the disclosure of information through the NEPA process. For example, CFV's public comments have helped the Forest Service to avoid impacts to previously unidentified old growth, preserve unroaded Mountain Treasure areas, relocate projects to protect endangered aquatic species, and even drop projects entirely over steep-slope concerns. These changes would not have occurred without transparent, site-specific EA analyses and the opportunities they create for informed public comment.

66.     CFV is concerned because the Forest Service's Final Rule will make project improvements like these a thing of the past. The new 2,800-acre timber harvest CE would almost certainly apply to every timber project proposed by the Forest Service within the Cherokee National Forest. The largest logging project on the Cherokee National Forest from 2009 to 2019 was less than a third of that size. And all upcoming logging projects proposed in the forest of which CFV is aware also fall under the 2,800-acre threshold for using the new CE. In addition, all Cherokee National Forest logging projects in recent memory have included "restoration" as a project purpose, even where the Forest Service has proposed to log old growth to create young forest habitat or to log within Mountain Treasure areas. Stating that a project has a "restoration purpose" does not guard against Forest Service decisions based on incomplete or flawed information, and thus does not eliminate the increased risk of harm inherent in uninformed decision-making. Restoration projects, like all projects, need site-specific analysis and public input to make sure they will not do more harm than good.

67.     Without the information and analysis provided by the EA process, CFV will be unable to adequately inform its members regarding the risks of particular projects impacting places and animals important to them. CFV will also lack the information necessary to craft informed public

20

comments that can and do help the Forest Service to reduce unnecessary environmental harms. As a result, the Forest Service is more likely to move forward with flawed projects that impact roadless areas, old-growth stands, and other Mountain Treasure areas important to CFV and its members.

68.     The Final Rule's substitution of a poorly-defined "collaborative" process for the open, accessible, and transparent NEPA process creates more problems than it solves. Importantly, the Final Rule does not specify what is required to satisfy the collaborative requirement, and many collaborative processes do little to resolve conflicts or promote site-specific understanding of what is being proposed. Even when collaboration is used as an effective way to gather public input, such as Forest Service–hosted field trips in which meeting participants try to reach a consensus, the process of collaboration requires a huge commitment of time and resources. For example, a recent collaborative project required CFV staff to attend 11 day-long field trips, participate in 8 roundtable meetings and numerous teleconference meetings with Forest Service staff and other interested parties, and respond to dozens of emails. And even after all of this effort, additional analysis and public input were needed during the EA period to avoid significant damage to soil and water resources.

69.     The Forest Service is constantly working to find stands to log long before the public is made aware of a project via scoping. Even where collaborative processes do include opportunities for site-specific input (for which there is no requirement), those opportunities would arise before scoping. As a result, CFV must decide whether to devote its scarce resources to a collaborative process before CFV knows where the project is located, whether it is likely to harm resources that are important to CFV's members, or whether the Forest Service intends to use a CE or not. By the time that a project is scoped, the opportunity to use collaboration to steer a project away from significant environmental harm will have already passed. CFV cannot participate in time-consuming collaboration for every project. This is a tremendous hardship on CFV's members who cannot skip work commitments to attend time-consuming meetings during business hours, who lack the time or

resources to drive long distances repeatedly to attend meetings, or who lack the physical ability to join field trips. Under the Final Rule, therefore, staying abreast of projects coming down the pipeline will require more effort, planning, and marshaling of resources, and CFV will sometimes have to pass on collaborative processes and lose the ability to provide any meaningful input.

70.     Outside of these vague and problematic collaborative processes, scoping would be the first and last opportunity for the public to learn about and comment on a project. Scoping does not disclose the site-specific impacts needed to inform site-specific comments. And it is all but impossible for an organization as small as CFV to gather the necessary information on its own, analyze impacts, and write comments in such a short window of time—usually only 30 days. CFV certainly does not have the resources to conduct its own information gathering, environmental analysis, and advocacy *before* every project is scoped.

71.     CFV is also concerned that the use of CEs will severely impede its ability to conduct its core organizational activities. For example, one of the primary goals of CFV is to increase the size of existing Wilderness areas and secure the designation of additional Wilderness areas under the Wilderness Act, 16 U.S.C. § 1131. With decades of work, CFV successfully persuaded the Forest Service to recommend certain areas within the Cherokee National Forest be designated as Wilderness, and then persuaded Congress to act on that recommendation in 2018. All told, approximately 20,000 acres in seven distinct areas were permanently protected. CFV still seeks to protect tens of thousands of other acres within the forest with a Wilderness designation. However, it does not take much to disqualify an area from consideration. Logging activities, and the associated roads used to haul out the timber, for example, can disqualify areas from permanent protection as Wilderness. The Forest Service often does not know where potential qualifying areas are on the landscape, particularly following revision of the criteria for identifying potentially Wilderness areas in 2012. When logging is proposed within such areas, informed public input is necessary to alert the agency to the presence of these areas and show the Forest Service that the public strongly prefers

leaving these areas intact. Without the EA process, there is an increased risk that projects impacting these special areas will unknowingly but permanently remove them from eligibility for Wilderness protections.

72.     CFV is concerned that the Final Rule will also force it to divert organizational resources. In order to understand what is at stake from a logging proposal, CFV will not be able to rely on Forest Service EA analyses and will instead be forced to offer input in the dark or to gather information on its own. Thus, CFV will be forced to spend significantly more time filing requests under FOIA, researching, hiring surveyors to conduct soil and water-quality analyses, and committing, when possible, to time-consuming collaborative processes that may or may not provide a meaningful opportunity for input. These are tremendous hardships for a small organization with a shoestring budget and only one staff member like CFV, especially as CFV's staff member lacks the expertise to conduct project surveys or assess biological resources on their own. What's more, CFV will not be able to use these alternative means of gathering information to make up for the loss of EA analyses—at best, CFV can only decrease the harm caused by the Final Rule. CFV expects that these changes will result in other important tasks going uncompleted, including its service, education, outreach, and fundraising efforts.

73.     In each of these ways, CFV and its members will suffer imminent, concrete, and particularized injuries to interests that are germane to its organizational mission now that the Final Rule has taken effect.

74.     The injury to CFV and its members would be redressed by an order from this Court vacating the Final Rule.

**Defenders of Wildlife**

75.     Plaintiff Defenders of Wildlife ("Defenders") is a national nonprofit organization. Founded in 1947, Defenders is dedicated to the protection of all native animals and plants in their natural communities, including our country's most imperiled wildlife and habitats. For over 70 years,

Defenders has protected and restored imperiled species throughout North America by promoting on-the-ground conservation initiatives; funding science-based research; developing ecologically sound policy; advocating on the local, state, and national levels; and litigating when necessary.

76.     Headquartered in Washington, DC, Defenders has regional and field offices across the United States, including the Southeast Program regional office in Asheville, North Carolina. Defenders has nearly 1.7 million dues-paying members nationwide, including dues-paying members in all fifty states and 65,502 dues-paying members in the southeastern states of West Virginia, Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Tennessee, and Kentucky. These members frequently visit the national forests of the Southeast to hike, paddle, fish, observe wildlife, take photographs, and seek solitude.

77.     Defenders' program work in the Southeast includes activities to protect a wide diversity of imperiled species, from the charismatic red wolf, North Atlantic right whale, red knot, and loggerhead sea turtle to the lesser known but no less important blackside dace, birdwing pearlymussel, eastern hellbender salamander, and northern long-eared bat. Defenders also fights to protect the astonishing variety of Southeastern habitats, from the Florida Everglades to the high mountain forests of North Carolina.

78.     NEPA is fundamental to Defenders' policy work and on-the-ground initiatives throughout the United States. Defenders relies on a robust NEPA process to learn about the environmental impacts of agency actions affecting public lands, including proposed timber harvest projects, infrastructure, and approvals and permits for energy and utility projects. Defenders also depends on the public comment opportunities afforded by the NEPA process to submit written comments and provide oral testimony on the impacts of such actions to ensure that federal decisionmakers consider the full array of environmental impacts and make informed decisions on a full range of reasonable alternatives. Defenders also uses the information and analysis provided

through the NEPA process to inform its members and the public about impacts to species and

habitats that they care about.

79.     Defenders has used the information, analyses, and opportunities provided by the

NEPA process to actively participate in the public process for making land management decisions in

our national forests. For example, Defenders has been and will continue to be an active participant in

the NEPA process for projects in national forests throughout the Southeast.

80.     Defenders participates in the NEPA process for Forest Service projects by reviewing

and commenting on project scoping notices, attending public meetings, reviewing draft EAs and EISs

and using their site-specific information to prioritize locations for site visits and surveys, critiquing

these drafts in public comments, and participating in the Forest Service's pre-decisional

administrative objection process. Defenders' participation by these means has helped the Forest

Service identify and avoid or mitigate potentially significant harms, including in the Nantahala

National Forest, where project changes have been made, based on information presented by

Defenders, to protect rare green salamanders and sensitive aquatic resources from logging and road

construction. Defenders has also used the information and analyses created during the EA process to

verify the condition of stands the Forest Service has prescribed for logging, to delineate sensitive

resources like old growth, to evaluate the Forest Service's analysis and conclusions, and to develop

recommendations for alternatives or mitigation strategies.

81.     Defenders is concerned that the Forest Service's Final Rule will dramatically reduce

the preparation of EAs for timber projects across the country, and thus diminish the ability of

Defenders and its members to offer informed input on proposed timber harvests. This change will be

felt most acutely in the Southern Appalachian national forests, where, judging by past practice,

practically every timber project proposed by the Forest Service will be eligible for the 2,800-acre

restoration CE. For example, all of the recent projects and new projects currently under preparation

in the Pisgah and Nantahala National Forests will be under the 2,800-acre threshold for commercial

logging created by the Final Rule. The Forest Service also characterizes most of its timber harvests as "restoration" projects and easily could add that label to any of its projects, even when they are indistinguishable from projects designed to prioritize commercial harvesting of trees. But Defenders has been able to use the NEPA process to guide the Forest Service on what constitutes true ecological restoration versus "business as usual" with a new label. For example, in NEPA comments on many projects throughout the National Forest System, Defenders has gone on the record in support of appropriate restoration including using prescribed fire, removing offsite species, enhancing aquatic connectivity, and maintaining ecological conditions necessary for the persistence of sensitive and at-risk species. Without the EA process, Defenders' ability to influence the Forest Service to ensure that projects with a "restoration" purpose actually accomplish beneficial restoration outcomes will be severely limited.

82.     Without the information, analysis, opportunities for informed public comment, and options to file pre-decisional objections afforded by the EA process, Defenders is concerned that the Forest Service will make uninformed and ill-advised decisions to proceed with flawed projects that negatively affect the natural communities and wildlife Defenders and its members seek to observe, study, and protect.

83.     Defenders has extensive experience engaging in "collaborative" processes with the Forest Service, and Defenders is concerned because the Final Rule would substitute a collaborative process for the required NEPA process. Defenders has been actively involved in collaborative processes at the project, landscape, and forest-wide scales. In some cases, collaborative efforts led to incorporation of specific actions to benefit wildlife and explicit protections for imperiled resources including State Natural Heritage Areas, wildlife corridors, and old-growth forests. However, each successful collaborative effort required significant investments of time and resources. In some cases, Defenders spent years working on these collaborative projects. As a national organization that engages in Forest Service planning and project decision-making across the National Forest System,

Defenders does not have sufficient capacity to collaborate on the vast majority of Forest Service projects; its conservation programs rely on the NEPA process to efficiently and effectively engage on projects nationwide. In other words, Defenders does not have the capacity to participate in the development of every Forest Service project from scratch; Defenders depends on the NEPA process to identify potential harms to the species they work to protect, which allows Defenders to prioritize its resources to engage on the most important projects.

84.     The Final Rule also does not specify what is required to satisfy the collaborative process requirement. The utility of collaborative efforts varies widely in practice; some can be worthwhile with significant investments of time and resources, while others are effectively a waste of participants' time. Defenders has been involved in several collaborative projects that incorporated only a single field trip or public meeting to provide "collaborative" input and to satisfy collaboration requirements (such as those required by statute under certain limited circumstances), only to have the Forest Service subsequently ignore legitimate concerns. Moreover, the Final Rule does not require the Forest Service to provide the public with information and analyses comparable to that provided during the EA process. And even if it did, many of Defenders' members would be unable to attend collaborative meetings where they could access such information. Defenders' members live in varied locations across the country, and they heavily rely on Defenders' staff to both attend local meetings and obtain relevant information to keep members informed so that they can provide their own comments on projects that impact the places they care about even if they don't live nearby.

85.     The Final Rule will force Defenders to divert organizational resources away from mission-critical activities to fill in the informational gaps that the Final Rule will create by curtailing the EA process. Without that process, Defenders will have to hire outside experts to perform surveys, collect data, or complete scientific analyses. Defenders will also have to perform the Forest Service's job of informing the public, such as by media efforts or organizing public meetings independently. In addition to providing input during the sole comment period (scoping), Defenders will have to

conduct all of its research, organizing, and advocacy work on an accelerated timeline in order to provide informed comments. Even with such efforts, without an EA to frame the issues, Defenders will be unable to provide informed, site-specific comments that would be most helpful to agency decision-making. In short, the Final Rule would put an undue burden on Defenders' work as a public interest organization and undermine its ability to provide the necessary feedback to protect our national forests.

86.    Going forward, Defenders will be forced to divert its limited resources to filing FOIA requests and conducting its own investigations and analyses in order to gather information about project details and impacts that the Forest Service would have otherwise disclosed in an EA. Yet even with this significant diversion of resources, the tools left at Defenders' disposal will be inadequate to realize its organizational mission and effectively advocate for imperiled species. For example, it often takes months and sometimes years to obtain information pursuant to a FOIA request, and responses may be irrelevant, lack context, or be or redacted of useful information, thus requiring a significant amount of time simply to make sense of the documents. These additional efforts will force Defenders to abandon other projects and efforts focused on species conservation, to the detriment of the organization and its members.

87.    In each of these ways, Defenders and its members will suffer imminent, concrete, and particularized injuries to interests that are germane to its organizational mission now that the Final Rule has taken effect.

88.    The injury to Defenders and its members would be redressed by an order from this Court vacating the Final Rule.

### Georgia ForestWatch

89.    Plaintiff Georgia ForestWatch ("ForestWatch") is a nonprofit organization founded in 1986 to enhance the health of Georgia's 867,000 acres of national forests by protecting their forests and streams, advocating for natural processes, and identifying opportunities to improve forest

management. ForestWatch's mission is specific to national forest lands in Georgia, and its work is focused primarily on the preservation of roadless areas, old-growth forests, biodiversity, and water quality.

90.     ForestWatch is based in Dahlonega, Georgia, and has approximately 650 members. Many of ForestWatch's members live in close proximity to Georgia's national forests. These members run and patronize businesses that rely on the health and beauty of the national forests to attract visitors, and they visit the national forests themselves to hike, observe nature, take photographs, and seek solitude.

