# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

THE CLINCH COALITION, *et al.*,    )
    )
    Plaintiffs,    )
    )
    v.    )
    )
THE UNITED STATES FOREST    )
SERVICE, *et al.*,    )    Case No. 2:21-cv-0003-JPJ-PMS
    )
    Federal Defendants,    )    MEMORANDUM IN SUPPORT
    )    OF PLAINTIFFS' MOTION FOR
    and    )    SUMMARY JUDGMENT
    )
AMERICAN FOREST    )
RESOURCES COUNCIL, *et al.*,    )
    )
    Intervenors-Defendants.    )
    )
    )

# Table of Contents

INTRODUCTION ...................................................................................................1

JURISDICTION AND VENUE ............................................................................2

LEGAL BACKGROUND .....................................................................................2

STATEMENT OF UNDISPUTED MATERIAL FACT ........................................3

STANDARD OF REVIEW ..................................................................................16

ARGUMENT .......................................................................................................17

I.  Conservation Groups have standing to challenge the Forest Service's
    Rule. .........................................................................................................17

    A.  Conservation Groups and their members will suffer aesthetic,
        recreational, and professional injuries due to the Rule. .........................18

    B.  Conservation Groups are directly injured by the deprivation of
        information to which they are entitled under NEPA. .............................21

    C.  Conservation Groups have suffered and will suffer financial injury by
        diverting scarce resources to mitigate the Rule's harms to their core
        missions. ...............................................................................................22

II.  Conservation Groups' claims are ripe. .........................................................24

III. The Rule Lacks Evidentiary Support ...........................................................27

    A.  The Rule is a three-legged stool: If even one leg is defective, the Rule
        falls. ......................................................................................................27

    B.  The Forest Service's analysis of past projects does not support the
        CEs. .......................................................................................................28

        i.   The Forest Service ignored evidence showing that projects
             below the thresholds for the Covered Actions can and do have
             significant effects. ..........................................................................29

        ii.  The Forest Service lacked evidence that its past projects have
             not caused significant effects in the Southern Appalachians.............30

iii.   The Forest Service ignored the benefits of the EA process that
its CEs would bypass............................................................................35

C.   The input of the agency's "key experts" and CEQ does not support
the rule...................................................................................................37

D.   Benchmarking ...........................................................................................40

IV.   The Rule and the CEQ regulation under which it was finalized are *ultra
vires* because they allow actions with significant effects to bypass
NEPA's procedural requirements....................................................................43

V. CEs cannot be used for the covered actions because they involve
unresolved conflicts concerning alternative uses of available resources,
mandating further NEPA analysis ..................................................................46

VI.   The Forest Service Failed to Provide the Public with an Opportunity to
Review the Proposed Rule for Conformity with CEQ's Recently Adopted
Regulations ...................................................................................................48

CONCLUSION .......................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AES Sparrows Point LNG v. Wilson*,
  589 F.3d 721 (4th Cir. 2009) ................................................27

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
  326 F.3d 505 (4th Cir. 2003) ...........................................17, 18

*Am. Clinical Lab'y Ass'n v. Becerra*,
  40 F.4th 616 (D.C. Cir. 2022) .............................................46

*Burlington Truck Lines v. United States*,
  371 U.S. 156 (1962) ..........................................................40

*City of Erie v. Pap's A.M.*,
  529 U.S. 277 (2000) ..........................................................21

*City of New York v. U.S. Dep't of Transp.*,
  715 F.2d 732 (2d Cir. 1983) ...............................................47

*Cohen v. United States*,
  650 F.3d 717 (D.C. Cir. 2011) .............................................26

*Colorado Wild v. U.S. Forest Serv.*,
  435 F.3d 1204, 1210 (10th Cir. 2006) .............................49, 50

*Defenders of Wildlife v. United States Dep't of the Interior*,
  931 F.3d 339 (4th Cir. 2019) ..............................................40

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) .....................................................17, 39

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) .......................................................2, 48

*Dreher v. Experian Info. Sols., Inc.*,
  856 F.3d 337 (4th Cir. 2017) ..............................................22

*Envt'l Defense Fund v. Corps of Engineers*,
  492 F.2d 1123 (4th Cir. 1974) ............................................47

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................43, 46, 48

*Friends for Ferrell Parkway, LLC v. Stasko*,
   282 F.3d 315 (4th Cir. 2002) ........................................................................18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)........................................................................................17

*Heartwood, Inc. v. U.S. Forest Serv.*,
   230 F.3d 947 (7th Cir. 2000) ...................................................................20, 25

*Hodges v. Abraham*,
   300 F.3d 432 (4th Cir. 2002) ........................................................................22

*Iowa v. Council on Env't Quality*,
   No. 1:24-CV-089, 2024 WL 3595252 (D.N.D. July 31, 2024) .....................46

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*,
   713 F.3d 187 (4th Cir. 2013) ...................................................................25, 26

*Loper Bright Enterprises v. Raimondo*,
   144 S.Ct. 2244 (2024)....................................................................................46

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).......................................................................................18

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
   No. 23-1067, 2024 WL 4745044 (D.C. Cir. Nov. 12, 2024).........................48

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)................................................................................ *passim*

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
   417 F.3d 1272 (D.C. Cir. 2005)............................................................24, 25, 26

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
   523 U.S. 726 (1998).......................................................................................25

*Piedmont Envt'l Council v. FERC*,
   558 F.3d 304 (4th Cir. 2009) ...................................................................48, 50

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*,
   120 F.4th 390 (4th Cir. 2024) .................................................................23, 24

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
   565 F.3d 683 (10th Cir. 2009) ........................................................................2

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989).........................................................................................2

*Sierra Club v. Bosworth,*
   510 F.3d 1016 (9th Cir. 2007) ............................................................29, 30, 36, 43

*State of N.C. v. Hudson,*
   665 F. Supp. 428 (E.D.N.C. 1987)...........................................................................47

*Sugarloaf Citizens Ass'n v. FERC,*
   959 F.2d 508 (4th Cir. 1992) ...................................................................................48

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009)..................................................................................................18

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014)............................................................................................18, 26

*Syracuse Peace Council v. FCC,*
   867 F.2d 654 (D.C. Cir. 1989) .................................................................................27

*Trinity Episcopal School Corporation v. Romney,*
   523 F.2d 88 (2d Cir. 1975)..................................................................................47, 48

*United Keetoowah Band of Cherokee Indians v. FCC,*
   933 F.3d 728 (D.C. Cir. 2019) ...........................................................................35, 37

*Wild Virginia v. CEQ,*
   544 F. Supp. 3d 620 (W.D.Va. 2021) .....................................................................19

*Wild Virginia v. CEQ,*
   56 F.4th 281 (4th Cir. 2022) .......................................................................... *passim*

*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC,*
   475 F.3d 319 (D.C. Cir. 2006) .................................................................................27

*Zzyym v. Pompeo,*
   958 F.3d 1014 (10th Cir. 2020) ...............................................................................27

**Federal Statutes**

5 U.S.C. § 706 .................................................................................................................2

5 U.S.C. § 706(2)(A)......................................................................................................17

5 U.S.C. § 706(2)(D)......................................................................................................50

16 U.S.C. § 1604(k) .........................................................................................................4

16 U.S.C. § 6591b......................................................................................................6, 41

16 U.S.C. § 6591d......................................................................................................6, 41

28 U.S.C. § 1331 ..................................................................................................2

28 U.S.C. § 1391(e)(1)(C) ...................................................................................2

28 U.S.C. §§ 2201–2202 ......................................................................................2

42 U.S.C. § 4332(2)(C) ..............................................................................43, 46

42 U.S.C. § 4332(C) ............................................................................................2

42 U.S.C. § 4332(D) (1970) ...............................................................................46

42 U.S.C. § 4332(E) (1975) ...............................................................................46

42 U.S.C. § 4332(H) ....................................................................................3, 46

42 U.S.C. § 4336e ..............................................................................................16

P.L. 118-5 § 321 .................................................................................................16

**Rules**

Fed. R. Civ. P. 56(a) .........................................................................................16

**Regulations**

36 C.F.R. § 218.5(a) ............................................................................................6

36 C.F.R. § 220.4(b)(2)(iii) ................................................................................35

36 C.F.R. § 220.4(e) ............................................................................................6

36 C.F.R. § 220.5 ................................................................................................6

36 C.F.R. § 220.6(a) ......................................................................................6, 48

36 C.F.R. § 220.6(e)(3) ........................................................................................6

36 C.F.R. § 220.6(e)(6) ......................................................................................41

36 C.F.R. § 220.6(e)(12) (2008) .........................................................................6

36 C.F.R. § 220.7(b) ..........................................................................................48

36 C.F.R. § 220.7(b)(2) ........................................................................................3

36 C.F.R. § 220.7(b)(3) ....................................................................................2, 6

36 C.F.R. § 250.51 ...............................................................................................5

36 C.F.R. § 251.50 ...............................................................................................34

36 C.F.R. § 251.50(a) ...........................................................................................42

40 C.F.R. § 1501.4(a) (2020) ..........................................................................43, 46

40 C.F.R. § 1506.6 .................................................................................................6

40 C.F.R. § 1507.3(a) ...........................................................................................50

40 C.F.R. § 1507.3(b) (2020) ...............................................................................49

40 C.F.R. § 1507.3(b)(2) (2020) .....................................................................48, 49

40 C.F.R. § 1508.4 (1978) ...............................................................................43, 44

**Other Authorities**

85 Fed. Reg. 1684 .................................................................................................49

85 Fed. Reg. 73620 ...............................................................................................45

86 Fed. Reg. 23453 ...............................................................................................16

88 Fed. Reg. 49924 ...............................................................................................16

89 Fed. Reg. 35442 .........................................................................................44, 46

## INTRODUCTION

For decades, Plaintiffs ("Conservation Groups") have relied on procedural safeguards required by the National Environmental Policy Act ("NEPA") to improve Forest Service proposals in the national forests they work to protect. Wherever the Forest Service proposed large commercial logging projects, roadbuilding, and permits for private "special uses" of public lands, NEPA required transparency, analysis, informed public input, and consideration of alternatives. Those procedural requirements were remarkably effective, avoiding and minimizing harms to old-growth forests, rare habitats, undeveloped backcountry areas, and clean mountain streams.

The Forest Service looked at this track record, saw its successes, and threw out the very process that made it possible. In November 2020, under pressure to ramp up logging, the Forest Service finalized a set of administrative loopholes to NEPA. Under the Forest Service's new rule (the "Rule"), logging, roadbuilding, and private exploitation of public lands are now covered under categorical exclusions ("CEs"), which means that they will no longer be informed by NEPA's ordinary requirements for analysis, informed public input, and consideration of alternatives. The use of the CEs in the Southern Appalachians will harm Conservation Groups' members' enjoyment of places they visit and love.

In creating its new loopholes, the Forest Service relied on supposed evidence that is *not* in the administrative record, and it ignored contrary evidence that *is* in the record. It took advantage of a weakened and unlawful standard promulgated by the Council on Environmental Quality ("CEQ") just a few months earlier, but it failed to abide by the procedural requirements of those same CEQ regulations. For these reasons and others discussed herein, Conservation Groups ask the Court to set aside the Rule as unlawful.

**JURISDICTION AND VENUE**

This Court has jurisdiction under 28 U.S.C. § 1331 and may issue declaratory and further relief requested pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201–2202. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Defendants Forest Service and CEQ are agencies of the United States, Defendants James Hubbard and Mary Neumayr are officers or employees of the United States acting in their official capacities, no real property is involved in this action, and The Clinch Coalition, Alliance for the Shenandoah Valley, Virginia Wilderness Committee, and Wild Virginia are headquartered within the District.

**LEGAL BACKGROUND**

**The National Environmental Policy Act**

NEPA has two purposes: ensuring that decisionmakers have and consider information about environmental impacts and making that same information available to the public that holds them accountable. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009). NEPA "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Nevertheless, NEPA's "procedures are almost certain to affect the agency's substantive decision." *Id.*

NEPA requires that federal agencies "shall . . . include in every recommendation or report . . . a detailed statement" regarding the effects of and alternatives to proposed actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This detailed statement is known as an Environmental Impact Statement ("EIS"). If it is unclear whether an EIS is needed, the Forest Service may first prepare an Environmental Assessment ("EA") to determine whether a proposal will have significant effects. 36 C.F.R. § 220.7(b)(3).

