**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| THE CLINCH COALITION, *et al.*, | ) | |
| | ) | |
|   Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE, *et al.*, | ) | |
| | ) | |
|   Federal Defendants, | ) | Case No. 2:21-cv-0003-JPJ-PMS |
| | ) | |
|  and | ) | |
| | ) | |
| AMERICAN LOGGERS COUNCIL, *et al.* | ) | |
| | ) | |
|   Intervenor Defendants. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF ANDREW YOUNG**

I, Andrew Young, declare as follows:

1.  My name is Andrew Young, and I live in Charlottesville, Virginia. This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen and competent to testify. I submit this declaration in support of Wild Virginia, which is one of several organizations challenging the new regulations promulgated by the United States Forest Service ("Forest Service") purporting to implement the National Environmental Policy Act ("NEPA").

2.  I am an active member of Wild Virginia, a non-profit organization incorporated in Virginia. I joined Wild Virginia in 2018 because I agree with their mission to protect and restore natural ecosystems in Virginia and the communities that use and depend on those resources. Specifically, Wild Virginia fulfills its mission by holding government agencies accountable for improving habitat connectivity and protecting water quality to counter

climate change, prevent species extinction, and defend the health of communities and ecosystems.

3.   In addition to being a member of Wild Virginia, I am a Staff Attorney for the Allegheny-Bue Ridge Alliance ("ABRA"), a former Board Member and current Watershed Monitoring Coordinator of the Cowpasture River Preservation Association, a Board Member of the Virginia Wilderness Committee, and a Board Member of the West Virginia Highlands Conservancy. I engage in Forest Service NEPA processes in these capacities, as well as in an individual capacity. I use, enjoy, and benefit from national forests across the southeast, especially in the Southern Appalachian Mountains. I particularly enjoy the streams and waterways of the National Forest, and take interest in waterways with sensitive and endangered species of mussels and fish. I visit the forest by foot, bike, kayak, raft and car at least 50 times a year, I fly over the forest at least a dozen times a year and have specific plans to return. Specifically, I visit Reddish Knob with my wife to mountain bike and enjoy the panoramic view at the summit. We also have a goal of backpacking in all of the Federally Designated Wilderness Areas within West Virginia and Virginia, and eventually then entire United States. So far, in West Virginia and Virginia, we have backpacked in 18 wilderness areas and counting. Additionally, I intend to ride the Shenandoah Mountain 100-mile mountain bike race through the George Washington National Forest sometime in the next 3 years. I plan to continue kayaking and rafting in the rivers like the Tye, Cowpasture and Jackson Rivers in the George Washington National Forest, the James River at Balcony Ledges in the Jefferson National Forest, as well as Greenbrier River in the Monongahela National Forest.  I plan to continue visiting the forest in these ways for as long as I am able.

2

4. Projects carried out by the Forest Service, such as commercial logging, roadbuilding, pipeline construction, and managing habitat with prescribed burns, have the potential to degrade water quality and habitats within the national forest. These impacts negatively affect my experience in the forest. Specifically, forest thinning can cause sedimentation in waterways, including those that contain species of mussels and darters sensitive to water quality. Waterways in national forests in Virginia are especially sensitive to sediment impacts, as there is a lot of karst terrain in this region that allows impacts to the aquifer which can alter water quality over 20 miles away from the site of ground disturbance.

5. I fly regularly in a friend's personal airplane over the national forests in Virginia and West Virginia, an activity I began in 2018. I love the unique perspective an aerial view of the forest brings to the areas I'm able to access on foot, as well as those I would otherwise not be able to access due to treacherous terrain or other limitations, such as closure orders that typically apply to logging projects. Recently, I have been flying over the George Washington, Jefferson, and Monongahela National Forests approximately 2-3 times per month, though in the past I have flown as often as 4-5 times per month, and I plan to continue doing so in whatever capacity I am able. In detail, when I first began flying, up until the COVID-19 pandemic, I estimate that I flew around 30 times per year, and sometimes multiple times per week. I estimate that I have flown approximately 20 times in 2024. Within the next few months, I have plans to fly over the North River area of Shenandoah Mountain, the Eastern Divide Projects on the Jefferson National Forest, the Dunlap Creek Project as well as the Archer Knob project on both the George Washington and the Jefferson National Forests, and the Gauley Heathy Forest Initiative project on the Monongahela National Forest. I will also participate in flights over the Corridor H Highway project on the Monongahela

National Forest to monitor the Forest Service's implementation of Special Use Permits for core drilling which are proceeding under categorical exclusions. I intend to make this monitoring flight quarterly. Taken together, these flights will allow me to monitor conditions across the broader forest landscape while various projects undergo implementation. I plan to continue these flights for as long as I am able.

