UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| THE CLINCH COALITION, *et al.*, | ) | |
| | ) | |
|    Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE, *et al.*, | ) | |
| | ) | |
|    Federal Defendants, | ) | Case No. 2:21-cv-0003-JPJ-PMS |
| | ) | |
|  and | ) | |
| | ) | |
| AMERICAN LOGGERS COUNCIL, *et al.* | ) | |
| | ) | |
|    Intervenor Defendants. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF CATHERINE NELL GIDENS MURRAY**

I, Catherine Murray, declare as follows:

1.      My name is Catherine Nell Gidens Murray. I live at 1101 Antioch Road, Johnson City, Tennessee 37604. I have lived at this address for 29 years and in the Johnson City area for 56 years. I have also spent significant time at my life partner's cabin near Roan Mountain, Tennessee. This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen (18) and suffer from no legal incapacity.

2.      I have been an active member of Cherokee Forest Voices ("CFV") since 1992. I am currently the Director of CFV and have been since 1999. CFV's mission is to restore and preserve biodiversity in the Cherokee National Forest; improve protections for fish, wildlife, plants, soil and water resources; increase the amount of designated wilderness area; create

opportunities for nature-oriented recreation; and protect scenic values. This mission is specific to

the Cherokee National Forest, and CFV's work is primarily focused on on-the-ground protection

and restoration of roadless areas that are vulnerable to logging—we call them our Mountain

Treasure areas—within the forest, along with other ecologically sensitive areas like old-growth

areas, critical aquatic habitat, and wilderness-study areas.

3.      The Cherokee National Forest holds immense social, biological, and recreational

value as a place where people of all abilities can enjoy nature and everyone in the surrounding

areas benefit from the better water quality the Forest naturally provides. I have been visiting the

Cherokee National Forest since 1968 and go as often as possible. In my earlier days, I mostly

camped, hiked, boated, and fished. Today, I continue to enjoy the Forest as my mobility allows

and continue to cherish the beauty and solitude. Even from my backyard 5 miles away near Roan

Mountain, I enjoy the deer and other wildlife that come down from the Forest. I never take for

granted that my drinking water comes from the Morgan Branch, which is protected in part by the

Forest. The Cherokee National Forest and the forests of Southern Appalachia broadly are unique

in our nation. Here, we have immense levels of biodiversity at all levels of the forests compared

to the vast forests in the West and remnant prairies of the Midwest. These forests are our Earth's

lungs. The carbon stored in old growth areas are critical in the age of climate change where

summers are getting hotter, and storms are getting more intense. The tides of public opinion are

turning on climate change as we begin to have more national conversations about how forests are

part of our approach to the climate crisis.

4.      The Cherokee National Forest in Eastern Tennessee is a part of my everyday life.

Holston Mountain, approximately 15 miles away, is part of the Cherokee National Forest and

part of the backdrop for the town where I live. I moved here decades ago to go to college, but I stayed here to be in the mountains, to be close to the forests and nature that I love.

5.      I study plants, mammals, invertebrates, butterflies, birds, trees, geology, and all aspects of the mountains and forests for my personal enjoyment. Maintaining natural processes in a living, thriving forest, as God created it, is important to me.

6.      When I arrived in the Johnson City area in 1968, I soon learned about and came to love the Cherokee National Forest, especially the Unaka and Roan Mountains because they had good road access and overlooks such as High Knob on Roan and Beauty Spot on Unaka. Flatwoods has always been a favorite spot for me to take a drive, picnic, hike, and camp. When I was younger, these were all great fun for a college student on a budget. I have hiked to the old fire tower on Holston Mountain countless times to take in the view west, back toward my home, with the Flatwoods area in the foreground.

