UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| THE CLINCH COALITION, *et al.*, | ) | |
| | ) | |
|   Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE, *et al.*, | ) | |
| | ) | |
|   Federal Defendants, | ) | Case No. 2:21-cv-0003-JPJ-PMS |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN LOGGERS COUNCIL, *et al.* | ) | |
| | ) | |
|   Intervenor Defendants. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF DAVID RAYMOND GOVUS**

I, David Raymond Govus, declare as follows:

1. My name is David Raymond Govus. I live in Ellijay, GA. This declaration is based on my personal knowledge, information, and belief.  I am over the age of eighteen (18) and suffer from no legal incapacity.

2. I own and live on a farm that is adjacent to the Chattahoochee National Forest where I grow hay and apples. In addition to farming, I also own and manage some rental property. Prior to this work I was a grading contractor for a number of years.

3. I have been visiting the Chattahoochee National Forest for decades. I enjoy grouse and woodcock hunting as well as trout fishing on the Forest, and I also have an interest in botany. I like to visit the Forest to observe the diversity of plant species, and I especially

enjoy looking for different species of trillium. When I visit the Forest, I spend most of my time in the Cohutta Mountains, the Rich Mountains, and in the Etowah and Toccoa River headwaters. I try to make at least 30 trips a year to the Forest, with more of these trips taking place in the winter when it is cooler and hunting season is open. I intend to continue using the forest in this way for as long as I am physically capable.

4. Specifically, I have fond memories of a visit to Cashes Valley with my wife to view a hillside of blooming Trillium Grandiflorum. This was in the Mountaintown Roadless Area. We also enjoy visiting the Rich Mountains to see blooming Trillium Vasey. I also especially enjoy trout fishing and regularly visit Turniptown Creek in the Rich Mountains, Big Creek at the head of the Toccoa River, and Mountaintown Creek in the Mountaintown Roadless Area. All of these creeks are on Forest Service land.

5. The Chattahoochee National Forest is a vital resource to me and other residents of northern Georgia. It provides a variety of recreational opportunities, including hunting and fishing; it protects the headwaters of the Savannah, Tennessee, Chattahoochee, and Alabama Rivers; it provides unique opportunities for solitude; and it provides unspoiled scenic beauty, which is a major economic incentive for our region. If the Chattahoochee National Forest weren't protected, the ridgelines would be jammed with houses. The beauty of the Forest is what draws tourists to northern Georgia, and these tourists power our local economies.

6. I have been a member of Georgia ForestWatch for more than 20 years, and I served as a board member for approximately 16 years, from 2002 until 2018. I currently serve as a district leader for Georgia ForestWatch, which is a volunteer position. I am familiar with the mission and work of Georgia ForestWatch, which is to enhance the health of

Georgia's National Forest by protecting the forests and streams and advocating for natural processes and improvements to the Forest Service's management.

7.  In my current capacity as a district leader, I often visit the Chattahoochee in order to monitor and report illegal recreational activity that the Forest Service lacks the resources and staff to detect and prevent. For example, I look for Forest Service gates that have been torn down, illegal motorcycle and off-road vehicle trails, and illegal camping. These activities can and do cause harm to forest resources, creating erosion which delivers sediment into nearby streams. This is especially important on the Chattahoochee National Forest, as we receive copious amounts of rain averaging over 60 inches per year. Even though the Chattahoochee National Forest Plan prohibits these activities from occurring in certain areas, the Forest Service lacks the resources and staff to effectively enforce these prohibitions. They simply don't have the necessary funding to put enough boots on the ground. In many cases, Ranger Districts have fully funded timber operations but little money for road maintenance. As a result, the road system on the Chattahoochee National Forest is collapsing with many important roads impassable to all but high clearance 4-wheel drive vehicles. These funding shortages demonstrate the need for thorough review of any proposed timber cutting, roadbuilding, and permitting that takes place on the Chattahoochee National Forest.

8.  Another important aspect of my work with Georgia ForestWatch is to review the NEPA documents for the Forest Service's project proposals, such as those which include timber harvests and related road building. We often find that the Forest Service doesn't have the staff capacity to verify the conditions of stands they are proposing for treatment; instead, they rely on outdated stand data gathered years ago. When the Forest Service proposes to

harvest certain stands of trees, I work with other members of Georgia ForestWatch to actually visit the stands, verify their condition, and relay this information back to the agency and to the rest of Georgia ForestWatch's members. This is a difficult and time-consuming job, but it is also important because we regularly find that actual forest conditions are different than those which the Forest Service anticipated.

