**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| THE CLINCH COALITION, *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES FOREST SERVICE, *et al.*, ) <br> ) <br> Federal Defendants, ) <br> ) <br> and ) <br> ) <br> AMERICAN LOGGERS COUNCIL, *et al.* ) <br> ) <br> Intervenor Defendants. ) <br> ) | Case No. 2:21-cv-0003-JPJ-PMS |

**DECLARATION OF DAVID SLIGH**

I, David Sligh, hereby declare and state as follows:

1.      My name is David Sligh and I live in Crozet, Virginia. This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen and competent to testify. I submit this declaration in support of Wild Virginia, which is one of several organizations challenging regulations promulgated by the United States Forest Service ("Forest Service") and the Council on Environmental Quality ("CEQ") purporting to implement the National Environmental Policy Act ("NEPA").

2.      I am Conservation Director of Wild Virginia, a role I have held since 2015. During my tenure at Wild Virginia, I have worked to protect and restore forests, waters, and wildlife species in Virginia and to help citizens participate effectively in decision-making

1

processes that affect their interests. I hold a B.A. in environmental science from the University of Virginia and a J.D. from Vermont Law School. I am a member of the District of Columbia Bar.

3.      Wild Virginia is a non-profit organization, incorporated in Virginia, which was founded in 1996 under the name Shenandoah Ecosystem Defense Group. The name was changed to Wild Virginia in 2003.

4.      Wild Virginia's mission is to protect and restore natural ecosystems in Virginia and the communities that use and depend on those resources. Wild Virginia's programs are designed to serve this mission by educating the public, landowners, and other stakeholders about threats to natural resources and ecosystems; advocating for connectivity and integrity of Virginia's forests and waters; and influencing decision-makers by mobilizing and equipping citizens to represent their own interests. Currently, we are particularly focused on water quality issues including water quality problems caused by logging and other construction activities that displace forests.

5.      Wild Virginia is based in Charlottesville, Virginia and works throughout the state. More than 500 members and dozens of volunteers support Wild Virginia's work and many participate in efforts to insist that government agencies' decisions comply with the law and reflect their values. Efforts have been intentionally focused on national forests in Virginia.

6.      The George Washington and Jefferson National Forests in Virginia are incredibly important for many reasons. They harbor rare and sensitive species, provide habitats that are now only minimally available on private lands, provide important plant and animal migration corridors, store millions of tons of carbon, and filter our air and water. The forests are the backbone of many local economies. They are also culturally important to indigenous people and people like me whose ancestors have lived in Virginia since the mid-1700s. It is very important

2

to me that these forests are soundly managed consistent with best available science and public input into the management of public forests.

7.      In addition to my position as Conservation Director, I am also an active member of Wild Virginia. Members of Wild Virginia—including me—use, enjoy, and benefit from Virginia's national forests and the ecosystems, streams and wetlands, and range of animal and plant species found there. For example, members enjoy botany and take trips to discover what is in bloom in different areas of Shenandoah Mountain. Members enjoy hiking in the mountains and discovering pond-like habitats where they can look at frogs, salamanders, newts, and rare plants.

8.      Members of Wild Virginia get physical, spiritual, and mental health benefits from hiking in the mountains of Virginia's national forests, and some members own property adjacent to the national forests. Members rely on clean water from Virginia's forests for recreation and drinking, and they are concerned about the water quality that is dependent on well-managed forest habitats. Some of our members joined Wild Virginia because of their specific interest in preserving and protecting national forests—keeping them as wild as practicable. Many of Wild Virginia's members plan to continue using Virginia's national forests for as long as they are able.

9.      I personally have a particular interest in the streams and waterways of Virginia's national forests. Prior to joining Wild Virginia as a staff member, I spent my career as a water quality regulator and a scientist for the Virginia state government and have worked for several other  non-profit organizations focused on conservation and environmental protection, and water resources continue to be important to me. Whenever I am near a beautiful stream on one of Virginia's national forests—usually about 10-12 times per year—I enjoy exploring and looking for benthic macroinvertebrates like crayfish and caddis fly larva. Some of my favorite areas on

3

Virginia's national forests are in the Craig Creek watershed, including Barbours Creek and Roaring Run, and Stony Creek, in Giles County. I plan to continue exploring Virginia's national forests, including these streams and rivers, for as long as I am able. This will continue to involve 10+ visits annually. I also hope to take Wild Virginia supporters to areas of the national forests I love, including the ones named above, so they can experience them too.

