**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| THE CLINCH COALITION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE, *et al.*, | ) | |
| | ) | |
| | ) | Case No. 2:21-cv-0003-JPJ-PMS |
| Federal Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN LOGGERS COUNCIL, *et al.* | ) | |
| | ) | |
| Intervenor Defendants. | ) | |
| | ) | |

**DECLARATION OF JESS RIDDLE**

I, Jess Riddle, declare as follows:

1.      My name is Jess Riddle, and I live in Atlanta, Georgia. This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen (18) and suffer from no legal incapacity.

2.      From April 2019 until July 2021, I was the Executive Director for Plaintiff Georgia ForestWatch ("GFW"). Prior to that time, I was GFW's forest ecologist, a position I held from February 2015 until April 2019. I am still a member of GFW and am currently consulting for GFW.

3.      I grew up hiking in the Chattahoochee National Forest, and it was this experience that led me to an interest in old-growth forests, champion trees (the largest trees of their species within a particular geography), and native flora. I earned my undergraduate degree in multidisciplinary plant ecology from Furman University and also have an M.S. from the SUNY

1

College of Environmental Science and Forestry, where I studied climate influences on tree growth. I am the author of the 2018 edition of *Georgia's Mountain Treasures*, an illustrated report on 40 wild areas within the Chattahoochee-Oconee National Forests.

4.      I am familiar with the goals, projects, and membership information for GFW. GFW is a §501(c)(3) nonprofit public interest organization based in Dahlonega, Georgia. Our mission is to enhance the health of Georgia's 867,000 acres of national forest by protecting our forests and streams, advocating for natural processes and identifying opportunities to improve Forest management. GFW has over 600 members.

5.      GFW was founded in 1986 in response to the Forest Service's publication of the first Forest Plan for the Chattahoochee National Forest. That Forest Plan was challenged by conservation groups in Georgia. In the wake of this challenge, it was clear that there was a need for a public interest organization with the exclusive mission of monitoring national forests in Georgia and identifying environmental threats to them. GFW was created to fill that role.

6.      Since its founding, GFW has participated in forest plan revision processes including the process that culminated in the current Forest Plan for the Chattahoochee-Oconee National Forest (CONF) in 2004. Despite GFW's best efforts, many ecologically sensitive areas, such as unroaded Mountain Treasure areas, patches of rare old-growth forest, rare and exemplary habitats, areas with steep slopes and fragile soils, and watersheds of streams with trout and rare aquatic organisms, were assigned to management zones in the current Forest Plan where commercial logging, road construction, and other potentially harmful activities are either allowed or specifically planned and scheduled.

7.      Even in areas that are not exceptionally sensitive or risky for these activities, certain types of timber harvest can cause a great deal of harm. Commercial timber sales in the CONF have caused a shift from highly diverse native forests to forests with less structural

2

diversity, meaning that the trees in the harvested area are all approximately the same age and size; less compositional diversity, meaning that light-loving trees like tulip polar are able to outcompete other native species like oaks; and a greater incidence of non-native invasive plants, which displace native plants and have less value for wildlife. These harms add up over time to a profound change in forest conditions. These harms also persist for many decades, and some are effectively permanent. A trained ecological eye will see the degraded structure and composition of logged stands even after mature trees have grown there again.

8.  Because the Forest Plan either fails to prohibit or affirmatively encourages activities that would cause harm to the ecological values GFW and I work to protect, individual projects implementing the Forest Plan regularly propose actions that would cause such harms. In my experience, almost all vegetation management projects that I have reviewed have included harmful elements in need of improvement.

9.  To achieve GFW's founding purpose, one of our core activities is to evaluate Forest Service proposals and to provide clear, science-based recommendations for how the Forest Service can achieve its multiple-use mandate while also ensuring ecological sustainability of our national forests. To that end, GFW reviews Forest Service project proposals to ensure that descriptions of land areas and proposed project benefits are accurate and to determine whether sensitive biological resources are at risk; GFW offers scoping comments, evaluates and comment on Forest Service NEPA analyses, suggests alternatives to harmful proposals, manages a volunteer program to document and evaluate Forest Service project proposals and outcomes, and conducts outreach to educate the public about the national forests.

10.  As Executive Director of GFW, I was responsible for organizational management and administration, including overseeing daily operations, supervising three part-time staff and any interns, producing a quarterly newsletter, guiding outreach program development, and

3

reporting to the Board of Directors. The position also required that I manage the organization's financial resources, prepare the annual budget, develop relationships with funders, and oversee grant applications. I also led our programmatic work including organizing our volunteer forest monitoring and advocacy programs, developing relationships with partner organizations, reviewing Forest Service project proposals, and preparing GFW's official comments on Forest Service projects.

11.     The CONF is very important to me and GFW for a variety of reasons. The CONF is located largely within the Southern Appalachians, which is one of the most biologically diverse regions in the temperate world. The CONF alone contains more species of trees than all of Europe, and it is a global hotspot for salamander and crayfish biodiversity. In addition, there are many specific places on the CONF of particular biological importance. For example, the headwaters of the Conasauga River are located on the Chattahoochee National Forest. The Conasauga is one of the most biologically diverse watersheds in the United States, with more species of fish than the Colorado and Columbia River watersheds combined. Georgia also has the highest diversity of trilliums in the world, and the CONF is home to many imperiled species, including very rare species that are not protected under the Endangered Species Act like the patch-nose salamander (Urspelerpes brucei), first discovered on the CONF and known from only 23 sites along the Georgia-South Carolina border.

12.     The CONF is also vitally important to the supply of clean drinking water for many thousands of people in the southeastern United States. The headwaters of five different rivers are located on the Chattahoochee National Forest, including the Chattahoochee River, which provides drinking water for the city of Atlanta where I live.