91.     ForestWatch actively participates in the public process for making land management decisions on the Chattahoochee-Oconee National Forest. ForestWatch was heavily engaged in the most recent revision of the Chattahoochee-Oconee Forest Plan, and it has been and will continue to be an active participant in the NEPA process for projects on Georgia's national forests. ForestWatch's participation in the NEPA process includes submitting comments, attending public meetings, conducting site visits and surveys in project areas as needed, reviewing draft EAs, critiquing Forest Service analyses where they are flawed, providing additional information that the agency is not aware of, and participating in the Forest Service's pre-decisional administrative objection process.

92.     For example, ForestWatch was previously involved in the NEPA processes for the Upper Warwoman Project and the Cooper Creek Project. ForestWatch is currently involved in the NEPA process for the Foothills Landscape Project. For each of these timber projects, ForestWatch relied on the information and analysis provided in draft EAs to develop feedback for the Forest Service. ForestWatch uses the information and impacts analysis provided by the Forest Service in EAs to inform its on-the-ground surveys in order to verify the condition of stands the Forest Service has prescribed for logging or burning, to locate rare species and sensitive resources like old growth and trout streams, to critique the Forest Service's analysis and conclusions, and to develop

recommendations for alternatives or mitigation strategies for the Forest Service to consider. The Forest Service has in turn used this feedback to make important improvements to projects and thereby protect important forest resources from unnecessary harm, including dropping stands and adding mitigation measures. For the since-completed Upper Warwoman and Cooper Creek NEPA processes, the resulting project improvements mean that the Forest Service has avoided potential harms to forest resources that ForestWatch members value, such as old growth and trout streams. Without the information and analysis provided by the EAs, ForestWatch would not have been able to help the Forest Service avoid those harms.

93.   ForestWatch is concerned because the Final Rule will allow the Forest Service to implement its entire timber program on the Chattahoochee National Forest without ever completing an EA, and it will thereby eliminate the ability of ForestWatch and other members of the public to assist the Forest Service in making improvements to projects needed to avoid unnecessary environmental harm. Most of the timber projects on the Chattahoochee-Oconee National Forest proposed in the last decade would be eligible for the 2,800-acre restoration CE created by the Final Rule, and it would be trivial for the Forest Service to ensure that future projects are under that threshold. Similarly, in recent years, even the most controversial and harmful projects on the Chattahoochee National Forest have been characterized as "restoration" by the Forest Service because they involving "restoring" young-forest conditions. Commercial timber projects on the Chattahoochee-Oconee National Forest that are intended to achieve restoration will have ancillary harmful effects, and like any other project, require site-specific analysis and input to ensure they are not based on flawed or incomplete information such that restoration efforts fail and forest resources are instead harmed.

94.   ForestWatch is concerned because without the information, analysis, and opportunities for public comment provided by the EA process, Forest Service projects are more likely to move forward based on incorrect information and flawed assumptions, resulting in an

increased risk of environmental harm to places where ForestWatch members make their livings, recreate, hunt, fish, and seek solitude.

95.    ForestWatch is further harmed by the Final Rule because it replaces the NEPA process with a poorly defined "collaborative" process for most or all logging projects on the Chattahoochee-Oconee National Forests. In ForestWatch's experience, collaborative processes may be light on information, heavy on time commitments, or both. The Final Rule's collaborative requirement does not ensure that site-specific information is available or that members of the public are able to use such information to provide meaningful input. When collaborative processes do provide opportunities for meaningful input (and sometimes even when they do not), they require extraordinary commitments of resources from participating groups. Many of ForestWatch's members have been unable to attend the numerous public meetings and workshops for collaborative processes, which have been scattered across northern Georgia during weekdays.

96.    ForestWatch is also concerned because, by authorizing the Forest Service to use CEs for virtually all timber-harvest projects on the national forests in Georgia, the Final Rule will severely impair ForestWatch's ability to carry out one of its core missions: educating its members and the public about the Forest Service's projects, which ForestWatch does through bimonthly meetings, quarterly newsletters, and email action alerts. Without a draft EA, information about a project and its environmental impacts that ForestWatch could provide to its members through these and other avenues would be insufficient for its members to fully understand the what, where, and how of Forest Service proposals.

97.    ForestWatch has already been harmed by the Final Rule, and these harms will be ongoing as the Final Rule is implemented. ForestWatch has been forced to make internal organizational changes in an attempt to limit the damage to its interests caused by the probable loss of the EA process for most Forest Service projects in Georgia. Without the information, analysis, and opportunities for public comment provided by the EA process, ForestWatch must seek other ways of

gathering information about projects and providing feedback to the Forest Service, including FOIA requests. The result is that the limited staff and financial resources of ForestWatch have already been shifted away from other work the organization carries out in order to limit the harm caused by the Final Rule. ForestWatch's work in fundraising, outreach to partners, and development of strategies for long-term protection of priority areas on the forests have all received less attention as a result of the Forest Service's promulgation of the Final Rule.

98.     As the Final Rule is implemented, ForestWatch will be forced to continue spending significantly more time filing requests under FOIA, researching, surveying, conducting its own soil and water-quality analyses, and committing, when possible, to time-consuming collaborative processes that may or may not provide a meaningful opportunity for input—all in order to gather information about project details and impacts that the Forest Service should be disclosing in an EA or EIS. These additional efforts will force ForestWatch to abandon other areas of its mission-driven work and still will not fully replace the value of the information deprived by the Final Rule.

99.     ForestWatch is also concerned because the Final Rule contains a new CE that authorizes the Forest Service to grant special-use permit applications for any proposed activity up to 20 acres in size. ForestWatch was heavily involved in the NEPA process for the Union County Target Range special-use permit, which authorized construction of a private target range in close proximity to Wilderness areas and the Appalachian Trail. Although the footprint of the proposed target range was less than fifteen acres—and therefore would have qualified for the Final Rule's new CE—the impacts of the project on nearby people and wildlife will extend far beyond the construction site. By eliminating the EA process for special-use permits like the one for the Union County Target Range, the Final Rule will deprive ForestWatch members of the opportunity to help the Forest Service identify and mitigate impacts to the health, beauty, and public accessibility of the Chattahoochee-Oconee National Forests from similar projects.

100.    In each of these ways, ForestWatch and its members have and will continue to suffer imminent, concrete, and particularized injuries to interests that are germane to its organizational mission now that the Final Rule has taken effect.

101.    The injury to ForestWatch and its members would be redressed by an order from this Court vacating the Final Rule.

### MountainTrue

102.    Plaintiff MountainTrue is a nonprofit corporation founded in 1982. Its mission is to champion resilient forests, clean waters, and healthy communities across the Southern Blue Ridge Mountains. To achieve that mission, MountainTrue fosters and empowers advocates throughout the region to be engaged in community planning, policy and project advocacy, outreach and education, and on-the-ground projects.

103.    MountainTrue is based in Asheville, North Carolina, and works on forest, water, land use, transportation, and energy issues throughout the mountain region through offices in Hendersonville, Boone, and Murphy, North Carolina. MountainTrue has over 10,000 members and supporters, primarily in North Carolina. Many of these members live in close proximity to the Cherokee, Nantahala, Pisgah, and Chattahoochee National Forests. Some of these members run or patronize businesses or conduct scientific research that depends on healthy, vibrant, and biodiverse national forest lands nearby. Many members regularly visit Western North Carolina's national forests to hike, fish, kayak, whitewater raft, camp, bird watch, trail run, mountain bike, research, observe rare and threatened species and other wildlife, take photographs, go on scenic drives, and experience Wilderness.

104.    MountainTrue devotes significant resources to the protection of the Cherokee National Forest in Tennessee and the Pisgah and Nantahala National Forests in Western North Carolina through its involvement in NEPA reviews for every notable timber sale project, roads and infrastructure, and any other management or special-use proposals with potentially significant

impacts on the forests and the natural resources therein. MountainTrue critiques the accuracy and completeness of the information being relied on by the Forest Service in its draft EAs, submits information from its own investigations and scientific analyses, shows where projects may have unacceptable or unlawful impacts, and assists its members and other citizens with participating in these processes.

105.    MountainTrue's participation in the EA process has repeatedly helped the Forest Service avoid unnecessary environmental harm. For example, MountainTrue's comments and suggested alternatives have helped the Forest Service avoid the loss of old-growth forests, rare habitats, and areas with culturally important plants, and have prevented risky road construction in steep areas with sensitive watersheds. MountainTrue often uses the information and opportunities created during the EA process to alert the Forest Service to problems in its proposals, which leads the agency to modify projects in order to mitigate or eliminate unnecessary environmental harm to forest resources. The analysis contained in a draft EA allows MountainTrue to understand the consequences of logging in the proposed locations and any alternatives the agency has considered. Sometimes reviewing the EA reveals that the Forest Service does not know about or understand the harms that will result from its proposal. MountainTrue has a tremendous amount of data, experience, and information about ecological resources and public uses of local national forest lands. If necessary, MountainTrue conducts its own limited investigations and scientific analyses and submits this information to the Forest Service during the EA process to show where projects may have unacceptable or unlawful impacts of which the Forest Service is unaware.

106.    A comprehensive analysis conducted by MountainTrue and its conservation partners examining Forest Service projects completed between 2009 and 2019 in the Southern Appalachian national forests supports the efficacy of the EA process. This analysis showed that in the aggregate, the process of vetting Southern Appalachian logging proposals in an EA resulted in 5,909 acres being dropped from a final decision on those proposals. Of those, 2,326 of the acres spared from timber

harvest were in the Cherokee, Nantahala, and Pisgah National Forests. Within the Nantahala and Pisgah National Forests—where MountainTrue invests the most staff time participating in Forest Service NEPA processes—the number of acres of commercial harvest included in EA-level projects shrank by over 20% net, from 9,244 proposed acres to 7,390 acres in final decisions.

107.   MountainTrue is concerned that the Forest Service's Final Rule will effectively eliminate the EA process within its focus area, and thus dramatically reduce the ability of MountainTrue and its members to offer informed input on proposed projects and thereby avoid unnecessary destruction of forest resources. The Final Rule includes a restoration CE eligible for use on logging projects under 2,800 acres in size. Virtually every timber project in recent memory within the Cherokee, Pisgah, and Nantahala National Forests has fallen under this threshold. Similarly, the Forest Service already characterizes most of its timber projects as being intended for the purpose of "restoration"—specifically, the creation of openings and "young forest" by logging. Such openings can be created through logging anywhere, even in sensitive, rare forest communities like old-growth stands. In fact, MountainTrue has seen firsthand projects proposing to "restore" young forest by logging old-growth forests.

108.   MountainTrue is also concerned because the Final Rule offers only a loosely defined "collaborative" process as a replacement for the open, transparent EA or EIS process. The "flexible" collaborative process does not require site-specific analysis and consideration of alternatives as would be provided in the NEPA process. Some processes that the Forest Service has characterizds as "collaborative" have not provided a meaningful opportunity for public input. And even when "collaborative" processes do provide more meaningful opportunities for public input, that collaboration comes at a significant cost. Good collaborative processes are much more time consuming for the public than reviewing EAs, often requiring numerous meetings and field trips. For example, one recent collaborative CE project required MountainTrue staff to attend numerous meetings and spend 10 full days in the field mapping and surveying. While MountainTrue is happy to

help the Forest Service do good work, it simply does not have the resources to make these kinds of investments in every project. Furthermore, because collaborative processes precede scoping, MountainTrue will be forced to choose whether to participate in such processes before learning whether the project may threaten its members' interests. If MountainTrue declines to join a collaborative process, it may be giving up its only chance to help the Forest Service avoid significant harm. For a project that will proceed under CE 25, the only real chance to steer the project will have passed before MountainTrue has any sense of whether it is likely to harm particular sites.

109.    MountainTrue is also concerned because the Final Rule would make scoping the only opportunity for the general public to provide input for logging projects, new roads, and special-use permits. Scoping serves a fundamentally different purpose than EA analysis, and does not provide sufficient project details to allow MountainTrue to investigate whether the project risks significant impacts and to inform its members about what, where, and how the Forest Service is proposing to conduct a project. MountainTrue and its members rely on the more robust information and analysis provided in EAs to analyze and understand the potential impacts of a project to specific places in the forests that they use and care about. As a practical matter, this means that MountainTrue and its members will either have to accept that many harmful stands will be included in projects and that those harms will not be analyzed and disclosed to the public, or alternatively MountainTrue will have to spend its own time and resources to make sure that projects avoid these harms from the outset, before scoping. Even more important, the single scoping comment period would not allow MountainTrue to provide data needed to protect rare species. MountainTrue regularly informs the Forest Service of the presence of rare species that the agency missed in its own surveys. These species are often very difficult to find in some seasons, and the time of year in which they can be located by MountainTrue may not coincide with the brief scoping period.

110.    MountainTrue is also concerned because the use of CEs to approve successive projects will prevent adequate consideration of cumulative impacts and contribute to the destruction

of the resources MountainTrue has sworn to defend. Because the new CE authorities will cover essentially the entire timber sale programs for the Cherokee, Nantahala, and Pisgah National Forests, the cumulative effects of these timber sale programs will therefore be omitted from any analysis and disclosure, such as the impacts of repeatedly conducting logging projects in rare and exemplary habitats and refugia, depletion of carbon stocks, and loss of habitat connectivity in the face of a changing climate.

111.    MountainTrue's primary concern, however, is that the virtual elimination of the EA process for timber projects in the Southern Appalachian national forests will lead the Forest Service to proceed with projects based on incomplete information and flawed and unlawful assumptions, which in turn increases the risk of environmental harm to the national forests that MountainTrue's members rely on to recreate, observe wildlife, and earn a livelihood.

112.    As an organization, MountainTrue has already been harmed by the Final Rule, and those harms are ongoing. The Final Rule and the related CEQ regulatory changes have already required MountainTrue to divert organizational resources away from its mission-critical activities to fill in informational gaps for projects under development that may qualify for the new CEs. MountainTrue estimates that staff currently tasked with reviewing EAs would need to increase their workloads by 50% to attempt to compensate for the time investment in responding to CEs and the need to use FOIA to gain necessary logging and development information that normally would have been disclosed in an EA. MountainTrue expects that these changes will result in other important tasks going uncompleted, including its service, education, outreach, and fundraising efforts.

113.    In order to timely replace information that MountainTrue correctly expected would be cut off when the Final Rule was issued, MountainTrue has already filed FOIA requests for information it would normally obtain through the NEPA process. The organization felt this was necessary due to imminent changes to the NEPA procedures applicable to projects of interest and its concern about being able to carry on its normal review of projects in the future. After considerable

time corresponding with the Forest Service and working with legal counsel, the Forest Service provided a response that was heavily redacted under the deliberative-process privilege with respect to projects that are still in development.