2

Further, regardless of whether the proposal's effects will cross the threshold of "significance," agencies must also "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H). For the Forest Service, this alternatives analysis is undertaken during the EA process. 36 C.F.R. § 220.7(b)(2).

## STATEMENT OF UNDISPUTED MATERIAL FACT

The Forest Service manages around 4.3 million acres in the George Washington and Jefferson National Forests in Virginia, the Pisgah and Nantahala National Forests in North Carolina, the Cherokee National Forest in Tennessee, and the Chattahoochee National Forest in Georgia (the "Southern Appalachian national forests"). Dkt. 1 at ¶ 156; Dkt. 31 at ¶ 156.

Conservation Groups work to protect these national forest lands on behalf of their members, supporters and future generations. *E.g.*, Fisher ¶ 14; Young ¶ 2; Kelly ¶ 5; Riddle ¶ 5; Murray ¶ 2.[1] Conservation Groups' members enjoy fishing in clear mountain streams, Winslett ¶ 3; Govus ¶ 3; Sligh ¶ 9, viewing healthy mature and old-growth forests, Kelly ¶ 9; Riddle ¶ 6, and spending time in relatively undeveloped backcountry settings without industrial uses and roads, Prater ¶ 10; Mahoney ¶ 19. They work to protect the most intact portions of the national forests for the long term as wilderness and similar protective designations. Miller ¶ 5.

**The Forest Service regularly proposes harmful site-specific actions**

The Forest Service regularly proposes actions that threaten Conservation Groups' interests in these national forest lands. Dkt. 1 at ¶¶ 1, 183; Dkt. 31 at ¶¶ 1, 183. To begin with,

---

[1] While most of the Conservation Groups are focused on particular forests in the Southern Appalachians, Plaintiff Defenders of Wildlife works nationally to protect imperiled wildlife both in the Southern Appalachians and throughout the National Forest System. Prater ¶¶ 5,7. In this brief, we cite to affiants' declarations as [last name] ¶ [paragraph number].

the Forest Service will conduct logging projects in places where it would directly harm

Conservation Groups' members. Each of the Southern Appalachian national forests have

identified broad areas as "suitable" for timber production. *See* 16 U.S.C. § 1604(k). The Forest

Service authorizes logging in these "suitable" areas to meet its annual "timber targets." Dkt. 1 at

¶ 186; Dkt. 31 at ¶ 186; Dkt. 1-4. Within the "suitable" areas are places Conservation Groups'

members enjoy and work to protect, including the unroaded, undeveloped parts of the forests

known as "Mountain Treasures," Miller ¶¶ 4-5, 10; Murray ¶ 8, which are currently not well

protected but are among the "most important lands in the U.S." for conservation. AR 093854.[2]

"Suitable" lands also include areas of old-growth forest and habitat for rare species that

Conservation Groups' members enjoy observing. Browning ¶ 16; Riddle ¶ 51; Mahoney ¶ 18.

Although the Forest Service intends to log these suitable areas on a regular basis to provide a

predictable flow of timber, Forest Service Handbook 1909.12.61.2, attached as Exhibit 4,[3] the

site-specific choice of where precisely to log, which determines how harmful the effects will be,

is deferred to the project level, *see* AR 086750-58, 029605-08; Kelly ¶¶ 14-15. The project level

is the stage of decisionmaking at issue in this case.

    The Forest Service also builds roads. It maintains an extensive road network, which is the

biggest threat to water quality in the national forests, impacting both surface and underground

flow of water, causing sedimentation, and blocking the passage of aquatic wildlife. AR 086601-

03, 093584-85. This road system is far larger than the Forest Service has budget to maintain. AR

---

[2] This reference is broken up in the administrative record ("AR") and can be found at: AR 093473-77, 093332, 093668, 094397, and 093854-58.

[3] An area is "suitable for timber production" when "[r]egeneration of the stand [by logging] is intended"; when "[t]imber production is anticipated to continue" in the long term; and when "[a] flow of timber can be planned and scheduled on a reasonably predictable basis," among other criteria.

094298, 093666 (showing a $3.153 billion backlog for road maintenance). And, because unmaintained roads cause both chronic and acute impacts to the waters they cross, AR 093513-17, building new roads exacerbates the backlog and increases harm in watersheds where it is already occurring. Kelly ¶ 75. In addition, the decisions of where and how to build a road determines its local effects. *E.g.*, Kelly ¶ 11. For example, it is more important to avoid road construction in "roadless or nearly roadless portions of the landscape." AR 094330; *see also* Murray ¶¶ 28-30. As with logging, where and how to build roads is deferred to the project level. *E.g.*, AR 086756 (deferral of site-specific road decisions on the Chattahoochee National Forest).

Finally, the Forest Service grants and administers a huge number of "special use" permits. AR 030796 (over 3,000 applications per year), 093426 (over 74,000 active authorizations). A special use permit is a type of authorization for a wide range of known and yet-unknown future uses, 36 C.F.R. § 250.51; AR 093426 (over 180 types of uses so far), from a "one-time group event" to bulldozing a new utility right of way, AR 091779. Special uses occur throughout the national forests, including places important to Conservation Groups' members for their rare ecological values or beloved recreational and scenic values. For example, Nicole Hayler of the Chattooga Conservancy describes a "cascade" of impacts due to increasing demand for group uses and commercial events in the Chattooga River watershed, which incrementally impair values of solitude and self-reliance. Hayler ¶¶ 14-16. Special uses sometimes even cause Conservation Groups' members to avoid places they would otherwise visit. Riddle ¶ 70. Whether to approve a special use permit or require modifications is a project-level decision.

The Rule created new CEs for these project-level decisions. Specifically, new CE 25 would cover commercial logging up to 2,800 acres (over 4 square miles) with temporary road construction up to 2.5 miles; new CE 24 would cover permanent road construction up to 2 miles,

and new CE 3 would cover approval of any "special use" requiring up to 20 acres (collectively, the "Covered Actions"). AR 091779-80. The Covered Actions will continue to be proposed throughout the Southern Appalachian national forests in the future. Dkt. 1 at ¶¶ 1, 183; Dkt. 31 at ¶¶ 1, 183.

**Status Quo Ante**

The Forest Service's project-level decisions for logging, roadbuilding, and special uses are subject to NEPA's requirements, already described at length in this Court's prior opinions. *See* Dkt. 63 at 3-4. In brief, for actions that are not categorically excluded from project-level analysis, the Forest Service must prepare either an EIS or EA. *Id.* Most such projects proceed under an EA, *see* AR 112930, but both EISs and EAs provide for NEPA's essential procedural safeguards of public notice, analysis of impacts, consideration of alternatives, and opportunities for public comment and administrative objection. 36 C.F.R. §§ 220.4(e), 220.5, 220.7(b)(3), 218.5(a); 40 C.F.R. § 1506.6. Except for an initial "scoping" notice, 36 C.F.R. § 220.6(a), CEs do not require any of these safeguards.

Before the Rule took effect, CEs were available for a smaller range and scale of agency actions. As relevant here, those CEs included authorization for commercial harvest of "live trees" up to only 70 acres, with incidental "temporary" road construction up to 1/2 mile. 36 C.F.R. § 220.6(e)(12) (2008).[4] There was no freestanding CE authority for permanent road construction, and special use approvals were available only for "minor" uses affecting up to 5 contiguous acres. *Id.* § 220.6(e)(3) (2008).

---

[4] In 2014 and 2018, two additional exclusions were established by statute, each allowing up to 3,000 acres of treatment, including timber harvest. 16 U.S.C. §§ 6591b, 6591d. These apply, however, only to narrow purposes and on a limited geography. AR 093329.

Most commercial logging in the Southern Appalachian national forests has not been

eligible for approval under the older CEs and has therefore been analyzed using EAs. Miller ¶

13; Smith ¶ 7; Mahoney ¶ 10; *see also* AR 112930. In the decade leading up to 2019, when the

Rule was proposed, the Southern Appalachian national forests approved 71 timber projects using

EAs, with 37,374 acres of commercial logging and 54,823 total acres of harvest. AR 086740-44.

The median project included 535 total acres of harvest; the smallest project was 75 acres; and

only two projects were larger than 2,800 acres. *Id.*

The EA process has been remarkably effective at improving project proposals to avoid

and minimize harm. To mention a few examples from the Southern Appalachians, the EA

process prompted the Forest Service to drop logging in old growth forests in the Stoney Creek

and Clarke Mountain projects, to drop logging and protect a state-delineated rare community in

the Mossy Oak project, and to drop road construction in an unroaded area in the Rocky Spur

project. AR 029596-98. Decision documents collected by the Forest Service during the

rulemaking show similar improvements nationwide because of the EA process. *E.g.*, 010134-35,

017994-95, 011391, 005668, 005533, 005517, 004218, 023744 (all describing substantial

changes based on EA analysis and public input).

These improvements to individual projects make big cumulative differences, especially in

the Southern Appalachians. Between 2009 and 2019, the Southern Appalachian national forests

dropped 5,909 acres of proposed commercial logging—roughly 14% of the total—during the EA

process. AR 086656-57. In addition to the acres that were dropped outright, mitigation measures

were consistently added during the EA process to avoid or reduce potentially significant impacts,

such as impacts to rare species. AR 086658-59. As a representative for the North Carolina

Wildlife Resources Commission explained, EAs are needed in this ecoregion for even relatively

small Forest Service timber projects, to "tailor[]" those projects and to protect wildlife under the

state agency's jurisdiction. AR 030985; *see also* 030998 (providing the speaker's credentials).

The EA process has significant cumulative benefits nationwide, too. In the 68 projects the

Forest Service relies on to support CE 25, 17% of acres proposed for logging were dropped

during the EA process. AR 086636. These improvements resulted directly from public input and

analysis during the EA process, which would not have occurred had a CE been used. AR

086637-48 (detailing improvements); *see also* AR 086736 (showing that modifications in 33 of

those 68 projects occurred only after the analysis and input required for EAs).

### The Rulemaking Process

The Forest Service has been unequivocal about its goal for the Rule—namely, "to

increase the pace and scale" of logging and special use approvals by "reduc[ing] costs and time

spent on environmental analysis." AR 030802. Indeed, while the Rule was in development, the

Southern Region (which contains the Southern Appalachian national forests) reported that it had

"depleted much of its shelf volume" (i.e., was running out of NEPA-approved timber projects) as

it tried to keep up with recently increased timber targets. AR 093681. The agency explained that

it was trying to move projects through NEPA faster to keep the pace. *Id.* The Rule was part of

the solution: The Forest Service observed that CE 25 as proposed would have "create[d]

efficiencies" for (*i.e.*, would have excluded from EA-level analysis) 94% of projects in the

Southern Region. AR 112929-31.

The rulemaking process began with the development of a wish list for activities certain

agency staff hoped could be covered by the CEs, then working backward to build a record to

support them. *E.g.* AR 105998, 109810 (both identifying activities staff saw a need to cover),

109400 (showing that a key change came from agency leadership[5] over staff objections), 106028 (working to "build a record" to support the choice of activities). When the Forest Service published its proposed rule in June 2019, it included CEs for up to 4,200 acres of commercial logging, 5 miles of road construction, and 20-acre special uses, which were no longer limited to "minor" and "contiguous" impacts. AR 030807, 030809.

In support of the proposed rule, the Forest Service cited three evidentiary pillars. Primarily, the agency relied on samples of past projects it had previously predicted would have no significant impact. Dkt. 63 at 5; AR 030611, 030624-25, 030665. For example, from an initial pool of 718 projects relevant to CE 25, the agency sampled 68 for review. AR 093321. The thresholds for the draft CEs were pinned to the acres and miles of activities in the sampled projects. *E.g.*, AR 030624-25 (describing rough averaging process). The Forest Service's dataset notably did not include past projects that *did* have significant effects. AR 112680 (noting the sampling bias caused by the omission of "[f]ailed or non-successful EAs"). Nor did the data include information about how sampled projects had changed between their initial proposals and final decisions. AR 091529 (describing the limited data pulled from the sampled projects).