6.   The first logging project I flew over was the Upper Greenbrier North Project in the Little River Wildlife Management Area of the Monongahela National Forest. The project area was notable for its proximity to virgin red spruce stands at the nearby Gaudineer Scenic Area, which were a prominent and increasingly rare relic of forest conditions in historical red spruce habitat. I recall looking east towards Middle Mountain and seeing intense scars of clear cutting across the western slope of the mountain. The landscape looked so tremendously terrible that I felt, deep in the core of who I am, that something very wrong had happened. With the unique perspective and scale revealed by being in the air, I felt like I was seeing the ruins of a sacred place. To this day, I continue to feel a pang of sadness each time I fly over the area—which is often as it lies along the route we take to get back to the landing strip.

7.   For the next several days after flying over a logging site, I often wake up feeling haunted by what I have seen. These forests are my lifeblood, and I love them. They are spectacular despite having a dark history of logging which we are still living in.

8.   When on the forest floor, it is difficult to grasp the sheer magnitude of impact from a large logging project. From the air, however, these impacts are abundantly clear. For example, the Eastern Divide Project on the Jefferson National Forest has involved several bouts of timber thinning. Although the individual cutting units may appear minor in isolation,

4

I can see their true scale from the air. Notably, the Eastern Divide project—which is being implemented in two phases—is situated near private land where extensive logging occurs. This logging degrades the overall integrity of the forest landscape. The project footprint on the National Forest offers a small vestige of what the broader landscape once contained. Specifically, the project contains rare old growth stands, as well as critical habitat for the endangered candy darter. It is imperative that these invaluable places are protected, or at the very least, subject to careful, site-specific management.

9.   The impacts of misguided Forest Service management activities adversely affect my ability to enjoy and use the forests. It is devastating to see the impacts of poor sediment management and clearcuts from the air, or areas where a prescribed burn has jumped over a mountain. When I first began flying, the logging projects I was able to see were so expansive that I initially did not understand what they were. On a hot summer day, I can see plumes of dust emanating from the roads used for logging projects. In other words, by flying, I can see impacts from logging projects that are proposed and implemented in remote areas that might otherwise be "out of sight, out of mind."  I experience an indescribable feeling of sadness when I see such remote, critical places in the forest destroyed. These ecosystems are essential to maintaining a livable planet in the future as the climate continues to change and extreme weather events continue to affect our region.

10. I recently saw the implications of what a super storm can mean for both the forest and communities surrounding it. In the wake of Hurricane Helene, I engaged in several disaster relief activities in eastern Tennessee and western North Carolina. Specifically, while in Hot Springs, North Carolina, I observed a slope that had previously been subjected to heavy logging. Although the hurricane took an immense toll on the region broadly, the

landslides and debris flows were especially extreme where there was a lack of vegetation cover—and in the case of this slope, it was due to logging.

11. Given the serious impacts that can flow from Forest Service projects, public input is critical to the Forest Service decision-making process. Community members have a level of on-the-ground familiarity with specific areas of the forest that the Forest Service is unable to replicate. In my experience, without public input, the Forest Service fails to adequately account for the impact of their management activities, including below ground carbon sequestration, climate impacts, and the cumulative impact of multiple projects in a given area over time.

12. I rely on organizations like Wild Virginia to gather and offer their input and specialized knowledge to the Forest Service. For instance, Wild Virginia recently commented on the Archer Knob project. I flew over it last month and regularly visit the area to hike, mountain bike, and boat on the Calfpasture River. The project has not been finalized yet, but even still, the opportunity to offer input about water quality impacts and sensitive species in the project footprint is invaluable. My and Wild Virginia's ability to meaningfully comment and alert the agency to such concerns are dependent on the details and information contained in a project's EA.

13. In the past several years, I have personally participated in the NEPA reviews for several Forest Service projects. I do so with the goal of improving resource management decisions and enhancing protections for forest resources and sensitive ecosystems.