7.      Older members of CFV remember Holston Mountain in this area being particularly hard hit by logging in the early 1900s and has been slow to recover only now to the point where you aren't camping in a clearcut. Nevertheless, I continue to use the area for hiking, bird watching, guided outings to learn and teach others about native plants and wildlife, and other recreational and educational purposes. It has been healing to watch this area recover during my lifetime, especially knowing that my work with CFV has helped that to happen. I will continue visiting these areas regularly as long as I am able to. I also love to see other people out enjoying the area and falling in love with it as I did.

8.      While Holston Mountain and the Flatwoods are favorite places for me, I enjoy many other parts of the Cherokee National Forest for the same reasons. In particular, I enjoy visiting and viewing from scenic vistas the undeveloped Tennessee Mountain Treasure Areas. I

first became aware of this special designation in 1996 when the Tennessee Mountain Treasures (TMT) book came out and I was astonished that I had been in or drove around the boundary of almost all of them. Over the span of 60 years, I have visited all of the TMT areas, including: Big Frog Perimeter Additions, Little Frog Additions, Smith Mountain, Rock Creek, Gee Creek, Coker Creek, Buck Bald, Bald River Gorge Addition West, Upper Bald River, Maple Camp Lead, Sycamore Creek, Brushy Ridge, Flats Mountain, Miller Ridge, Cowcamp Ridge, Joyce Kilmer/Slickrock Addition, Laurel Hollow Mountain, Devils Backbone, Laurel Mountain, Walnut Mountain, Wolf Creek, Meadow Creek Mountain, Brush Creek Mountain, Paint Creek, Bald Mountain, Sampson Mountain Addition, Nolichucky, Unaka Mountain Extensions, Stone Mountain, Strawberry Mountain, Highlands of Roan, Doe River Gorge, Ripshin Ridge, White Rocks/Laurel Falls, Slide Hollow, Watauga Reserve, Big Laurel Branch Addition, Hickory Flat Branch, Flint Mill Mountain, Lower Iron Mountain, Upper Iron Mountain, London Bridge, Beaverdam Creek and Rogers Ridge.

9.      Though my body has slowed over the years, I still plan to visit and return to as many TMTs as I can. Around the time of filing, I revisited the Iron Mountain Cluster of Big Laurel Branch Addition, Hickory Flat Branch, Flint Mill Mountain, Lower Iron Mountain, Upper Iron Mountain, London Bridge, Beaverdam Creek, and Rogers Ridge. I have also traveled to the Roan Mountain Cluster of Strawberry Mountain, Highlands of Roan, Doe River Gorge, Ripshin Ridge, White Rocks/Laurel Falls, and the Unaka Mountain cluster of Nolichucky, Unaka Mountain Extensions, and Stone Mountain. On many spring and fall weekends, I often take scenic drives with my niece and great nephew to visit these areas since they are all off county highways or good secondary roads. Though they are more the "camp at a hotel" type, I have gotten them on a few hikes—I so enjoy showing the next generation the mountains I love. I have

now taken 5 generations of our family to the mountains. When I am able to stand a longer drive or a slow hike, we plan to explore more and consider visiting more of the southern TMT areas.

10. Because I have been around long enough to see many different logging projects, and seen their short- and long-term effects on the forest's plants and wildlife, I know that many logging projects are harmful to special places like these. Birdsongs that I would regularly hear before a logging project will be absent afterward. Stands that used to be oaks and hickories will often come back crowed with nothing but yellow poplar. And logging certainly impacts my own personal use of the forest. When I encounter a cut or logged area on a trail, I have learned to turn around and go back because it is unpleasant and impassable, choked with briars and often invasive weeds. The shady, cool forest is no more in these areas. Logging also mars the view from the mountain and along the otherwise scenic drives I enjoy. Seeing the scars of logging in these forests is painful for me, and they last for a very long time. Scars can be seen in Flatwoods, on Holston Mountain, and Iron Mountain from Shady Valley, and from Hwy 167 in Johnson County looking up to Stone Mountain to name a few. They look like a punk haircut even after close to 30 years since it was logged.