9. For example, in 2011, the Forest Service proposed the 6,000-plus-acre Forest Health Stewardship Project, the purpose of which was to thin stands which the agency believed were overstocked with pines. I participated in Georgia ForestWatch's investigation of the stands that the Forest Service prescribed for treatment. When Georgia ForestWatch visited these stands, we discovered that there was only a minority of pine trees there—and certainly none of the stands could be characterized as "overstocked" with pines. After receiving this information, the Forest Service pulled the project.  The Forest Health Stewardship Project continues to be indicative of the risks of large project proposals. The bigger the project footprint, the more detail that the Forest Service can miss, and consequently, the more likely the Forest Service makes mistakes. In my experience, well-supported and ecologically appropriate projects tend to be much smaller. A good example of this is the prescribed fire that the Forest Service applied to a 10-acre site on Montgomery Creek in the Etowah drainage which contained a number of Table Mountain Pines. These trees require fire to open up their cones and disperse viable seeds. Some 15 years after the applied fire, I visited the site and was pleased to see a healthy crop of young Table Mountain Pines.

10. Another example of how our involvement can improve Forest Service projects is from the Etowah River Watershed Project. In that project, the Forest Service proposed to

restore short leaf pine stands by removing other species and planting replacement trees. But when Georgia ForestWatch visited some of the stands prescribed for treatment, we saw that some of the stands the agency planned to harvest contained short leaf pine that were marked to be cut—in other words, they were planning to cut the very type of trees the project was intended to promote. After we pointed this out to the Forest Service, the agency changed the marking to avoid these trees.

11. Detecting and reporting these discrepancies is important because certain Forest Service projects—particularly those which involve timber harvest and road building—harm the resources on the Forest that I and other members of the public value. By providing more accurate information to the Forest Service, I and other Georgia ForestWatch members seek to help the agency avoid wasting its financial resources and creating unnecessary environmental harm.

12.  Even when the Forest Service carries out a logging project based on accurate stand data, it still causes serious environmental impacts. To access stands prescribed for treatment, loggers build "temporary" roads that become permanent sources of erosion, sending mud and silt into nearby streams, in some cases filling up culverts, and damaging roads. Siltation and sedimentation are detrimental to aquatic wildlife, and ongoing logging leads to harmful effects in some streams that I enjoy fishing in.

13. For example, all of these negative effects took place in the wake of the Forest Service's Brawley Mountain Project on the Chattahoochee National Forest. In that project, the Forest Service's objective was to create an open woodland ecosystem and to create habitat for the Golden Winged Warbler. In response to the Forest Service's draft EA, Georgia ForestWatch submitted comments informing the Forest Service that the site in

question was not ecologically suited for woodland restoration and that attracting new Golden Wing Warbler populations was very unlikely given the species' local decline and movement to more northern climates.  However, the Forest Service disregarded our concerns and moved forward with the project anyway. Unfortunately, as we suspected it would, the project failed to establish woodland conditions and did not result in a return of Golden Wing Warbler populations. But the project *did* produce significant erosion from logging roads and left substantial amounts of bare ground which has taken years to revegetate. During the logging at Brawley Mountain, many mature acorn-producing oak trees were cut. Many of the trees that were left have since died as a result of the repeated prescribed fire applied to the area. These oak trees have been replaced by species such as Virginia Pine, Locust and Devils Walking Stick. This is disturbing, as oak acorns are the most important food source for a variety of animals. In addition, in the wake of the Brawley Mountain logging, invasive Japanese Stilt Grass has spread along many of the "temporary" roads used to remove the timber throughout the project area.

14. Another example of environmental harm that can arise from poorly planned and executed Forest Service projects is the aftermath of the Fightingtown Creek Project. In that instance, the Forest Service proposed harvesting some stands that Georgia ForestWatch determined would be very difficult to access with the type of equipment used by loggers these days; we pointed this out to the Forest Service, but the agency moved forward with a timber sale anyway. The contractor who won the bid hauled the timber out with a tractor trailer truck. This required creating huge, cleared areas for the truck to turn around; these areas are now devoid of vegetation.  The soil that the loggers drove across with the tractor trailer truck has become heavily compacted, which will negatively impact

vegetative growth for decades. Compacted soil does not allow water to percolate into the subsoil, and accordingly, leads to increased runoff and soil erosion.