10.     Decisions made by the Forest Service, such as whether and where to allow oil and gas operations, grazing, clearing of rights-of-way, logging operations, and road construction, have the potential to degrade the habitats and water quality of Virginia's national forests, which are important to Wild Virginia's members. For example, building roads and removing mature forests changes forests habitats and leads to habitat fragmentation. Application of herbicides threatens numerous species on the forests. Bringing machinery into the forests to log, build roads, or construct pipelines introduces invasive species into areas where they didn't exist previously. That same machinery often causes erosion, clogging our streams with sediment and sometimes causing landslides. All of these impacts adversely affect my ability to enjoy and use the forests along with the ability of Wild Virginia members and other members of the public.

11.     Indeed, decisions about whether and where these impacts should occur are some of the most consequential decisions that the Forest Service ever makes, and these decisions also tend to involve unresolved conflicts over how the agency carries out its multiple-use mandate and manages the resources under its purview. Any time a Forest Service decision involves potentially significant impacts on Virginia's national forests, whether to soil, water, native species and their habitats, cultural heritage, recreation, scenery, or opportunities for solitude, it is Wild Virginia's mission to protect those resources, which often involves participating in the NEPA process and assisting the Forest Service with additional information needed to identify

4

potential harms and avoid them, involving members and the public to oppose unnecessary harms, or both.

12.    Public input is critical to this process. In my experience, people who use the national forests are the best experts on it. Many Forest Service staff do their best to understand an area but there is a lot of turnover in the agency and staff can only understand so much by spending a couple of years in an area. The people who visit places year after year—often people whose parents and grandparents visited those same places—have an irreplaceable well of knowledge. If the Forest Service doesn't have sufficient public input, special places and sensitive resources in areas can be destroyed without the Forest Service even knowing.

13.    Wild Virginia campaigns focus in part on protection of national forests in Virginia, through involvement in NEPA reviews ranging from broad-scale Land and Resource Management Plan ("Forest Plan") revisions for both the George Washington and Jefferson National Forests to individual project reviews, including timber sales and other site-specific actions. During these NEPA reviews, Wild Virginia submits information from its own investigations along with detailed scientific and legal analyses, and recruits and trains citizens to participate in these processes. We will continue this work moving forward.

14.    Wild Virginia opposed potential changes to the George Washington National Forest ("GWNF") Forest Plan in a 2014 NEPA review that would have increased the area within the Forest that could have been used for fracking. We engaged by providing information about potential water quality impacts for communities downstream from the headwaters areas in the James River and Potomac River basin where these activities could occur. Members of Wild Virginia also attended public meetings, submitted public comments, and analyzed data related to plants and other wildlife to help contribute to the planning process. The revised plan limited the

5

areas available for fracking to those where parties already had mineral rights or where leases had previously been granted, protecting the rest of the 1.1 million acres in the Forest.

15.    During the past several years, Wild Virginia has also participated in NEPA reviews for at least fifteen separate Forest Service projects. That participation has served Wild Virginia's mission and improved resource management decisions and enhanced protections.

16.    For example, Wild Virginia participated at every stage of the NEPA process for the Lower Cowpasture Restoration Project on the GWNF, which spanned an area of nearly 120,000 acres and proposed dozens of separate management actions. Wild Virginia was concerned about aspects of the project and used NEPA to advocate for changes to reduce water quality degradation, spread of non-native invasive species, and impacts on old-aged timber stands, and to insist on additional and enhanced pre- and post-project monitoring.

17.    We consider it a win-win when the Forest Service changes project proposals to address concerns raised by the public, including Wild Virginia. For example, Wild Virginia submitted comments on the Lee Ranger District Range Management Project, opposing continued use of floodplain and sensitive areas for livestock grazing that had damaged streams and threatened continued impairments. Wild Virginia asserted that the grazing leases must be ended to protect water quality and sensitive species and the Forest Service decided that two of three land areas in the project would be converted to natural habitats and that livestock would no longer be allowed on these areas. This change better protected environmental resources important to me, Wild Virginia, and Wild Virginia's members, while allowing the Forest Service to continue to effectively manage public lands. This is how the NEPA process was designed to work—public input and scientific analysis leading to better decisions. But the process cannot

6

work if the Forest Service removes opportunities for public involvement and minimizes the importance of scientific analysis.