13.     The Chattahoochee National Forest is the primary driver of the economy of northern Georgia, which is based primarily on outdoor recreation and tourism. A wide range of

businesses in this region, from fishing and hiking outfitters to wineries, rely on the health and beauty of the Chattahoochee National Forest to draw visitors. These visitors include people hiking the Appalachian Trail, which has its southern terminus on the Chattahoochee. Altogether, the Chattahoochee National Forest each year receives 3 million visits, and these visits provide a vital economic boost for communities in northern Georgia.

14.    Many members of GFW live in the communities in northern Georgia that rely on the Chattahoochee. They drink water that the CONF helps to keep clean and they run businesses that depend on a healthy Forest. Many if not most of GFW's members also visit the forest themselves to enjoy hiking, birdwatching, and other nature-based recreation—including myself. Even for GFW members who are older and unable to hike and explore as they did when they were younger, the Forest still provides an important existence value.

15.    I visit the CONF between 5 and 10 days per year. I enjoy hiking, visiting waterfalls, and experiencing the sense of equilibrium and balance that visiting the forests often provides. I have visited all of the 40 unroaded areas known as Mountain Treasures areas in the Chattahoochee National Forest in order to observe and document the unique and superlative geological, botanical, and scenic values that make them special. For example, I periodically visit the Georgia Mountain Treasure known as the Ellicott Rock Wilderness Extension to enjoy activities such as observing the tallest known tree in Georgia, which I personally measured. I continue to be interested in observing and documenting these unique and superlative values, and I will continue to regularly visit these areas in the future. I recently spent time in the Lake Russell WMA, an area that I often visit and will certainly return to, and at Alec Mountain, another site where I have started making plans for a return visit. Additionally, I recently visited the Upper Conasauga area, where I looked at sites proposed for treatment by the Foret Service. I intend to visit this area again to explore additional sites in the near future.

5

16.    I have other specific plans to return to the CONF. For example, I am scheduled to visit the Devils Den area with another GFW member between Thanksgiving and Christmas of this year. This visit will take us through the Fightingtown Creek Project. This spring, I plan to invite several GFW members to join me on a trip to an area of ultramafic rock in Rabun Country. I am also in the process of scheduling trips to Yellowback Mountain and Lee Mountain (within the Panther Creek Mountain Treasure area) and Stony Mountain in Habersham County—an area impacted by a timber harvest from the East Side project.

17.    Under the National Forest Management Act (NFMA), the Forest Service is required to manage the CONF to balance multiple uses, including timber harvest, recreation, and environmental preservation. In developing and implementing management projects, the Forest Service carries out a range of activities that have the potential to cause significant environmental impacts to the CONF and, as a result, to the interests of GFW members like me and the wider public.

18.    In particular, timber harvests and associated road building often negatively impact a variety of forest resources, including old growth forest, rare species, sensitive soils, and aquatic species in nearby creeks and streams. In addition, vegetation management projects often include the use of herbicides and prescribed fire, which impact the aesthetic values of the CONF and, if improperly used, can negatively impact biological resources as well.

19.    For example, largely in the 1970s through the 1990s, the CONF converted over 100,000 acres of forest dominated by native hardwoods to single-species plantations, primarily loblolly pine. The CONF now recognizes that these plantations provide much lower quality wildlife habitat than native forests and views the plantations as a forest health risk due to their susceptibility to southern pine beetle. While the Forest Service is no longer making that particular mistake, some of its current practices will be recognized in hindsight as harmful too.

20.    Roadbuilding, and even "temporary" roads constructed for timber projects on the

forest, can have significant short-term and long-term environmental consequences, including soil

compaction, erosion, and introduction of invasive species. Long-term mismanagement of the

Forest Service road system—whether through mistake, neglect, or lack of funding—create ongoing sources of water pollution to creeks and streams. For example, the Flatlands Road has become a 10-foot deep trench that even jeeps need to use a winch to travel. This trench drains directly into Flowers Cove Branch. Because of its entrenchment, there is little opportunity to divert water from the road's surface, which would be necessary to control the ongoing erosion. Other roads are not in as dire condition but are still highly problematic because of their location and proximity to sensitive waters, like the Cooper Creek Road and Mulky Gap Road, which run along Cooper Creek and are responsible for ongoing impacts to habitat for Georgia's largest known population of hellbender salamanders. Still other roads are vectors that bring off-roaders into areas where they cause tremendous damage, as in the Lake Russell Wildlife Management Area, where jeeps are tearing up slopes with rare plant habitat and prime restoration potential.

21.     Temporary roads associated with logging projects cause harm too. For example, in the Fightingtown Creek Project on the Chattahoochee National Forest, the Forest Service constructed "temporary" logging roads in order to access stands of trees prescribed for treatment. GFW inspected these roads after their construction to ensure that they were the proper width and steepness; some were not, and we reported this information to the Forest Service. Some of these temporary roads were also actively eroding into a watershed that supports state-threatened hellbender salamanders. Another temporary road for this project had to be abandoned by the logger because it stayed too wet. The logger built another temporary road to replace it, increasing the impacts even further.

22.     When the Forest Service proposes activities in amounts or locations across the CONF that create risks of harm to fragile or irreplaceable resources and ecosystems, the NEPA process enables GFW, people like me, and other stakeholders to bring these risks to the Forest Service's attention and to suggest mitigation measures or alternatives to the agency's proposed

8

course of action. As a longtime employee of the organization, I know that participating in the NEPA process on the Chattahoochee National Forest is a vital part of GFW's organizational mission.

23.     The Forest Service is required to circulate NEPA documents to interested parties. To comply with this requirement it maintains a list of persons and organizations who are interested in receiving them. GFW has requested to be on that list for NEPA documents related to the Chattachoochee National Forest. GFW receives, reviews, and comments on the vast majority of project scoping notices and draft environmental assessments (EAs) published for the CONF.