114.    As this FOIA foray demonstrates, obtaining and reviewing records pursuant to a FOIA request is a resource- and time-intensive process, and MountainTrue will have to divert staff time and funding to submit and review FOIA responses to obtain information that it would have normally accessed directly through the NEPA process. Agencies often take months, and sometimes years, to provide documents pursuant to a FOIA request. Once MountainTrue receives the records, it takes staff significant time to review the thousands of pages provided. Agencies often provide voluminous non-responsive records through which MountainTrue staff must sift to find relevant information. Sometimes responsive records are not initially disclosed, and MountainTrue must follow up to obtain the documents requested. Sometimes the timeline is so slow that MountainTrue is forced to litigate to obtain the records it has requested. If MountainTrue has to resort to FOIA to obtain information it normally would have been given under NEPA, this will detrimentally impact the working of the organization as well as its mission.

115.    In each of these ways, MountainTrue and its members have and will continue to suffer imminent, concrete, and particularized injuries to interests that are germane to its organizational mission now that the Final Rule has taken effect.

116.    The injury to MountainTrue and its members would be redressed by an order from this Court vacating the Final Rule.

### Virginia Wilderness Committee

117.    Plaintiff Virginia Wilderness Committee is a 501(c)(3) nonprofit citizen group.

118.    The mission of the Virginia Wilderness Committee is threefold: to permanently protect the best of Virginia's wild places for future generations; to foster understanding and

appreciation of Wilderness; and to promote enjoyment and stewardship of our last remaining wildlands.

119.    Virginia Wilderness Committee is headquartered in Lexington, Virginia, and has approximately 330 members. Members and staff of Virginia Wilderness Committee enjoy recreating in Wilderness and throughout the George Washington and Jefferson National Forests, as well as the Southern Appalachian national forests generally. They participate in a variety of activities, including birding, hiking, mountain biking, trail running, camping, studying nature, fishing, and learning outdoor skills. They have strong professional, recreational, and aesthetic interests in preserving national forests and other public lands, as well as the process by which land-management decisions are made there. And for those of Virginia Wilderness Committee's members who are older and unable to hike and explore as they did when they were younger, the forests still provide an important existence value.

120.    Virginia Wilderness Committee's work focuses on issues impacting national forests, with a particular focus on working to obtain Wilderness designations for qualifying portions of the national forests in Virginia. Virginia Wilderness Committee also focuses on protecting the most special resources within our national forests, which involves participating in Forest Plan revisions and engaging on the wide variety of projects that impact national forests in Virginia. For over a decade, Virginia Wilderness Committee has devoted a great deal of time and resources to working with the George Washington Stakeholder Collaborative, which is a diverse group representing a range of interests including timber producers, game wildlife managers, and a variety of groups related to hunting, fishing, conservation, and recreation.

121.    Virginia Wilderness Committee's goals in forest planning and project development and implementation are to protect a number of ecological and social resources that are present on the national forests, including old-growth forests; clean water; healthy and productive soil; native plants and animals; critical habitat for wildlife like black bear, migratory songbirds, and Appalachian

39

salamanders; large unroaded areas; well-connected forest habitat throughout the Southern

Appalachians; and opportunities for recreation, including for those seeking solitude and "to get away

from it all." Although these resources occur in specific places within the George Washington and

Jefferson National Forests, complete inventories of where and to what degree they occur do not exist.

Staff and members of Virginia Wilderness Committee have personal knowledge of specific areas

where such resources exist and share that information with the Forest Service—particularly when the

Forest Service is proposing logging projects in those areas. This often happens during the NEPA

process.

122.    On many occasions, the Forest Service proposes activities in habitat that is rare,

fragile, or simply inappropriate (ecologically and legally) for the proposed management, and in those

cases the NEPA process has enabled Virginia Wilderness Committee to successfully argue for the

protection of sensitive resources.

123.    Virginia Wilderness Committee's participation in the NEPA process generally

focuses on reviewing environmental impacts to specific locations on the forest and the biological

communities they support, and addressing the questions of where and how proposed work should (or

should not) be done and whether the Forest Service has properly considered the impacts of its

proposed actions, as well as possible mitigation measures and alternatives. Virginia Wilderness

Committee regularly analyzes Forest Service project proposals down to the stand level. And where

the Forest Service prescribes vegetation treatment that is unnecessary or which poses unnecessary

risks to forest resources like old growth, water quality, rare species, and habitat connectivity,

Virginia Wilderness Committee aims to provide analysis of those risks to the Forest Service.

124.    Virginia Wilderness Committee participates in the NEPA process for most actions

that the Forest Service proposes on the George Washington and Jefferson National Forests, and uses

the NEPA process to learn more about those projects and to influence the Forest Service to avoid or

mitigate significant impacts. In many cases, projects are improved in direct response to Virginia

Wilderness Committee's input during the EA process. For example, Virginia Wilderness Committee's comments on the draft EA for one recent project prompted the Forest Service to drop logging units that would have resulted in impermissible sediment loading into a creek that is home to the endangered candy darter, because Virginia Wilderness Committee showed that the agency's initial sediment modeling was flawed.

125.    Virginia Wilderness Committee remains engaged on a variety of other proposed Forest Service projects that are still undergoing NEPA analysis and plans to stay involved in these projects and other projects as they proceed through the NEPA process.

126.    In recent years, the NEPA process has also provided a framework by which Virginia Wilderness Committee, working with the George Washington Stakeholder Collaborative, has collaborated with the Forest Service and other stakeholders on two expansive projects. The NEPA process was crucial to these collaborative efforts resulting in projects that enjoyed consensus support from stakeholders, because the Forest Service and stakeholders worked through important issues affecting sensitive resources through multiple rounds of comment on NEPA documents.

127.    The EA process in particular has been responsible for important improvements to Forest Service projects. Virginia Wilderness Committee uses information and analysis disclosed in the EAs to verify, critique, and supplement the Forest Service's analysis by conducting on-the-ground surveys and scientific analysis of soil, water, and ecological impacts; and to provide detailed comments and suggestions for alternatives. Virginia Wilderness Committee's ability to provide timely and rigorous feedback to the Forest Service is directly influenced by the amount and quality of the information and analysis provided to it by the Forest Service during the NEPA process. Compared to the CE process, the EA process allows Virginia Wilderness Committee to be far more effective at identifying errors and oversights in the Forest Service's plans, thereby decreasing the risk of unnecessary environmental harm and protecting the interests of Virginia Wilderness Committee's members.

128.    In 2019, Virginia Wilderness Committee submitted comments on this rulemaking along with a number of other groups, attached to which was a comprehensive analysis of Forest Service projects completed between 2009 and 2019 in the Southern Appalachian national forests, including the George Washington and Jefferson National Forests. This analysis showed the environmental benefits of the NEPA process under the previous Forest Service rules. Overall, for projects for which an EA was completed, the NEPA process resulted in roughly 5,000 acres of commercial timber harvests being dropped from final decisions in the Southern Appalachian national forests. Of those, over 1,500 of the acres spared from timber harvest were on the George Washington and Jefferson National Forests—a reduction of over 12% compared to the commercial harvest acreage proposed at the outset of the NEPA process.

129.    The EA process also culminates in the opportunity to file pre-decisional objections if necessary, which provides a critical framework in which Virginia Wilderness Committee, stakeholders, and the Forest Service can resolve conflicts during project development instead of in litigation. That communication and change simply does not happen without the procedural requirements that facilitate it.

130.    Projects developed under CEs do not provide the same opportunities for Virginia Wilderness Committee and other members of the public to analyze potential impacts, provide detailed feedback, and develop alternatives or mitigation strategies that can help the Forest Service achieve the goals of the project while avoiding unnecessary environmental harm. Projects developed under CEs provide for public comment only at the scoping stage, but scoping notices often do not provide sufficient information for Virginia Wilderness Committee or its members to meaningfully understand, much less analyze and respond to, what the Forest Service is proposing. For example, the scoping notice for the Eastern Divide Phase 2 project indicated that the Forest Service had completed some old-growth surveying within the 1,366 acres proposed for regeneration harvest, but it did not disclose where those surveys had occurred, and it did not it commit that no old growth would be

harvested once it was identified. If the NEPA process had ended there—as it would under a CE—Virginia Wilderness Committee would have been forced to accept the potential for significant impacts or survey all the proposed acreage itself, which would have been impossible as a practical matter.

131.    To make matters worse, scoping periods are often short, usually only 30 days, and can be even shorter. This presents two crucial problems. First, it is all but impossible for an organization as small as Virginia Wilderness Committee to gather the necessary information, analyze impacts, and write comments in such a short window of time. Second, field surveys are often looking for things that are not present on the forest year round. For example, Virginia Wilderness Committee and its members and agents could not have surveyed for gypsy moth defoliation in the Eastern Divide Phase 2 project area when leaves were off the trees in fall and winter, nor could they have surveyed for endangered rusty-patched bumble bees in the North Shenandoah Project area when the bees are underground for the winter. If those projects had only a single opportunity for public comment during scoping, information about those resources necessarily would have been missed.

132.    Virginia Wilderness Committee is concerned that the Final Rule will effectively eliminate the requirement for the Forest Service to prepare EAs for timber projects on the George Washington and Jefferson National Forests, and with it, the ability of Virginia Wilderness Committee and other members of the public to assist the Forest Service in making improvements to projects to avoid unnecessary and sometimes significant environmental harm. All but one of the 28 timber projects approved by the Forest Service on the George Washington and Jefferson National Forests between 2009 and 2019 were smaller than the 2,800-acre threshold for timber harvest in the restoration CE created by the Final Rule. Similarly, the Forest Service already characterizes timber harvest on the George Washington and Jefferson National Forests as restoration, even where the clear purpose of a project is to maximize logging. Of course, even well-intentioned projects can have significant impacts if they are not designed carefully. For example, a timber sale that leaves a

network of temporary roads administratively deemed "in storage" may nonetheless lead to massive influx of non-native invasive species and unauthorized vehicle use.

133.    Diverting essentially every project from the NEPA process into CEs would deprive Virginia Wilderness Committee of crucial information that it needs—and to which it is entitled—and would also increase the risk of harm to forest resources that Virginia Wilderness Committee and its members care about.

134.    Virginia Wilderness Committee is also harmed by the Final Rule because it deprives the public of NEPA's required process (transparent, predictable, site-specific analysis; public comment; and consideration of alternatives) and replaces it with only a promise of collaboration with no strings attached. Virginia Wilderness Committee supports and often participates in collaboration with the Forest Service, but this type of collaboration is extremely time intensive. It is difficult for members of Virginia Wilderness Committee who are interested in a collaborative project to attend meetings, particularly when they occur on weekdays, either during the work day or starting right after the end of the business day. Yet missing a meeting can mean missing the opportunity to participate in that topic. Virginia Wilderness Committee would need to hire an additional 1 or 2 staff members to be able to engage in collaboration for the projects that the Final Rule would shunt from the EA process into CEs. Virginia Wilderness Committee simply does not have the resources to do that, which means Virginia Wilderness Committee and its members will be left out while the Forest Service charges ahead with damaging projects that injure the Virginia Wilderness Committee members' use and enjoyment of the George Washington and Jefferson National Forests.

135.    Moreover, a collaborative process complements, but is not a substitute for, the scientific analysis, public disclosure, and opportunities for comments and objections that are required under the EA process. The EA process and its associated comment periods provide the Virginia Wilderness Committee with the time needed for outreach, communication, research, fieldwork, and analysis, as well as the ability to present concerns and provide well-researched, detailed, thoughtful

feedback on those issues. While meetings, calls, and conversations with the Forest Service and other stakeholders can be constructive, they do not provide these same opportunities to Virginia Wilderness Committee and other members of the public.

136.    Relatedly, Virginia Wilderness Committee is also harmed because the Final Rule would result in only a single, short scoping period for the public to provide comments. Because scoping does not include site-specific analysis and consideration of alternatives, public comments will either be uninformed, or the public will have to inform itself—spending time and resources to investigate and understand the harms and find ways to avoid them—on a prohibitively short timeline. Virginia Wilderness Committee does not have the resources to step into the shoes of the Forest Service by doing its own information gathering, groundwork, environmental analysis, and advocacy before every project is scoped. The practical result of the Final Rule will be unacceptable, unlawful harm to forest resources and the Virginia Wilderness Committee's interests.

137.    In each of these ways, Virginia Wilderness Committee and its members suffer imminent, concrete, and particularized injuries to interests that are germane to its organizational mission now that the Final Rule has taken effect.

138.    These injuries to Virginia Wilderness Committee and its members would be redressed by an order from this Court vacating the Final Rule.

## Wild Virginia

139.    Plaintiff Wild Virginia, Inc. ("Wild Virginia") is a nonprofit organization, incorporated in Virginia, which was founded in 1996 under the name Shenandoah Ecosystem Defense Group. The name was changed to Wild Virginia in 2003.

140.    Wild Virginia's mission is to protect and restore natural ecosystems in Virginia and the communities that use and depend on those resources. Wild Virginia's programs are designed to serve this mission by educating the public, landowners, and other stakeholders about threats to natural resources and ecosystems; advocating for connectivity and integrity of Virginia's forests and

waters; and influencing decisionmakers by mobilizing and equipping citizens to represent their own interests.

141.     Wild Virginia is based in Charlottesville, Virginia, and works throughout the state. More than 500 members and dozens of volunteers support Wild Virginia's work, and many participate in efforts to insist that government agencies' decisions comply with the law and reflect their values. Wild Virginia's efforts are particularly focused on the George Washington National Forest and the Jefferson National Forest in Virginia.

142.     Members of Wild Virginia use, enjoy, and benefit from Virginia's national forests and the ecosystems, streams and wetlands, and range of animal and plant species found there. For example, many members enjoy botany and take trips to discover what is in bloom in different areas of Shenandoah Mountain. Other members enjoy hiking in the mountains and discovering pond-like habitats where they can look at frogs, salamanders, newts, and rare plants. Members of Wild Virginia get physical and mental health benefits from hiking in the mountains of Virginia's national forests, and some members own property adjacent to the national forests. Members rely on clean water from Virginia's national forests for recreation and drinking, and they are concerned about the water quality that is dependent on intact forest habitats.

143.     Wild Virginia actively participates in the public processes for making land management decisions on the George Washington National Forest and the Jefferson National Forest. Decisions made by the Forest Service, such as whether and where to allow oil and gas operations, clearing of rights-of-way, logging operations, and road construction, have the potential to degrade the habitats and water quality of Virginia's national forests, which are important to Wild Virginia's members. Indeed, decisions about whether and where these impacts should occur are some of the most consequential decisions that the Forest Service ever makes, and these decisions also tend to involve unresolved conflicts over how the agency carries out its multiple-use mandate and manages the resources under its purview. Any time a Forest Service decision involves potentially significant

46

impacts on Virginia's national forests, whether to soil, water, native species and their habitats, cultural heritage, recreation, scenery, or opportunities for solitude, it is Wild Virginia's mission to protect those resources, which often involves participating in the NEPA process to assist the Forest Service with additional information needed to identify and avoid potential harms, involving members and the public to oppose unnecessary harms, or both.