The Forest Service acknowledged that its *predictions* of no significant impact in past projects were not evidence that those projects *actually* had no such effects. *See* AR 097519 (requiring "validat[ion]" of predicted effects), 113536 (cautioning that unvalidated projects "should *not* be relied on"). Consequently, the Forest Service circulated a questionnaire to local staff who worked on some of the sampled projects. AR 029964. Although originally withheld from the administrative record, the survey responses were added to the record per the Court's order, Dkt. 63 at 14-16, and they show that the Forest Service had very little information about

---

[5] "Jim" is Jim Smalls, Assistant Director of the department developing the Rule. See AR 107622.

the Covered Actions' actual effects. *See* Exhibits 1-3 (discussed further in Section III.B.ii, *infra*).

By the time the Rule was finalized, only 19 of the 68 projects considered in connection with CE

25 had received a survey response, along with 14 of 53 for CE 24 and 10 of 62 for CE 3. *Id.*

The lack of information about actual effects was even more pronounced in the Southern

Appalachians. As summarized in Exhibits 1-3, not one of the 68 projects sampled in connection

with CE 25 is located in the Southern Appalachians. *See* Exhibit 3. Similarly, of the 53 projects

sampled in connection with CE 24, two are located in the Southern Appalachians, but neither

received a survey response to validate the absence of significant effects. *See* Exhibit 2. Finally,

of the 62 projects sampled in connection with CE 3, five are located in the Southern

Appalachians, but none has a survey response. *See* Exhibit 1. Ultimately, even the agency's

internal experts recognized that the evidence from past projects was "not robust." AR 112680.

As a second evidentiary basis for the Rule, the Forest Service gestured vaguely to "input"

from its experts and CEQ. AR 030612, 030627-28, 030668. Although the Forest Service listed

these experts by name, AR 030685-86, 030727-29, 030744, their input was not provided to the

public for comment with the proposed rule. Indeed, it was also withheld from the administrative

record in this case for over three years and four rounds of briefing. Dkt. 63; Dkt. 77-1; Dkt. 101;

Dkt. 118. When the record was finally completed, it showed that neither the agency's experts nor

CEQ had provided opinions substantiating a lack of significant effects from the Covered Actions.

Only one expert opined directly on the question of whether "the activities listed in the proposed

CE cause significant or highly uncertain impacts as defined in NEPA." AR 112680. She

answered, "likely *it depends* and that is when you get to significant impacts." *Id.* (emphasis

added). In other words, the Covered Actions are not *categorically* insignificant. As discussed

more fully below, other experts also shared serious concerns and criticisms. *E.g.*, AR 106592

(opining that the CEs "will get challenged on best science pretty easily"), 107535 ("some team members question whether the record can show this broad category of activities has no significant effect"). CEQ, too, offered criticism rather than support. *E.g.*, AR 116296 (suggesting the Forest Service might be ignoring "evidence that certain CEs are not justified").

The Forest Service's third evidentiary pillar was "benchmarking" to other agencies' CEs. The Forest Service listed existing CEs from other agencies and stated without explanation that they were similar. AR 030612-13, 030628-34, 030668-73.

Conservation Groups submitted timely comments during the rulemaking process, criticizing the evidentiary bases the agency disclosed. AR 029580-603, 086492-800. The Forest Service's internal reviewers offered similar critiques and candidly agreed that the Rule had serious problems:

Table: Comparison of Selected Conservation Groups Critiques and Internal Agency Assessments

| Conservation Groups' Critique | Internal Agency Assessment |
|---|---|
| The sample of past projects was biased because it failed to include projects of comparable size that did have significant effects. *See, e.g.*, AR 086627, 086651, 029598, 029596. | "There is a very likely bias in the sample," because "[f]ailed or non-successful EAs would provide insight into 'how big is too big.'" AR 112680. |
| The analysis of past projects did not support a conclusion that the Covered Actions would lack significant effects in the Southern Appalachian national forests. AR 086516. | "No consideration was given for stratifying the sample to ensure representative projects across the nation." AR 112680. |
| Very few of the sampled projects had been monitored for their actual effects. AR 086576-79. | "[A] sample size of only 19 is tiny, especially given that the category applies to multiple types of activities, so your sample size for individual activities is even lower." AR 113589. |
| Past projects have warranted a "finding of no significant impact" *because* of improvements attributable to the EA process, and those improvements would be lost if the same | "Team member experience is that critical parts of quality project design occur during the EA process. . . . How would processes change to ensure this key work still happens (and provide correction when it doesn't) if we |

11

| | |
|---|---|
| projects proceeded under CEs. AR 086573-76. | don't have the EA process?" AR 107535. *See also* AR 113540 (describing same criticism as "valid" and "serious"), 106907 (noting mitigation developed during EA is "essential" to avoid significant effects). |
| The CEs failed to safeguard against cumulative significant effects. *See, e.g.*, AR 029596 (providing examples of cumulative effects of Covered Actions in the Iron Mountain and Cheoah Bald areas and arguing agency "doesn't have the track record" to show absence of cumulative effects). | "Our records may be inadequate to support the conclusion that these activities do not have any further cumulative effects." AR 116044. *See also* AR 113532 (noting "dubious approach" of relying on "individual projects scattered across the country" without assessing cumulative effects), 112500 (noting that "adjacent" projects could cause cumulative effects). |

**Intervening CEQ Rulemaking**

Consistent with the CEQ regulations in effect at the time, the Forest Service initially set out to show that the CEs would cover "actions that normally will not have significant environmental impacts (*individually or cumulatively*)." AR 105844 (emphasis added). In July 2020, however, after the comment period on the Forest Service's proposed rule had closed, CEQ changed the definition of a CE from a category of actions that "individually and cumulatively" lacks significant effects to a category of actions that "normally" lacks significant effects. NEPA_0000183, 186.[6] Immediately after CEQ's rules became effective, NEPA_00000179 (specifying effective date of Sep. 14, 2020), the Forest Service scrubbed its drafts of references to the phrase "individually or cumulatively." *Compare* AR 114316 (May 13, 2020 draft) *with* AR 114431 (Sep. 18, 2020 draft). Even at the eleventh hour, staff were still registering concerns about cumulative impacts, but the Forest Service declined to address them. AR 113206.

---

[6] CEQ simultaneously redefined the incorporated term "effect" to exclude cumulative effects. NEPA_00000186-87.

While CEQ's new regulations weakened the threshold for establishing a CE, it nevertheless retained a strong procedural requirement that agencies "provide an opportunity for public review and review by the Council for conformity with the Act and the regulations in this subchapter before adopting" new NEPA rules. NEPA_00000181. Despite being on notice of this requirement, AR 091556-57, "the Forest Service offered CEQ, but not the public, an opportunity to review its Proposed Rule for conformity with the applicable regulations." Dkt. 63 at 6.

### Final Rule

In the final version of the Rule, the Forest Service tackled only "some of the issues" raised by the public and internal reviewers. AR 113048. The agency did address some mathematical and statistical errors before finalizing the Rule, which resulted in changes to the CE thresholds, *see* AR 090700-09 (correcting "double counting" errors), 091533 (basing thresholds on median project size rather than the skewed mean), but it did not correct the fundamental problems described above. For example, the final version of the Rule does not even mention cumulative effects. AR 091768-80.

As finalized, CE 25 covers commercial logging projects up to 2,800 acres along with 1/2 mile of associated road construction; CE 24 covers up to 2 miles of permanent road construction for any purpose; and CE 3 covers special uses up to 20 acres, no longer limited to "minor" and "contiguous" impacts. Dkt. 63 at 3, 6-7; AR 091779-80. The final version of CE 25 also includes two additions that were not subject to prior public comment—namely, that the "primary purpose" of the project be "restoration," and that the project somehow involve a "collaborative" process. AR 091776. The administrative record contains no evidentiary basis (whether from past projects, "key experts," or "benchmarked" CEs) to show that these last-minute additions are relevant to avoiding significant effects. In fact, the Forest Service recognized internally that the

purpose of an action is a different question than whether its effects will be significant. AR 117921; *see also* AR 113167-69 (noting that in many "restoration" projects "harvest prescriptions . . . are ecologically counterproductive").

### Developments Subsequent to Finalization of the Rule[7]

The Rule went into effect immediately upon promulgation, AR 091768, and Conservation Groups promptly filed suit in this Court. Dkt. 1. At that time, the President had instructed the Department of Agriculture to use "all applicable categorical exclusions," and the Secretary of Agriculture, in turn, had instructed the Forest Service to undertake NEPA procedures only as "required by law and regulation." Dkt. 1-2 at 4, 7. The President's Executive Order remains on the books, and although the Secretary's Memorandum was rescinded, it was replaced by direction from the Chief of the Forest Service reiterating that local officials must use "the most responsibly expedient [NEPA] process available," specifically mentioning CE 25 as an example of one such process. Prater ¶ 55, Attch. 1.

Without the assurance that EAs would be prepared for the newly Covered Actions, Conservation Groups faced an immediate and ongoing hardship. When a project is vetted using an EA, the public has analysis and information to react to, time to validate that information, the right to comment and hear the agency's responses to those comments, and the right to file an administrative objection. Smith ¶ 14; Riddle ¶¶ 36, 38. In contrast, by the time the Forest Service proposes a project using a CE, the public has only a short amount of time (typically 30 days or less) to submit comments, and it must do so without the headstart of the EA's information and

---

[7] Even in an administrative record review case, post-filing developments are relevant to considerations of ripeness and mootness. *Wild Virginia v. CEQ*, 56 F.4th 281, 292-94 (4th Cir. 2022).

analysis. Kelly ¶ 35; Browning ¶ 25; Mahoney ¶ 17. This is difficult enough for small projects; it would be prohibitive for projects at the scale of the Covered Actions. Kelly ¶ 62; Riddle ¶ 40.

To make up for the loss of EAs and prepare to provide informed input on upcoming projects, Conservation Groups have turned to requests under the Freedom of Information Act ("FOIA"). In July 2020, before the Rule was even finalized, MountainTrue submitted a FOIA request seeking information regarding which projects would move forward under CEs in North Carolina. Kelly ¶ 48. In September of that same year, awaiting publication of the final Rule, counsel submitted a FOIA request on Conservation Groups' behalf for "silvicultural surveys" (internal agency work that precedes project proposals) to anticipate where projects might first arise. Prater ¶ 46. Later, in February 2022, Plaintiff Defenders of Wildlife requested records relating to the proposed or actual use of the challenged CEs. Prater ¶¶ 47-48. That last request was not answered voluntarily, necessitating litigation in this Court. Prater ¶ 50. Each of these requests has required substantial time to prepare, follow up and/or litigate, and review—time that has been diverted from Conservation Groups' other duties. Prater ¶¶ 51-52; Kelly ¶ 48.

Despite agency direction to use the new CEs when available, projects that Conservation Groups previously anticipated moving forward under the new CEs have instead moved forward under EAs or other inapt CEs, or they've been canceled. Prater ¶ 53; Kelly ¶ 47; *see also* Miller ¶ 40; Riddle ¶ 49. The FOIA records show why: The agency has placed a "hold" on the CEs, Prater Attach. 3 at 1, to "avoid anything the lawsuit may throw at us later." Prater Attach. 2 at 5. The agency was clear that it meant *this* lawsuit. Prater Attach. 3 at 1 (explaining that the "risk" the hold was intended to address was "tied to the litigation on the new NEPA regs actually making the categories unavailable"). Agency leaders were worried that a proposal under CE 25 in particular would "show[] up" in the lawsuit. Prater Attach. 2 at 25. While some local officials

15

have sought and received exemptions from the hold, Prater Attch. 2 at 15, the agency has refused

exemptions in the Southern Region because of "current litigation." Prater Attch. 2 at 42, 88. The

hold process continues to be used to screen out projects that might appear here as examples of

harm. *E.g.*, Prater Attch. 2 at 50 (mentioning a "no commercial element" limitation on use of CE

25), 56 ("if you do hear any grumbling as to why we're still doing [the hold] just whisper 'the

strategy seems to be working so far – we still have the CEs'").