14. A prominent example of this is the Greenbrier Southeast project. The project included 2,210 acres of commercial and non-commercial logging which contained critical habitat for the endangered candy darter. I helped draft comments that were submitted by the

6

West Virginia Highlands Conservancy which largely focused on the Forest Service's failure to perform an adequate baseline or cumulative effects analysis. My comments were dependent on information I learned through the EA. Specifically, through the project's EA, we learned that the Forest Service was improperly relying on incomplete or unavailable documentation as the basis for its environmental assessment and resulting determinations. We also learned that the agency had failed to assess current ecological conditions in the project-affected area as well as options for preservation and restoration of critical biological species and their habitats. Rather, the agency deferred a lot of important environmental data collection and preparation of specific project plans until after project approval. These issues were compounded by the agency's reliance on ineffective best management practices for prevention of soil erosion and stream sedimentation associated with timber harvest on steep slopes. Ultimately, if not for this information in the EA, I would not have been able to understand just how the agency had come up with such a bad project. With the benefit of this knowledge though, I was able to express my concerns and ensure that they were part of the record before the agency. Additionally, the Forest Service is obligated to respond to the comments it receives back on its EA, and where those responses are inadequate, the public is enabled to file a formal objection. Each of these steps are critical for engaging in Forest Service decision-making that has the potential to detrimentally impact my interests in the forest.

15. I have also, more recently, submitted comments on the Deer Creek project proposal. This is a massive, sprawling project affecting 89,000 acres of forest land. The various activities contemplated under the project are wide ranging and include commercial logging. Such activities will be subject to their own environmental analysis, and it is

imperative that this analysis is thoughtfully and carefully done under the normal EA process. The project area includes Deer Creek, Greenbrier River, and a portion of Sitlington Creek headwaters. Because of the detrimental effect that logging and roadbuilding can have on water quality, it is critical that individual projects carried out are rigorously considered by their own individual EAs and EISs. I will continue to stay engaged with this proposal as individual projects come up for review—no matter which level of NEPA they ultimately receive.

16. In short, the kind of robust and meaningful engagement that Wild Virginia is able to provide through the EA process is invaluable for protecting areas of the forest which I regularly hike through and fly over. Because I enjoy flying over large swaths of the national forests, my experience is greatly enriched by the cumulative effects of the many improvements to forest management that have stemmed from Wild Virginia's advocacy and the NEPA process generally. Each of these improvements act in concert to achieve a healthier, more resilient forest. On the other hand, logging—especially poorly planned logging—will affect my interests no matter where it occurs on the forest, because I will see it from the air.

17. I am deeply concerned about the Forest Service's recently promulgated categorical exclusions for logging under 2800 acres, roadbuilding up to 2 miles, and certain special use permits.

18. In my experience, CEs are used as shortcuts around more robust NEPA processes like EAs for controversial logging projects. This is, in part, because projects developed under Categorical Exclusions ("CEs") do not allow as much opportunity for the public to engage in the Forests Service decision-making process. When the Forest Service uses a CE for a

8

project, they publish a scoping notice with limited detail about the proposed management activities on which the public can comment. After public comment, the Forest Service does a limited assessment of whether the project would involve "extraordinary circumstances" before finalizing and approving the project. Unlike the Environmental Assessment ("EA") process, which includes a draft EA comment period and an administrative objection period, there is no opportunity for formal comment beyond scoping when a CE is used. The only opportunity to engage with the project after it is approved for CE coverage is via litigation, which is costly and inefficient. Further, my ability to gain information in the first place is significantly limited for CE projects. When the Forest Service prepares an EA, they generally include scientific analyses that assess impacts to old growth tree communities, terrestrial and aquatic habitats, endangered species, and the cumulative impact of Forest Service management and other land-disturbing activities in an area. With a CE, the Forest Service does not provide this information, and often does not provide sufficient information in scoping notices for the public to meaningfully understand the management activities the Forest Service is proposing, let alone their potential impacts. In other words, when the Forest Service uses a CE, it is nearly impossible for the public to verify whether the agency has done their due diligence.