11. I have also seen what I consider to be good logging projects on the Cherokee National Forest. When done in the right places for the right reasons, logging can sometimes improve the forest's long-term health, such as by removing an old pine plantation and helping it recover as a native hardwood stand. Still, even the best logging projects cause considerable harm to scenic views, soil and water, and certain types of wildlife like salamanders, and of course to the people like me who enjoy them.

12. My connection with many of these places is deeply personal. For example, I know the TMT Watauga Reserve incredibly well because my life partner's cabin was within 20 feet of

its boundary line, and we promoted it and provided the information required for it be listed as a TMT. I explored that mountain for 25 years and have explored many other TMTs while hiking on the Appalachian Trail. I have gained even more knowledge about these areas while on countless field trips with both the Forest Service and the conservation community.

13.    CFV is based out of Johnson City, Tennessee, and has approximately 200 individual members and 6 organizational members: the Wilderness Society, Wild South, Smoky Mountains Hiking Club, Tennessee Citizens for Wilderness Planning, Tennessee Audubon Council, and the Tennessee Chapter of the Sierra Club. Many of CFV's members live in and near the Cherokee National Forest along the North Carolina-Tennessee border. Some members own or patronize businesses that depend on an ecologically vibrant and protected Cherokee National Forest to attract visitors and customers. Many members frequently visit the Forest to hike, backpack, fish, camp, birdwatch, kayak, whitewater raft, take photographs, and enjoy true wilderness experiences.

14.    To protect the Forest that these members use and rely on, CFV engages in a variety of activities, including monitoring Forest Service management activities; commenting on proposed activities and regulations including those challenged here; enhancing public awareness or and interest in forest-related issues; sponsoring or promoting activities designed to increase citizen participation in the forest management process; proposing and promoting alternatives to harmful logging proposals; and cooperating with other groups throughout the region who share common interests and concerns regarding the Cherokee National Forest.

15.    A robust NEPA process is key to all of these activities because the Cherokee National Forest's management plan defers decisions about whether to log old growth or in Mountain Treasure areas to the project level. That makes the project-level decisions

tremendously consequential. Timber projects are almost always proposed with a mixture of good, bad, and neutral actions, because they are put together by staff who are looking for opportunities for timbering but don't always know what sensitive issues might be affected. It's what happens after the proposal that matters the most. With good analysis, listening to public input, and being open to less harmful alternatives, projects turn out better with less harm. Finding the right areas for the right project is a difficult process that requires site-specific information and informed public input. It would be impossible for the Forest Service to get it right all of the time without help. That is where CFV comes in. We provide information to fill in the gaps that the Forest Service misses, and we provide alternatives that can meet the same needs with less harm. This all occurs during the NEPA process when the Forest Service prepares an Environmental Assessment ("EA") for public review. The transparency and accountability that come with this public process are good for the Forest and the people who enjoy it.

16.    CFV depends on information provided by the EA process to inform its members and the public about the management of and issues involving our National Forests, including impacts to Mountain Treasure areas, old growth, wildlife, invasive plants, steep slopes and erosion, water quality, scenery, and recreation. CFV encourages the public to use the NEPA process as well to comment on the issues that matter to them most. CFV also participates directly in the Forest Service's NEPA decision-making process by offering critiques, additional information, and alternative proposals based on the Forest Service's draft EA analyses. Sometimes, CFV will file an appeal or administrative objection if problems are not corrected, an option not available for projects done under categorical exclusions. To remove the EA process for these projects is to remove meaningful public participation. The EA process makes the

difference between CFV being invited to the table to have a dialogue and coming to the Forest

Service and finding the door locked.