15. Although in some cases, like with the Fightingtown Creek Project, the Forest Service disagrees with the input of Georgia Forest Watch, in many cases the Forest Service uses the information we provide to improve projects. The NEPA process, and particularly the environmental assessment (EA) process, is an essential part of this collaborative effort. In my capacity as a Georgia ForestWatch member, I have helped evaluate multiple Forest Service EAs and have many drafted public comments in response.

16. When the Forest Service prepares an EA for a project, Georgia ForestWatch uses the information that is included within it to verify the forest conditions that the agency is proposing to treat, to develop and suggest alternatives, and to recommend mitigation strategies.

17. For example, during the Cooper Creek project, Georgia ForestWatch provided public comments in response to the Forest Service's draft EA, which proposed logging along a steep slope on the northern side of Duncan Ridge that contained a large number of mature Northern Red Oaks. I was shocked when I read the Forest Service's project proposal. Duncan Ridge is an unroaded area that is near the Blood Mountain Wilderness and is popular with hikers. Despite these many attributes, the Forest Service considers it open to logging. I helped draft Georgia ForestWatch's public comments to the agency, which recommended against logging these stands. In response, the agency dropped most proposed logging of the mature forest on the high elevation areas on the north side of the ridge.

18. Despite this success, other portions of the project went forward and were advertised for sale. The Burnette Creek area was the first to be offered for sale under the Cooper Creek Project. When it was initially listed, Georgia ForestWatch visited the affected stands. In addition to containing mature, old growth trees, we found that the area was very remote, steep, and difficult to access. Logging in such areas can lead to exacerbated impacts. Further, the available access roads were long and winding. At an initial open house meeting about the sale, loggers questioned whether they would be able to get the necessary equipment to the stands. Ultimately, the Forest Service received no bids on the first offer. They lowered their price and accepted a bid from a questionable company who was ultimately unable to qualify for the necessary bond. The contract was offered a third time in Spring of 2024, and though it has received a bid, logging has yet to begin. This saga is indicative of the poor decision making that the Forest Service is currently exercising on the Chattahoochee. Specifically, the Burnette Creek Sale is a prime example of an area of the forest which is simply not suitable for logging: reputable logging companies know it and Georgia ForestWatch knows it, but seemingly, the Forest Service does not. I most recently visited the cutting units on the Burnette sale last fall. I am saddened to think of what will transpire on it in the coming years—especially as the effects of CE implementation cumulatively weaken the Forest as a whole.

19. Virtually all of the timber projects on the Chattahoochee fall under the 2,800-acre threshold that would apply to the Forest Service's new categorical exclusion (CE) allowing logging. This means that Georgia ForestWatch and other members of the public will lose the ability to meaningfully improve Forest Service timber projects in the way that we have previously done during the EA process.

20. For one thing, we will lose a lot of detailed information about *what* the Forest Service plans to do, *how* it plans to do it, and *where.* For example, we expect to lose information like the method of harvest for a particular stand, the percentage of trees that would be treated, and where temporary roads would be located. For example, the Fightingtown Creek project's EA included incredibly detailed information and maps about the percent of trees to be cut per stand and where temporary roads would be built. The specificity of information enabled us to go right to the affected areas and conduct our own surveys. In one such instance, when we visited the site of a proposed temporary road, we found that it was extremely wet from typical summer rains. We submitted comments addressing our concerns and eventually the agency abandoned the road plans. Had the project not had an EA, we likely would not have been able to meaningfully study the area, and the issue would not have been raised. Indeed, as proposed, because the Forest Service failed to account for typical climactic factors, their initial study of the road would not have revealed the harm it risked causing. This is an especially concerning problem with CE's. If the agency believes logging is *categorically* not going to cause harm, then why would the public deserve to know these details? This loss of information will limit my and Georgia ForestWatch's ability to identify inaccuracies in the Forest Service's proposals as well as sensitive resources that the Forest Service proposes to put in harm's way. On the Chattahoochee National Forest, no two places are exactly alike. There is a great amount of biological and geological variety from one area to the next. Before judging the impacts of a project, it is crucial to know exactly where a project will be implemented, how much timber will be cut, and where roads will be constructed.  As the many examples included above illustrate, without Georgia ForestWatch's engagement, the

Forest Service is very likely to miss important pieces of the ecological puzzle. Without the relevant information, we will be unable to inform them of such mistakes. Additionally, even if we had all of the necessary information, our only window for engagement—under the scoping process—does not allow enough time to meaningfully participate. As an organization primarily made up of volunteers, the 30-day scoping process is not always enough time to even get out into a particular area of the forest, let alone to meaningfully analyze and report on its condition—especially when the area in question is up to 2,800 acres.