18.    As another example, in December 2016, Wild Virginia submitted comments opposing the Hearthstone Lake Dam Rehabilitation Project. Wild Virginia pointed to evidence indicating that parties may have already taken action that could improperly limit the range of reasonable alternatives to be considered under the NEPA process. The comments further provided published research findings and analyses of watershed data to support the need to examine dam removal as a preferable alternative. Unfortunately, the Forest Service moved forward with this project without addressing Wild Virginia's concerns through the NEPA process.

19.    More recently, in 2022 Wild Virginia submitted comments on the Environmental Assessment ("EA") prepared for the Forest Service's Archer Knob Project. We expressed concerns about water quality impacts in impaired watersheds, the use of Forest Service roads with complex crossings of the Little Calfpasture River and Daniel Run, inadequate consideration of impacts to sensitive and endangered species, and planned harvest units in the Archer Knob Potential Wilderness Area and Archer Knob and Elliot Knob Virginia Mountain Treasures. The Forest Service is yet to finalize that project.

20.    Given our reliance on the NEPA process to fulfill our organizational mission, Wild Virginia engaged in the Forest Service's process to develop its new NEPA regulations. In 2019, Wild Virginia signed on to comments submitted by The Wilderness Society, the Western Environmental Law Center, and the Southern Environmental Law Center, attached to which was a comprehensive analysis of Forest Service projects completed between 2009 and 2019 in the Southern Appalachian national forests, including the GWNF and Jefferson National Forest

7

(JNF). This analysis showed the environmental benefits of the NEPA process under the previous

Forest Service rules. Overall, for projects for which an EA was completed, the NEPA process

resulted in roughly 5,000 acres of commercial timber harvests being dropped from final

decisions in the Southern Appalachians. Of those, over 1,500 of the acres spared from timber

harvest were on the GWNF and the JNF—a reduction of over 12% compared to the commercial

harvest acreage proposed at the outset of the NEPA process.

21.     The EA process, in particular, facilitates these improvements during a project's

development. With its larger window for public involvement and greater volume of

informational and analytical output from the agency, the EA process enables stakeholders to

provide more rigorous feedback about Forest Service proposals. Fortunately, the Forest Service

often uses that information to inform its analysis and modify projects to avoid significant

impacts. In the rare circumstance where that is not achieved, Forest Service regulations provide

another important opportunity for Wild Virginia and other members of the public to articulate

their concerns: we have the opportunity to file a pre-decisional objection to the Forest Service's

draft decision notice and EA. In short, the communication that is facilitated by NEPA helps to

resolve conflicts over Forest resources during project development.

22.     Preparing a project that avoids significant harm requires more than just foresters

identifying stands with merchantable timber; it also requires botanists, archaeologists, wildlife

biologists, hydrologists, fisheries biologists, and recreation specialists to prioritize locations for

logging that will do the most good with the least harm. Without early and substantial

involvement of the staff most familiar with the resources likely to be harmed by logging, projects

are likely to include stands that would cause unnecessary harm. These harmful impacts are not

necessarily indicative of a Forest Service desire to log sensitive areas (although some foresters

8

do intentionally target older, healthier areas), but are often just mistakes or are the result of incomplete information, which can be supplied by the public through comments at every stage of the NEPA process. The NEPA process has always been the backstop for fixing those mistakes because site-specific analysis and informed public input can point out errors and blind spots. That is why the majority of changes to logging projects occur in response to public comments.

23.    Often, new information is discovered through public involvement during the scoping process, correcting factual mistakes and providing insights and perspectives that improve the Forest Service's analyses and lead to positive changes in projects. However, in many other cases useful new information comes later in the NEPA process. For example, on the Lee Ranger District Range Management Project, Wild Virginia was able to arrange a field visit to the project areas with Forest Service personnel after the scoping comment period had been closed and through our meeting with those personnel and our subsequent comments on the draft EA we advocated changes to the project that were reflected in the final decision.