24.     Through members and staff, GFW has developed a deep knowledge of the CONF and its natural systems. This knowledge is built upon (and results from) the personal connections that staff and members have with specific locations across the forest. Correspondingly, GFW's participation in the NEPA process is generally focused on environmental impacts to specific locations on the forest and the biological communities they support. The organization does not categorically oppose logging or road building—I don't personally either; indeed, sometimes these actions are necessary for the Forest Service to carry out its statutory mandates. Instead, GFW's participation in the NEPA process generally concerns the questions of *where* and *how* this work should be done and whether the Forest Service has properly considered the impacts of its proposed actions, as well as possible mitigation measures and alternatives, such as different locations for harvest. GFW routinely analyzes Forest Service project proposals down to the stand level; where the Forest Service prescribes vegetation treatment that is unnecessary or which poses unnecessary risks to forest resources like old growth, water quality, rare species, and habitat connectivity, GFW provides detailed feedback on these risks to the Forest Service.

9

25.    In 2019, GFW submitted public comments on the Forest Service's Proposed Rule for the rulemaking at issue in this case, and also signed on to comments submitted by The Wilderness Society, the Western Environmental Law Center, and the Southern Environmental Law Center. Attached to the latter was a comprehensive analysis of Forest Service projects completed between 2009 and 2019 in the Southern Appalachian National Forests, including the Chattahoochee. This analysis showed the environmental benefits of the NEPA process under the previous Forest Service rules. The analysis focused on projects for which an EA was completed, because nearly all of the logging on the Chattahoochee National Forest is completed using EAs. Except for the Lake Russell Rare Plant Habitat Improvement Project—a 1,300-acre project which should not have been eligible for the CE it proceeded under—only a few very small projects have been categorically excluded under previously available CEs. Overall, for projects for which an EA was completed, the NEPA process resulted in a total of 5,909 acres of commercial timber harvests being dropped from final decisions in the Southern Appalachians. Of those, 1,949 of the acres spared from timber harvest were in the Chattahoochee National Forest.

26.    From 2009 to 2019, the Chattahoochee National Forest completed eight decisions authorizing commercial logging using the EA process. Seven of the projects were at a scale smaller than 2,800 acres, ranging from 340 to 1,776 acres of commercial harvest and 394 to 2,058 acres of total harvest. One outlier, meant to cover five years' worth of logging, included 6,663 acres. The eight projects together had a mean of 1,780 acres of commercial harvest and a median of 1,253 acres. During that same time period, the Chattahoochee National Forest also authorized a number of relatively small timber sales (typically under 70 acres) using Categorical Exclusions ("CEs"), but did not authorize any logging projects using a more detailed Environmental Impact Statement ("EIS").

27.     The eight projects on the Chattahoochee National Forest that were authorized under EAs changed significantly between initial proposal and final decision. For six of these eight projects, the acreage of commercial timber harvest decreased. On average, commercial logging for EA-level projects on the Chattahoochee shrank by around 8% during the NEPA process, largely the result of the Forest Service dropping stands that were initially proposed for treatment but subsequently identified through analysis and public comment as likely to experience various undesirable environmental impacts—in other words, stands where the benefits of the agency's proposed treatment would not outweigh its harms. Some projects shrank even more than 8%. For example, in the Cooper Creek Project, there was a 40% reduction in commercial harvests from the initial project proposal to the final decision. This change was needed to eliminate logging on certain steep slopes and areas in close proximity to Bryant Creek and its tributaries—environmental risks that were pointed out by GFW during the NEPA process. Many of these risky stands would not have been dropped from the decision but for GFW's efforts during the EA process.

28.     This beneficial environmental improvement to logging projects from the EA process is something I personally witnessed during my professional involvement in four of these eight projects on the Chattahoochee. In my experience, the Forest Service's decision to drop risky stands and road building from its proposals is often a direct result of the input that GFW provides during the NEPA process.

29.     The purpose of GFW's participation in the NEPA process is twofold: first, to ensure that the Forest Service is fully aware of the extent of soil, aquatic, biological, and cultural resources located in the path of its proposed projects and the impacts to these resources that may result; and second, to assist the agency in improving the effectiveness and efficiency of its projects.

11

30.     For example, for the Forest Health Stewardship Project on the Chattahoochee, the Forest Service originally proposed a 6,375-acre project the purpose of which was to thin pine stands. During the scoping process in 2011, GFW pointed out that virtually none of the stands that the Forest Service proposed to treat had any pine in them and logging would therefore not provide the benefits that the Forest Service had claimed. As a result, the Forest Service pulled the project completely and replaced it, in 2013, with a new 713-acre project by the same name, which underwent a new scoping and EA process. Because this project was re-scoped, it was not included in the comprehensive analysis of EA-level projects on the Chattahoochee, discussed in paragraphs 24 through 26. If it were, the average reduction in problematic logging acreage for projects on the Chattahoochee would be much greater than 8%.

31.     In another example, for the Fightingtown Creek Project, GFW reviewed the stands that the Forest Service prescribed for treatment in its scoping notice and determined that some of them contained mature trees with high wildlife value. GFW conducted surveys to identify alternative stands and proposed these to the agency, some of which were adopted in lieu of the mature trees. As a result, the agency was able to accomplish its management goals while also avoiding harm to particularly important ecological resources. Similarly, in the Upper Warwoman Project, GFW identified old growth in a stand the Forest Service prescribed for treatment in its draft EA. GFW provided this information to the Forest Service and in response, the agency re-drew its prescribed treatment to exclude the identified old growth. Likewise, for the Cooper Creek Project, GFW identified old growth in a stand the Forest Service prescribed for non-commercial thinning in its draft EA. After providing this identifying information to the Forest Service, the stand was dropped.

32.     In another example from the Upper Warwoman Project, the Forest Service's draft EA revealed a plan to extend a spur road across Tuckaluge Creek. The EA included tonnage

estimates for the amount of sediment that would be dislodged and potentially eroded into the creek as a result of the road construction. Relying on this information, GFW and its members—including a retired professional grader—provided detailed information to the Forest Service about how to better maintain its nearby existing road, the improvement of which would obviate the need to build a new road. The Forest Service accepted this input and opted not to build the new road across Tuckaluge Creek.