144.    The NEPA process is critical for improving Forest Service projects on Virginia's national forests. Wild Virginia uses the information and impacts analysis provided by the Forest Service in EAs to understand the condition of stands the Forest Service has prescribed for logging, to locate rare species and sensitive resources like old growth and trout streams, to assess and, if necessary, critique the Forest Service's analysis and conclusions, and to develop recommendations for alternatives or mitigation strategies for the Forest Service to consider. Wild Virginia's analysis, research, and advocacy during the EA process can and do lead the Forest Service to make changes to projects which have the effect of protecting important forest resources from unnecessary and significant harm.

145.    Wild Virginia submitted comments on this rulemaking, along with many other groups, attached to which was a comprehensive analysis of Forest Service projects completed between 2009 and 2019 in the Southern Appalachian national forests, including the George Washington National Forest and Jefferson National Forest. This analysis showed that over 1,500 acres were spared from commercial logging during that timeframe on Virginia's national forests—a reduction of over 12% compared to the commercial harvest acreage that would have been logged without the improvements that resulted from the NEPA process.

146.    Wild Virginia is concerned that implementation of the Final Rule will effectively eliminate the requirement for the Forest Service to prepare EAs for timber projects on the George Washington and Jefferson National Forests, and with it, the ability of Wild Virginia and other members of the public to assist the Forest Service in making improvements to projects which avoid

unnecessary and sometimes significant environmental harm. Virtually all (27 of 28) of the timber projects approved by the Forest Service on the George Washington and Jefferson National Forests in recent years included less logging than the 2,800-acre limit under the new restoration CE would allow. Likewise, virtually all (if not all) of these projects either were characterized as being for the purpose of restoration or could have been so characterized. The Forest Service nearly always labels its logging projects in the Southern Appalachians as restoration of "young forest" habitat. This is true even though in reality projects intended to achieve restoration can have significant impacts and can also be based on flawed information or uninformed decision-making, with the result being that restoration efforts fail and forest resources are instead harmed.

147.    Wild Virginia is concerned that without the information, analysis, opportunities for public comment, and opportunities to file administrative objections associated with the EA process, Forest Service projects are more likely move forward based on incorrect information and flawed assumptions, and with legal violations. This in turn will lead to an increased risk of environmental harm in places where Wild Virginia's members recreate, hunt, fish, and seek solitude.

148.    Wild Virginia is also concerned because of the addition to the Final Rule of a "collaborative" requirement that would effectively replace the NEPA process for timber harvests in Virginia's national forests. Collaboration is often very time-intensive and places financial and logistical burdens on Wild Virginia and its members. Even the best examples of collaboration are not an adequate substitute for the scientific analysis, public disclosure, and opportunities for comments and objections that are required under the EA process.

149.    Compounding the problem, collaboration with the Forest Service often involves bargaining between and among the agency and stakeholders to reach consensus about things like where logging should occur. However, Wild Virginia believes the long-term health and sustainability of natural ecosystems in all parts of the national forests are a baseline condition that should not be negotiated away in any area, even when that impact is accompanied by improvements or added

protections somewhere else. During the EA process, Wild Virginia can present evidence and analysis about possible ecosystem costs and defend this position, through formal objections if necessary. By contrast, collaboration usually involves a kind of horse trading that Wild Virginia philosophically opposes. Forcing Wild Virginia to choose between forgoing its right to have a say in land management decisions, on one hand, and participating in a process that Wild Virginia philosophically opposes, on the other, is an injury unto itself.

150.    Wild Virginia is also concerned that implementation of the Final Rule will effectively eliminate the requirement for the Forest Service to prepare EAs for road building and special uses like utility rights-of-way, which now will be approved under new and expanded CEs created by the Final Rule. These actions lead to habitat and forest fragmentation, and have potentially significant impacts, including cumulative impacts, on Southern Appalachian national forests and the surrounding lands, which must be analyzed during the NEPA process. A core part of Wild Virginia's mission is to preserve habitat connectivity and wildlife corridors, and its ability to do so is curtailed when impacts like these are not disclosed and subject to the NEPA process, with the end result being an increased risk of environmental harm in places where Wild Virginia's members recreate, hunt, fish, and seek solitude.

151.    Wild Virginia is harmed by the Forest Service's promulgation of the Final Rule because without the information, analysis, and opportunities for public comment provided by the EA process, Wild Virginia must seek other ways of gathering information about projects and providing feedback to the Forest Service. In many cases, Wild Virginia will either have to accept that categorically excluded projects will have harmful impacts and that those harms will not be analyzed and disclosed to the public, or alternatively will have to spend its own time and resources to bring those harms to light, informing the public and the Forest Service of them. Wild Virginia will also have to marshal these resources on a very compressed timeline, because scoping periods are typically very short.

152.     As the Final Rule is implemented, Wild Virginia will be forced to continue spending more time filing requests under FOIA for information that the Forest Service has gathered but is no longer disclosing under NEPA, as well as researching, surveying, and conducting its own soil and water-quality analyses in order to gather information about project details and impacts. These additional efforts will force Wild Virginia to neglect other areas of its mission-driven work, and even then will not fully replace information that has been provided in the EA process but is now cut off by the Final Rule.

153.     In each of these ways, Wild Virginia and its members suffer imminent, concrete, and particularized injuries to interests that are germane to its organizational mission now that the Final Rule has taken effect.

154.     The injury to Wild Virginia and its members would be redressed by an order from this Court vacating the Final Rule.

### Defendant Federal Agencies

### United States Forest Service

155.     Defendant United States Forest Service is a federal agency within the United States Department of Agriculture.

156.     The Forest Service is charged with stewarding nearly 193 million acres of publicly owned forests and grasslands throughout the country, including 4.3 million acres in six national forests in the Southern Appalachians: the George Washington and Jefferson National Forests in Virginia, the Cherokee National Forest in Tennessee, the Nantahala and Pisgah National Forests in North Carolina, and the Chattahoochee National Forest in Georgia.

157.     Defendant James Hubbard is the Under Secretary for Natural Resources and Environment of the United States Department of Agriculture. The Secretary's authority for

administration of NEPA has been delegated to the Under Secretary. 7 C.F.R. § 2.20. Mr. Hubbard signed the Final Rule challenged in this matter, and he is named here in his official capacity.

### Council on Environmental Quality

158.    Defendant Council on Environmental Quality is the federal agency responsible for overseeing the implementation of NEPA. CEQ was established by NEPA as an agency within the Executive Office of the President, with the duty to "develop . . . national policies to foster and promote the improvement of environmental quality to meet the conservation, social, economic, health, and other requirements and goals of the Nation." 42 U.S.C. § 4344(4). CEQ recently rewrote the framework NEPA regulations applicable to all agencies. Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). The Forest Service has relied on illegal provisions of CEQ's new regulations to promulgate the Final Rule. Thus, in addition to challenging the Forest Service's Final Rule, Conservation Groups also bring an as-applied challenge to CEQ's regulations.

159.    Defendant Mary Neumayr, Chair of CEQ, is the highest-ranking official in CEQ. Ms. Neumayr signed the Final Rule on July 9, 2020. Conservation Groups sue Ms. Neumayr in her official capacity.

### **LEGAL BACKGROUND**

### The Forest Service's Relevant Statutory and Regulatory Obligations

160.    The Forest Service is required to manage national forests for their "multiple use" including outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. 16 U.S.C. §§ 528, 529, 1604(e). Each of these resources is to be given equal consideration with the others.

161.    The National Forest Management Act provides the structure by which the Forest Service converts this broad balancing act into site-specific action or inaction. First, the Forest Service must develop programmatic forest plans, which set management direction broadly for a unit or units of the National Forest System. Forest plans are supported by a programmatic NEPA analysis, which

defers site-specific decisions (and supporting analysis) to the project level. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998). Subsequent site-specific projects must be consistent with the applicable forest plan. 16 U.S.C. § 1604.

### The National Environmental Policy Act

162.    NEPA has "twin aims." First, it obliges agencies to consider every significant aspect of the environmental impact of a proposed action, and second, "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

163.    NEPA requires that "every" major federal action with significant impacts to the human environment be analyzed in a "detailed statement," otherwise known as an EIS. In the EIS, an agency must disclose to the public the effects of its proposed action and alternatives. 42 U.S.C. § 4332(2)(C).

164.    If it is uncertain whether a project may have significant impacts, an agency may first prepare an EA, which provides a briefer analysis of the project's impacts and alternatives. Based on the EA's analysis, if the project is likely to have significant impacts, the agency must prepare an EIS. Otherwise, it may issue a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1501.6 (2020).[1] To avoid significant impacts that would necessitate the preparation of an EIS, an agency may change its proposed action, or commit to mitigation measures in the EA, enabling the agency to justify its FONSI.

165.    Even for projects that ultimately are deemed to have no significant impact, and are authorized with an EA and FONSI, NEPA requires agencies to "study, develop, and describe appropriate alternatives" for "any proposal which involves unresolved conflicts concerning

---

[1] The validity of the new CEQ rule is already before this Court in a related case, Docket No. 3:20-cv-00045-JPJ-PMS. One aspect of that rule is being challenged here as it applies to the Forest Service's Final Rule. However, some fundamental requirements have not changed between the 1978 rule and the revised 2020 version. As relevant here, the role of an EA and FONSI to determine whether an EIS is required did not change between the 1978 and 2020 versions of the regulations.

alternative uses of available resources." 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1501.5(c)(2) (2020) (requiring consideration of alternatives in EAs).

166.    Site-specific Forest Service actions are subject to NEPA. 36 C.F.R. § 220.4(a). The Forest Service may avoid preparing an EIS or EA only if its proposal falls within a CE. 36 C.F.R. § 220.7(a).

167.    Prior to developing the Final Rule, the Forest Service already had codified a number of CEs in its regulations at 36 C.F.R. § 220.6. Among other activities, these CEs covered the commercial harvest of live trees only up to 70 acres, 36 C.F.R. § 220.6(e)(12), the commercial harvest of dead and dying trees only up to 250 acres, *id.* § 220.6(e)(13), and the approval of "minor" special uses only up to 5 acres, *id.* § 220.6(e)(3) (2008).

168.    In addition to these administratively created CEs, Congress has given the Forest Service two statutory CEs under the Healthy Forests Restoration Act, which can be used to authorize up to 3,000 acres of forest management activities, including logging, to address the risks of insect and disease outbreaks or wildfire. 16 U.S.C. §§ 6591b, 6591d. Under either of these statutory authorities, the Forest Service may use a "collaborative" process to develop its projects rather than an EA or EIS, but the agency must "maximize[] the retention of old-growth and large trees" and cannot create new permanent roads.

169.    Unlike projects authorized using an EIS or EA, documentation for a CE does not include site-specific analysis, informed public comment, and consideration of alternatives. *See* 40 C.F.R. § 1501.5 (stating the requirements for the development of an EA) *and* 40 C.F.R. § 1501.4(a) (specifying that CEs "do not require preparation of an [EA]").

170.    For decades, CEQ's NEPA regulations prohibited development of new CEs unless the CE-developing agency showed that covered actions would not "individually or cumulatively" cause significant impacts. 40 C.F.R. § 1508.4 (1978). Accordingly, CEs were limited to small, insignificant, and routine actions. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1027 (9th Cir. 2007)

(enjoining the Forest Service from using CE). CEQ's 2020 revisions to its NEPA regulations, challenged in relevant part in this suit, purport to allow development of CE for actions that do not "normally" cause significant impacts. 40 C.F.R. § 1508.1(d) (2020).

171.     NEPA requires agencies to consider the cumulative effects of their actions. This duty extends to the development of CEs, especially "where the categorical exclusion is nationwide in scope and has the potential to impact a large number of acres." *Bosworth*, 510 F.3d at 1028. If an agency cannot predict the cumulative effects of repeatedly using its proposed CE, then promulgation of the CE is improper. *Id.* at 1029–30.

172.     In determining whether a CE's effects will be significant, an agency "cannot focus only on the beneficial effects" of the CE, even where it will be deployed for important purposes, but must also consider its adverse impacts. *Id.* at 1029; *see also* 40 C.F.R. § 1508.8 (1978) (requiring consideration of detrimental effects "even if on balance the agency believes that the effect will be beneficial"); 40 C.F.R. 1508.1(g)(1) (2020) (same).

173.     Many of the resources that will be impacted by projects authorized under the new CEs are vulnerable to significant harm from logging projects and other ground-disturbing activities including, among many others, undeveloped areas that may be suitable for future wilderness designation, old-growth forests, and steep slopes, erosive soils, and sensitive downstream waters.

174.     Under NEPA, an agency must consider reasonable alternatives to its proposed action. An alternative is not made unreasonable by the fact that the agency would have to seek additional funding to put it into action. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999).

175.     CEQ's NEPA implementing regulations prohibit other agencies from adopting final procedures under NEPA without first offering both CEQ and the public an opportunity to review the draft procedures for "conformity" with CEQ's regulations. 40 C.F.R. § 1507.3(b)(2) (2020).

176.     The Forest Service is entitled to no deference in its interpretation of NEPA. *See, e.g.*, *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 738 (D.C. Cir. 2019).

## The Administrative Procedure Act

177.     The APA creates a right to judicial review for any person wronged or aggrieved by a final agency action when there is no other adequate remedy available. Under the APA, a reviewing court shall "hold unlawful and set aside agency action[s], findings, and conclusions" that the court finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. §§ 701–706.

178.     Agency action is arbitrary and capricious, and must be set aside, where, among other things: the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" or where the agency's action is not based on a "reasoned analysis." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).

179.     The rationale for an agency's new policy must be clearly stated in the administrative record. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020).

180.     The APA requires that agencies give interested persons a meaningful opportunity to participate in their rulemakings. 5 U.S.C. § 553(c). "The important purposes of this notice and comment procedure cannot be overstated." *N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012).

181.     The APA requires that notice of a proposed rulemaking published in the Federal Register contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The APA's notice requirements are "designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure

55

fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C.Cir. 2005).

182.    While a final rule need not be identical to the proposed rule, notice will be found adequate only where the "final rule is a 'logical outgrowth' of the notice and comments already given," and not where "the final rule materially alters the issues involved in the rulemaking." *Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1105 (4th Cir. 1985) (citation omitted).

## FACTS

### Forest Service Decision-making

183.    The Forest Service regularly proposes logging projects and new road construction on national forest lands and will continue to do so. The Forest Service may be asked to respond to applications to permit new special uses, such as utility rights-of-way, at any time.