 After the Rule was finalized, CEQ's regulations continued to evolve. In litigation

initiated in this Court, CEQ "ceased defending the merits" of its regulations and expressed

doubts about their lawfulness. *Wild Virginia v. CEQ*, 56 F.4th 281, 290-91 (4th Cir. 2022). CEQ

then restored the definition of "effects" to include cumulative effects in April 2022. 86 Fed. Reg.

23453 (Apr. 20, 2022). Soon after, Congress stepped in to codify the definition of categorical

exclusions as a category of actions that "normally does not significantly affect" the environment,

but without changing the then-applicable definition of "effects" or otherwise relieving agencies

of the obligation to consider cumulative effects. P.L. 118-5 § 321 (Jun. 3, 2023), codified at 42

U.S.C. § 4336e. Finally, in July 2023, CEQ incorporated the new statutory direction into its

regulations, explaining that categorical exclusions are "categories that do not normally have a

significant effect on the human environment, individually or in the aggregate." 88 Fed. Reg.

49924, 49969 (Jul. 31, 2023). Unlike CEQ, the Forest Service has made no effort to rescind the

CEs. Instead, the Forest Service has solidified the Rule, officially adding the CEs to its

Handbook. Forest Service Handbook 1909.15.30 (March 3, 2023), attached as Exhibit 5.

## **STANDARD OF REVIEW**

 Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In

reviewing agency action, the court "evaluat[es] the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Commerce v. New York*, 588 U.S. 752, 780 (2019). Agency actions must be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) [hereinafter "*State Farm*"].

## **ARGUMENT**

### I.    **Conservation Groups have standing to challenge the Forest Service's Rule.**

Conservation Groups have standing because the new CEs will cause harm in the places their members visit and care about, because the Rule deprives them of information to which they are entitled and rely on, and because they must now divert their own scarce resources to mitigate the Rule's harm to their core missions.

"In the environmental litigation context, the standing requirements are not onerous." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003). To establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Notably, "'procedural rights' are special."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992). Plaintiffs alleging a violation of procedural rights can file suit "without meeting all the normal standards for redressability and immediacy," so long as they can show a concrete injury traceable to the challenged conduct. *Id.*; *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Further, standing turns on the facts "at the time the complaint was filed." *Wild Virginia*, 56 F.4th at 293. Accordingly, the focus of the standing inquiry in this case is simply whether, at the time of filing, Conservation Groups had a "personal stake" in the controversy and that there was at least a "substantial risk" that the Rule would cause them cognizable harm. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). They have undoubtedly cleared that bar.

### A. Conservation Groups and their members will suffer aesthetic, recreational, and professional injuries due to the Rule.

Conservation Groups have standing because the new CEs will be used in the areas that their members visit and care about, causing harm to those members' aesthetic, recreational, economic, spiritual, and other interests. *See Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (recognizing an association's standing to bring suit on behalf of members who "would otherwise have standing to sue as individuals"); *Am. Canoe Ass'n*, 326 F.3d at 517-18 (recognizing standing based on members' "reasonable concerns" about impacts to their recreational, aesthetic, and economic interests).

Conservation Groups' members have a variety of concrete interests in the Southern Appalachian national forests. They hike, fish, hunt, forage, trail run, mountain bike, float, enjoy scenery, and observe nature in the portions of the Southern Appalachian national forests where their organizations operate. *E.g.*, Browning ¶ 16; Hayler ¶ 22; Kelly ¶ 47; Smith ¶ 2; Fisher ¶ 15. As this Court recently explained, however, environmental plaintiffs must show not only that they have concrete recreational or aesthetic interests; they must also show that the risk of harm to

those interests is imminent—*i.e.*, not requiring "guesswork." *Wild Virginia v. CEQ*, 544 F. Supp. 3d 620, 638-39 (W.D.Va. 2021). Specifically, plaintiffs must (1) show a specific interest in places they allege will be harmed (met in *Wild Virginia* by pointing to project proposals in places they had concrete interests) and (2) show how the challenged conduct will harm those interests. *Id.* This Court held that the *Wild Virginia* plaintiffs had shown where, but not how, they would be imminently harmed. *Id.*

Conservation Groups here have made both showings in spades. First, they have shown *where* they will be harmed. Both at the time this suit was filed, and still today, the imminent use of the new CEs threatens harm in specific places where Conservation Groups have concrete interests. For one thing, the CEs were (and still are) likely to be used in specific areas where members visit regularly and had (or have) specific future plans to visit. *E.g.*, Kelly ¶¶ 48, 41-45; Govus ¶¶ 26-27; Riddle ¶¶ 45-47. For example, a new CE 25 project is in the offing on the Blue Ridge District of the Chattahoochee National Forest, where Georgia ForestWatch member Jess Riddle regularly visits. Riddle ¶ 47. In addition, some of Conservation Groups' members will be harmed by the Covered Actions no matter where the CEs are used on their national forests. Wild Virginia member Andrew Young regularly flies over the George Washington National Forest in a private aircraft and is saddened by the sight of impacts from logging, roads, and special uses no matter where they appear. Young ¶¶ 5-9. Other members will visit project sites before and after logging to monitor impacts, regardless of where they are proposed. Kelly ¶ 33; Hayler ¶ 49. Still other members are affected by impacts to downstream water quality and will be harmed by logging and roadbuilding anywhere in their watersheds. *E.g.*, Govus ¶ 24.

In addition, Conservation Groups have shown precisely *how* the new CEs will harm them. Their members' interests are negatively affected by logging, roadbuilding, and special use

19

permitting. Young ¶ 16; Kelly ¶ 10; Hayler ¶ 30; Sligh ¶ 10; Prater ¶ 11; Govus ¶ 24; Riddle ¶ 75; Smith ¶¶ 8, 10. For example, Georgia Forest Watch member Jess Riddle is distressed to see forests degraded by logging, whether immediately after logging or decades later, when natural communities have still not fully recovered. Riddle ¶ 7. Other members are harmed by impacts to water quality or the scenic or ecological values they rely on professionally and economically. *E.g.*, Fisher ¶ 12 and Wofford ¶ 15 (drinking water); Browning ¶ 34 (scientific research interests) and Winslett ¶ 6 (professional interests). These harms will be more frequent and more serious when the Forest Service uses CEs instead of EAs, because the EA process is critical to avoid and minimize harm. *E.g.*, Mahoney ¶ 8; Young ¶ 12; Hayler ¶¶ 23, 27; Smith ¶ 15; Sligh ¶ 17; Kelly ¶¶ 25, 70, 76; Riddle ¶¶ 31, 34; Smith ¶ 14; Browning ¶ 19.

Finally, it requires no guesswork to conclude that the Forest Service will indeed use the new CEs in the Southern Appalachians: The Forest Service will continue proposing the Covered Actions as it has in the past, Dkt. 1 at ¶ 183; Dkt. 31 at ¶ 183, and virtually all timber projects in the Southern Appalachians have been under the threshold for the new CEs. AR 086740-43. Furthermore, when Conservation Groups filed suit, the Forest Service had been instructed to use CEs whenever available. Dkt. 1-2 at 4, 7. Accordingly, Conservation Groups have standing because their members use and enjoy Forest Service lands that would be affected by the establishment of a categorical exclusion and the resulting loss of the EA process. *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947, 952 (7th Cir. 2000).

The Forest Service's voluntary and temporary "hold" on the CEs does not change the analysis. Although projects that Conservation Groups thought would move forward under the new CEs have instead used other processes (or been canceled), Prater ¶ 53; Kelly ¶ 47, this is only because the Forest Service has restrained local officials from using the challenged CEs so

that Conservation Groups would not have examples of ongoing, on-the-ground harm in this litigation. Prater ¶¶ 54-55; Prater Attch. 2 at 42, 88 (blocking the use of the challenged CEs in the Southern Region because of "current litigation"); Prater Attch. 2 at 5. It its own words, the Forest Service did not want to see any examples of harm from the CEs "show[] up" in the lawsuit, Prater Attch. 2 at 25, because it knew there was a risk that this litigation could "mak[e] the categories unavailable," Prater Attch. 3 at 1; *see also* Prater Attch. 2 at 56 (preening that the agency's private strategy to insulate the CEs from challenge "seems to be working so far").

But for the Forest Service's voluntary hold, therefore, use of the new CEs remains imminent. The Forest Service continues to develop new projects that will fall below the eligibility thresholds for the new CEs. Riddle ¶¶ 45, 47; Kelly ¶¶ 41-44, 50; Govus ¶¶ 26-28; Murray ¶ 22. And the agency has recently reiterated its direction to local officials to use the most "expedient" NEPA process available, explicitly mentioning CE 25. Prater Attch. 1. If this lawsuit were to be resolved in the Forest Service's favor, the reason for the "hold" would evaporate, and the Forest Service would begin using the new CEs to authorize the Covered Actions in this region immediately. Prater ¶¶ 54-55; Kelly ¶ 49.

In summary, Conservation Groups have shown that their members' concrete interests in enjoyment of the Southern Appalachian national forests will imminently be harmed by the new CEs. Although the Forest Service is strategically waiting to use the CEs while this case is pending, that choice is nothing more than a contrivance to manipulate the Court's jurisdiction, and the Court should reject it. *Cf. City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000).

### B. Conservation Groups are directly injured by the deprivation of information to which they are entitled under NEPA.

Conservation Groups are also injured in their organizational capacities because the Rule deprives them of information to which they are entitled under NEPA and on which they rely to

further the purposes of NEPA. Informational injury is sufficient to confer standing when a

plaintiff "is denied access to information required to be disclosed by statute" and "suffers, by

being denied access to that information, the type of harm Congress sought to prevent by

requiring disclosure." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017)

(citation and quotations omitted). Plaintiffs must also be able to show, beyond speculation,

"which precise information" they will not receive. *Wild Virginia*, 56 F.4th at 300.

Such is the case here. NEPA "ensures that relevant information about a proposed project

will be made available to members of the public so that they may play a role in . . . the

decisionmaking process." *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002). And

Conservation Groups have availed themselves of that right by requesting notices and analyses for

projects in their respective geographies. *E.g.*, Riddle ¶ 23; Fisher ¶ 21; Miller ¶ 12; Wofford ¶ 8.

Conservation Groups have also shown "which precise information" they will be denied—

namely, EA analysis and responses to public comment, which help Conservation Groups develop

informed and persuasive comments and objections. *E.g.*, Riddle ¶¶ 43-44; Kelly ¶¶ 28-29, 56.

The Rule deprives Conservation Groups of this information by categorically exempting harmful

projects from the analysis and disclosure requirements applicable to an EA. Because

Conservation Groups have lost access to the information they need to identify blind spots and

inaccuracies in the Forest Service's thinking and thereby improve its decisions, *E.g.*, Riddle ¶ 36;

Kelly ¶ 35, the Rule causes the type of harm that Congress sought to prevent—namely,

"uninformed . . . agency action" that threatens environmental quality. *Hodges*, 300 F.3d at 438.

### C. Conservation Groups have suffered and will suffer financial injury by diverting scarce resources to mitigate the Rule's harms to their core missions.

Finally, Conservation Groups are injured because they must divert their limited financial

and personnel resources to mitigate harm caused by the Rule to their core missions. An

organization has standing in its own right where it challenges a decision that "directly impact[s]" its "core organizational mission[]" and is forced "to divert significantly more of [its] resources" to mitigate that impact. *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 396-97 (4th Cir. 2024) (internal quotes omitted). In *Republican Nat'l Comm.*, a plaintiff whose "core mission" was to organize lawful voters had standing to challenge a policy it claimed led to defects in the voter rolls, which it then spent its own resources trying to remedy. *Id.*

In the same way here, Conservation Groups' core missions are the protection of national forest lands and waters from harmful logging and development. Hayler ¶ 5; Fisher ¶¶ 5-6; Winslet ¶ 9; Murray ¶ 2; Kelly ¶¶ 5-6; Young ¶ 2; Mahoney ¶ 3; Prater ¶¶ 5, 8; Wofford ¶ 4; Riddle ¶ 5. For example, The Clinch Coalition's founding purpose, "to organize and weigh in on Forest Service management proposals that potentially threaten[] important resources" on the Jefferson National Forest, "remains the heart of [their] mission today." Fisher ¶ 4. The Rule directly impacts Conservation Groups' core missions by depriving them of valuable information and insight into the Forest Service's thinking and by taking away their primary means of persuading the agency to make beneficial changes to project proposals. *See, e.g.*, Kelly ¶¶ 27-31; Govus ¶ 20. For example, as Jess Riddle explains, the Forest Service's "responses to comments on an EA or through the objection process" create "valuable insight into the agency's thinking, [which enables Conservation Groups] to identify blind spots, scientific misunderstandings, and logical errors that [they] would otherwise not know about." Riddle ¶36.