19. Each of these problems came to bear recently on the Monongahela National Forest. Specifically, I have been involved in litigation for two years over the Gauley Healthy Forest Restoration Project which was originally proposed in 2019. The Forest Service relied on the Insect and Disease Infestation CE under the Healthy Forest Restoration Act to pursue development of this project without the usual EA public review process—despite the fact that the project footprint contains critical habitat for the endangered candy darter. The project

9

includes 2,759 acres of forest thinning and clearcutting. As such, the Forest Service could have used the 2,800-acre CE for the project had it been proposed today which would have granted it significantly more discretion in how to achieve its logging goals. Specifically, the Insect and Disease Infestation CE carries significant guardrails, including a prohibition on harvesting large and mature trees as well as requirements for the treatment areas that can be included.

20. The Forest Service finalized and approved the Gauley Project in June 2022, and I have visited areas affected by project on multiple occasions in an attempt to better understand how it is being implemented, and I plan to continue to do so. Specifically, because of the lack of information provided for the Gauley project, I have had to conduct my own surveys of the project area, and much of this has been done after project implementation had already begun. For instance, I discovered and photographed a skid road which breached an aquifer in candy darter critical habitat. It was dismaying to see clear impacts that would have been predicted by any basic analysis typical of the EA or EIS process. Today, the site looks something like a war zone. There are huge gashes across the forest floor where heavy logging equipment drove over it. The damaged aquifer was a muddy mess back in February and continues to be severely impacted by siltation. Candy Darters require clean, fast-moving water and their required habitat is degraded by erosion and siltation. It broke my heart to discover these impacts and know that I was too late, and powerless, to protect such a special ecosystem from reckless harms. Under an EA, I could have ensured that the Forest Service did its due diligence *before* the project was implemented. Because the project proceeded under a CE instead, I was left in the dark and the forest has been left burdened by irreparable consequences.

10

21. I have also flown over this project on several occasions. Whether by foot or from the air, I am dismayed each time I see the catastrophic impacts of this irresponsible logging and associated construction of skid roads in such an ecologically significant area of the forest.

22. What's more, to make up for the lack of information provided about the project, which normally would have been disclosed under an EA, I have been consumed by FOIA request work. In order to effectively engage with CE projects, I am forced to request materials under the Freedom of Information Act. The Forest Service typically does not provide sufficient materials in a timely fashion. Instead, they will issue a Decision Notice for a project before I even receive documents, refuse to produce documents until after years of litigation, or will produce documents that are outdated and do not effectively inform the project. This was indeed the case with the Gauley project, for which litigation has placed a severe toll on my capacity to monitor other projects that affect my interests. I expect this approach to FOIA will continue to be standard practice as the agency implements its new CEs.

23. Moreover, the Gauley project is part of the much larger Cranberry Springs project which encompasses approximately 10,000 acres of commercial timber harvest over a 69,448 acre footprint. The way that the Forest Service segmented the Gauley Project to fall under a CE is very concerning, and likely to remain a problematic tactic in the Forest Service's tool belt with these new CEs in place. By choosing to segment logging under the Cranberry Springs proposal and thereby use a CE for the Gauley Project, I am concerned that the Forest Service is treating watershed integrity and sustainability of critical aquatic species (e.g., brook trout and candy darter) as secondary issues not deserving of special review. Instead of

11

segmenting analysis of management plans to circumvent the purpose and intent of NEPA review, the Forest Service should include all similar and contemporaneous proposed management activity in the area in one Environmental Assessment or Environmental Impact Statement.

24. Given the harms that have come to bear under the Insect and Disease Infestation CE, with its significant guardrails, I expect even greater harms to flow from CE 25. Specifically, I am concerned about future projects tiered to the massive and sprawling Deer Creek Integrated Resource Project, mentioned above. Although the project area's sensitivity warrants caution and rigorous analysis, I am concerned that the Forest Service will instead authorize individual logging projects—which are extremely likely to fall under 2800 acres—under CE 25, just as they segmented the Gauley project to fall under the Insect and Disease Infestation CE.

25. The availability of the new CEs will increase the amount of logging the Forest Service allows, thereby increasing the sediment load in sensitive waterways, removing critical habitat for terrestrial and aquatic species, limiting the development of mature and old growth stands, and impairing the extent to which the forest can help mitigate climate change.

26. I rely on the NEPA process to engage in the Forest Service's decision-making process. Consequently, I will suffer concrete and particularized injuries to interests that are imminent now that the Final Rule has taken effect. My interests are fully represented by Wild Virginia in this case.

27. This injury would be redressed by an order from this Court vacating the Final Rule.

12

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

Executed this **15th** day of *November* 2024.

_____
Andrew Young