17.     Public participation through the EA process results in better forest management

decisions. The EA process creates the opportunity for CFV to visit a sensitive area that would be

affected, and the Forest Service has more time and capacity to join in those visits, which have

historically been very productive in reaching agreement about the "right" prescription. CFV

expends a lot of resources tracking projects and understanding EAs in order to take Forest

Service rangers out to particular areas in the project footprint to identify previously unknown old

growth sections and other sensitive areas. Even without field visits, critiquing EA analysis and

providing local input is effective to improve project proposals. Where CEs are based on an

assumption that a project won't be harmful, EAs must be based on science. And if EAs are

wrong or miss important issues, public input and local knowledge can make all the difference. If

the EA process is lost, no one will know there is a problem until the wrong trees are cut and mud

is coming down the stream and no one can catch a fish anymore, for example. That is not

hypothetical. Whatever the damage, it can generations to restore—if restoration is even possible.

18.     I have personally observed the difference that informed public input makes. Some

projects do not draw much controversy and change little after they are proposed. Other projects

change dramatically to avoid harms and satisfy public concerns. For example, the Beaverdam

project was proposed in 2008 to create early successional habitat on 721 acres of Cherokee

National Forest land. During the EA process, CFV pointed out in public comments that the

project involved logging within the Flint Mill Roadless Area and identified impacts to potential

old growth. Before CFV identified these issues, the Forest Service was unaware that its project

would impact roadless areas and old growth. In response to CFV's comments, the Forest Service removed the Flint Mill Roadless Area and old growth stands from the project.

19.    Similarly, during more recent projects like the Clarke Mountain and Stoney Creek projects, hundreds of acres of old growth were proposed for logging. These old growth areas were not known or mapped beforehand. But when the Forest Service provided a draft EA for public review, CFV used this information to determine where stands of old growth might be located. CFV then worked with other conservation groups, including MountainTrue, to delineate old growth and alert the Forest Service to its presence in EA comments. Thanks to those comments, the Forest Service decided not to commerically log the stands that CFV and others had identified. The Forest Service was aware of the old growth on its own. It took an actively engaged and informed conservation group to point it out. But because of the EA process, the old growth was conserved. Old growth is so rare in our Eastern forests, and losing this relatively large tract of it would have been a significant impact by any measure. It is still there for future generations to experience because of the EA process.

20.    Because the preservation of old growth is central to CFV's organizational mission and my personal interest (for example, the old growth forest on the Josiah Ridge Trail on Holston Mountain is a very special and powerful place for me), CFV plans to continue to identify and advocate for old growth stands throughout the Cherokee. At present, CFV and other conservation groups are aware of about 4,574 acres of old growth on the Cherokee National Forest, but we know there is more out there that we haven't found yet. CFV especially wants to see the following areas prioritized for protection and expansion of old growth communities: Laurel Mountain, Wolf Creek, Ripshin Mountain, Street Gap to Big Bald, and Crest of Holston

Mountain. These areas are currently vulnerable to logging at the project level. CFV will continue to use the EA process to advocate for these areas.

21.    As a result of other CFV-authored EA comments, the Forest Service also dropped the entirety of the Big Creek project over steep-slope concerns, relocated expansion of horse trails to protect endangered aquatic species in the Middle Citico Project, and modified the Offset Project to ensure that an unroaded Mountain Treasure area would not be negatively affected. I am proud of these changes that have been made at CFV's request and were supported by broader public input. Projects like these show how CFV's research, analysis, and comments encourage the Forest Service to make changes to flawed proposals and avoid unnecessary environmental harm. These changes would not have occurred without the EA process and the opportunity it creates for informed public comment.

22.    I am concerned that the Forest Service's Final Rule will make project improvements like these a thing of the past. The new 2,800-acre restoration categorical exclusion ("CE") would almost certainly apply to every timber project proposed by the Forest Service within the Cherokee National Forest. The largest timber-harvest project on the Cherokee National Forest from 2009 to 2019 was less than a third of that size. And all upcoming timber harvest projects of which CFV is aware (like Pond Mountain, West Flatwoods, and the implementing projects for the dry forest communities restoration initiative) will also fall under the 2,800-acre threshold for using the new CE.