21. In addition, if the Forest Service uses only CEs for timber projects in the future, as it has received guidance to do, it simply won't be possible for the agency to make sure that its projects are furthering the goals of the Chattahoochee National Forest Plan—a document which creates binding, overarching goals and guardrails for forest management. I participated in the development of the Forest Plan for the Chattahoochee National Forest; it is a complicated document, which reflects the ecological complexity of the Forest itself. Without preparing EAs for its projects, the Forest Service will not develop an adequate understanding of how timber harvests, road building, and herbicide applications will collectively either frustrate or further the goals of the Forest Plan for individual areas of the Forest.

22. As part of my duties as a District Leader for Georgia ForestWatch, I visit Forest Service projects before and after they happen in the Conasauga and Blue Ridge Ranger Districts. I will continue to do the same for projects implemented under a CE. While I am always saddened to see the impacts of logging in the forest, I will feel especially devastated to

see impacts that would have otherwise been avoided through analysis and review under an EA.

23. These concerns are not lessened by the fact that the new NEPA regulations limit the Forest Service to using the 2,800-acre harvest CE for "restoration" projects. Indeed, this label is meaningless. The Forest Service already labels all of its timber harvest projects on the Chattahoochee as "restoration," even when they have far from restorative goals and consequences.

24. For example, in the Cooper Creek Project, the agency proposed to log hundreds of acres of mature white pine for the stated reason of improving the health and vigor of these very same trees. Yet when I visited these stands, I found the trees to be perfectly healthy—not to mention the fact that they bordered Bryant Creek, one of Georgia's finest native brook trout streams. The vegetation treatment that the agency proposed was unnecessary and it risked collateral damage to a rare resource, but the trees were valuable as harvestable timber because they were around 90 years old (on average). In sum, regardless of how projects are labeled, restoration is rarely the *only* purpose for logging. Rather, like here, timber production is often an objective in and of itself. Indeed, even when the Forest Service has good intentions for a project, harvesting can nevertheless have serious impacts and tradeoffs. After reviewing the Forest Service's EA for the Bryant Creek project, Georgia ForestWatch raised these concerns with the agency in public comments. Ultimately, we were successful in convincing the agency to drop some of its proposed harvests in the Bryant Creek area. Yet, the agency retained many of the proposed harvests, still with the stated sham purpose of "restoration." Long after the project is carried out, White Pines will continue to dominate the forest along Bryant Creek but the

watershed will be impacted by runoff from the "temporary" roads and skid trails created by the large machines used in modern logging. I am dismayed that the Forest Service is willing to take a chance on a beautiful stream like Bryant Creek, especially under false and misleading pretenses. I fondly recall memories fishing in the stream and sharing stories with friends about an 11-inch native Brook trout that was rumored to have been caught there. Brook Trout have been adversely affected by the introduction of non-native Rainbow and Brown Trout and only exist in headwaters above waterfalls which bar upstream migration of Browns and Rainbows. Streams like Bryant Creek are the last refuge for Brook Trout at the southern most extent of their range. It is reckless to log along these headwater streams for no particular reason as is the case with the Burnette sale. Streams collect the impacts that happen in their watersheds.  Accordingly, logging that occurs in these national forest watersheds will affect my experience as an angler.

25. The availability of collaborative processes will also not protect my interests in the Forest. Such a requirement is a sorry substitute for the robust protection afforded by the EA process under NEPA. My experience participating in collaborative processes with the Forest Service has been disappointing. For example, for the Foothills Landscape Project on the Chattahoochee National Forest, the Forest Service initially announced a plan to harvest trees, conduct prescribed burning, and spray herbicides over tens of thousands of acres of land. The Forest Service held a series of poorly-attended "collaborative" meetings over a three-year period to discuss the project proposals. Many of the meetings were held on workday nights or even during the workday, and many meetings featured more Forest Service personnel in attendance than the public. There was a significant power differential in place at the meetings which was not conducive to gathering

meaningful citizen input. What's more, most of the information put forward at the meetings was displayed in the form of one-line slogans on poster boards; it was too vague to provide members of the public with an idea of what resources on the Chattahoochee would be impacted. The location of where planned activities were to be executed was not identified, which made informed comment impossible and rendered the overall collaborative process just as much of a sham as a label of "restoration."