24.    More fundamentally, projects developed under categorical exclusions ("CEs") do not provide the same opportunities for Wild Virginia and other members of the public to analyze the potential impacts, to provide detailed feedback, and to develop alternatives or mitigation strategies that can help the Forest Service achieve the goals of the project while avoiding unnecessary environmental harm. One crucial difference between CE and EA projects is that the Forest Service does not consider alternatives to its proposed actions under CEs, and comments suggesting alternatives are disregarded as beyond the scope of the analysis.

25.    Although Wild Virginia's overall approach to CE and EA projects starts in mostly the same way, our ability to move through this approach is far more limited for CE projects. For CE projects, the Forest Service provides significantly less information and analysis to the public.

Whereas in EAs the Forest Service provides analysis of impacts to soil, water, biological communities, and cultural resources, the Forest Service typically provides none of this information for CE projects. Frequently, the scoping notice for a CE project will not even provide information about which stands of trees are being proposed for management, and the included maps are often highly general and low resolution, making them very unilluminating. The information provided typically makes it unclear what streams are affected, whether the agency is cutting old growth and other rare habitats, and provides no information on cumulative effects. Even when Wild Virginia reaches out to the Forest Service to gain basic information that would be provided in an EA, there is no guarantee the Forest Service will provide the requested information and it can often take weeks or even months to get project information from the Forest Service. This information is vital; it enables us to hone our surveys and analysis on the areas of greatest concern, such as the locations of sensitive soils, rare species, unique biological communities, and threatened waterways.

26.    If we are not able to get the information that would be provided in an EA, Wild Virginia will be forced to continue spending more time filing requests under the Freedom of Information Act, and collecting and analyzing information on potential soil and water quality impacts and habitat fragmentation caused by projects that the Forest Service otherwise would be required to disclose. These additional efforts will force Wild Virginia to abandon other areas of its mission-driven work, although on the whole, Wild Virginia will not be able to use these alternative means of gathering information to make up for the loss of information in an EA—at best, these other means of gathering information can only lessen some of the harm.

27.    Having to shift our resources like this would impede our ability to perform one of our key organizational missions—helping people understand the environmental consequences

and ways to be involved in various decisions, including decisions made by the Forest Service on Virginia national forests.

28.     Moreover, CE projects provide a single scoping period (often 30 days) in which public comments are allowed. As a practical matter, it is all but impossible for Wild Virginia to gather the necessary information, analyze impacts, write comments, and inform the public about the project within 30 days. Comparatively, for projects developed under EAs, Wild Virginia can utilize the window of time between scoping and publication of the draft EA to prepare surveys, conduct scientific analysis, and communicate with its members. This additional time allows us to develop a more comprehensive analysis of a project area, whereas under the limited timeframe for CEs, we often cannot do so.

29.     Wild Virginia is very concerned that the new and revised CEs will shift projects including major logging projects out of the EA process, depriving the public of a meaningful opportunity to influence how its national forests are managed and forestall significant impacts.

30.     This is not a conjectural fear. One of the new CEs allows the Forest Service to categorically exclude timber management projects up to 2,800 acres in size, so long as those projects have a restoration purpose and are developed in "collaboration." This CE, known as CE 25, would encompass virtually every timber project on the GWNF and JNF—because nearly all of them have a purported "restoration" focus and are smaller than 2,800 acres—with the end result being that no such projects would be analyzed in an EA. And because the Chief of the Forest Service  has issued an order requiring the Forest Service to use the minimum level of NEPA review allowed under law, the Forest Service will be required to develop large timber projects (and others) under a CE instead of an EA.

11

31.    CE 25 has two ostensible limitations on its use, but they are cold comfort at best. First, CE 25 projects must have restoration as a primary purpose. This is a meaningless limitation in Wild Virginia's experience. The Forest Service almost always invokes "restoration" as a goal for its projects regardless of the agency's true goal, which, for example, allows the Forest Service to justify major logging projects under the banner of creating young forests. The Forest Service has such a capacious definition of the term "restoration" that every major logging project I can recall on the GWNF and the JNF has been, or could have been, for the ostensible purpose of "restoration," even if it involved intensive clearcutting. How do these projects "restore" streams and rivers degraded by sedimentation, for example? They don't. They exacerbate the degradation instead. The Forest Service's strained definition of "restoration" is especially galling in the context of CE projects, because Wild Virginia and others are not able to suggest alternatives to the proposed action that might actually be restorative.