33.     The improvements to the projects described above are a direct result of GFW's participation in the NEPA process for EAs. Specifically, they are the result of GFW utilizing information and analysis provided to the public by the Forest Service to verify, critique, and supplement the Forest Service's analysis by conducting on-the-ground surveys and scientific analysis of soil, water, and ecological impacts, and by providing detailed comments and suggestions for alternatives. GFW's ability to provide this timely and rigorous feedback to the Forest Service is directly influenced by the amount and quality of the information and analysis provided by the Forest Service during the NEPA process. Compared to the CE process, the EA process allows GFW to be far more effective at identifying errors and oversights in the Forest Service's plans, thereby decreasing the risk of unnecessary environmental harm.

34.     In addition to improvements to individual projects through the EA process, there is also a cumulative benefit that accrues to the Forest Service, to GFW, and to the general public from the Forest Service repeatedly preparing EAs for its management projects. Over the course of years of dialogue between the Forest Service and GFW about how the Forest Service can best achieve its goals on the CONF and how these activities impact biological, physical, and cultural resources, there has been an overarching improvement in the Forest Service's process for developing projects. The NEPA process has helped the Forest Service to better understand the various resources it is charged with managing and how the values of different stakeholders

intersect with these resources. This has in turn helped the Forest Service avoid unnecessary conflicts over important projects. There is still a long way to go, however, to ensure that Forest Service projects do not cause unnecessary harm, and the NEPA process continues to be important in further progress.

35.     The EA process, in particular, facilitates improvements during a project's development. With its larger window for public involvement and greater volume of informational and analytical output from the agency, the EA process enables stakeholders to provide more rigorous feedback about Forest Service proposals.

36.     The Forest Service is also required to respond to public concerns for projects that go through the EA process. Its responses to comments on an EA or through the objection process must be documented in the record. This provides a valuable insight into the agency's thinking, allowing us to identify blind spots, scientific misunderstandings, and logical errors that we would otherwise not know about, which then enables us to be more effective in persuading the agency to change course.

37.     The EA process also encourages the Forest Service and stakeholders like GFW to work together on project development. Because public concerns and conflicts over alternatives will ultimately be daylighted during the EA process, there is an incentive to avoid and resolve potential conflicts early, so that projects can advance smoothly.

38.     Under Forest Service regulations, members of the public have the opportunity to file a pre-decisional objection to the Forest Service's draft decision notice and EA. GFW rarely files an administrative objection to Forest Service projects. One of the reasons that GFW rarely objects is that the process of developing an EA provides opportunities for projects to improve based on public feedback, prior to a draft decision notice being issued. The dialogue that is facilitated by NEPA helps to resolve conflicts over forest resources during project development.

14

The rare occasions when GFW has objected to projects have been when the agency has dug in its heels, refusing to even consider viable alternatives or analyses that we have provided.

39.     Compared to projects developed under EAs, projects developed under CEs do not provide the same opportunities for me, GFW, and other members of the public to analyze the potential impacts, to provide detailed feedback, and to develop alternatives or mitigation strategies which can assist the agency in achieving its objectives while avoiding unnecessary environmental harm. Additionally, there is no opportunity for an informal objection to resolve concerns over a project that falls under a CE.

40.     When the Forest Service develops a project under a CE, GFW's fundamental goals for reviewing and improving the project are the same as if it were proposed under an EA. GFW uses its staff, contract experts, and volunteer expertise to conduct in-field evaluations of Forest Service proposals based on information provided in scoping notices; GFW analyzes potential impacts to physical and biological resources; and GFW advocates for improvements to projects that would avoid these impacts. Yet GFW's ability to achieve its goals and complete its work is more limited for projects developed under CEs. For CEs, significantly less information and analysis are provided to the public, there is no consideration of alternatives, and a single scoping period, which has no specified length, is the only stage at which public input is required. Comparatively, for projects developed under EAs, GFW can utilize the window of time between scoping and publication of the draft EA to prepare surveys, conduct scientific analysis, and communicate with our members. This additional time under the EA process allows GFW to develop a more comprehensive analysis of a project area, and the additional information makes it possible for us to identify the places where field visits and other resources will be best spent. Without the information provided in an EA, GFW is less able to prioritize locations for review, and under the limited timeframe for CEs, is difficult if not impossible to visit every location for

15

ourselves. This is true even for comparatively small CE-level projects, and it will be even more prohibitive for larger scale CEs up to 2,800 acres, which is over four square miles, in which local conditions and resources can vary wildly.

41.    As an example of the importance of the EA process, in the Cooper Creek Project, GFW used the time between scoping and publication of the draft EA to bring new staff up to date on the project and to visit project areas that there was no time to visit during the scoping response window. Similarly, the interlude between the Fightingtown Creek scoping and draft EA allowed time for a field trip with the Forest Service and other stakeholders. The field trip allowed better communication of GFW's concerns and the ways the Forest Service would address them, better understanding of other stakeholders' desires, and ultimately led GFW to propose an alternate set of treatment stands that the Forest Service partially adopted in its final decision.

42.    There are other ways in which the more limited opportunities for public involvement under CEs makes it more difficult for GFW to accomplish its organizational mission. For example, the organization publishes a newsletter updating members about projects on the forest, historically every quarter but sometimes less frequently. The frequency of these outreach efforts is primarily determined by GFW's limited staff capacity and resources. Projects that are developed under CEs can in some cases go through an entire scoping period during the time in between volunteer meetings and newsletters. This makes it difficult for GFW to inform our members about projects that may directly impact their interests with enough time for them to provide meaningful input to the Forest Service.