184.    The Forest Service devotes more resources to accomplishing timber-harvesting projects than any other activity besides firefighting. Access for logging is the primary reason that the agency has built and maintained an extensive road network. The national forests are expected to meet timber targets, measured volumetrically.

185.    Prompted by Executive Order 13855, 84 Fed. Reg. 45 (Dec. 21, 2018), the Forest Service has increased its annual timber targets. In 2018, the national target was planned at 3.4 billion board feet, with an increase to 4 billion board feet by 2020 and 4.2 billion board feet by 2022. Exhibit 2 at 4. The Forest Service's Southern Region, which includes Virginia, Tennessee, North Carolina, and Georgia, has also increased its regional timber targets in service of the national goal, from 680 million board feet in 2018 to 740 million board feet in 2020 and 780 million board feet in

2022. *Id.* at 16. Those targets have since been adjusted downward, but the agency's targets remain higher than its outputs.

186.    Regional- and forest-level timber targets influence the development of projects on individual forests. Forests engage in annual and multi-year planning to determine how their logging projects will contribute to meeting targets. For example, the Chattahoochee National Forest updates its "Five Year Timber Sale Plan" on an annual basis. *See* Exhibit 3. The timber sale plan tracks past, current, and future logging projects subject to NEPA and divides those projects into one or more separate timber sales. *See id.* The total collection of timber sales across the forest in any given year is intended to fulfill that year's timber target. Timber planning documents reveal that the agency is already planning on timber sales of specific volumes to result from specific projects in fiscal years 2021, 2022, 2023, and 2024. *Id.*

187.    Forest Service decisions are made in at least two stages. First, the agency develops a forest plan, which sets broad parameters for future projects. Second, the agency develops site-specific projects, which must be consistent with the applicable forest plan. 16 U.S.C. § 1604. All of the relevant forest plans for the Southern Appalachian national forests identify broad portions of the forests in which logging is allowed or set as an affirmative objective, as well as other portions where logging is limited.

188.    Many old-growth forest patches, rare and exemplary habitats, and unroaded or undeveloped areas are located in areas of each forest where logging is allowed or made an explicit objective. Steep slopes, sensitive streams, areas vulnerable to the spread of invasive plants, and other site-specific risks are also found to varying degrees in areas open to logging.

189.    Forest plans explicitly defer many consequential site-specific decisions to the project level, including, as examples: (1) where to log and what harvest method to use, (2) whether to conduct activities that would affect the wilderness character of unroaded Mountain Treasure areas, (3) identification of old growth and decisions whether to log old growth, (4) where to build roads or

trails and whether to open or close them to the public, (5) whether and where to approve "special uses" such as utility rights-of-way, (6) what site-specific water-quality and soil protection measures to require, and (7) what measures are necessary to protect rare species.

190.   At the project level, the Forest Service chooses how many acres and which particular acres to harvest from among all the acres that could theoretically be logged.

191.   Project development begins before projects are proposed in any NEPA process. Prior to beginning the NEPA process, the agency's forestry staff identify particular stands within the project area for harvest. These stands are later packaged together and formally proposed as a project in the NEPA "scoping" process. 36 C.F.R. § 220.4(e). Scoping for CEs consists of soliciting public feedback on whether the action is eligible for the CE and whether it complies with the forest plan and other law. Scoping for EAs is comparatively more broad; it solicits feedback, among other things, on the issues in need of analysis and alternatives that should be considered. Scoping does not provide commenters with site-specific analysis of impacts for either type of decision-making process.

192.   For projects authorized under an EA and FONSI, the scoping process is followed by (and occasionally combined with) drafting and public vetting of a draft EA, in which site-specific harms are disclosed and alternatives are weighed. During the EA process, the public can critique the analysis, offer additional information, or point to alternatives that the agency missed. The Forest Service responds to public comments when it issues its final EA and draft decision. A draft decision for an EA may then be further modified if any commenters object in an informal administrative objection process.

193.   There are always alternatives to proposals for logging for the Forest Service to consider, and often those alternatives will have very different environmental consequences, thereby raising conflicts in how the agency should use its limited personnel and funding. Alternatives include logging more acres, fewer acres, or none at all. Critically, because the Forest Service picks and chooses locations for logging and particular types of logging, there are location alternatives—i.e.,

logging a different site where sensitive resources are not present. There are also alternatives involving different logging techniques, such as thinning trees instead of removing all trees through clearcuts, in the same locations. Similarly, there are always alternatives to proposals for road construction, including not building the road or building it on a different location or alignment. And there are always alternatives to approving a utility right-of-way, including denial, shifting to different locations on national forest lands, or shifting to different locations not on national forest lands.

194.    Historically, the EA process (conducting site-specific analysis, vetting the EA with the public, responding to public comments and submission of alternatives, and resolving any objections to the proposal) has been effective in helping the Forest Service make changes (eliminating and mitigating harmful proposals) that are needed to avoid significant impacts, both within the Southern Appalachian national forests and in national forests across the country.

195.    Projects authorized using CEs do not enjoy the same procedural safeguards as those authorized under EAs. No site-specific analysis is required for CEs, and consequently the public is denied the opportunity to offer informed, site-specific comments. The Forest Service need not consider alternatives to proposals in a CE, and there is no informal objection process to resolve controversial issues.

## Site-dependent Harms of Forest Service Actions

196.    The ecological and social resources of the national forests occur in varying degrees in specific locations within the national forests. The same action in different locations will therefore yield different benefits and harms depending on localized factors.

197.    The place-specific differences on the national forests are even more pronounced in the Southern Appalachian national forests. Acre for acre, the Southern Appalachian national forests are among the most ecologically complex lands in the National Forest System, with incomparable biodiversity. They are also some of the most visited national forests in the country, with different stakeholders valuing areas of the forests for different reasons.

198.     Prior to conducting site-specific analysis and soliciting informed public input, the Forest Service does not have a complete picture of where and to what degree ecological and social resources occur, nor their relative importance in each location. For example, the Forest Service does not know where all existing old-growth forests or populations of rare species are located.

199.     Prior to conducting site-specific analysis and soliciting informed public input, the Forest Service also does not know which particular locations carry unusual risk factors. For example, the Forest Service does not know where soils are most vulnerable to erosion, and therefore does not know what avoidance and mitigation measures will be needed to prevent harm.

200.     Additionally, prior to offering site-specific analysis to support informed, site-specific public input, the Forest Service does not know what public preferences attach to particular places or uses thereof. For example, the Forest Service does not know which areas are most important to the public for gathering medicinal, edible, or culturally significant plants.

201.     The types and degrees of harm to ecological values and human uses caused by Forest Service actions depends on the particular characteristics of the site proposed for the action. Commercial logging, road construction, and permanent clearing for road or utility rights-of-way, can damage ecological values and impact human uses, with the types and degrees of harm depending on which resources are present, the human uses of and preferences regarding those resources, and which risk factors are present at the particular location where the action occurs.

202.     Commercial logging involves building roads to access timber, log landings where trees are stored prior to loading on trucks, and skid trails used to move trees from where they fall to the log landing. The soil disturbance associated with these activities creates a risk of erosion, the degree of which depends on localized factors, including local annual rainfall levels and storm frequencies, slope gradient, and soil types, all of which vary greatly in the Southern Appalachians. Sediment in streams negatively affects aquatic wildlife, including trout and imperiled freshwater mussels and fish.

203.    Ground-disturbing timber projects are becoming more and more risky as the climate changes. Storm severity is increasing in our region, and disturbed soil on steep slopes is more prone to erosion as a result.

204.    Commercial harvest of old-growth forests carries a high risk of significant impacts to biodiversity, ecological values, and social preferences. Old-growth forests are exceedingly rare in the Southern Appalachians, including on national forest lands, compared to natural or historical levels. Logged old growth cannot be replaced on a human time scale, if it can ever be replaced.

205.    Commercial logging is also harmful when located in unroaded and generally undeveloped areas that are open to logging. These areas are generally known to Conservation Groups as "Mountain Treasure" areas. Conservation Groups have invested significant work to protect these areas and advocate for their permanent protection as Wilderness or another long-term protective designation, but many still lack long-term protections, leaving them vulnerable to project-level harms. For example, successive decisions to construct roads in the Iron Mountain area of Tennessee shrank this Mountain Treasure area from nearly 14,000 acres to less than 4,000 acres.

206.    Mountain Treasure areas are degraded by logging in at least four ways: (1) by altering the areas' natural appearance with roads and large clearings; (2) by diminishing the areas' ability to provide solitude and unconfined recreation, which is important to visitors and businesses that depend on tourism; (3) by degrading habitat connectivity in areas that are essential for wildlife movement in response to climate change; and (4) by disqualifying the areas from future designation as Wilderness, which depends on an absence of roads and a natural appearance.

207.    Commercial logging is also significantly harmful when conducted in rare and exemplary habitats. For example, the State of North Carolina has delineated a number of "Natural Heritage Natural Areas" in the Nantahala and Pisgah National Forests. These areas are routinely proposed for logging, despite the Forest Service's admissions that prior logging in such areas has

degraded them to the point that they are no longer suitable for inclusion in the Natural Heritage Natural Area delineation.

208.    Commercial logging also creates a site-dependent risk to the diversity of plant species, depending on the type and location of the activity. Logging can cause a shift in canopy tree composition—for example, young tulip poplars, which outcompete slower-growing trees after a heavy harvest, often replace mature oaks and hickories that provided acorns and nuts for wildlife such as deer, bear, and turkey. Removing trees can make habitat unsuitable for localized populations of rare plants, including plant species that are imperiled or federally protected under the Endangered Species Act. Soil disturbance and logging equipment are vectors for the spread of non-native invasive plants that displace native species and disrupt food webs.

209.    Commercial logging also creates a site-dependent risk to wildlife. While logging creates open and brushy habitats utilized by some species, it makes those same areas unsuitable for other species. Logging and associated roads fragment the large, intact forest blocks needed by forest-interior species, some of which are recognized as imperiled by the Forest Service or federally protected under the Endangered Species Act.

210.    Commercial logging in the wrong places can also interfere with recreation and social and cultural values. Active logging areas are closed to the public, along with any trails or trailheads within them. Logging creates visible scars that mar scenic vistas, and active logging creates noise pollution. Logging in a single project area often continues for several consecutive years. Sedimentation in streams caused by logging makes for poor fishing. Logging also impacts foragers' ability to gather culturally significant, edible, and medicinal plants like ramps, ginseng, and bloodroot.

211.    Like commercial logging, road construction involves ground disturbance and creates a risk to streams and rivers. Forest roads are the single greatest source of sediment to streams in the

Southern Appalachian national forests. Building roads also increases the risk of major slope failures, with the degree of risk depending on highly site-specific factors like slope and soil types.

212.     Unmaintained roads are more likely to harm streams. The Forest Service currently has funding to maintain only a fraction of its existing roads or to replace only a fraction of its impassable culverts. Building additional roads exacerbates these funding backlogs and increases the risk to waters.

213.     Road construction is increasingly risky due to climate change. Increasing storm severity is causing more and more serious landslides and road washouts. The expense of repairing these issues has also increased, further worsening the maintenance backlog across the road system as a whole.

214.     Road construction also increases habitat fragmentation and creates a risk to habitat connectivity. Culverted stream crossings are obstacles to passage for aquatic wildlife, depending on the species present in the stream reach, and the road itself can be an impassable barrier to species with limited dispersal abilities like salamanders.

215.     In addition, road construction within unroaded, generally undeveloped areas degrades their backcountry character and undermines their ability to provide solitude and a naturally appearing setting for recreation.

216.     Utility rights-of-way create permanent linear clearings in otherwise forested landscapes, a serious impact to scenic quality and to habitat connectivity. Rights-of-way also follow straight lines even through mountainous areas with steep slopes, which creates a site-dependent risk of erosion and sedimentation. As with logging and roads, this risk is increasing due to climate change.

217.     All of these site-specific impacts are even more consequential when added together in the timber sale program over time. Successive project-level impacts to old growth, unroaded areas, rare and exemplary habitats, and other site-specific resources threaten a death by a thousand cuts.

Relatedly, the site-specific choices of where to conduct logging operations (e.g., whether within highly productive forests that grow trees rapidly or in less productive forests where logging is generally less harmful) cumulatively determine how much carbon is stored on national forest lands and therefore the extent to which the Forest Service is contributing to or mitigating climate change.

## The Forest Service's Advance Notice of Proposed Rulemaking

218.    On January 3, 2018, the Forest Service published an advance notice of proposed rulemaking ("Notice") related to its NEPA procedures. The Notice sought comment related to the development of new CEs, among other things. The agency explained that its goal was to "complete more projects" by "[i]ncreasing efficiency of environmental analysis." 83 Fed. Reg. 302, 302 (Jan. 3, 2018).

219.    Conservation Groups timely offered two separate sets of comments on the Notice, explaining that the Forest Service's delays are attributable not to its NEPA procedures, but to problems with staffing, funding, and training, and suggesting alternatives that could meet the agency's goal with fewer adverse impacts.

220.    Conservation Groups' comments further explained that the EA process itself is an important reason that projects often avoid significant impacts, and that the agency could not assume that projects approved without those safeguards would not have significant impacts.

221.    Conservation Groups' comments also explained, with examples, that even very small projects in some ecoregions (like the Southern Appalachians) cause significant impacts.

## The Forest Service's Proposed NEPA Rule

222.    On December 21, 2018, the President ordered the Secretary of Agriculture to "develop[] and us[e] new categorical exclusions to implement active management of forests." Executive Order 13855, 84 Fed. Reg. at 47.

223.    On June 13, 2019, the Forest Service published its notice of proposed rulemaking ("Proposed Rule"), including a host of changes to the Forest Service's NEPA procedures, such as

64

eliminating scoping for CEs and EAs and creating or expanding a number of CEs. 84 Fed. Reg. 27,544.

224.     The Proposed Rule included a CE that would have allowed up to 4,200 acres of logging. Although the CE was styled as a "restoration" CE, 84 Fed. Reg. at 27,549, it would have allowed timber harvest for any purpose, including commercial timber production. The CE would also have covered up to half a mile of permanent road construction and 2.5 miles of temporary road construction to access timber.

225.     Another proposed CE would have authorized up to 5 miles of road construction for any purpose.

226.     An existing CE for special-use permits was proposed to be expanded. The previous CE allowed only "minor" special uses affecting up to 5 acres. The proposed CE would have allowed any special use up to 20 acres, such as a utility right-of-way crossing 4 miles of national forest lands.

227.     In support of the Proposed Rule, the Forest Service relied on three sources of information: experience from past projects, professional judgment, and "benchmarking" against other agencies' CEs. The bulk of the Forest Service's analysis was based on past projects completed using an EA and FONSI. The agency sampled 68 projects it considered relevant to the "restoration" CE, 55 projects related to the road management CE, and 62 projects related to expansion of the special-use CE.