As a result, Conservation Groups have been or will be forced to shift resources away from other work to submit FOIA requests, do their own field work, hire consultants, and/or participate in time-consuming collaborative processes to make up for the lost information and persuade the Forest Service to make project improvements. *See* Kelly ¶ 37, 63-65; Riddle ¶ 71-

72. For example, Ben Prater of Defenders of Wildlife has already spent significant time and resources submitting, litigating, and then reviewing documents from a FOIA request needed to understand where the new CEs were being used. Prater ¶ 52. As another example, Wally Smith of The Clinch Coalition anticipates the need to hire additional staff to respond to CE proposals, which will take funding away from other work. Smith ¶ 22. To be sure, a plaintiff cannot "manufacture" standing by expending resources in anticipation of a speculative harm, *Wild Virginia*, 56 F.4th at 300, but the loss of the EA process is concrete and certain. Because Conservation Groups must expend significant resources to mitigate that harm, the Rule frustrates their core missions. *See Republican Nat'l Comm.*, 120 F.4th at 396-97.

## II.    <u>Conservation Groups' claims are ripe.</u>

Conservation Groups' claims are ripe for review because they are purely legal challenges to a final agency rule and they do not depend on further factual development, and because the Rule is already causing Conservation Groups hardship.

Ripeness turns on the "fitness" of the issues for judicial review and "hardship" of withholding review. *Wild Virginia*, 56 F.4th at 294. "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.* (internal quotes omitted). Here, the challenged action, a fully consummated rulemaking, is clearly final and Conservation Groups' challenges based on the administrative record are purely legal, making them "presumptively reviewable." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005).

The controversy—whether the Rule was supported by the administrative record—is also concrete, not contingent on future uncertainties. In *Wild Virginia*, the Fourth Circuit found challenges to "floor-setting principles that will guide future analyses to be performed by other

agencies" too uncertain because harm was contingent on those other agencies' separate

decisions. 56 F.4th at 298. The court also noted, however, that "promulgation of a categorical

exclusion . . . *is a much more definitive action*" than the regulations at issue in that case. *Id.*

(emphasis added). *See also Heartwood*, 230 F.3d at 952-53 (holding that a facial challenge

Forest Service categorical exclusion was ripe). As the *Wild Virginia* court anticipated, the

controversy here has already taken definite shape and is not contingent on any third party's

actions. The Covered Actions are no longer subject to the EA process, and waiting for a specific

application of the CEs would have no benefit because "[a]ll of the facts necessary for judicial

review" are in the administrative record, which closed in November 2020. *See Home Builders*,

417 F.3d at 1282.

      Furthermore, although courts may sometimes defer review when plaintiffs can participate

in the refinement of a policy through future decisionmaking processes, *see Ohio Forestry Ass'n,*

*Inc. v. Sierra Club*, 523 U.S. 726, 735 (1998) (noting that the plaintiffs there could provide

comments on future site-specific environmental reviews), the Conservation Groups are

challenging the loopholes that *take away* their ability to participate in future decisionmaking

processes, both their ability to persuade during the EA process and their legal right to file an

administrative objection. *See, e.g.*, Kelly ¶¶ 29-31. Unlike the claim rejected as unripe in *Ohio*

*Forestry*, the Rule challenged here plainly takes away Conservation Groups' legal right "to

object to trees being cut." 523 U.S. at 733.

      Finally, the mere possibility that the Forest Service might "gratuitously" decline to use

the CEs for eligible projects does not defeat ripeness. *See Lansdowne on the Potomac*

*Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 199 (4th Cir. 2013). In

*Lansdowne*, the defendant argued that it "might yet decide in the future" to refrain from

exercising the right it was litigating to protect. *Id.* at 198-99. The Fourth Circuit held that the controversy was nonetheless ripe for two independent reasons: first, because the record showed the defendant "ha[d] no intention of giving . . . up" that right and, second, because the defendant's future exercise of discretion had no bearing on the "actual [legal] issue before the court." *Id.* at 199. So too here. Certainly the possibility that the Forest Service will elect not to use the CE for some future project has no bearing on the legal claims in this case, which turn exclusively on the facts in the administrative record. *See Home Builders*, 417 F.3d at 1282. Furthermore, the Forest Service has shown no interest in giving up the ability to use the CEs whenever it wishes. Its forbearance so far, by its own admission, is merely a contrivance to avoid vacatur in this litigation. Prater Attch. 2 at 56.

Conservation Groups are also facing hardship because of the Rule. To be sure, this prong "is largely irrelevant" and "cannot tip the balance against judicial review" once a court has "determined that an issue is clearly fit for review" in the APA context, *Cohen v. United States*, 650 F.3d 717, 735-36 (D.C. Cir. 2011) (citations omitted); *see also Susan B. Anthony List*, 573 U.S. at 167 (noting the federal courts' "virtually unflagging" obligation to hear cases within their jurisdiction, even in the face of prudential ripeness concerns regarding hardship). But the ongoing hardship to Conservation Groups provides even more reason that this Court should reach the merits. As in *Susan B. Anthony List*, Conservation Groups face a dilemma: They must choose between undertaking costly measures to protect their ability to influence projects (FOIA, field work, hiring consultants, and time-consuming collaboration) or accept that unnecessary harms will occur in the places they enjoy visiting. Fisher ¶¶ 34-35; Kelly ¶ 69; Riddle ¶ 76; Young ¶ 22. As Catherine Murray of Cherokee Forest Voices explains, such efforts "are a tremendous hardship for [her] small organization with a shoestring budget." Murray ¶ 25.

### III.    The Rule Lacks Evidentiary Support

#### A.  The Rule is a three-legged stool: If even one leg is defective, the Rule falls.

The Forest Service "based its conclusions—that the newly created CEs would not 'normally' cause significant impacts—on three evidentiary pillars: (1) experience with past projects; (2) professional judgment; and (3) benchmarking with other agencies' CEs." Dkt. 77-1 at 3. *See also* AR 093268, 093331. For the reasons discussed below, *none* of these three justifications provides sufficient support for the Rule. If even one pillar fails, however, the Rule must be vacated.

"When an agency relies on multiple grounds for its decision, some of which are invalid, [courts] may only sustain the decision where one is valid *and the agency would clearly have acted on that ground even if the other were unavailable*." *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 329-30 (D.C. Cir. 2006) (internal quotations and alterations omitted, emphasis added) (vacating agency order where one of two rationales was invalid and the agency had not "accord[ed] the two conclusions individual weight"); *see also Syracuse Peace Council v. FCC*, 867 F.2d 654, 657 (D.C. Cir. 1989) (upholding agency decision where one of two rationales was valid and was clearly an "independent basis"); *AES Sparrows Point LNG v. Wilson*, 589 F.3d 721, 730 (4th Cir. 2009) (following *Syracuse Peace Council* to uphold an agency decision adequately supported by an "independent ground"). Simply put, a court cannot be asked to "'guess at'" whether "the agency would have reached the same decision without relying on the unsupported reasons." *Zzyym v. Pompeo*, 958 F.3d 1014, 1034 (10th Cir. 2020) (*quoting SEC v. Chenery*, 332 U.S. 194, 197 (1947)).

Here, the Forest Service did not accord its evidentiary pillars individual weight or otherwise explain that it "would clearly have acted" to finalize the Rule without one or more of them. *Id.* Nor does the administrative record implicitly show that the bases for the Rule were

considered independently sufficient. Indeed, they could not have been. For example, the new CEs' acreage and mileage thresholds were derived from the Forest Service's review of past projects. *See* AR 093321-22. If that analysis was invalid, the agency has no non-arbitrary basis to choose any specific numerical threshold.

Rather than showing that its rationales were independent grounds for the decision, the agency explicitly stated the opposite—that its justification is based on the "combination" of its three pillars. AR 093268. In short, the Forest Service has built a three-legged stool. If even one of those legs cannot bear the Rule's weight, then it falls.

**B.  The Forest Service's analysis of past projects does not support the CEs.**

The Forest Service's primary source of evidence—its analysis of past projects—does not support a conclusion that the Covered Actions will not have significant impacts. During the rulemaking process, Conservation Groups pointed out several fundamental problems with this analysis, but the agency did not correct them, even though its own experts agreed with Conservation Groups' critiques.

The conceit of the Forest Service's analysis is that past examples of the Covered Actions have not had significant impacts, and that the categories themselves will therefore not have significant impacts. *See* AR 093268. However, the agency's retrospective analysis is cherry picked to exclude past examples of the Covered Actions that *did* have significant effects. Even for the biased sample, moreover, the Forest Service lacked evidence to validate its predictions of no significant impact, particularly in the Southern Appalachians. Finally, the Forest Service failed to recognize that it was jettisoning the very process that was responsible for avoiding significant impacts in its past projects. For these reasons, the Forest Service either ignored important aspects of the problem or drew conclusions contrary to the evidence before it in violation of *State Farm*. *See* 463 U.S. at 43.

> i.    *The Forest Service ignored evidence showing that projects below the thresholds for the Covered Actions can and do have significant effects.*

The agency argues that it "did not encounter any significant impacts" when looking at its past projects. AR 091661. But that is because it *did not look for any*. Its sample deliberately excluded similarly sized projects that *have* had significant impacts or projects that were abandoned because they would have had significant impacts.

The Forest Service was obligated to consider past projects with significant impacts and "identify what specific characteristics of those projects made those effects significant" so that those characteristics could be excluded from the category. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1032 (9th Cir. 2007). During the comment period, Conservation Groups provided several examples of Covered Actions that have had (or, if not abandoned, would have had) significant effects. AR 086792-93 (EIS needed for less than one mile of road construction), 086627 (small timber project abandoned because of significant impacts identified by the public), 029598 (same), 086651 (describing two timber projects that, despite a finding of no significant impact, did in fact have significant and unlawful impacts to soil and water), 029596 (describing significant cumulative effects on two unroaded areas caused by a series of small projects). The Forest Service was aware of other examples, too. *See* AR 107149 (showing 3 projects below 2,000 acres needed an EIS).

Nowhere did the Forest Service attempt to explain why past significant impacts associated with the Covered Actions were not relevant to identifying thresholds for the CEs. Internally, however, the agency's experts knew that the Rule was based on a "bias in our sample of projects." AR 112680. Specifically, the sample of projects was drawn from only "successful EAs"—i.e., projects that were predicted to have no significant impacts. *Id.*; *see also* AR 091519,

091529, 091539. The reviewer offered an analogy: "[W]ill a person be able run a marathon

without significant impacts? Let's test a group of people who have already run marathons." *Id.*

In summary, the Forest Service knowingly excluded evidence that ran counter to its

conclusions and thereby "failed to consider an important aspect of the problem." *State Farm*, 463

U.S. at 43 (1983). The "problem" that the Forest Service was purportedly trying to solve was the

identification of acreage or mileage thresholds below which logging projects, new roads, or

special uses will not have significant impacts—in the reviewer's words, "how big is too big"?

AR 112680. Because it failed to look at projects below its thresholds that did have significant

impacts, the Forest Service could not rationally answer that question.

> ii.     *The Forest Service lacked evidence that its past projects have not caused significant effects in the Southern Appalachians.*

In addition to ignoring counterexamples, the Forest Service's review of past projects did

not provide affirmative evidence that the Covered Actions will not result in significant effects,

particularly in the Southern Appalachians. The agency's analysis is undermined by several

related and compounding errors, including a failure to account for unique geographical contexts,

a failure to validate the absence of past significant effects, and a lack of factual support relevant

to each of the separate actions that would be covered by its broad "kitchen sink" CEs.