23.    I am concerned that without the information and analysis provided by the EA process, CFV will be unable to adequately inform its members regarding the risks of particular projects impacting places and animals important to them. CEs, by their very nature, do not produce the same amount of information or opportunities for improvement as EAs. As a result,

CFV will lack the information necessary to craft informed public comments that can and do help the Forest Service to reduce unnecessary environmental harms. CFV does not have the resources to seek out this information itself. As the grant funding landscape evolves, it has become harder for small groups like CFV to access resources and small grants. I used to take a salary but now do this work as a volunteer due to funding. CFV's work depends on the information made available through EAs and will not be able to gather that information through other means. Though the Forest Service maintains it will keep scoping for CEs, scoping periods for CEs are short, usually only 30 days at most. It is all but impossible for an organization as small as CFV to gather the information that would normally be provided in an EA, analyze impacts, and write comments in such a short window of time. In fact, because of my reduced mobility, it would be physically impossible for me to cover that much ground on my own in order to understand a proposed project's impacts as well as I would by simply reading an EA. Therefore, by using CEs the Forest Service is certain to move forward with flawed projects that impact roadless areas, old-growth stands, and other Mountain Treasure areas important to CFV and its members.

24.    In essence, the Final Rule forces CFV and other members of the public to either (1) accept that harmful management will be included in projects and that those harms will not be analyzed and disclosed to the public, or (2) spend time and resources (if even available) to identify the harms and share the information with the public. Furthermore, losing the EA process means losing the leverage to improve projects. This is because the agency has "sunk costs" in its project after scoping, and it will often be counting on the project to provide a certain amount of timber that will be used to meet annual timber targets. Insisting that the Forest Service disclose harmful impacts to the public during the EA process—impacts it could sweep under the rug

otherwise—creates an incentive to avoid those impacts or accept alternatives offered by the public.

25.     Furthermore, the public has no way to know before scoping whether a project may be particularly harmful or even whether it will be approved using a CE or an EA. Assessing the impacts of these projects will require CFV to devote significant staff time and resources to figuring out where the next projects will be located and how they might impact sensitive resources. And this will be true for every project that *might* potentially be eligible for a CE—which under the Final Rule will likely be every timber project on the Cherokee National Forest—because if we wait until a CE is proposed, it will be too late and we will not have time to gather this information. These efforts are a tremendous hardship for a small organization with a shoestring budget like CFV because we cannot afford to hire consultants and pay travel time to do the work to gather the information we previously relied on the Forest Service to provide.

26.     These changes pose a serious threat to CFV's core organizational priorities. For example, it is a personal goal of mine as well as the organizational goal of CFV to see Mountain Treasure areas protected so that future generations can experience their wonders. One of the primary ways CFV accomplishes this goal is by advocating for increasing the size of existing Wilderness Areas and securing the designation of additional Wilderness Areas. For decades, CFV sought to persuade the Forest Service to recommend that Congress designated additional Wilderness within the Cherokee National Forest, and the agency did so for a few areas in 2004. CFV continued to work for the protection of those recommended areas until, finally, in 2018 the Forest Service's recommendation was adopted by Congress. All told, approximately 20,000 acres in seven distinct areas were permanently protected. While cause for celebration, there are

many more areas deserving of similar protection. CFV still seeks to protect tens of thousands of other acres within the forest that are currently unprotected.

27.     However, it does not take much to disqualify an area from permanent protection. Logging activities and associated roads used to haul out the timber, for example, can disqualify areas from permanent protection as Wilderness. The Forest Service often does not know where potentially qualifying areas are on a landscape, and the criteria for identifying potential Wilderness areas has changed since the Cherokee National Forest last considered this issue. When logging is proposed within such areas, informed public input is necessary to alert the agency to the presence of these areas and show the Forest Service that the public strongly prefers leaving these areas intact. By my count, 56,981 acres of Mountain Treasure areas have no protection whatsoever and forest stands within them are regularly proposed for logging. And the impact to these areas is much bigger than the footprint of the logging. Large tracts can be disqualified by even small timber projects because building roads to access the timber fragments the area and causes it to lose its unroaded character. Without the EA process, therefore, projects impacting these special areas will unknowingly but permanently remove them from consideration for Wilderness protections. If we comment on EAs asking for protection of Mountain Treasure areas, there is no guarantee the Forest Service will listen. But at least we can make sure that they know, and the public knows, what is at stake. That is often enough to get them to change course from a harmful proposal.