26. The Forest Service has since revised its initial EA for the Foothills Project, and currently proposes to use a "programmatic" approach which facilitates "tiering" of future site-specific NEPA analyses to its new programmatic EA. While the Foothills Project area is over 100,000 acres in size, the future site-specific projects will be similar in scale to other vegetation management projects completed on the Chattahoochee in recent years—i.e., less than 2,800 acres in size.  And to be clear, even the smallest projects can have significant impacts in this region of the forest. For instance, when Georgia Forest Watch visited the Moneyham site, we discovered a good deal of erosion on steep slopes as a result of frequent prescribed fire and reported this to the Agency. The initial proposal to roll out under the Foothills umbrella, the Moneyham sale, in fact is less than 300 acres. For each of these site-specific projects, the big question will be whether it requires further analysis or not, versus whether it may be already covered by the programmatic analysis. Currently, Georgia ForestWatch can point to specific resources that need site-specific analysis, as deferred from the programmatic EA. But if the CEs are opened up for use, Georgia ForestWatch will lose an argument that further analysis is needed. Instead of preparing EAs for these projects, as the Forest Service has done in the past, the agency will likely instead use the 2,800-acre "restoration" CE wherever it is available. The

Forest Service's July 2021 revised EA for the Foothills Project specifically contemplates using CEs for site-specific implementation.

27. The Foothills Project area is a place I visit often. is The Etowah River headwaters, which is in the Foothills area, is just twenty-five miles to the east of my home. I have spent a good deal of time fishing in Montgomery and Jones Creek, which are also in the Foothills area and join to form the Etowah River. I also frequently hunt in the Foothills area. I have specific plans to return to the Foothills Project area in the coming months, and more generally, I plan to return every year for as long as I am physically able. For example, I plan on hunting grouse and woodcock in the area this winter and will make a trip to fish for brown trout in either Jones or Montgomery Creek this fall when the spawning season starts. I also hunt, fish and gather mushrooms annually along Cochran Creek, another tributary of the Etowah, which is also in the Foothills Project area. Surveys by Georgia Forest Watch on the headwaters of Montgomery Creek discovered a large section of old growth forest in Penitentiary Cove which the Forest Service was unaware of. The area now has partial protection. I and other Georgia Forest watch members enjoy visiting the area to view the large trees and I hope to continue to do so for as long as I am able.

28. The Foothills Project will likely impact my interests in these places. I find logging sites to be very ugly and unpleasant to be anywhere near. Additionally, woodcock—a species which I enjoy hunting—avoid newly cut-over areas, and no matter how carefully the Forest Service plans, timber cuts inevitably add silt to streams, which harms the populations of fish that live there. Each of these impacts negatively affect the ways in which I use the forest. Many of them could and should be avoided through the EA process, with its scientific analysis and consideration of both alternatives and  public

input. Yet, when the Forest Service implements these actions under CEs, these and other impacts to my interests in specific areas of the Chattahoochee will never be meaningfully considered by the agency. Seeing harms that could have been avoided through site-specific EAs will be doubly painful for me.

29. For all of these reasons, the Forest Service's implementation of its new NEPA regulations will harm my interests in the Chattahoochee National Forest. I feel grateful to live in a country with so many invaluable public lands, but I am deeply alarmed at the blatant attempt at de-regulation that these CEs represent. Huge damage has been done to forest lands across the southeast by reckless agency decision making. I can still recall a Georgia ForestWatch lawsuit from 1994 which addressed clear cutting and hundreds of miles of roadbuilding in the Chattahoochee. Scars from those actions remain vivid on the landscape today. Now, with global warming knocking at the door, it is time now for more thoughtful regulation than ever.

30. By effectively eliminating the requirement for the Forest Service to prepare EAs for timber projects on the Forest, the Forest Service will be flying blind: I and other members of Georgia ForestWatch will not be able to rigorously review Forest Service proposals and provide detailed feedback as we have done numerous times in the past. This will, in turn, increase the likelihood that the agency carries out unnecessary timber harvests and builds unnecessary roads near beloved creeks and streams. These activities will diminish my enjoyment of the Forest and scar the landscape for untold decades in the future.

31. This injury would be redressed by an order from this Court vacating the Final Rule.

32. I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this _20th_ day of _November_ 2024.



David Govus