32.    Second, CE 25 projects must be developed collaboratively, although it is not clear what the Forest Service means by this requirement. True collaboration is very time intensive and imposes burdens of time and cost on Wild Virginia and other members of the public. For example, we spent significant time collaborating on the Lower Cowpasture Project and yet we missed numerous site visits and collaborative discussion related to that project—we simply could not keep up with the time and resource investment required. It's unlikely we could sustain a similar level of investment in collaboration in future projects. On the other hand, the term collaboration could also be understood to entail something as meaningless as a public meeting where Wild Virginia members and other parties from the interested public are simply told their concerns are heard. We do not want to be listened to for the sake of it; we want our concerns to inform how the Forest Service manages our public lands. The NEPA process provides the

12

mechanism by which that happens. Without it, we have very little opportunity to keep the Forest

Service accountable.

33.     Even the best examples of collaboration are not an adequate substitute for the

scientific analysis, public disclosure, and opportunities for comments and objections that are

required under the EA process. One major problem is that collaboration with the Forest Service

often involves bargaining, between and among the agency and stakeholders, which seeks to

balance a variety of interests and values. However, Wild Virginia believes the long-term health

and sustainability of natural ecosystems in all parts of the national forests are a baseline

condition that should not be negotiated away in any area, even when that impact is accompanied

by improvements or added protections somewhere else. During the EA process, Wild Virginia

can present evidence and analysis about possible ecosystem costs and defend this position,

through formal objections if necessary. By contrast, collaboration usually involves a kind of

horse trading that Wild Virginia philosophically opposes.

34.     In sum, CE 25 would allow the Forest Service to log more acres with less analysis

and less transparency and accountability. This means that, without additional expert input from

staff or the public, there will be more mistakes. As a practical matter, this means that Wild

Virginia and other members of the public will either have to accept that the Forest Service will

move forward with projects that involve harmful logging in sensitive areas and that these effects

will not be analyzed and disclosed to the public, or alternatively that we will have to spend our

own time and resources to make sure that projects avoid these harms from the outset, before

scoping. We will also have to devote these resources to *every* project that might potentially be

eligible for a CE (which is virtually every project in this region), before we even know whether it

will be particularly harmful or whether it will be approved using a CE or an EA. By the time a

CE-level project is scoped, the critical time for steering the project away from significant harm will have already passed because it's very difficult to get the Forest Service to reconsider its proposal at that point. Once a CE project is scoped, the wheels are largely in motion to complete the project in its scoped form.

35.     I also understand that the Forest Service's new NEPA regulations include CEs that would authorize some permanent road building and special uses including utility line rights of way without analysis in than EA. These projects lead to habitat and forest fragmentation, and have potentially significant impacts, including cumulative impacts, on Southern Appalachian national forests and the surrounding lands, which must be analyzed during the NEPA process. A core part of Wild Virginia's mission is to preserve habitat connectivity and wildlife corridors. The GWNF and JNF are relatively intact compared to other forests in the eastern United States, but they are still heavily fragmented. New roads and rights of way obviously threaten site-specific impacts, but they also threaten to exacerbate the cumulative impacts of forest fragmentation. Wild Virginia's interest in protecting the GWNF and JNF will be injured if the Forest Service turns a blind eye to these types of impacts. I understand that the CE allowing special uses like utility line rights of way has a 20-acre cap but there can be significant effects from a 20-acre project in Virginia depending on where it's located and how severely it disrupts those 20 acres. That's part of what makes these forests special—they are complex and exceptionally diverse. It's also what makes the new CEs so problematic in Virginia and the rest of the Southern Appalachians.

36.     The Forest Service did not address the numerous concerns we raised in our comments on the CEs before they were finalized. Had it done so, I don't believe the CEs could have been finalized in their current form.

14

37.    A court decision vacating the challenged USFS NEPA regulations and the new

CEQ NEPA regulations will redress these concerns.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on October 21, 2024.

David Sligh