43.    GFW's ability to provide information about CE projects to our members and to develop detailed feedback for the Forest Service is also hindered by the comparative lack of information and analysis provided by the agency. Whereas for EAs, the Forest Service provides analysis of impacts to soil, water, biological communities, and cultural resources, for CEs the

16

Forest Service provides none of this information. This information is vital to GFW; it enables us to hone our surveys and analysis on the areas of greatest concern, such as the locations of sensitive soils, rare species, unique biological communities, and threatened waterways.

44.     For example, in the Cooper Creek Project, the Forest Service proposed commercial timber harvests in areas that qualified for the next wilderness inventory, often known as "unroaded" or "roadless areas," and with substantial overlap of GFW's inventory of Mountain Treasure areas. By law, the Forest Service was required to analyze and disclose the impacts of its proposed timber harvests (and other associated activities) on these unroaded areas. However, the agency failed to do this in its scoping notice or draft EA. Reviewing the EA allowed GFW to see that the Forest Service had a blind spot to impacts that we at GFW understood very well, and it allowed us to focus our comments on pointing out this deficiency. If the Forest Service had instead developed the Cooper Creek project under a CE, GFW would not have known what impacts the Forest Service was aware of and what impacts it might have been overlooking. We would have not known how to most effectively use our time to comment. And we would not have been able to effectively provide the information needed to inform a responsible decision.

45.     I expect that new projects proposed on the CONF will be developed under the Final Rule's CE 25, which covers logging projects up to 2,800 acres. This includes the work that will occur under the Foothills Landscape Project. While the Foothills project is massive in scale, it uses what the Forest Service is calling a "programmatic" approach, which simply means that the Forest Service has already made a broad scale decision covering many thousands of acres, but it will make further "tiered" decisions for the individual site-specific actions that will implement the Foothills project. GFW believes that site-specific analysis in a tiered EA is essential for logging projects implementing the Foothills vision. To be sure, the Forest Service does not necessarily agree. There have been discussions between the agency and stakeholders

17

about which actions have been fully analyzed under the programmatic approach and which actions need further analysis, as well as discussions over the form that analysis will take. While there may currently be a gray area, however, the availability of the new CEs would answer this question in black and white. No further EA-level analysis would be needed. In fact, the Forest Service's revised EA for the Foothills Project, published in July 2021, specifically states that the Forest Service may use CEs and Decision Memos to implement the site-specific actions under the Foothills project. Furthermore, the new CEs are easily broad enough cover those future actions. Future projects will be smaller than 2,800 acres because agency capacity and ecological factors limit how much a site-specific project can realistically include. Indeed, the first two site-specific projects to roll out under Foothills have been well under 2,800 acres.

46.     The Foothills landscape is personally valuable to me. For over 20 years, I have visited the area. It has been important to me for hobbies, exercise, professional development, research, and personal relationships. Those values have come from over a dozen different areas within the landscape. I have shared areas within the landscape, such as Camp Creek and Grassy Mountain, with others in both a personal and professional capacity. Spring wildflowers on Grassy Mountain are a particular interest. I plan to continue visiting these areas and sharing them with others.

47.     I also expect CE 25 to be used for an upcoming project on the Blue Ridge District of the Chattahoochee National Forest. The District Ranger has personally informed me that he is developing a project in this area and hopes to move forward under CE 25. The Blue Ridge District is a special area to me—one which I visit at least once per year and will continue to do so.

48.     I am aware that the President, at the time this lawsuit was filed, had instructed the Department of Agriculture (including the Forest Service) to use CEs when available and to

18

conduct only the environmental review required by law. Likewise, the Secretary of Agriculture had instructed the Forest Service to ensure that NEPA processes focus only on what is required by law. I am also aware that the current Chief of the Forest Service more recently instructed agency decisionmakers to use the most "expedient" NEPA process available, including the new CEs at issue in this case. Even if the Forest Service retains some discretion to use an EA rather than a CE for upcoming projects, the loss of the mandatory requirement to analyze site-specific impacts, respond to public input, and offer an opportunity to resolve objections, means that my organization will be much less able to elevate those issues in a way that persuades the agency to make conservation-friendly choices. Indeed, if the Forest Service learns during scoping that a proposal into which it has invested sunk costs has some difficult issues and public concerns, it will be much easier for the agency to pivot and issue a Decision Memo under the new CE than it will be for them to actually follow through with an EA, analyze and disclose those issues fully, and accept the public's negative feedback.

49. At the time this lawsuit was filed in January 2021, I was particularly worried about the use of the CE to authorize specific projects that were at that time under development in areas that I care about and visit regularly, including the site-specific projects implementing the Foothills Landscape decision, the Rock Creek Restoration Project, which included a small commercial timber harvest adjacent to a rare mountain bog, and the Lake Russell Rare Plant Habitat Improvement project—mentioned above--which involved commercial timbering of over a dozen stands. Somewhat to my surprise, those projects did not move forward under the new CEs, although two of them did move forward under other CEs that were not a good fit. For example, the Rock Creek Restoration project moved forward under the same older CE as the Russell project. That CE covers "stand improvement," which, as defined by the Forest Service, does not include commercial harvest of mature trees. It was puzzling that the new CEs were not

being used, especially where other inapt CEs were being used instead. After reviewing documents obtained through FOIA and shared with me by counsel, however, I am aware that the Forest Service wants to use the CEs but is holding back and not allowing local staff to use them, at least for projects here in the Southeast or projects that might be controversial, because of this litigation. If the Forest Service is legally able to use the CEs when this litigation is over, I fully expect they will begin using them immediately on the CONF, including on the Blue Ridge District, the next and future site-specific Foothills projects, and in the Lake Russell WMA area, where the Chattooga River Ranger District has been doing field work in advance of a coming proposal. A project in this latter area would be highly problematic if it proceeded under a CE instead of an EA. Although there are good reasons to work in the area, there are also many sites with unusual soils and lots of rare species, necessitating careful site-specific analysis.