228.     The Proposed Rule included a host of expansive and fundamental changes to the Forest Service's NEPA process, along with the addition or revision of numerous CEs. The public was given 60 days to respond to the Proposed Rule, and Conservation Groups did so in detailed technical comments.

229.     With respect to the "restoration" CE, Conservation Groups first pointed out mathematical and statistical errors in the Forest Service's interpretation of the data from its 68

projects and explained that the agency was inappropriately conflating dissimilar actions in its calculations.

230.     Conservation Groups also pointed out, with examples, that the Forest Service's sample sets (projects "completed" using an EA) were cherry-picked, because they did not account for projects that did require an EIS even though they were smaller than the proposed CE thresholds, or projects that the agency abandoned after analysis revealed they would be too harmful.

231.     Relatedly, Conservation Groups pointed out the Forest Service's sample set for the restoration CE was skewed to overrepresent forests that routinely produce large, uncontroversial projects and underrepresent smaller, more complex forests with fewer projects overall. Not one of the 68 projects included in the sample set was located in the Southern Appalachian national forests of Virginia, Tennessee, North Carolina, or Georgia, where projects much smaller than the thresholds in the proposed CE have had significant impacts in the past.

232.     Conservation Groups further explained that the Forest Service was relying on irrelevant factors to conclude that projects covered by the restoration CE will not have significant impacts, such as generic best management practices, consistency with forest plans, comparison to dissimilar CEs adopted by other agencies or created by Congress, and inadequate monitoring data. With respect to monitoring data in particular, Conservation Groups explained that the absence of significant impacts caused by past projects could not fairly be used to predict that similar projects will not have significant impacts in the future, particularly because conditions are changing so rapidly due to climate change.

233.     Conservation Groups devoted the most analysis to explain that the EA process itself was responsible for the improvements allowing the 68 sampled projects to be approved with a FONSI. Specifically, Conservation Groups showed that about 17% of all acres proposed for timber harvest in the sampled projects were dropped during the NEPA process. Of the Forest Service's 68 sampled projects, 43 (63%) changed substantially during the NEPA process. 33 (49%) of the projects

changed substantially *after* release of a draft EA. Of those 33 projects, 26 were modified at least in part due to public comment; the other seven were changed due to internal agency review.

234.    Conservation Groups also provided a comprehensive summary of project data from the Southern Appalachian national forests of Virginia, Tennessee, North Carolina, and Georgia from 2009 to 2019. Fully 70 out of 71 logging projects completed during that time included fewer acres than the threshold for the proposed CE. Of those 71 projects, the median project size was a mere 535 acres of total harvest and 357 acres of commercial harvest. Despite the relatively small project sizes in this region, the EA process was necessary to improve projects and avoid significant harms. Projects shrank by about 12% on average, but some projects shrank by as much as 60%. As Conservation Groups further explained, these changes avoided or mitigated many of the most controversial actions with the most significant impacts, such as logging old growth or building roads into unroaded areas to access timber. On average, members of the public pointed out at least two potentially significant impacts during the NEPA process per project, such as harms to Mountain Treasure areas, old growth, rare habitats, soil, or water quality. Conservation Groups pointed out specific occasions in which they identified the presence of rare species in comments on a draft EA that the Forest Service had been unaware of after conducting its own surveys. The large majority of these potentially significant impacts were avoided or mitigated by project changes.

235.    Conservation Groups provided similar analysis of the 55 projects relied on by the Forest Service to support its proposed CE for road construction. Analogous to its rationale for the proposed restoration CE, the Forest Service sampled road management activities that were authorized using an EA and FONSI. However, only ten of the 55 projects included any road construction at all, and the median length of new road construction in those ten projects was a mere 0.6 miles.

236.    Conservation Groups further showed that road management projects improved considerably because of the NEPA process. Of the ten projects that included road construction, four (40%) changed between scoping and the publication of an EA, and two (20%) changed between

publication of an EA and the final decision. Additionally, four (40%) merited consideration of more than two alternatives.

237.    Conservation Groups further explained that the proposed road construction CE was "benchmarked" to dissimilar and irrelevant CEs from other agencies.

238.    Conservation Groups also explained that monitoring data from prior projects could not be used to accurately predict future effects due to the effects of climate change, both because of the increasing importance of unfragmented landscapes that allow for migration and because of increasing storm severity that increases the risk of landslides, washouts, erosion, and sedimentation.

239.    With respect to the proposed special-use CE, Conservation Groups highlighted flaws in the proposal to expand 36 C.F.R. § 220.6(e)(3) to cover non-minor special uses. According to the Forest Service's rationale in the Proposed Rule, the term "minor" in the existing regulation was confusing and warranted deletion on that basis. Conservation Groups explained that the distinction between minor and non-minor uses had not been difficult in the past. Conservation Groups also explained that expanding the CE to cover non-minor uses would allow very harmful actions like gravel pits or fracking wells. Because the scope of possible special uses is so broad, the Forest Service inappropriately relied on the absence of significant impacts from less harmful actions to justify a prediction of no significant impact from more harmful (and currently unknown) actions on similar acreages.

240.    Conservation Groups explained that the Proposed Rule failed to account for the need to consider alternative locations for future rights-of-way, the likelihood that utility rights-of-way crossing national forest lands would also have impacts to lands in other ownership, and that mitigation measures ordinarily developed during the EA process would be lost if future projects are developed using CEs.

241.    Finally, Conservation Groups offered extensive analysis showing that the Forest Service's difficulties during decision-making result from funding, staffing, training, and cultural

obstacles rather than NEPA, and offered alternatives to the proposed rule that would meet the proposed rule's objectives lawfully and with less harm to the environment. Conservation Groups explained that the Forest Service was obligated to conduct a NEPA analysis of the harmful impacts of the Proposed Rule itself, in comparison to the lesser impacts of these reasonable alternatives.

### Intervening CEQ NEPA Rulemaking

242.    The opportunity for public comment on the Forest Service's Proposed Rule closed in August of 2019. Five months later, on January 10, 2020, CEQ issued its own proposed rule overhauling and weakening the framework NEPA regulations applicable to all agencies. 85 Fed. Reg. 1,684 (Jan. 10, 2020).

243.    CEQ finalized its new rule on July 16, 2020, with an effective date of September 14, 2020. 85 Fed. Reg. at 43,304. The CEQ rule included several changes relevant here.

244.    First, CEQ's new rule changed the standard applicable to developing new CEs. Under prior law, a CE was defined as "a category of actions which do not *individually or cumulatively* have a significant effect on the human environment." 40 C.F.R. § 1508.4 (1978) (emphasis added). Under CEQ's new rule, a CE is defined as "a category of actions that . . . *normally* do not have a significant effect on the human environment." 40 C.F.R. § 1508.1(d) (2020) (emphasis added).

245.    Second, CEQ's new rule redefined "scoping" as limited to EISs. 40 C.F.R. § 1501.9(a), (e) (2020).

246.    Third, CEQ's new rule created a ceiling on other agencies' existing and new NEPA procedures. It provides that "[w]here existing agency NEPA procedures are inconsistent with the regulations in this subchapter, the regulations in this subchapter shall apply." 40 C.F.R. § 1507.3(a) (2020). It provides further that, "[e]xcept for agency efficiency . . . , [new] agency procedures shall not impose additional procedures or requirements beyond those set forth in the regulations in this subchapter." *Id.* § 1507.3(b) (2020).

**The Forest Service's Final Rule**

247.     The Forest Service offered CEQ but not the public an opportunity to review its

Proposed Rule for conformity with the applicable CEQ regulations under 40 C.F.R. § 1507.3(b)(2)

(2020). On November 11, 2020, counsel for Conservation Groups alerted the Forest Service by letter

that the agency had not provided an opportunity for public review as required by CEQ's new

regulations. Eight days later, without offering the public any further opportunity for review, the

Forest Service issued the Final Rule.

248.     The Final Rule finalized new and expanded CEs for logging, road construction, and

special uses such as utility rights-of-way. *National Environmental Policy Act (NEPA) Compliance*,

85 Fed. Reg. 73,620 (Nov. 19, 2020).

249.     The Final Rule abandoned some of the changes in the Proposed Rule "[i]n light of

CEQ's revised regulations." 85 Fed. Reg. at 73,621. In particular, the Forest Service abandoned its

proposed changes to scoping requirements—a subject that CEQ's new rule specifically addressed.

The Final Rule nevertheless moved forward with new and expanded CEs.

250.     Relying on CEQ's newly weakened standard for creating new CEs, the Forest Service

concluded that its new CEs would not "normally" cause significant impacts. As in the Proposed Rule,

the Forest Service stated that its conclusion was based on experience with past projects, professional

judgment, and benchmarking to other agencies' CEs.

251.     The new CE for "restoration," CE 25, which covers timber harvest, was codified at

36 C.F.R. § 220.6(e)(25). Like the proposed CE, the final CE 25 allows for up to half a mile of

permanent road construction and 2.5 miles of temporary road construction associated with timber

harvest. The acreage for timber harvest was reduced from 4,200 acres to 2,800 acres.

252.     The Forest Service changed its acreage cap after correcting some of the mathematical

and statistical errors Conservation Groups identified in comments. Explaining the changed acreage

cap, the Forest Service stated that it "reviewed information submitted in public comments, conducted

a science review, and reviewed the original project data" and determined that "the 2,800-acre limitation better accounts for the effects of outliers in the sampled EA data set, better reflects the average size of projects from the sampled EAs, and also aligns with average acreages of specific activities in the sampled EA data set for which some commenters had concerns regarding the degree of impacts (such as commercial timber harvest)." 85 Fed. Reg. at 73,628.

253.   The Forest Service did not respond to Conservation Groups' comments, data, and analysis related to the problems with the Forest Service's cherry-picked sample set and monitoring data, failure to account for differences between ecoregions, and the importance of the EA process in improving projects to avoid or mitigate significant impacts.

254.   CE 25 was also modified to add two new qualifications that had not been included in the Proposed Rule and for which the Forest Service did not seek public comment: actions undertaken under the CE must have the "primary purpose of meeting restoration objectives or increasing resilience," and qualifying projects must be "developed or refined through a collaborative process that includes multiple interested persons representing diverse interests." 36 C.F.R. § 220.6(e)(25) (2020).

255.   Explaining the addition of the "restoration" purpose qualification, the Forest Service stated that the change was responsive to requests "that the category focus on outcomes." 85 Fed. Reg. at 73,627. The agency also stated, however, that restoration need not be the *only* purpose of the project, and that covered projects may also generate other "multiple use benefits" like the commercial sale of timber. *Id.* The Forest Service did not provide any data, analysis, or explanation to show whether or how the primary purpose test would exclude actions with significant harm from coverage under the CE.

256.   The Forest Service explained the addition of a "collaborative" process requirement as responsive to public requests. The Final Rule states that "[t]he Agency has had success working with various types of collaborative processes. This requirement is intended to be flexible, accommodate a

71

variety of collaborative approaches, and does not require convening a formal collaborative group."
85 Fed. Reg. at 73,628. The Forest Service did not explain what makes collaboration "successful,"
nor did it provide any data, analysis, or explanation of whether or how this "flexible" requirement is
expected to limit future projects' impacts.

257.     Had the primary purpose test and the collaborative process requirement been offered
for public comment, Conservation Groups would have offered facts and analysis showing that those
sideboards are unlawful, will not prevent significant harms, will not diminish the applicability of the
CE to projects in the Southern Appalachian national forests, and will in fact cause immediate harm to
Conservation Groups.

258.     The new CE for road construction, CE 24, was codified at 36 C.F.R. § 220.6(e)(24).
The maximum level of road construction in a single decision was reduced in the final version of CE
24 from 5 miles to 2 miles. The agency did not demonstrate how it calculated this new threshold.

259.     The Forest Service failed to respond to Conservation Groups' showing that
categorically excluding construction of new roads will exacerbate maintenance shortfalls and cause
increased risk to water quality. The agency also failed to respond to Conservation Groups' showing
that the EA process was responsible for substantially improving the projects on which the Forest
Service is now relying to eliminate those very safeguards.

260.     The expanded CE for special uses affecting up to 20 acres of national forest lands, CE
3, was codified at 36 C.F.R. § 220.6(e)(3). CE 3 did not change between the Proposed Rule and the
Final Rule.

261.     Regarding the decision to cover non-minor uses with CE 3, the Final Rule merely
repeated the rationale from the Proposed Rule—namely, that the change would "improve clarity and
reduce confusion." 85 Fed. Reg. at 73,625. The Final Rule did not remove the same distinction from
36 C.F.R. § 220.6(d)(8), a separate CE which authorizes approval or continuation of special uses, but
only if they are both "minor" and "short-term."

262.    The Forest Service did not address any of the problems related to CE 3 that were identified in Conservation Groups' comments—that linear rights-of-way also impact lands outside national forest ownership, and that those impacts may be significant even when relatively few acres of national forest lands are affected; that the agency cherry-picked the projects in its sample set; that in expanding the category to new kinds of uses, the Forest Service was improperly conflating actions that have very different risks of harm; and that the procedural safeguards of the EA process have been essential to avoid and mitigate significant harm in the projects included in the Forest Service's sample set.

263.    For all the new CEs, the Forest Service relied on the use of possible mitigation measures to justify its prediction that the actions would not normally have significant impacts. *See* U.S. Forest Serv., Supporting Statement: Categorical Exclusions (Oct. 23, 2020) at 20–21. The agency listed examples of design features that might be used in future projects but did not make any of these design features a requirement for using the CEs, nor did it explain how the less-rigorous CE process could be expected to result in adequate and appropriate mitigation for future projects.

264.    As in the Proposed Rule, the Forest Service relied on forest plan consistency to argue that project impacts will not be significant, but did not address Conservation Groups' comments explaining that forest plans allow significant impacts and defer consequential decisions to site-specific projects.

265.    In addition, the Forest Service relied on consultation with a panel of agency scientists. This panel included only one person with experience in the Forest Service's Southern Region, which includes the states of Virginia, Tennessee, North Carolina, and Georgia. The sole representative from the Southern Region is a forester, not a specialist in any of the resources that may be negatively impacted by forestry operations. The Final Rule provided no description of what questions the agency posed to the panel or how the panel answered them.

266.    For all the CEs, the Forest Service also relied on monitoring data from a small number of projects (19 projects related to "restoration" activities, 20 projects related to road management, and 9 projects for special-use authorizations) to conclude that its projects will not normally have a significant impact on the ground. The agency failed, however, to address the examples provided by Conservation Groups of similar projects that did have significant impacts.

267.    Finally, for all of the CEs, the Forest Service relied on "benchmarking" to other CEs. The Forest Service acknowledged public concerns about its benchmarking, but it did not respond to the substance of those concerns—chiefly, that the other CEs are dissimilar because they cover only less harmful actions or are irrelevant because they were created by statute.