First, geography. To conclude that an action categorically will not have significant

impacts, the prediction must hold everywhere the CE will be used. *See Bosworth*, 510 F.3d at

1027 (holding that the Forest Service must "consider adequately the unique characteristics of the

applicable geographic areas"). And, when asking "how big is too big," the answer is much lower

in the Southern Appalachians. Take CE 25 for example. The Forest Service based the acreage

threshold for this category based on a sample of 68 projects from across the country. AR

091592-99. That sample had a median of 2,813 acres of timber harvest, AR 093321, and the

30

agency set the threshold at a round 2,800 acres. A 2,800-acre project, however, is massive by Southern Appalachian standards. Because the ecological and social complexity of the Southern Appalachians makes it difficult to approve large projects without significant effects, comparable projects here have a median timber harvest of only 535 acres, less than 1/5 the size of projects in the national sample. AR 086619, 086743.

Notably, not one of the 68 projects sampled in connection with CE 25 is located in the Southern Appalachians. See Exhibit 3, Table 1. Internally, the Forest Service's experts recognized that this was a serious problem, opining that "no consideration was given for stratifying the sample to ensure representative projects across the nation," and that the comparatively small size of Southern Appalachian projects was relevant to understanding "what truly had no significant impacts." AR 112680. Yet the Forest Service did not explain why its 2,800-acre threshold could be expected to prevent significant effects in the Southern Appalachians, where projects run much smaller.

Second, validation. Under the applicable CEQ guidance, which the Forest Service adopted as authoritative, AR 091480,[8] information about past projects can provide support for a proposed CE only to the extent that it "*validates* the environmental effects (or lack thereof) predicted in the EA." AR 097519 (emphasis added); *see also* AR 029964 (acknowledging the need to document "observed" effects), 113536 (cautioning that unvalidated projects "should *not* be relied on"). The Forest Service had very little validating information. Only 19 survey responses were returned for projects considered relevant to CE 25, only 14 responses for CE 24, and only 10 responses for CE 3. *See* Exhibits 1-3. As the Forest Service's internal experts

---

[8] Although this document adopting the CEQ guidance is marked as a deliberative draft, the Forest Service represents in this litigation that it was a final agency determination. Dkt. 58 at 18.

recognized, this data was "not robust" and "is likely not substantial enough to be significant." AR 112680; *see also* AR 113589 (criticizing the sample size as "tiny").

Moreover, many of the survey responses do not provide validating information because the projects were not implemented or monitored, or because the answers are ambiguous. To begin with, the survey required a "yes" or "no" answer to the key question of whether the project had excessive effects, but it did not provide an option for "unknown." *See* AR 094577 (answering "no" but explaining separately that the respondent was "unable to assess" because of a lack of monitoring), 094676 (answering "yes" but explaining separately that "[w]e don't know because there has not been adequate monitoring"). As a result, unless a survey response otherwise shows that the relevant portion of the project was implemented and monitored for its effects, the survey provides no useful data. *See* AR 106586 (noting that the survey needed "follow-up" because of this ambiguity). And, in fact, many projects had not been implemented at all,[9] had not been implemented fully,[10] or were ambiguous as to how much of the project had been implemented.[11] Other projects did not have monitoring results for the activity relevant to the CE under consideration,[12] and still more projects were observed during implementation but lacked validation of their effects.[13] In total, across all three CEs, only four projects—2.6% of all sampled projects, which were themselves a fraction of a much bigger pool of relevant projects—

---

[9] Exhibit 3, Rows 3, 32, & 40; Exhibit 1, Row 7.
[10] Exhibit 3, Rows 8, 16, 23, 24, 48, & 57; Exhibit 2, Row 9; Exhibit 1, Row 8.
[11] Exhibit 3, Rows 1, 4, 13, 29, 30, 34, 41, 51, 54, & 60; Exhibit 2, Rows 1, 5, & 7, and 13; Exhibit 1, Rows 5 & 6 (all answering "yes" that the project was implemented partially *or* completely but not providing information to determine how much or what portion).
[12] Exhibit 2, Rows 3 & 9 (describing, for projects relied on for the roads CE, only monitoring relating to timber harvest).
[13] Exhibit 3, Rows 29 & 30 (describing monitoring of whether projects were implemented according to the decision, not for their effects); Exhibit 3, Row 51 (unable to confirm that any effectiveness monitoring occurred); Exhibit 2, Row 4 (effectiveness monitoring not completed).

were fully implemented and supported by unambiguous information about whether the effects of special uses, road construction, or commercial logging had been excessive. *See* Exhibit 1, Rows 1, 4, & 9; Exhibit 2, Row 12. An equal number of projects had effects beyond what had been predicted. Exhibit 3, Row 1; Exhibit 2, Rows 6, 7, & 10. To state the obvious, this "tiny" and equivocal sample does not show a lack of significant effects in all the different contexts in which the CEs will be used. Because the evidence validating predicted effects is "not substantial," AR 112680, it simply cannot support a conclusion that the challenged CEs will not have significant effects no matter where or how they are used.

Third, "kitchen sink" categories. It was the Forest Service's responsibility to "clearly define the eligible category of actions" for its CEs. AR 097517. The Forest Service did not limit each CE to a discrete category of actions, but instead lumped together many dissimilar types of actions. For example, CE 25 covers activities as different as culvert replacement, "pruning," and commercial logging. AR 091780. Within each CE, these disparate types of actions carry very different risks, and the Forest Service did not meet the burden to show that none of them would lead to significant effects. *See* AR 107287 ("I wonder if we are trying to put too many subcategories into this proposed CE."). Similarly, for CE 24, the Forest Service's record contains no evidence to show that the lack of significant impacts for bridge replacement is relevant to understand the impacts of new road construction in a previously unroaded area.

CE 3 provides perhaps the clearest illustration. The administrative record shows that the Forest Service's special use program includes "more than 74,000 authorizations for *over 180 types of uses*." AR 093422 (emphasis added). These uses cover a range of impacts, from innocuous authorizations for outfitting or guiding services to others with long-term physical impacts, like construction of utility rights of way. *See* AR 093427. Indeed, instead of clearly

defining a single category of action, CE 3 covers a type of *authorization* for an indefinite number

of actions. *See* 36 C.F.R. § 251.50 (requiring a "special use authorization" for "all uses" other

than a few enumerated carve-outs). As a result, CE 3 would exclude from future NEPA analysis

types of uses that do not even exist yet. The agency's sample of 62 past special use approvals,

and even less so its 10 projects with survey responses, could not begin to provide support for a

conclusion that more than 180 existing types of uses and more unknown future uses will

categorically lack significant effects no matter where they occur. *See* AR 093286 (showing that

only 12 categories of actions were included in the 62-project sample).

These analytical errors—poor geographic representation, lack of validation, and "kitchen

sink" categories—stack up. Again, not one of the 68 projects sampled in connection with CE 25

is located in the Southern Appalachians. *See* Exhibit 3, Table 1. Similarly, of the 53 projects

sampled in connection with CE 24, two are located in the Southern Appalachians, but neither

received a survey response to validate the absence of significant effects. *See* Exhibit 2, Table 1.

And of the 62 projects sampled in connection with CE 3, five are located in the Southern

Appalachians, but none has a survey response. *See* Exhibit 1, Table 1.

Even zooming out to the much larger Southern Region, which the Forest Service

internally considered relevant to Conservation Groups' critiques, *see* AR 112929-31, the agency

comes up short. Fourteen projects associated with CE 25 are in the Southern Region, but only

three of them (1) include commercial logging, (2) have a questionnaire or other monitoring

information, and (3) had been at least partially implemented at the time monitoring information

was provided. Exhibit 3, Table 2 Rows 23, 29, & 54. Similarly, 18 projects associated with CE

24 are in the Southern Region, but only 3 have survey responses, and two of those included no

road construction. Exhibit 2, Table 2 at Rows 10, 13, & 14. Finally, 10 projects associated with

CE 3 are in the Southern Region, but only one has a survey response, and that project did in fact have serious and unexpected adverse effects. Exhibit 1, Table 2 at Row 34.

Even more than the Forest Service's internal reviewers realized, the evidence on which the Rule was built is "not robust." AR 112680. The agency needed much more support for CEs like these, which cover a host of different actions and apply nationwide across different ecological contexts. On the other side of the ledger, furthermore, was evidence that comparable projects *have* caused significant harm in the past, including in the Southern Appalachians. *See* Section III.B.i, *supra*. Accordingly, the record simply cannot support a conclusion that the Covered Actions *categorically* lack significant effects. In light of the evidence before the agency, such a conclusion is so implausible that it cannot be chalked up to agency expertise. *See State Farm*, 463 U.S. at 43.

> iii. *The Forest Service ignored the benefits of the EA process that its CEs would bypass.*

Finally, even if the review of past projects had been robust enough to show that the Covered Actions had not caused significant effects in the past, the Forest Service nevertheless failed to recognize that the Rule was jettisoning the very process that was responsible for avoiding such impacts in the first place.

An agency eliminating environmental review based on the assumption that "adverse effects are rare" must first "consider[] . . . how that rarity depends on the very review it [would] eliminate[]." *United Keetoowah Band of Cherokee Indians v. FCC*, 933 F.3d 728, 744 (D.C. Cir. 2019). The record here definitively shows that the EA process is responsible for significant improvements to the Covered Actions. The EA process is, of course, *designed* to avoid adverse effects. *See* Dkt. 63 at 3 (explaining how site-specific analysis and consideration of alternatives during the EA process results in project changes or mitigation); 36 C.F.R. § 220.4(b)(2)(iii)

(providing direction to memorialize such changes). And the record is replete with examples of actions within the scope of the new CEs that would have caused significant adverse impacts but for improvements made during the NEPA process. AR 029596-98 (describing projects in which old-growth forests, unroaded areas, and other unique values were spared because of the EA process); *see also* AR 010134-35, 017994-95, 011391, 005668, 005533, 005517, 004218, 023744 (all describing substantial changes based on EA analysis and public input). In the Southern Appalachians, these changes to individual projects add up to about 14% of proposed logging being dropped from project decisions. AR 086656-57. A similar pattern holds nationwide, where about17% of acres proposed for logging are dropped during the EA process. AR 086636. Indeed, the Forest Service's own experts agreed that the loss of the EA process would preclude "critical" project improvements. AR 107535-36.

The Forest Service offers no basis to conclude that similar improvements will occur in the future without the EA process. While the Forest Service asserts that mitigation measures will continue to be adopted as part of routine project development, AR 093269, 093272, the mitigation measures needed to avoid significant impacts "are not part of the CE requirements," AR 113540, and the agency simply "could decline to implement" them. AR 113590. *See Bosworth*, 510 F.3d at 1029 (holding new CEs invalid where potential mitigation measures were listed but not required); AR 097519 (explaining that, when relying on past projects to substantiate a CE, "any mitigation measures developed during the EA process" must be included as "integral component[s]" of the new CE). More fundamentally, the Forest Service will not know what mitigation measures are needed unless it completes the EA process. Indeed, one of the examples chosen by the Forest Service perfectly illustrates why the EA process is indispensable. The Laurel Creek Property Owners Association Access project, relied on in

36

support of CE 3, AR 091564, was actually proposed twice. The first iteration of the project was reversed during an administrative appeal because of a failure to consider alternatives as required for an EA. AR 023416, 086599. When those alternatives were duly considered in the second iteration, the project was updated to include critical stream protection requirements. *Id.* In other words, necessary mitigation was not applied to the project until the Forest Service complied with the procedural requirements for an EA. This example shows that a promise of continued mitigation is hollow without the EA process that makes it possible.

The record unambiguously shows that the EA process "forestall[s] adverse effects that otherwise would have occurred." *See United Keetoowah Band*, 933 F.3d at 744. Yet despite the overwhelming evidence showing that the EA process is responsible for avoiding significant harm, the Forest Service did not address the issue. It remains a glaring and important aspect of the problem that the Forest Service has entirely ignored. *See State Farm*, 463 U.S. at 43.

In summary, the Forest Service's analysis of past projects cannot support the conclusion that the Covered Actions categorically will not have significant effects. This leg of the stool fails.