28.     Sometimes even the opportunities for public input afforded by the EA process are not enough to protect roadless areas from fragmentation caused by ill-advised timber harvests and road construction. A tragic example is the Iron Mountain Tennessee Mountain Treasure ("TMT") area, which consists of the Upper Iron Mountain and London Bridge TMT areas. In the

late 1970s, the Iron Mountain area was inventoried as "roadless" under the RARE II process. At that time, the area consisted of 13,700 acres—the second largest roadless area in the Cherokee National Forest and one of the largest in the entire Southern Appalachia region. Early descriptions of the Iron Mountain Area in the Cherokee Forest Plan focused on the size of the area and the opportunities provided by such significant unroaded acreage. The Plan recognized Iron Mountain as being large and isolated enough to maintain a wilderness area. Perhaps the most important reason to keep the area wild is that it is crucially important for biological diversity in the Southern Appalachians because it is one of the few corridors that can connect southern populations of bear and other species in Tennessee, North Carolina, South Carolina, and Georgia with more northern populations in Virginia and West Virginia. The area also offers opportunities for cold-water fishing, small- and big-game hunting in a backcountry setting, and features abundant hiking trails. For example, the Iron Mountain Trail runs for over 13 miles along the crest of the mountain and forms a loop with the Appalachian Trail. There are good views of Doe Valley, Rogers Ridge, and Mount Rogers from outcrops on the trail. Abandoned logging road #322 connects the Iron Mountain Trail with Backbone Rock. All in all, Iron Mountain Trail provides an excellent backcountry experience as well as economic values to the country because folks out camping need to purchase supplies and food.

29.    Despite the inventoried status of the Iron Mountain area under RARE II, the Forest Service continued to offer timber sales and punch roads into the area which degraded its roadless characteristics. Since the RARE II inventory, in fact, the agency has apparently planned and executed at least three projects within the boundaries of the Iron Mountain Roadless Area resulting in extensive disturbances and road development. For example, in 1980, the Forest Service planned and approved a massive timber sale with extensive road construction within the

RARE II Area. This project resulted in the construction of at least 5.5 miles of road and logging on 480 acres.

30.    CFV and many concerned citizens objected to these activities in the Iron Mountain RARE II area, citing concerns about degradation of the roadless character and the need for a full environmental review under NEPA. The Forest Service dismissed these arguments, asserting that the planned activities would not have a substantial impact on the area.

31.    In 1990, the Forest Service approved another timber sale in the Iron Mountain Roadless Area. This project called for harvesting 1.1 million board feet ("MMNF") of timber— including 123 acres of clearcutting—and well over 5 miles of road construction and development. In 1993, the Forest Service put forward another proposal in the Iron Mountain area calling for harvesting 2.1 MMBF of timber and over 6 miles of road development. Again, concerned citizens and CFV opposed the activities and called for an EIS before the project could go forward in a roadless area. Again, these arguments were rejected.