50.     In short, under the Final Rule, I expect that the Forest Service will now use CEs, and especially the CE covering 2,800-acre logging projects, to develop many if not all of its future timber projects on the CONF, thereby allowing the Forest Service to implement its forest-wide timber program without ever (or rarely ever) completing site-specific analysis under an EA.

51.     In this way, the Forest Service's new NEPA rule will impact the interests of GFW members by increasing environmental harm to specific places on the Chattahoochee National Forest that members regularly visit. The Final Rule will also impact my interests in the Forest by allowing the agency to utilize the new 2,800-acre restoration CE to log in areas that I visit, including the many Georgia Mountain Treasures areas mentioned above. As just one example, I am worried about use of the CE in the Ellicott Rock Wilderness Extension. The champion white pine tree that I periodically visit in that area—as well as the other exceptional habitat in that vicinity—could be included in a vegetation management project because it's in a management zone that is "suitable" for timber production and encourages logging to create young forest

20

habitat. But under the new NEPA Rule the Forest Service would not be required to disclose this or other environmental impacts to the public. Without this disclosure, the public will effectively lose the ability to advocate that the Forest Service steer away from this special area; public scrutiny is the only serious check on the risk of logging and road building there. But this is just one example. I regularly visit all parts of the Chattahoochee, and projects anywhere in this forest are likely to affect me. This is especially true because the negative effects of logging last for such a long time.

52.     The Final Rule contains two limitations on the Forest Service's use of its new 2,800-acre timber harvest CE: projects developed under this CE must be primarily for a "restoration" purpose, and they must be developed "collaboratively." However, neither of these limitations serves to eliminate the increased risk of harm to forest resources on the CONF or the harm done to GFW and its members.

53.     First, in GFW's and my own experience, a collaborative process is not an adequate substitute for the scientific analysis, public disclosure, and opportunities for comments and objections that are required under the EA process.

54.     GFW has been involved in relatively few Forest Service collaborations in recent years, but we have had wildly varying experiences with the process. For example, the Armuchee Healthy Forests Project was very narrowly focused on thinning planted stands of pine to prevent southern pine beetle infestation. All of the stands were in the part of the CONF with the least stakeholder and public involvement. The small number of participants and limited range of topics to discuss allowed the collaboration to be completed in few meetings, which limited the burden on participants. For that project, participation in the collaboration was not taxing beyond what we had experienced participating through environmental assessments in other Forest Service projects.

21

55.     I have also personally been involved in collaborative project-development efforts on the Cherokee National Forest in Tennessee. These have been productive and the Forest Service has taken many collaboratively developed recommendations to heart.

56.     In contrast, participating in the Foothills Landscape Project "Collaborative" took much more resource dedication for less meaningful participation. The Foothills Landscape Project involves vegetation management, prescribed fire, recreation, infrastructure management, and all of their interactions. The sweeping project also attracted many different stakeholders with diverse views and backgrounds. GFW staff spent numerous hours and hundreds of travel dollars just on the first phase of collaborative meetings, which were focused on introducing the project and stakeholders. That investment has only increased since, with our representative attending meetings regularly, coordinating follow-up activities, and participating in field trips. GFW's participation drew resources away from other CONF projects and reducing the other work we needed to respond to. The biggest opportunity cost was in developing volunteer capacity. We had to focus our volunteer meetings on the Foothills project rather than providing education and training on forest monitoring, ecology, and fire. Furthermore, the logistics were prohibitive for many of GFW's members to participate. Most meetings were on weekdays, either during the workday or starting right after the end of the business day. Many of GFW's dedicated members live in Atlanta, and it was simply impossible for them to make it through Atlanta traffic to the small mountain-town meeting sites without taking off hours of work. With only one topic per meeting and the Forest Service setting the schedule, missing a meeting meant missing the opportunity to participate in that topic. Many stakeholders became fatigued with the over one dozen meetings that stretched across more than a year and simply stopped participating.

57.     Even if people could attend the Foothills meetings, that was not the equivalent of participating through EA comments. The Forest Service set the agenda for the meetings, and did

not announce them in advance. The conversations remained general while the points that would determine what environmental damage would occur as part of management proposals, such as the specific locations of logging treatments, the details of treatments, and specific needs of different ecosystems, were never included on the agenda. Stakeholders simply did not have a chance to discuss many issues. Indeed, we found out about most of the specifics from the draft Environmental Assessment for the project, not through the collaborative process.

58.     The lack of advance notice of topics for collaborative meetings, in contrast to a comment period on a written analysis, meant that the Forest Service received only a "hot take" from each participant. If an important thought occurred to someone overnight or the issue needed research or analysis, they could send that to the Forest Service later, but the comment would not be heard by other stakeholders or impact the overall impression created by the discussion. And of course, the Forest Service only heard from a small number of people from among the many members of the public who have an interest in the project, as evidenced by the thousands of comments later submitted on the EA. In contrast, NEPA comment periods allow GFW and its members to highlight and discuss whatever issues raise environmental concerns and provide well-researched, detailed, thoughtful feedback on those issues, and they make that opportunity equally available to all who are interested. If different stakeholders raise competing concerns in EA comments, they can be ironed out through the predecisional objection process.

59.     After an administrative pause, the Foothills Landscape Project was revised and is being implemented. Implementation includes a more formal collaborative group which is also very time consuming and resource intensive. As Executive Director, I had to decide to allocate our limited resources to those meetings instead of pursuing other parts of our mission like educating the public, planning and hosting volunteer activities, and reviewing research relevant to ongoing Forest Service activities. I did not feel like GFW could afford to not participate in the

formal collaborative, because otherwise we would lose any meaningful opportunity to steer the project away from harmful logging. Ultimately, I did not feel like the collaborative process had much of an impact on the first phases of project implementation. It was not worth GFW's efforts or investments and felt more like a box to check.