268.    The Forest Service did not prepare an analysis of the effects of its rulemaking under NEPA, stating that the Final Rule "does not have any reasonably foreseeable impact on the environment." 85 Fed. Reg. at 73,629.

269.    The Final Rule made the new CEs effective immediately.

270.    The Forest Service's CEs will be used to authorize projects with potentially significant impacts in the Southern Appalachian national forests of Virginia, Tennessee, North Carolina, and Georgia. Logging projects in these six forests are generally much smaller than CE 25's acreage cap. Because of the site-specific complexities associated with logging projects, Forest Service staff have not been able to produce large projects at the scale approved in CE 25 in the Southern Appalachian national forests without creating the risk of significant impacts. Over the last decade, the median size of Southern Appalachian national forest projects warranting a FONSI was only 357 acres of commercial harvest and 535 acres of total harvest—less than 1/5 of the size authorized by CE 25.

271.    Despite their relatively small size, projects in the Southern Appalachian national forests regularly threaten harms to rare and unique resources, and if they avoid or minimize those harms it is in large part because of improvements made during the NEPA process through site-

specific analysis, informed public input, and consideration of alternatives. CE 25 would allow much larger projects without the procedural safeguards needed to prevent significant harm.

272.　Similarly, new roads or road extensions of two miles or less and utility rights-of-way up to four miles can easily dissect or fragment intact forest habitats, form a barrier to aquatic organism passage, increase erosion and landslide risks, and directly impact special areas like old growth, rare habitats, and patches of culturally significant plants. Such actions often avoid causing significant harms because of improvements made during the NEPA process.

273.　It is currently the Department of Agriculture's policy to use CEs whenever available. *See* Exhibit 1 (ordering the Secretary of Agriculture to "us[e] all applicable categorical exclusions set forth in law or regulation" and ordering the Forest Service to "ensure environmental reviews focus on analysis that is required by law and regulation"). The Final Rule confirms that the agency expects its new CEs to be used: "The direct benefits of the rule are . . . reduced costs and time spent on environmental analysis." 85 Fed. Reg. at 73,629.

274.　As the Final Rule is implemented and the Forest Service develops logging projects, constructs roads, and approves special-use permits that would impact sensitive resources like old growth, Mountain Treasure areas, rare species and habitats, steep slopes, and areas vulnerable to the spread of invasive species, significant impacts will occur despite the public's best efforts to remain involved.

## CLAIMS FOR RELIEF

### Count 1: The Final Rule is Arbitrary and Capricious and Violates the APA

275.　The allegations of the paragraphs 1 through 274 are incorporated here by reference.

276.　The Final Rule violates the APA because the Forest Service entirely failed to consider important aspects of the problem, drew conclusions contrary to the evidence, and did not provide a reasoned analysis to support its decision. *See State Farm*, 463 U.S. at 43.

### A) The Forest Service Failed to Consider Important Aspects of the Problem

277.     One important aspect of the problem when an agency is considering the creation of a CE is "to consider adequately the unique characteristics of the applicable geographic areas." *Bosworth*, 510 F.3d at 1027. The Forest Service violated the APA when it failed to consider the regional differences between the Southern Appalachian national forests and the areas of the country from which the Forest Service's data were drawn.

278.     Another important aspect of the problem is to "take specific account of the significant impacts identified in prior . . . projects and their cumulative impacts in the design and scope of any future . . . CE." *Id.* at 1032. The Forest Service violated the APA when it failed to include projects that required EISs in its dataset. The Forest Service compounded this error when it failed to consider examples provided by the public of prior projects that would have been eligible for the new CEs but nevertheless had significant impacts.

279.     Yet another important aspect of the problem is to consider the importance of the procedural safeguards being eliminated. *United Keetoowah Band*, 933 F.3d at 744. The Forest Service violated the APA by failing to consider the importance of the EA process in improving projects so that they avoid causing significant harm, which Conservation Groups demonstrated with respect to CEs 3, 24, and 25.

280.     With respect to CEs 24 and 25, the Forest Service relied on monitoring data from a tiny sample of its past projects to conclude that future projects would not have significant impacts. The Forest Service failed to consider, however, Conservation Groups' comments showing that past projects are a poor predictor of future performance because conditions are rapidly changing due to climate change and volatility.

281.     With respect to CE 3, the Forest Service failed entirely to consider the likelihood that linear rights-of-way may cause significant harm to lands and waters not located on the national forests, even if relatively few acres of national forest land are directly affected. There is no necessary

relationship between the length of a national forest crossing and the impacts of the project as a whole, so the failure to account for the likelihood of off-forest impacts was arbitrary and capricious.

282.    Also, with respect to CE 3, the Forest Service did not consider the category's overbreadth, which Conservation Groups pointed out in comments. A CE is a category of *action*, 40 C.F.R. § 1508.1(d) (2020); 40 C.F.R. § 1508.4 (1978), but CE 3 purports to exclude a type of *approval* for an unlimited variety of different actions, 36 C.F.R. § 251.51 (defining "special use authorization"); *see also id.* § 251.50 (explaining that "special uses" include "[a]ll uses" except a few enumerated types). This is a significant departure from the previous CE which was specifically limited to "minor" and small special use approvals. The Forest Service could not possibly predict that an unknown future use will not have significant impacts merely because it affects only 20 acres of national forest lands. The Forest Service's failure to address this problem and develop "[s]pecific criteria for and identification of" the specific kinds of actions that will not have significant impacts and may therefore be covered by the CE was arbitrary and capricious. *See* 40 C.F.R. § 1507.3(e)(2) (2020); 40 C.F.R. § 1507(b)(3) (1978).

### B) The Forest Service Reached Conclusions Contrary to the Evidence Before It

283.    The Forest Service also violated the APA by concluding, without substantial evidence or reasoned explanation, that actions included in the CEs would not cause significant harm.

284.    The Forest Service relies on the promise of future "typical" mitigation measures, but no such measures are required to qualify a project for coverage under the CEs. The Forest Service acted irrationally when it assumed that mitigation measures, which often are developed to justify a FONSI and to avoid the need to prepare an EIS, will continue to be developed in equal measure for projects that are categorically deemed to have no significant impact even without mitigation.

285.    Additionally, the Forest Service benchmarked its overbroad CE 25 to other dissimilar and narrower CEs, but there is no evidence in the record that these dissimilar CEs are comparable to the Forest Service's newly excluded actions, such as ground-disturbing commercial timber harvest.

The Forest Service also benchmarked CE 25 against two authorities created by Congress, which are irrelevant to the administrative creation of a CE because Congress, unlike an administrative agency, is not bound by any requirement to create CEs that fall below a threshold of significant impacts. Moreover, CE 25 would go even further than these congressionally created authorities, allowing logging in broader areas, for broader purposes, and with impacts to old growth and permanent road construction forbidden by Congress. By purporting to go farther than Congress specifically allowed, the Forest Service acted arbitrarily and capriciously.

286.     Likewise, the Forest Service benchmarked CE 24 against a number of dissimilar CEs. Only two of those CEs apply to any sort of new road construction (one on agricultural land and the other on Department of Energy facilities). Neither relates to road construction on national forests or similar lands where the absence of roads may protect important resource values. The conclusion that road construction, including in currently unroaded areas, would not be significant is not supported by the record.

287.     Similarly, the Forest Service benchmarked its expanded CE 3 against several dissimilar CEs used by other agencies. Only two of those CEs relate to authorizations of uses on public lands, and both of them are expressly limited to "short-term" uses or impacts. Comparatively, the Forest Service's CE is extraordinarily broad and open ended.

**C)  The Forest Service Failed to Provide a Reasoned Explanation for its Conclusions**

288.     The Forest Service failed to explain the relevance of forest plan consistency to its decision to promulgate new CEs. To the extent the agency is relying on forest plan consistency to conclude that projects will not cause significant harm, such reliance is contrary to the evidence in the record, which demonstrates that forest plans specifically allow actions that may cause significant harms and defer consequential decisions to site-specific projects.

289.     The Forest Service also failed to provide a reasoned explanation for why its new additions to the Final Rule (namely, requiring that actions under CE 25 be intended for the purpose

of restoration or resilience and be preceded by a collaborative process) are relevant to the conclusion that this CE will not cause significant impacts. The Forest Service offers no data, analysis, or other explanation to show that restoration or collaborative projects are uniformly beneficial and have not needed to be improved through the NEPA process in order to avoid significant impacts. To the extent that the Forest Service believes that restoration and collaborative projects will have greater benefits that will outweigh any adverse effects, that conclusion is irrelevant to the question of whether effects will be significant. Agencies may not use CEs to avoid considering adverse effects simply because "on balance the agency believes that the effect will be beneficial." *See* 40 C.F.R. § 1508.1(g)(1) (2020); 40 C.F.R. § 1508.8 (1978).

290.    For the foregoing reasons, the Final Rule violates the APA's notice requirement and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. 5 U.S.C. § 706(2).

## Count 2: The Final Rule Violates the APA Because It Is Not a Logical Outgrowth of the Proposed Rule

291.    The allegations of the paragraphs 1 through 274 are incorporated here by reference.

292.    The Forest Service's Final Rule materially alters the issues involved in the rulemaking by adding two new elements to CE 25—specifically, the addition of a requirement that "all activities conducted under [CE 25] have a *primary purpose* of meeting restoration objectives or increasing forest and grassland resilience," and that projects be developed or refined in a loosely defined "collaborative process." 85 Fed. Reg. at 73,627–28 (emphasis added).

293.    Had these elements of the Final Rule been available for public comment, Conservation Groups could have explained that they do not limit CE 25 to benign uses, and they instead create new problems for Conservation Groups and other members of the public. Conservation Groups, however, did not have the opportunity to develop evidence in the record to support their objections to these new concepts.

79

294.     Among the proposals in the Proposed Rule was the so-called "restoration" CE, which was paradoxically not limited to restoration actions and instead included commercial timber harvest for any purpose. Conservation Groups' comments, accordingly, explained that the category was not adequately limited and included actions with a risk of significant harm.

295.     In the Final Rule, the Forest Service requires that timber harvest and other actions covered by CE 25 be intended for the primary purpose of restoration or resilience. To the extent that the Forest Service relies on this new language to conclude that CE 25 will be used only for beneficial actions, neither Conservation Groups nor the public had a fair opportunity to explain why it will not. Conservation Groups could have shown that all logging projects in the Southern Appalachian national forests are characterized or could easily be characterized as "restoration" projects, and that such projects have proposed logging in areas where it carries a high likelihood of significant harm, such as Mountain Treasure areas, old-growth forests, and state-recognized rare habitats. Conservation Groups would have further shown that "restoration" projects still benefit considerably from the NEPA process, which results in substantial project changes and mitigation measures even for projects that begin with good intent.

296.     The facts needed to show the inadequacy of the Final Rule's restoration requirement for CE 25 are materially different from the facts needed to show the problems with the absence of any limiting requirement.

297.     The concept of collaborative project development was entirely absent from the Proposed Rule. If Plaintiffs had been on notice of the possibility that a collaborative process requirement was under consideration, Plaintiffs would have provided comments demonstrating their past experiences and serious concerns with the lawfulness and wisdom of conditioning the use of a CE on a collaborative process, effectively replacing the transparent, open, and predictable NEPA process with a nebulous process that excludes most members of the public, does not require site-

specific analysis and input, and often requires a much greater commitment of time and resources from stakeholders.

298.    Some collaborative processes have been very effective to help the Forest Service propose better actions. But the "flexible" collaborative requirement in CE 25 does not include any guarantee that participants will have a meaningful opportunity to provide input regarding the site-specific issues that matter to them. Conservation Groups would have provided examples of nominally collaborative processes that lacked site-specific discussions or input and resulted in controversial and extraordinarily harmful projects. Conservation Groups would also have provided examples of collaborative processes that did involve site-specific discussions and field visits and resulted in better project proposals as a result. But those benefits come at a cost; such processes are much more time consuming than providing input through the EA process. And stakeholders must commit to collaborative processes before a project is even scoped—i.e., before they know whether it would affect their particular interests.

299.    Conservation Groups would also have explained the serious environmental justice concerns of replacing the EA process with a collaborative process. Time-consuming collaborative processes are accessible only to members of the public who have the time, resources, and physical capability to travel and attend meetings that are often held in remote locations or in the field.

300.    Conservation Groups would also have explained the agency's need to ensure that collaborative processes do not violate the Federal Advisory Committee Act.

301.    The facts that Conservation Groups would have needed to submit to demonstrate the legal and practical problems with the collaborative requirement in the Final Rule are materially different from the facts relevant to the Proposed Rule.

302.    Because Plaintiffs could not have anticipated the adoption of the collaborative process and "primary purpose" requirements, Conservation Groups were denied the opportunity to participate fully and meaningfully in the rulemaking process.

303.    Accordingly, the Final Rule violates the APA's notice requirement and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. 5 U.S.C. § 706(2).

**Count 3: The Forest Service Failed to Allow Public Review for Conformity with CEQ Regulations, Violating Both NEPA and the APA**

304.    The allegations of the paragraphs 1 through 274 are incorporated here by reference.

305.    Under the CEQ regulations now in effect, agencies revising their NEPA procedures must "provide an opportunity for public review and review by the Council for conformity with . . . the regulations in this subchapter before adopting their final procedures"—i.e., the new CEQ regulations. 40 C.F.R. § 1507.3(b)(2) (2020).

306.    The Forest Service acknowledged that it was obligated to give CEQ an opportunity to review its rule for conformity with the new regulations, 85 Fed. Reg. at 73,622, 73,623, but failed to comply with the other half of the same requirement—namely to "provide an opportunity for public review" of the Final Rule for conformity with NEPA and the new CEQ regulations.

307.    The Forest Service's comment period on the Proposed Rule closed before either the proposed or final CEQ regulations were available to the public. Many of Conservation Groups' extensive comments on the Proposed Rule were based on the 1978 CEQ regulations, which were materially different from the regulations now in effect.

308.    If Conservation Groups had been given the required opportunity to comment on conformity with the new CEQ rule, they would have offered facts and argument related to the material changes in the CEQ rule. For example, CEQ's new limitation on other agencies' ability to develop "additional procedures" is relevant to both the collaborative process requirement in CE 25 and the issue of whether the Forest Service can continue scoping CEs and EAs (and the factual record needed to do so).

309.    Conservation Groups would also have offered facts and arguments related to the conformity of new aspects of the Forest Service's rule with requirements of CEQ's rule. For

example, the Forest Service's new requirement that logging projects be intended for the purpose of restoration or resilience is inadequate to meet the requirement that CEs be described with "[s]pecific criteria" to identify the category of actions that will not cause significant impacts. 40 C.F.R. § 1507.3(e)(2) (2020).