### C.  The input of the agency's "key experts" and CEQ does not support the rule.

The second leg of the stool is input from experts within the Forest Service and CEQ. Dkt. 77-1 at 3. This input, explicitly relied on to support the Rule, was withheld from the administrative record for over three years and was only recently added to the record in full. Dkt. 101; Dkt. 106; Dkt. 118; Dkt. 128. Yet in the 454 documents comprising that input, Conservation Groups have found no opinion offered by the experts or CEQ that the new CEs would not have significant effects. Instead, most of the named experts do not provide any substantive input whatsoever. For example, Brenda Christensen, Doug Wise, Steve Schnetzler, Veronica Mitchell, and David Payne are only in the record as recipients to emails or when listed in appendices. Others, like Steve Kuennen, John Exline, and James Menakis, give comment in the record only

once, simply to list their credentials for the supporting statement's appendices. AR 096868,
096870, 096872; *see also* AR 108462-63, 108598-99 (seeking staff to add their names and
credentials even if they had not provided feedback). A few staff members offered input on
actions that they *wanted* to be covered by the new CEs, but without explaining why those actions
do not have significant effects. *E.g.* AR 105998, 109810.

Substantive expert input is largely missing because the agency failed to ask for it. Prior to
publishing the proposed rule, the Forest Service considered seeking structured input from its
experts on the likely effects of the new CEs. AR 107219-20 (blank template for expert opinion);
107406 (discussing the possibility of questions for subject matter experts to learn about "effects
of proposed activities"). However, the Forest Service did not follow through by circulating these
questions to its experts.

Where there is substantive input, it shows that the agency's experts had serious concerns
about the CEs. One staff member opined that "these CEs will get challenged on best science
pretty easily." AR 106592. Another criticized trying to include "too many subcategories" and
emphasized the need for limits based on evidence. AR 107287-107288. Still others reported that
staff were "skeptical," AR 107374, and "question whether the record can show this broad
category of activities has no significant effect," AR 107535-56. Engineering staff were
concerned the cumulative impact of roadbuilding given the agency's "history of not taking care
of the roads we have." AR 107535-36. Other staff made unheeded suggestions for language to
limit the CEs to activities with a "proven track record" of protecting environmental resources.
AR 112528; *see also* AR 109400 (emphatically recommending retention of the "minor"
limitation for CE 3). As noted above, staff also worried that "critical parts of quality design"

would not occur during the CE process. AR 107535-36. And others worried that the rule was moving forward without safeguards to prevent cumulative impacts. AR 116044-47, 113198.

Only one expert—who, notably, was not named as one of the "key experts" whose input the agency relied on—directly tackled the question at the heart of this rulemaking: "Do the activities listed in the proposed CE cause significant or highly uncertain impacts as defined in NEPA?" AR 112689. Her answer: "likely *it depends* and that is when you get to significant impacts." *Id.* (emphasis added). In other words, the only expert to address the question could not say that the Covered Actions are *categorically* nonsignificant.

The input from CEQ was no more supportive. CEQ's experts did not offer opinions that the CEs would not have significant effects. Indeed, CEQ seemed to have some of the same concerns as the public and as the Forest Service's internal experts. For example, CEQ pressed the Forest Service (with no apparent response) regarding its biased sample of past projects, asking whether projects "without a FONSI"—i.e., projects that were predicted to have significant effects—might "provide[] other evidence that certain CEs are not justified?" AR 116296. CEQ also echoed others' concerns that the CEs' effects might differ by geography, suggesting that new road construction might have greater impacts "based on [the] size and character of particular forests." AR 116871.

In summary, the Forest Service claimed it was relying on input from its key experts and CEQ substantiating that the CEs would not have significant effects. That evidence does not exist. In the circumstances, it is difficult to see the Forest Service's asserted reliance on expert input as anything other than pretext for a decision the agency had already made. *See Dep't of Com. v. New York*, 588 U.S. 752, 783-784 (2019) (vacating and remanding where the "significant mismatch" between the agency's stated reasons and the evidence showed that its rationale

"seems to have been contrived"). At the very least, the agency has failed to draw a rational

connection between the evidence and its conclusions. *See Burlington Truck Lines v. United

States,* 371 U.S. 156, 168 (1962); *Defenders of Wildlife v. United States Dep't of the Interior*,

931 F.3d 339, 349-52 (4th Cir. 2019) (vacating where the agency's rosy conclusion was

underlain by an absence of information and a "wild guess").

### D. Benchmarking

The third and final evidentiary pillar—"benchmarking" to other agencies' CEs—also

fails to support the Forest Service's conclusions. To use "benchmarking" as a source of support

for a proposed CE, "an agency must demonstrate that the benchmarked actions are comparable to

the actions in the proposed categorical exclusion" in terms of the "characteristics of the actions,"

the "methods of implementing the actions," and "context, including the environmental settings in

which the actions take place," along with several other criteria. AR 097521 (CEQ's criteria); *see

also* AR 093268 (adopting CEQ's criteria).

The Forest Service attempts to benchmark CE 25 to those of several other agencies, but

most have nothing to do with timber harvest, instead covering actions like mending fences,

planting trees, and prescribed burning. AR 093327-29. Only three CEs created by another agency

relate to tree cutting, and the Forest Service fails to show that they are in any way comparable.

The first two relate to Bureau of Land Management ("BLM") CEs authorizing harvest of

"individual trees or small groups of trees" without road construction and "[p]re-commercial

thinning and brush control using small mechanical devices." AR 093327. The Forest Service

makes no showing that the "characteristics" of cutting individual trees or small groups are the

same as commercial logging on 2,800 acres (over four square miles). Likewise, it cannot show

that the "methods" of using small mechanical devices for noncommercial thinning and brush

control are comparable to the use of heavy equipment in a commercial logging project. The third

40

is a Bureau of Indian Affairs CE covering "stand improvement" projects up to 2,000 acres, but the Forest Service makes no effort to show that such activities are comparable to commercial timber production. Indeed, if the Forest Service's new CE were limited to "stand improvement," there would be no need for the new CE, because that category of action is already authorized by a different Forest Service CE. 36 C.F.R. § 220.6(e)(6) (allowing stand improvement with no acreage limitation).

Finally, the Forest Service points to two additional CEs created by statute. AR 093329-31 (citing 16 U.S.C. §§ 6591a, 6591b, and 6591d). These authorities allow timber harvest, including commercial harvest, on up to 3,000 acres for the purpose of addressing the risks of wildfire, pests, and pathogens. For these categories, Congress declared as a matter of law, not fact, that covered projects could be "considered" excluded from NEPA analysis. To use benchmarking, however, an agency must be able to rely on the other agency's administrative record to substantiate the absence of significant effects. AR 097521. These CEs have no administrative record and therefore do not provide any relevant evidence. They are also much more limited, both geographically and otherwise, than CE 25. AR 093329 (acknowledging that CE 25 "differs from the [statutory] CEs in that it allows for a broader scope of restoration activities" and "is not limited to the areas designated by statute"). The Forest Service's new CE 25 goes far beyond any of the categories to which it is benchmarked, and it therefore fails the comparability test.

Similarly, the Forest Service has identified no other agencies' CEs that allow actions comparable in context and effect to road construction under CE 24. Most of the CEs identified by the Forest Service don't cover new road construction at all. Two agencies—the Farm Service Agency and the Department of Energy—do have CEs allowing for road construction or "short access roads." AR 093317, 093320. Yet the Forest Service makes no showing that the effects of

road construction in an agricultural setting or appurtenant to energy infrastructure are remotely comparable to the effects of breaking new ground in an unroaded portion of the national forests, as would be allowed under CE 24.

Finally, for CE 3, the Forest Service leans on the Tennessee Valley Authority's CE allowing construction of new transmission rights-of-way. AR 093289. Yet the existence of this CE does not show that rights-of-way across national forests won't need an EA. Indeed, to cross national forest lands, the TVA must first obtain a special use permit from the Forest Service which, until now, would have required an EA for impacts exceeding 5 acres. *See* 36 C.F.R. § 251.50(a). The Forest Service's attempt to rely on TVA's CE is therefore circular—it begs the question of whether additional analysis for larger projects is needed to protect national forest resources. And even if TVA's CE provides some narrow support for an absence of significant harm caused by transmission rights-of-way, it cannot bear the weight of the 180-plus other kinds of special uses covered by the CE.

The Forest Service also points to two other agencies' CEs with superficial similarities to CE 3, but each of them is limited to very minor or short-term uses. For example, the BLM limits its approvals to "short-term (3 years or less)" and requires the land to be returned to its original condition following the use. AR 093289. The National Park Service CE covers approvals for activities like concerts or craft shows "entailing only short-term or readily mitigatable environmental disturbance." *Id.* These CEs are therefore different in kind from the Forest Service's new open-ended authority to approve long-term, non-minor uses.

In summary, the Forest Service's CEs cover actions much more likely to cause significant effects than those to which they are purportedly benchmarked. This leg of the stool, too, fails.

**IV.    The Rule and the CEQ regulation under which it was finalized are _ultra vires_ because they allow actions with significant effects to bypass NEPA's procedural requirements.**

Because the Rule allows actions with significant effects to bypass NEPA's procedural requirements, the Rule violates NEPA and must be vacated under the APA. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency action is arbitrary and capricious if the agency cannot demonstrate its "new policy is permissible under the statute"). For the same reason, the weakened CEQ regulation under which the Rule was finalized also violated the statute.

Under NEPA "*every . . .* major Federal action[] significantly affecting the quality of the human environment" requires an EIS. 42 U.S.C. § 4332(2)(C) (emphasis added). CEs provide a categorical bypass to NEPA's analytical requirements. Thus, to comply with the statute, CEs have always been limited to actions with "insignificant or minor" effects. *Bosworth*, 510 F.3d at 1027 (*quoting Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir.1999)). *See also* Dkt. 63 at 3 (noting that CEs are intended to cover "small, insignificant, and routine actions that categorically do not have significant impacts no matter where they occur"). Accordingly, for decades CEQ regulations defined a CE as "a category of actions which do not individually or cumulatively have a significant effect." 40 C.F.R. § 1508.4 (1978). In its 2020 regulations, however, CEQ redefined CEs as "categories of actions that *normally* do not have a significant effect on the human environment," deleting the "individually or cumulatively" limitation. NEPA_00000186 (emphasis added); 40 C.F.R. § 1501.4(a) (2020). In doing so, CEQ fundamentally weakened the threshold for CEs to allow the categorical exclusion of actions that normally do not—but sometimes or in the aggregate do—have significant impacts.

To be sure, the word "normally" has always been a part of the definition for CEs—but as an additional safety net to preclude use of CEs where "extraordinary circumstances" would cause

an otherwise insignificant action to have a significant impact. 40 C.F.R. § 1508.4 (1978); 89 Fed.

Reg. 35442, 35537 (May 1, 2024). In other words, until 2020 a CE was defined as a category of

actions that did not "individually or cumulatively" have significant effects *and* was subject to

disqualification if "extraordinary circumstances" were present. Under the 2020 definition,

however, the word "normally" took on very different role: Categories of action that individually

or cumulatively have significant effects could nevertheless qualify for a CE if it could be shown

that they would "normally" lack significant effects. This change was reinforced by CEQ's

abolition of the concept of cumulative impacts throughout its regulations. NEPA_0000186-187;

*see also Wild Virginia*, 56 F.4th at 289.

The Forest Service understood the importance of this dramatic change. When CEQ's

rules became effective on September 14, 2020, NEPA_00000179, the Forest Service

immediately scrubbed the "individually or cumulatively" threshold from its drafts. *Compare* AR

114316 (May 13, 2020 draft) *with* AR 114431 (Sep. 18, 2020 draft).