32.    In 1996, the Forest Service completed a preliminary inventory of roadless areas to be finalized in the Cherokee Forest Plan revision process. And this is where the *cumulative* effect of the prior timber projects came home to roost. The updated roadless survey determined that the Iron Mountain RARE II area no longer qualified as roadless and therefore is not appropriate for future wilderness designation. This determination was made based on the Forest Development Roads built for the various timber projects, increasing the road density beyond the limit required by the roadless inventory criteria. In the years since the roadless designation was removed, the Forest Service has continued to implement projects in and substantially degrade the unroaded, undeveloped character of the Iron Mountain area. While any of these projects individually might not have foreclosed the designation of a wilderness in this area, together they have. As Iron

Mountain unfortunately illustrates, small projects can snowball and cumulatively degrade a large area's character, permanently removing it from consideration for wilderness protections. Because no substantive laws or regulations prevent this kind of degradation, the EA process is the only way CFV has to protect them. Ensuring that the Forest Service understands potential cumulative impacts and has to disclose them to the public is usually effective in reducing the harm. Now that practically all timber projects within the Cherokee will qualify as CEs, however, the Forest Service is more likely to move forward with proposals impacting these Tennessee Mountain Treasure and other special areas.

33. One thing that an "old timer" like myself understands is that protecting the national forest is not just about dealing with any single project. The Forest Service has areas all across the Cherokee National Forest designated for "timber production." These timber production zones have roads that the agency considers "capital improvements," which require a return on investment. The Forest Service makes regular "entries" into each of these areas for timber harvest every one or two decades. The Forest Service's goal is to work its way through all of these zones and then restart the cycle every ten years or so, although it seems to take longer in practice. For example, during my time the Forest Service has made several entries into the Flatwoods area, which is so dear to me, leaving long-lasting scars on the land. While the Forest Service may cut only a portion of the area during each entry, it will be back again to cut more. In fact, the Forest Service is getting ready to make another entry into the West Flatwoods area in the next year or two. The same thing is true for all of the timber-production zones in the Cherokee National Forest. Even if the Forest Service doesn't have a project in a particular area this year or next year, it will be back again. This goes for all of the specific areas I have mentioned, because portions of all the Mountain Treasures are within timber production zones.

For me and others who visit these places, this guarantees that sooner or later the Forest Service will have a timber project in each of these areas. These timber projects will now be eligible for a CE, and we will not have the EA process to make sure they don't cause any more harm than necessary.

34.    The Forest Service's seems to think that its "restoration" and "collaborative process" sideboards will guard against outcomes like these. But neither will protect the areas CFV is concerned about, and the "collaborative" requirement will actually hurt CFV's ability to protect special areas.

35.    "Restoration" is a term that is applied to a wide range of activities, including some projects that have significant harms (even if they also have arguable benefits). All Cherokee National Forest logging projects in recent memory have included restoration as a project purpose, even where they have proposed to log old growth to create young forest conditions or to log within Mountain Treasure areas. For example, the Clarke Mountain and Stoney Fork projects proposing to log old growth were explained as needed to restore young forest habitat that was supposedly missing in the project areas. Restoration projects, like all projects, need site-specific analysis and public input to make sure they will not do more harm than good. Simply stating that a project has a "restoration purpose" has very little to do with what effects it will have. The Forest Service is willing to break eggs to make an omelet. And it will break more eggs if it makes its decisions based on incomplete or flawed information.

36.    Collaboration is another Forest Service buzz word that can be applied to good or bad processes and projects. The Final Rule does not specify what is required to satisfy the collaborative requirement. And many collaborative processes do little to resolve conflicts or promote substantive understanding of specific projects. At times, collaboration can be an

effective way to provide input, such as Forest Service–sponsored field trips in which participants try to reach consensus. From my perspective, collaboration in the Cherokee National Forest has been a generally positive and fruitful experience because staff have seen the value of public input. In my early years of working with the Forest Service, rangers were entirely focused on roads and timber, dismissing me as a young person who did not know anything. Good collaboration deeply depends on the people who are a part of it, and in other Forests there are no guarantees that it will be as productive. But even "good" collaboration requires a huge commitment of time and limited resources. This is a tremendous hardship on many of CFV's members who cannot skip work commitments to attend time-consuming meetings during business hours, or who lack the time or resources to drive long distances repeatedly to attend meetings, or who lack the physical ability to join field trips. Good collaboration will take time and resources from the Forest Service too since they need to get out in the community to let people know what is happening in their own backyards.