60.    Another example of collaboration comes from the Oconee Forest Health and Wildlife Habitat Improvement Project. The "collaborative" implementation process for that project has consisted solely of the Forest Service reporting what actions they took in the prior year and what they plan to do in the coming year. There is no solicitation of feedback from the public.

61.    After these different experiences with collaboration, I have seen just how different collaborative processes can be. The requirements for collaboration are not spelled out in the rule and it is therefore just as likely to be a box-checking exercise as it is to produce meaningful project improvements.

62.    Second, the Final Rule's limitation on the use of the 2,800-acre CE to "restoration" projects will be meaningless for most timber projects, because the Forest Service *already* characterizes its timber harvests on the CONF as restoration—even where it is clear that the purpose of a project is to meet timber harvest quotas. The agency has so conflated these purposes—"restoring" habitat and producing timber—that it characterizes all timber harvest as restoration of wildlife habitat and improvement of forest health, no matter where it occurs. The projects that will be implemented in the Foothills landscape, for example, are characterized as restoration, even though they include actions that may cause significant individual and cumulative harms. The Cooper Creek project on the Chattahoochee National Forest provides an example of how the Forest Service manipulates the term "restoration." In the Cooper Creek project, the Forest Service planned several hundred acres of commercial timber harvest in an

24

undeveloped area managed for recreation, which was deemed "unsuitable" for timber production under the Chattahoochee National Forest Plan. The Forest Service justified the timber harvests in this unsuitable area by asserting that they were needed to "restore" early successional habitat, but under applicable provisions of the Forest Plan, there was no need for early successional habitat creation in these areas. Instead, the Forest Service was attempting to meet timber targets.

63.    Many of GFW's NEPA comments on forest projects focus on whether particular treatments characterized as "restoration" are in fact likely to have ecological benefits that are worth their negative tradeoffs. For example, at the Brawley Mountain Project GFW worked with an independent expert to analyze whether a woodland treatment in the project area would be restoration or rather would convert a forest to a new habitat. We determined that the treatments would in fact be habitat conversion, which suggested that the CONF would only be able to maintain the ecosystem by an artificial disturbance regime, something that consumes Forest Service resources and is ripe with the potential for unintended consequences.

64.    In meeting with the Forest Service to discuss the draft Environmental Assessment for the Upper Warwoman Project, discussion again focused on woodland restoration. GFW did not have an issue with the woodland treatment conceptually, but physical conditions and species composition suggested the treatment would not be restoration for all the stands where the Forest Service had proposed the treatment. The woodland treatments on inappropriate sites were disclosed in the draft EA, and I pointed them out to the Forest Service project manager during field trips. The Forest Service ultimately agreed and dropped some woodland restoration stands from the project while keeping others in the project with our support. Without the disclosure and opportunity for public involvement provided by the EA process, I would not have been able to provide this input to the agency, and in all likelihood the inappropriate stands would have been cut and degraded.

25

65.     In addition to the 2,800-acre restoration CE, the Final Rule also includes a new CE for special use permits for projects up to 20 acres in size. This CE will also eliminate the EA process for projects on the Chattahoochee which impact the interests of GFW members, because when private third parties seek to use public lands for their own commercial benefit, the effects can be very harmful even if the project is smaller than 20 acres.

66.     For example, GFW was heavily involved in the NEPA process for the Forest Service's Union County Target Range special use permit. In that project, Union County proposed to lease land from the Forest Service to construct a new target range. The expected footprint of the project was only 15 acres. We looked to the EA for information about what impact the project would have on the site, such as how much grading would be required, the impacts of that grading, and impacts of constructing a short access road for the site.

67.     However, our main concerns about the project involved how it would impact the surrounding area. The analysis of the potential for lead contamination in the EA was inadequate due to ignoring post-grading conditions, so we were concerned that lead could leach from the site into surrounding streams and impact downstream aquatic life. We reached out to a local university about the feasibility of monitoring this site and other national forest target ranges for lead in the stream. While we gathered one test sample to evaluate the process, limited resources have stalled further monitoring action.

68.     Many of our members were most concerned about the impact of noise pollution from the range. Two Wilderness areas, Brasstown and Mark Trail, lie within a half-mile of the site, and the Appalachian Trail is less than one-mile down range. We conducted a live-fire test and stationed observers on the Appalachian Trail, including one with a decibel measuring tool. We recorded conversation level noise (over 70 decibels) on the Appalachian Trail over a mile from the shooting at the proposed site. The orientation of the

range also made us concerned about the safety of hikers on the Appalachian Trail, since they would be down range from the site and within range of many firearms authorized for use there. Clearly, the impacts of a target range extend far beyond the immediate construction site. Yet if this special use permit application were proposed today, under the Final Rule the Forest Service would authorize it by using a CE.

69. By eliminating the ability of GFW members to receive detailed information and analysis about the environmental impacts of special use permits, like the one for the Union County Target Range, the Final Rule deprives our members of the opportunity to assist the Forest Service in improving these projects so that they are implemented without causing unnecessary harm to forest resources or forest visitors. Without question, a special use permit may authorize an activity with a physical footprint of less than 20 acres but still pose significant risks to the health, beauty and safety of the forest.

70. The Forest Service moved forward with its Union County Shooting Range project. Because of the effects from that project, particularly sound effects, I largely now avoid this area. This is far from the only special use permit the CONF has or will be asked to authorize. The agency routinely processes such permits, about a dozen per year. These uses regularly affect my and other members' experience in the CONF, from the aforementioned sound impacts to area closures and concerns about erosion and water quality.

71. As an organization, GFW has already suffered harms as a result of the Final Rule, and I expect these harms to be ongoing if the rule is implemented. First, as Executive Director I was forced to make internal organizational changes (using limited staff and financial resources) in an attempt to compensate for the project-related information and public comment opportunities that will be lost under the Final Rule. Many of these changes are still in place. For example, under my tenure we began developing an advocacy training program designed to

recruit and train volunteers to engage in direct advocacy with the Forest Service (including participation in collaborative project development), local governments, and other public officials who may be able to influence the development of projects on the Chattahoochee. Without the benefit of the EA process, GFW members have no choice but to seek alternative means of gaining information from, providing input to, and attempting to persuade the Forest Service in an effort to improve projects and help the agency avoid unnecessary harm to forest resources.