310.    Conservation Groups would have further argued that the Forest Service should exercise caution in the application of CEQ's new definition of CEs as actions that "normally" do not cause significant impacts. As CEQ has argued in related litigation, agencies like the Forest Service will "refine" the meaning of CEQ's new regulations as they develop their own separate procedures. By creating categories that will occasionally and cumulatively cause significant impacts, the Forest Service takes a broad reading of CEQ's new rule that ultimately does not comport with the NEPA statute.

311.    By skipping this mandatory public participation step, the Forest Service has prevented Plaintiffs and the public from commenting on whether and how the Final Rule violates the new CEQ rule.

312.    For these reasons, the Final Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of NEPA and the APA. 5 U.S.C. § 706(2).

### Count 4: CEQ's New Standard for Development of CEs, on which the Forest Service Relied to Promulgate the Final Rule, Violates NEPA and the APA

313.    The allegations of the paragraphs 1 through 274 are incorporated here by reference.

314.    To comply with the APA, an agency must demonstrate that the new policy it adopts is consistent with the governing statute. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009).

315.    The governing statute, NEPA, requires that for "every . . . major Federal action[] significantly affecting the quality of the human environment," agencies must prepare a "detailed statement" including analysis of the action's impacts and comparison to alternatives. 42 U.S.C. §

4332(2)(C). Agencies must comply with this requirement "to the fullest extent possible," *id.* § 4332, which means that the requirement must be met "unless there is a clear conflict of *statutory* authority," *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1115 (D.C. Cir. 1971).

316.     Under CEQ's previous regulations, CEs could be established only for categories of actions that "do not *individually or cumulatively* have a significant effect on the human environment and which have been found to have no such effect." 40 C.F.R. § 1508.4 (1978) (emphasis added). CEQ's new regulations purport to allow agencies to adopt CEs for categories of actions that *normally* do not have a significant effect on the human environment. 40 C.F.R. §§ 1500.4(a), 1500.5(a), 1501.3(a)(1), 1501.4(a), 1507.3(e)(2)(ii), and 1508.1(d) (2020).

317.     On its face, the "normally" standard allows CEs to be created even when they would occasionally or cumulatively have significant impacts.

318.     The Forest Service explicitly relies on the "normally" standard as the legal standard for its new CEs. *See, e.g.*, 85 Fed. Reg. at 73,629.

319.     CEQ reviewed the CEs issued in the Final Rule and found them to be in compliance with its new regulations, so the Forest Service CEs satisfy CEQ's interpretation of the new "normally" standard for CE identification.

320.     The activities authorized by CEs 3, 24, and 25 in the Final Rule are actions that cumulatively have significant environmental effects and, on at least some occasions, individually have significant environmental impacts. These CEs demonstrate that the "normally" standard allows agencies to identify CEs for categories of actions that may have significant individual and cumulative effects on the environment.

321.     The "normally" standard for CEs introduced in CEQ's revised 40 C.F.R. §1501.4(a) violates NEPA's requirement that every action significantly affecting the environment must be analyzed in detail.

322.     CEQ's changes to the standard under which CEs can be identified are inconsistent with the governing statute and are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of NEPA and the APA. 5 U.S.C. § 706(2).

### Count 5: The Forest Service Violated the APA by Promulgating CEs that are Inconsistent with NEPA

323.     The allegations of the paragraphs 1 through 274 are incorporated here by reference.

324.     To comply with the APA, an agency must demonstrate that the new policy it adopts is consistent with the governing statute. *Fox Television Stations*, 556 U.S. at 514–15.

325.     The Forest Service's Final Rule is inconsistent with the requirements of NEPA and therefore violates the APA.

### A)  The CEs Violate NEPA by Authorizing Actions with Significant Impacts

326.     NEPA requires that for "every . . . major Federal action[] significantly affecting the quality of the human environment, a detailed statement" (i.e., an EIS) must be prepared analyzing environmental impacts and reasonable alternatives. 42 U.S.C. § 4332(2)(C). If it is uncertain whether an action will have significant impacts, the agency may first prepare an EA, which is an abbreviated analysis of impacts and alternatives.

327.     The Forest Service's Final Rule creates CEs that cover large logging projects, road construction, and special uses with non-minor and permanent impacts.

328.     The presence of sensitive, site-specific resources vulnerable to significant harms do not disqualify projects from coverage under the CEs. As a result, actions affecting these resources sometimes will have individually significant impacts and certainly will have cumulatively significant impacts. Indeed, CE 25 is broad enough to cover virtually every logging project in the Southern Appalachian forests of Virginia, Tennessee, North Carolina, and Georgia for the last decade. Without site-specific analysis to assess which resources will be affected and their relative importance, it is at best uncertain whether any particular project will have significant environmental impacts.

329.     In addition to site-specific impacts, the Final Rule also allows significant climate impacts to occur without analysis. Because there is no programmatic analysis of the cumulative impact of successive projects on carbon storage, such analysis must occur, if at all, at the project level. If projects move forward using CEs, then there will be no such analysis. CE 25 allows the agency to exclude entire forests' timber sale programs from any analysis of carbon storage potential or climate change impacts.

330.     Under NEPA, these actions must be analyzed in a "detailed statement" because they are likely to have individually or cumulatively significant environmental effects. By allowing them to bypass the detailed statement requirement, the Final Rule is inconsistent with NEPA, and it is therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. 5 U.S.C. § 706(2).

**B) The CEs Violate NEPA By Authorizing Actions with Unresolved Conflicts Concerning Uses of Available Resources**

331.     NEPA directs agencies to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Where there are such unresolved conflicts, this requirement may be met by preparation of an EA or EIS. 40 C.F.R. § 1501.5(c)(2) (2020); 40 C.F.R. § 1508.9(b) (1978).

332.     The actions covered in CEs 3, 24, and 25 inherently involve environmentally consequential choices. Logging projects can be conducted in alternative locations or with alternative treatments; roads can be built on different alignments; utility rights-of-way can be built on different locations on or off public lands. These actions therefore involve unresolved conflicts in how and where to use agency resources to meet agency goals, such as timber targets.

333.     For example, under the applicable forest plans, there may not be an open question of *whether* the Forest Service will harvest timber or build and maintain roads to access timber, but the

location and intensity of that harvest or those roads is a matter of serious debate, and how that debate is resolved is highly consequential. A stand of older trees could be commercially harvested, or it could be allowed to continue aging while a nearby younger stand is harvested. Making "the most judicious use of the land," *see* 16 U.S.C. § 531(a), requires site-specific information and comparison of alternatives. These activities often involve tradeoffs between desired results and adverse environmental impacts, which create high public interest and necessitate public involvement.

334.    CEs 3, 24, and 25 purport to allow the Forest Service to bypass consideration of alternative locations or project modifications as required by 42 U.S.C. § 4332(2)(E) for covered rights-of-way, logging projects, and road construction.

335.    CEs 3, 24, and 25 are inconsistent with NEPA and therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2).

### C)  CE 25 Violates NEPA Because the Forest Service Failed to Consider the Adverse Effects of "Restoration" Actions

336.    Under NEPA, a beneficial purpose, and even a beneficial result, does not excuse the agency from considering and disclosing adverse impacts. "When an agency thinks the good consequences of a project will outweigh the bad, the agency still needs to discuss both the good and the bad." *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1375 (D.C. Cir. 2017).

337.    The Final Rule includes a requirement that activities authorized under CE 25, including timber harvest, must have a "primary purpose of meeting restoration objectives or increasing forest and grassland resilience." 85 Fed. Reg. at 73,627. Restoration need not be the only purpose, and timber harvest under CE 25 can produce commercial timber as an "ancillary" benefit. *Id.*

338.    The Forest Service characterizes the addition of the restoration requirement as a "limit[]" on the CE, 85 Fed. Reg. at 73,627, implicitly concluding that the beneficial purpose of

restoration outweighs any adverse effects. This is an error of law. Regardless of the purpose of commercial timber harvest, its biophysical effects are the same. When those effects occur in areas with sensitive resources, the potentially significant impacts must be disclosed in an EIS, or analyzed and avoided or mitigated using an EA. These potential harmful effects are highly site-specific in nature; the balancing of restoration benefits with ecological harms is necessarily different in every project.

339.   Indeed, in recent years, the great majority of, if not all, timber harvest projects in the Southern Appalachian national forests of Virginia, Tennessee, North Carolina, and Georgia have been characterized by the Forest Service as having a primary goal of restoration or resilience, including projects that have proposed logging in old-growth forests, in areas where ground disturbance was likely to encourage the spread of non-native invasive species, in areas with known populations of rare or regionally sensitive plant and animal species, and in areas accessible only by building new roads through steep and/or roadless areas. The NEPA process has been necessary and effective in improving "restoration" projects to the point that they can move forward under an EA and FONSI rather than an EIS.

340.   The Forest Service has not explained how its restoration projects will avoid significant negative impacts without the EA or EIS process. Instead, the Final Rule focuses solely on a beneficial purpose and fails to recognize or account for inevitable adverse effects. As a result, the promulgation of CE 25 is inconsistent with NEPA because it fails to account for the adverse impacts of these actions as required by the statute.

341.   CE 25 is therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2).

**Count 6: The Forest Service Violated the APA by Failing to Prepare an EIS or EA for the Final Rule as Required by NEPA**

342.   The allegations of the paragraphs 1 through 274 are incorporated here by reference.

343.    NEPA requires that for "every . . . major Federal action[] significantly affecting the quality of the human environment," an EA or EIS must be prepared analyzing environmental impacts and reasonable alternatives. 42 U.S.C. § 4332(2)(C). Major federal actions may include "new or revised agency rules, regulations, plans, policies, or procedures." 40 C.F.R. § 1508.1(q)(2) (2020).

344.    The Final Rule is a major federal action—the adoption of a rule changing the Forest Service's NEPA procedures. The Final Rule states that it "does not have any reasonably foreseeable impact on the environment." 85 Fed. Reg. at 73,629. However, the Final Rule has an easily quantified and foreseeable impact on the environment. It removes procedural safeguards that have quantifiable benefits for the protection of sensitive resources. As the record shows, similar projects are reduced in size by 17% on average because of the NEPA process. In other words, in such projects, the Forest Service decides to drop nearly 1 in 5 acres from harvest because it is persuaded by its own analysis and/or public input that the benefits are not worth the harms. A shift to CEs for these projects would mean that those improvements would be lost.

345.    In the past, the creation of new CEs did not require preparation of an EIS because CEs by definition did not have significant impacts, either individually or cumulatively. *See, e.g.*, *Heartwood v. U.S. Forest Service*, 230 F.3d 947, 954–55 (7th Cir. 2000). Under CEQ's new rule, however, the definition of a CE has changed: now a CE is a category of action that "normally" does not have significant impacts. Because CEQ's standard expressly allows (and the Forest Service's Final Rule includes) CEs for actions with at least occasional and cumulative significant impacts, NEPA requires analysis of those impacts.

346.    Because the Final Rule is a major federal action that may significantly affect the quality of the human environment within the meaning of 42 U.S.C. § 4332(2)(C), the Forest Service violated NEPA by failing to prepare and circulate an EIS or EA for public comment prior to the publication of the Final Rule.

347.   An EA or EIS on the Final Rule should also have analyzed the environmental justice impacts of substituting a "flexible" collaborative process in place of the transparent, open, and accessible comment and objection process required by the Forest Service's previous policies. Environmental justice communities and organizations are historically underrepresented in collaborative processes and will be harmed by the replacement of the NEPA process with a collaborative process for timber projects. Relatedly, the Forest Service should have considered the effect of its Final Rule on the participation of people who do not live near the venues for collaborative discussions, who lack the resources to travel or attend collaborative meetings, or who lack the physical ability to join field visits.

348.   An EA or EIS on the Final Rule should also have addressed the impact of the Final Rule on efforts to limit greenhouse gas emissions that worsen global climate change. National forests, particularly in the Southeast, are a key national carbon sink, and timber harvest and soil disturbance release greenhouses gases into the atmosphere. The Forest Service has made clear its intent to increase the pace and scale of logging by speeding up environmental reviews. Authorizing these projects under CEs will reduce carbon storage, release greenhouse gases, and worsen climate change. Because these cumulative impacts will not be analyzed when projects proceed under CEs, the Forest Service was required to consider them in an EIS for this rulemaking.

349.   The Forest Service's promulgation of the Final Rule without preparing an EA or EIS that examines a reasonable range of alternatives, addresses unresolved conflicts over resource use, and assesses the environmental effects of the Final Rule using high-quality scientific information is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of NEPA and the APA. 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

A.       DECLARE that the Forest Service's Final Rule, *National Environmental Policy Act (NEPA) Compliance*, 85 Fed. Reg. 73,620 (Nov. 19, 2020), is arbitrary, capricious, and not in accordance with law;

B.       DECLARE that CEQ's NEPA regulations, to the extent they purport to allow the categorical exclusion of actions that "normally" do not have significant impacts, 40 C.F.R. §§ 1500.4(a), 1500.5(a), 1501.3(a)(1), 1501.4(a), 1507.3(e)(2)(ii), and 1508.1(d) (2020), are arbitrary, capricious, and not in accordance with law;

C.       VACATE and set aside the challenged regulations;

D.       ENJOIN Defendants from implementing, enforcing, or relying on the challenged regulations;

E.       AWARD Plaintiffs their reasonable costs, fees, and expenses, including attorneys' fees, associated with this litigation; and

F.       GRANT Plaintiffs such further and additional relief as the Court may deem just and proper.


Respectfully submitted, this the 8th day of January, 2021.


                                    /s/ Kristin Davis
                                    Kristin Davis
                                    VA Bar No. 85076
                                    SOUTHERN ENVIRONMENTAL LAW CENTER
                                    201 West Main Street, Suite 14
                                    Charlottesville, VA 22902-5065
                                    Telephone: 434-977-4090
                                    Facsimile: 434-977-1483
                                    kdavis@selcva.org

/s/ Sam Evans
Sam Evans (*pro hac vice pending*)
N.C. Bar No. 44992
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
Facsimile: 828-258-2024
sevans@selcnc.org

/s/ J. Patrick Hunter
J. Patrick Hunter (*pro hac vice pending*)
N.C. Bar No. 44485
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
Facsimile: 828-258-2024
phunter@selcnc.org

Julie Reynolds-Engel (*pro hac vice pending*)
N.C. Bar No. 54596
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
Facsimile: 828-258-2024
jreynolds-engel@selcnc.org

Spencer Gall
V.A. Bar No. 95376
SOUTHERN ENVIRONMENTAL LAW CENTER
201 West Main Street, Suite 14
Charlottesville, VA 22902-5065
Telephone: 434-977-4090
Facsimile: 434-977-1483
sgall@selcva.org

*Attorneys for Plaintiffs*