The Forest Service relied on the weakened CEQ threshold to establish new CEs that

could not have satisfied the old requirements. First, the Forest Service developed CEs it knew

would have significant *cumulative* effects. Early reviewers asked that the CEs be developed with

limits to "assure no cum[ulative] effects would occur" in accordance with the old CEQ

regulations. AR 108095-96. And early versions of the CEs did include such limits. For example,

drafts of CE 25 limited the number of acres that could be affected in a given area or during a

given period of time. AR 107211. Drafts of CE 24 similarly included a "no net increase"

requirement for road construction, which would have required "an equal or greater number of

road miles [be] proposed for decommissioning" as proposed new "miles of permanent road." AR

107211, 107582. In the same vein, internal agency experts assumed that CE 25 would include

restrictions on removal of large trees, which store significant amounts of carbon, to limit the potential cumulative impact to carbon stocks. AR 115949 (bottom row). Ultimately, however, the Forest Service rejected these limitations, declined to adopt other strategies to avoid cumulative effects, *see* AR 113206, and simply relied on the new and weakened CEQ threshold. 85 Fed. Reg. 73620, 73,629 (Nov. 19, 2020). As noted above, staff were concerned about the CEs' cumulative impacts. *E.g.*, AR 116044 ("Our records may be inadequate to support the conclusion that these activities do not have any further cumulative effects."), 113532 (noting "dubious approach" of neglecting cumulative impacts). Staff continued to propose changes to address cumulative effects up until the last minute, but the Forest Service did not act on their concerns. AR 113206.

Second, the Forest Service developed CEs for actions that it knew would *individually* have significant effects, at least sometimes. As explained above, the Forest Service's sample of past projects ignored examples of the Covered Actions that did have significant effects. *See* Section III.B.i, *supra*. Accordingly, the record showed *at least* that the Covered Actions "sometimes" have significant effects. As noted above, moreover, the sole agency expert to directly answer the question whether the proposed CEs would "cause significant or highly uncertain impacts" answered, "likely *it depends* and that is when you get to significant impacts." AR 112689 (emphasis added).

"It depends" on a host of site-specific factors that Conservation Groups raised in their comments, such as whether old-growth forests are present in a logging project or whether a new road is located in a hitherto unroaded area. AR 086622-24. According to Forest Service researchers, it also depends on whether the project is "[p]oorly planned," AR 115944, because in many "restoration" projects "harvest prescriptions . . . are ecologically counterproductive," AR

113169, or whether "too much area" is harvested," AR 113167. More generally, it simply

depends on "highly local" ecological conditions and the details of the planned harvest. *Id.; see*

*also* AR 115959 (citing a "gold standard" study and reporting that CE 25 could "move forests . .

. away from old-growth conditions [and] cause reductions in species diversity").

"Every" means "every." 42 U.S.C. § 4332(2)(C); *Loper Bright Enterprises v. Raimondo*,

144 S.Ct. 2244, 2266 (2024) ("In the business of statutory interpretation, if it is not the best, it is

not permissible."). Because the Forest Service created CEs it knew would sometimes or

cumulatively have significant effects, the Rule is not permissible under NEPA and must be

vacated. *See FCC*, 556 U.S. at 515. Likewise, section 1501.4(a) of CEQ's 2020 regulations,

which purported to allow the Forest Service to establish these categories, must be declared as

beyond CEQ's statutory authority.[14]

### V.  CEs cannot be used for the covered actions because they involve unresolved conflicts concerning alternative uses of available resources, mandating further NEPA analysis

In much the same way, the Forest Service's Rule is *ultra vires* because the Covered

Actions involve "unresolved conflicts." *See* 42 U.S.C. § 4332(E) (1975).[15] Federal agencies must

"study, develop, and describe appropriate alternatives" whenever a project involves "unresolved

---

[14] Conservation Groups seek only declaratory, not injunctive, relief with their as-applied challenge to CEQ's 2020 regulations. In 2024, CEQ restored the definition of CEs as "categories of actions that normally do not have a significant effect on the human environment, *individually or in the aggregate*." 89 Fed. Reg. at 35469-70 (emphasis added). Declaratory relief remains appropriate, however, because the 2020 CEQ regulations may yet spring back into effect. A coalition of twenty states is currently seeking vacatur of CEQ's 2024 rule and reinstatement of the 2020 regulations. *See Iowa v. Council on Env't Quality*, No. 1:24-CV-089, 2024 WL 3595252 (D.N.D. July 31, 2024). Because there is a possibility of reinstatement, Defendants cannot show "'that the challenged conduct cannot reasonably be expected to start up again.'" *See Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 622-623 (D.C. Cir. 2022) (quoting *Laidlaw*, 528 U.S. at 189).

[15] This section was originally codified at 42 U.S.C. § 4332(D) (1970). In 1975, it was moved to § 4332(E), then in 2023 it was moved again to § 4332(H). It was located at § 4332(E) when the Rule was adopted in 2020.

conflicts concerning alternative uses of available resources," "whether or not a project's impacts

are deemed significant," *State of N.C. v. Hudson*, 665 F. Supp. 428, 445-46 (E.D.N.C. 1987); *see*

*also Envt'l Defense Fund v. Corps of Engineers*, 492 F.2d 1123, 1135 (4th Cir. 1974) (explaining

that this requirement is "supplemental to and more extensive in its commands than" the EIS

requirement); *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 742 (2d Cir. 1983); Dkt.

63 at 3. An unresolved conflict exists when "the objective of a major federal project can be

achieved in one of two or more ways that will have differing impacts on the environment."

*Trinity Episcopal School Corporation v. Romney*, 523 F.2d 88, 93 (2d Cir. 1975).

  The Covered Actions are the quintessential examples of actions involving unresolved

conflicts. The Forest Service uses a two-stage decisionmaking process, setting broad direction in

a long-range management plan and deferring the choice of where to log, build roads, and permit

special uses. *See generally* AR 086750-58 (excerpting forest plan language). When the Forest

Service decides where to log or build a road, for example, it is making a site-specific choice

between location alternatives, and these kinds of choices are explicitly deferred to site-specific

NEPA analysis. For example, the Chattahoochee National Forest planning documents provide

that "[l]and management activities . . . are conducted only after appropriate site-specific NEPA

analysis." AR 086755. They further explain that site-specific analysis is necessary to "identify

and minimize" environmental effects." AR 086755-56. Likewise, the decision where to build

roads is explicitly left to future site-specific analyses. AR 086756. Thus, by the Forest Service's

own design, these important site-specific choices are left unresolved by the applicable

management plans.

  If there were any doubt that the Covered Actions involve unresolved conflicts, the proof

is in project outcomes. Conservation Groups use the EA process to submit alternative locations

and methods for implementing the Covered Actions, and these alternatives consistently result in important project improvements. *See supra* at 7-8; Kelly ¶ 29; Riddle ¶ 31. Because the impacts of the Covered Actions differ meaningfully depending on how the agency chooses between its available alternatives, NEPA requires the agency to make an informed choice between them. *See Trinity Episcopal School Corporation*, 523 F.2d at 93.

Categorical exclusions, of course, do not involve the study, development, and description of alternatives, but EAs do. *Compare* 36 C.F.R. § 220.6(a) *with id.* § 220.7(b) (requiring consideration of alternatives in an EA unless "there are no unresolved conflicts"). Because the Covered Actions inherently involve unresolved conflicts, they must at least be analyzed in an EA. And because the Rule purports to exclude them *categorically* from such an analysis, the Rule is *ultra vires. See FCC*, 556 U.S. at 515.

## VI.    The Forest Service Failed to Provide the Public with an Opportunity to Review the Proposed Rule for Conformity with CEQ's Recently Adopted Regulations

The Rule should be vacated due to the Forest Service's refusal to allow public review of the Rule's conformity with the 2020 CEQ regulations. The 2020 CEQ regulations required that agencies "provide an opportunity for public review and review by the Council for conformity with the Act and *the regulations in this subchapter*"—i.e., the then-current regulations as revised in 2020—"before adopting their final procedures." 40 C.F.R. § 1507.3(b)(2) (2020) (emphasis added).[16] Both public review and CEQ review are plainly required before a proposed rule can go

---

[16] A panel of the D.C. Circuit recently held that CEQ lacks the power to issue regulations to govern how other federal agencies comply with NEPA. *See Marin Audubon Soc'y v. Fed. Aviation Admin.*, No. 23-1067, 2024 WL 4745044 (D.C. Cir. Nov. 12, 2024). That is not the law in the Fourth Circuit, where "CEQ regulations are binding on federal agencies." *Piedmont Envt'l Council v. FERC*, 558 F.3d 304, 318 (4th Cir. 2009) (citing *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979)); *see also Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 512 n.3 (4th Cir. 1992); *Pub. Citizen*, 541 U.S. at 75 (stating CEQ was "established by NEPA with authority to issue regulations interpreting it").

into effect. Dkt. 63 at 4; *Colorado Wild v. U.S. Forest Serv.,* 435 F.3d 1204, 1210 (10th Cir. 2006). And the Forest Service was on notice of its obligation to seek public conformity review. AR 091556-57. Yet the Forest Service complied with only half of this requirement, submitting its rule to CEQ, AR 091770, but failing to give the public an opportunity to review the rule for conformity with the updated regulations. Dkt. 63 at 6.

To be sure, the Forest Service did offer its proposed rule for public comment in June 2019. AR 030796. At that time, however, the public had not even seen a draft of CEQ's new regulations, much less the final version under which the Forest Service's Rule was promulgated. *See* 85 Fed. Reg. 1684 (Jan. 10, 2020) (publishing proposed CEQ rule). As a result, the public never had the chance to review for conformity with "the requirements of this subchapter," *see* 40 C.F.R. § 1507.3(b)(2) (2020), because those requirements had changed. Indeed, the 2020 CEQ regulations completely upended the legal standard applicable to the Rule, weakening the qualifications for categorical exclusions. *See* Section IV, *supra*.

Had Conservation Groups been able to review for conformity with CEQ's 2020 regulations, they would have shown where the CEs would violate the new CEQ regulations. For example, CEQ's 2020 regulations newly barred agencies from adopting "additional procedures" not strictly required by CEQ's regulations. 40 C.F.R. § 1507.3(b) (2020). Conservation Groups could have shown that the Forest Service's requirement for a vaguely defined "collaborative" process in CE 25 clearly violates the prohibition of additional procedures. In addition, the lack of public conformity review prevented Conservation Groups from showing how the Forest Service's overbroad CEs would stretch the CEQ rule beyond a permissible interpretation of the statute. Indeed, such public comments would have been invaluable to CEQ, as well. Without the benefit of public conformity review, CEQ's separate conformity review was hamstrung by a lack

of input and perspective. See *Colorado Wild*, 435 F.3d at 1210 (explaining that CEQ's conformity review should also consider public comments).

In sum, the Forest Service was obligated to offer public conformity review under the CEQ's 2020 regulations. Its failure to do so deprived Conservation Groups of an opportunity to show that the new CEs were unlawful and to persuade Defendants to adopt a narrower view of the CEQ regulations that might have comported with the statute. The Forest Service therefore failed to observe procedures required by law, and the Rule must be vacated. *See* 5 U.S.C. § 706(2)(D); *Piedmont Envt'l Council*, 558 F.3d at 318-19 (vacating a rule for violation of 40 C.F.R. § 1507.3(a)).

## **CONCLUSION**

For all of these reasons, the Court should grant summary judgment to Conservation Groups and hold the Rule and the 2020 CEQ regulation under which it was established as arbitrary, capricious, unlawful, ultra vires, and procedurally infirm.

Respectfully submitted, November 21, 2024.

SOUTHERN ENVIRONMENTAL LAW CENTER

/s/ Sam Evans
N.C. Bar No. 44992
sevans@selcnc.org

/s/ Alyson R. Merlin
N.C. Bar No. 58223
amerlin@selcnc.org

/s/ Abigail M. Hunt
N.C. Bar No. 62453
ahunt@selcnc.org

/s/ Clara J. Derby
N.C. Bar No. 62330
cderby@selcnc.org

50

48 Patton Ave
Suite 304
Asheville, NC 28801-3321
828-258-2023

/s/ Kristin Davis
VA. Bar No. 85076
201 West Main St.
Suite 14
Charlottesville, VA 22902-5065
kdavis@selcva.org
434-977-4090

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2024, I electronically filed the foregoing

Memorandum in Support of Plaintiffs' Motion for Summary Judgment with the Clerk of Court

using the CM/ECF System, which will automatically send e-mail notification of such filing to all

counsel of record.


/s/____Sam Evans_____
Sam Evans
Southern Environmental Law Center