37.    I participated in a collaborative process for the Paint Creek project, which was being developed beginning in 2011. During that process, a few select members of the public spent time in the field with Forest Service staff discussing the needs and opportunities for management in particular stands. We had 11 field trips visiting 4 to 6 sites each of these days, and 8 meetings (about 3 per year until scoping came out on March 11, 2013 and a few after scoping so issues could be discussed). The EA came out in 2014 and decision in November 2015. There were numerous teleconference meetings as well as emails over the course of 5 years. Even after all this work to find broadly supported places to log, additional analysis and public input was needed during the EA process to avoid significant damage to soil and water. That's right: this exemplary collaborative restoration project still needed the EA process to prevent

significant harms. The Pond Mountain project is another good example of the same thing. This was also a collaborative restoration project, but it still had some serious problems (including logging in excess of what the forest plan allows) that need to be addressed through consideration of alternatives in the EA process.

38.    These days, I am not able to participate in the field trips to remote locations during collaborative processes because of my physical health and limitations. After a fall and an injury about 6 years ago that I am still recovering from, I realized that the field trips needed to be left to younger CFV members and partner groups, though I would still read reports and listen to their findings. That is also why EAs are very important to me. Both personally and on behalf of CFV, I strongly desire to continue offering my perspective and information to influence Forest Service projects. In order to share my experience and information with the Forest Service, I now rely even more on the EA process. But when the Forest Service authorizes projects using CEs, it will not provide an EA for public review. Therefore, even if those projects are preceded by collaborative processes, I personally will not be able to provide informed, site-specific input on these projects. My decades of experience and personal knowledge about the places being affected will not be part of the process anymore.

39.    Even if collaborative processes do include opportunities for site-specific input (for which there is no requirement), CFV and its members will have to decide whether to join those processes before they even know whether the project may harm places they care about. The Forest Service is constantly working to find stands to log, long before the public is made aware of such a project or knows whether an EA will be prepared.

40.    At the time of filing this case, the Cherokee National Forest was once again in the process of deciding where to log on the western side of Holston Mountain in the West Flatwoods

analysis area, which includes the Flint Mill Mountain Treasure area. Similar preparatory work was beginning on the Pond Mountain Project in the Laurel Fork watershed, which includes the White Rock Mountain Treasure area. CFV was particularly worried about these projects at the time because they were under the threshold to qualify for the new CE. Both then and now, under a Secretarial Memorandum and later under a letter from the Chief, the Forest Service is *required* to use CEs whenever available. The West Flatwoods project has not moved forward yet, but the Forest Service is surprisingly preparing a draft EA for the Pond Mountain project even though it was under the threshold for the CE. CFV has provided alternatives for consideration in the EA, and we are waiting to see whether our recommendations were accepted.

41.    We have since learned why Pond Mountain is moving forward with an EA. The Forest Service has not been allowing the new CEs to be used, at least in our region, but only because of this lawsuit. If this lawsuit is out of the way, they will begin using them when available, as directed by the Chief, including for upcoming projects like West Flatwoods and the dry forests initiative projects. I plan to continue visiting and taking others to the West Flatwoods area, as I long have. I worry about the impacts that I will see in this area, and especially how those impacts will be worse than they could have been if the Forest Service had used an EA instead of a CE.

42.    CFV fully intends to participate in the decision-making process for these projects. However, CFV is no longer able to rely on the certainty of Forest Service EA analyses to understand what is at stake from these logging projects. Therefore, CFV will either be forced to blindly decide whether to join in time- and resource-intensive collaborative processes for these projects that may or may not provide meaningful opportunities for input or spend its limited time and resources gathering information about potential impacts on its own.

43.    The injuries to CFV caused by the Forest Service's new rule and particularly the CEs would be redressed by an order from this Court vacating the rule.

44.    My own personal interests are fully represented by CFV's participation in this litigation

I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this day of November 18, 2024

Catherine Murray