72. The development of this training program and similar ones have already absorbed a significant amount of my time and effort, as well as that of other GFW staff and volunteers, and it will continue to do so. As a result, other areas of my work have received less attention, such as fundraising, outreach to potential partners, and developing materials to support long-term protection of priority areas.

73. Another shift in GFW's organizational resources as a result of the Final Rule is that is that we will have to prepare our own analyses of impacts to soil and water, because these impacts will no longer be analyzed and disclosed by the Forest Service during the EA process. The Forest Service's analyses of impacts to soil and aquatic resources often form a core component of our own responsive analysis and public comments; for example, our public comments to the agency on the Cooper Creek and Upper Warwoman projects focused on these specific sections of the agency's analysis. Without the benefit of the EA process for projects like Cooper Creek and Upper Warwoman, we will start these comment processes with significantly less information about the resources that are present and what the Forest Service plans to do. The result will be an increased risk of unnecessary environmental harm and, consequently, harm to the interests of our members. GFW is unable to fully replace the Forest Service's environmental analysis with our own—we simply do not have the resources necessary to do this.

28

74.     I also anticipate that GFW will be forced to file more requests under the Freedom of Information Act (FOIA) in order to access some of the information about projects that the Forest Service would previously have been required to disclose during the EA process. This will require additional expenditure of our limited time and resources, resulting in other program areas being neglected.

75.     Without question, FOIA requests are not an adequate substitute for the information and analysis that the Forest Service is required to disclose in an EA. For one thing, responses to FOIA requests are generally in the form of raw data, whereas an EA contains the Forest Service's interpretation and analysis of this data. These are fundamentally different forms of information. Raw data in many cases is simply not understandable by members of the general public whose interests in forest resources are at stake. Second, the Forest Service's responses to FOIA requests are often not timely enough to form the informational basis of our analysis of projects developed under CEs. Consequently, GFW would be forced to decide between two bad options: on the one hand, we could file a FOIA request early in a project's development in order to increase our chances of analyzing the responsive information with enough time to provide feedback to the agency during scoping, but in doing so we would risk the omission of important later-generated information; on the other hand, we could file a request later in the development of project, but we would risk receiving responsive information too late for us to analyze in scoping comments. The Forest Service also often fails to provide information requested under FOIA, claiming that it is "deliberative" and can be withheld until the project is finalized, when it is too late for us to use that information to critique a harmful proposal. Even when FOIA requests are answered before the decision is made, the agency often provides an abundance of documents that are only marginally relevant to the salient issues, creating an additional time burden to sort through them.

76.     On the whole, the Final Rule will require GFW staff to devote more time to gathering information and developing analysis of projects than we did under the previous regulations, and this work will be condensed into smaller time frames, requiring us to neglect other programmatic work for weeks at a time. And yet ultimately, because we will be starting with significantly less information and analysis from the Forest Service, and with less time to do the work, our ability to ground-truth and critique the Forest Service's assertions about the need for a given project and its impacts will necessarily be more limited. Our feedback to the agency will be less thorough, and the result will be unnecessary environmental harm.

77.     There is yet another way in which implementation of the Final Rule will harm the interests of GFW members including me: by authorizing (and indeed requiring) the Forest Service to use CEs for virtually all timber projects across the CONF, the Final Rule will prevent the agency from considering the cumulative impacts of successive timber projects within the CONF. And though the CE framework provides no way to account for it, the harms caused by successive projects tend to snowball over time. For example, repeated pulses of sedimentation caused by periodic logging projects can extirpate even the hardiest native aquatic organisms, resulting in permanently altered aquatic communities. Successive logging projects also fragment the terrestrial forest landscape, triggering the loss of forest-interior species and the erosion of native biodiversity and critical ecological processes. Yet none of these impacts will be assessed under the challenged Forest Service regulations.

78.     Likewise, under the Final Rule, the Forest Service would not be required to analyze the cumulative impacts of logging on climate change—an issue that GFW members are deeply concerned about. Trees are the most effective means of sequestering atmospheric carbon and consequently, their removal through successive logging impacts the concentration of carbon dioxide in the atmosphere—and thereby, climate change. While any single timber project may

30

not have a significant impact on the forest's carbon stocks, the effects of successive projects are cumulative. Under the Final Rule, the Forest Service's entire timber sale program on the Chattahoochee National Forest will likely be removed from environmental review and consequently, the timber program's significant cumulative effects on carbon storage will not be considered in deciding where and how much to harvest.

79.    Simply ignoring these cumulative impacts in project development and decision-making does not make them disappear; on the contrary, it makes them more likely. In this way, too, the Final Rule will increase the environmental harm to forest resources that our members cherish. The interests of GFW and its members will be harmed if the Final Rule is implemented on the CONF and the Forest Service stops using EAs to inform the public and about direct, indirect, and cumulative effects, to consider alternatives suggested by the public, and to gather information about the public's interests in forest resources. The result will be uninformed decision-making and unnecessary environmental harm.

80.    GFW relies on the NEPA process to engage in the decision-making processes that affect our members. Therefore, we have and will continue to suffer imminent, concrete and particularized injuries to our interests from the Final Rule's implementation.

81.    Had the Forest Service taken the concerns we raised in our comments on the proposed rule seriously, I do not believe it could have issued the Final Rule. The agency made numerous errors in the rulemaking process and now I, along with many others including GFW and its members, am paying the price.

82.    This injury to me, GFW, and its members would be redressed by an order from this Court vacating the Final Rule.

83.    I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

31

Executed this __18th__ day of November, 2024.

Jess Riddle
Jess Riddle

32