**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| THE CLINCH COALITION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE, *et al.*, | ) | |
| | ) | |
| Federal Defendants, | ) | Case No. 2:21-cv-0003-JPJ-PMS |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN LOGGERS COUNCIL, *et al.* | ) | |
| | ) | |
| Intervenor Defendants. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF JOSH KELLY**

I, Josh Kelly, declare as follows:

1.      My name is Josh Kelly, and I live in Asheville, North Carolina. This declaration is based on my personal knowledge, information, and belief.  I am over the age of eighteen (18) and suffer from no legal incapacity.

2.      I hold a B.A. in Biology from the University of North Carolina at Asheville, where I graduated cum laude and won the Bernhardt-Perry Award for Undergraduate Research. I also hold a certificate in Geospatial Technology from Asheville-Buncombe Technical Community College and I am a member of the Southern Appalachian Botanical Society. I have worked in the fields of Conservation Biology and Ecological Restoration since 2003. I have won US Forest Service Region 8 Regional Foresters award for Partners/Community Engagement for my service on the Cherokee National Forest Landscape Restoration Initiative. I also won the Restored and Resilient Landscapes award for my role in the Grandfather Restoration Project,

where I was the lead author. This 10-year grant funded collaborative restoration project was designed to reduce wildfire risk, restore fire adapted ecosystems, save hemlock trees, and produce wood for the local economy on the Grandfather Ranger District of Pisgah National Forest. Being born and raised in Western North Carolina, I have had a lifelong interest in the history, culture, ecology, geography, and biodiversity of the Southern Appalachian Mountains.

3. I have been employed for Plaintiff MountainTrue since July 11, 2011 and I am currently the Resilient Forests Director. My work for MountainTrue is focused on the mountain forests of the Pisgah and Nantahala National Forests in North Carolina, along with the contiguous Cherokee National Forest in Tennessee and Great Smoky Mountain National Park in both North Carolina and Tennessee. In my role as Resilient Forests Director, I educate the public about the conservation significance of public lands, mobilize public support for beneficial management of public lands, and provide site-specific, scientific information in support of ecologically sound management of Southern Appalachian ecosystems.

4. MountainTrue is a not-for-profit corporation founded in 1982.[1] One of its founding purposes was to protect the national forests surrounding Asheville, NC from abusive logging practices by the U.S. Forest Service.

5. Today, MountainTrue champions clean water, resilient forests, and healthy communities in the Southern Blue Ridge Mountains. Its core mission remains focused on protecting the Pisgah, Nantahala, and Cherokee National Forests. We achieve this mission, in large part, through our engagement with the NEPA process. Specifically, the EA process is central to our work.

6. MountainTrue devotes significant resources to protection of the Pisgah and Nantahala National Forests in Western North Carolina, through involvement in National

---

[1] MountainTrue's original name was the Western North Carolina Alliance. The name was changed to MountainTrue in 2015.

Environmental Policy Act (NEPA) reviews, including NEPA processes for the forest plan revision, along with every notable timber sale project and any other management proposal or permit that may adversely affect the forests, their natural resources, and/or the ability of members of the public to enjoy those resources unimpaired.

7.      Nantahala, Pisgah, and Cherokee National Forests are very important to MountainTrue and the public at large for a variety of reasons. The Southern Blue Ridge Mountains are perhaps the most biologically diverse region of comparable size in the continental United States. The National Forests of this region are part of more than four million acres of Federal Public Land that are an Ark of survival for many plants and wildlife. The biodiversity of the region is influenced by the great height of the mountains – higher than any others east of the Mississippi – and the southerly latitude combined with the range of elevations makes this an area rich in unique species and a mixing zone of northern and southern species. The ruggedness of the mountains also protects many exemplary natural communities that are in excellent condition – including places that have never been logged or farmed – and provide important habitat for numerous species. The Blue Ridge Mountains are also rich in water that feeds many of the major rivers of the Southeast, sustaining fish and wildlife populations and providing drinking water to millions. Finally, Nantahala, Pisgah, Chattahoochee, and Cherokee National Forests are among the most visited units of public land in the entire nation. They are within a day's drive of more than half of the nation's population and receive more recreational visitors than many National Parks.

8.      Members and staff of MountainTrue enjoy recreating in the Southern Appalachian national forests in and around Western North Carolina, from kayaking and rafting in the rivers to hiking in the mountains. They enjoy fishing, hunting, birding, hiking, mountain biking, trail running, camping, scenic driving, studying nature, and learning outdoor skills. I personally visit

areas of the Nantahala, Pisgah, and Cherokee National Forests roughly 75 days each year, for both professional and personal reasons. I enjoy fishing, hiking, bicycling, swimming, hunting, foraging, and nature study in Southern Appalachian National Forests. I have visited hundreds of peaks, streams, ridges, coves, and slopes within these National Forests, by road, trail, and cross-country travel, and I am currently continuing to visit these places and will return to them for as long as I am physically capable of doing so.

9.      MountainTrue works to protect a number of ecological and social resources that are present on the national forests, including old-growth forests, rare and native plants and animals and their habitats, large unroaded areas, clean water, and opportunities for recreation. These resources occur in specific places within the national forests. However, although MountainTrue and other conservation groups have worked to identify special parts of the national forests, the Forest Service itself has no complete inventories for where or in what degree these resources occur or the relative importance of those occurrences. This is in contrast to timber resources, for which the Forest Service does have a robust inventory by age and forest type.

10.     Commercial timber harvest, road construction, clearing for road or utility rights of way, land exchanges, and overuse by commercial permittees can damage the ecological and social resources that MountainTrue's members and staff enjoy and work to protect. For example, old-growth forests enjoy no protection in the Nantahala and Pisgah National Forests. Old growth forests are like a combination of libraries and cathedrals. They inspire great awe and hold great knowledge. When those places are destroyed, it's an indescribable loss. More generally, when an area is logged, much more is lost than just the trees. Sediment from disturbed soil washes into streams, polluting sensitive aquatic ecosystems. Corridors connecting different populations of wildlife get interrupted, sending animals far out of their way exposing them to greater risks or

cutting them off from genetically diverse populations all together. Species that depend on dense continuous tracks of forest are displaced by those preferring more open areas. Trails through logged areas become choked with thorny brambles and invasive species. Scenic viewsheds become spoiled by these scars on the landscape. Such damage can be much greater when logging occurs in old growth, in rare habitats, on steep slopes with fragile soils, or near sensitive streams and rivers. These issues are compounding until a once pristine area, such as those designated as Mountain Treasure areas, has been entirely degraded.

11.     The Forest Service builds a lot of temporary roads, but these roads aren't temporary at all. The disturbances from earth moving required to make roads persists for decades, if not centuries. Roads intercept water flowing down the steep slopes typical of the Southern Appalachian Mountains, redirecting the water into the roadbed eventually leading to washouts and sending huge amounts of sediment into the water ways. Sedimentation is the number one threat to native aquatic species in the Southern Appalachians and roads are the number one driver of sedimentation. For example, Hawkbill Creek in Pisgah National Forest used to have a healthy and abundant brook trout population. Between the late 1980s and early 1990s, the Forest Service built "temporary" roads to access logging projects. Over the years, the roads were not maintained (due in part to their "temporary" status) but the culverts remained. When Tropical Storm Fred hit in 2021, the culverts became clogged with debris and blew out, washing road material down Hawkbill Creek. The last several times I visited the creek I have not been able to find any brook trout. It seems that the local population has been extirpated by the combination of improperly considered and poorly maintained "temporary" roads and the heavy precipitation that comes with a tropical storm. If there were still a healthy trout population, I would continue to visit the area to fish but now it does not seem worthwhile.

12.     When I think about the amount of water pollution in our streams, I see a paradise lost. I see these streams that have the potential to be so vibrant with life and so clean. Instead, I see deep pools choked with silt. Places that I would like to swim are unswimmable. Places that I would like to fish aren't worth fishing. It leaves me feeling hopeless at times, and very disappointed in what is being done to the landscape.

13.     Commercial timber sales are used by the Forest Service to accomplish a number of purposes, including providing timber products to local economies and creating open and brushy habitats for the benefit of some wildlife species, particularly game species. In addition, the Forest Service is able to use commercial timber sale revenues to maintain roads, and they can keep excess receipts in order to pay staff and administrative costs, although it is highly doubtful that timber sales over time are actually bringing in more revenue than they cost.

14.     In any particular year, the Forest Service authorizes logging only on a subset of acres where it could theoretically occur. Under the relevant management plans for the Cherokee, Nantahala, and Pisgah National Forests, the agency has dedicated hundreds of thousands of acres to "timber production," which means that the Forest Service eventually intends to harvest the trees as a crop. Yet only a portion of those acres can be harvested in any year. The maximum annual average harvest allowed by the Cherokee National Forest Revised Land and Resource Management Plan is about 2,170 acres, spread across four administrative Districts. The maximum annual average harvest allowed by the Nantahala and Pisgah National Forests in the 1994 Revised Land and Resource Management Plan, which was in effect when this lawsuit was filed, is about 3,270 acres annually, spread across six administrative Districts. The Nantahala and Pisgah National Forests have since revised their forest plan, with a "projected timber sale quantity" of up to 9.4 million cubic feet, which equates to about 113 million board feet from 3,200 acres of heavy logging, plus additional acres of lighter harvests like thinning. The Forests

are not obligated to reach these maximum levels and rarely, if ever, do. However, these are stated "objectives" that the Forests would like to reach if possible, and the Forests are under pressure to achieve as much of these levels as possible with the capacity they have available. Capacity is the bottleneck, and it is my understanding that the Rule challenged in this lawsuit is intended to make it possible to produce more timber with existing capacity.

15.     Many factors affect which forests are logged in a given year, including the age and commercial value of the trees, their accessibility, and whether there have been recent timber sales in the immediate area. Although the Forest Service intends to eventually harvest the areas it has designated for timber production, it can "defer" logging in an area that it would otherwise harvest based on site-specific factors. Because ecological and social resources are present in different places to different degrees on the national forests, the choice of locations for commercial logging projects can be very consequential. To support the use of discretion to choose locations for logging, the Forest Service makes decisions pursuant to the National Environmental Policy Act ("NEPA") before trees are cut or sold.

16.     On numerous occasions, the US Forest Service has proposed activities in habitat that is fragile and easily damaged, and in many cases, the NEPA process has enabled MountainTrue to successfully argue for the protection of sensitive resources. To name just a few examples: In the Upper Tellico Project on Cherokee National Forest, we persuaded the Forest Service during the development of an Environmental Assessment under NEPA to abandon a proposal to convert a rare "Beech Gap" type of Northern Hardwoods Forest into a field that would have destroyed habitat for the Federally Endangered Carolina northern flying squirrel (*Glaucomys sabrinus coloratus*). On a number of occasions, such as in the Clarke Mountain Project on Cherokee National Forest, the Harmon Den Project on Pisgah National Forest, and the Haystack Project on Nantahala National Forest, we have availed ourselves of these same

procedural safeguards to persuade the Forest Service to abandon proposals to log remnant old growth, a resource that is irreplaceable on human time scales.

17.    MountainTrue submitted comments on both the Advanced Notice of Proposed Rulemaking and the Proposed Rule at issue in this case. In preparation to submit comments in 2019, I participated in a comprehensive analysis of Forest Service projects completed between 2009 and 2019 in the Southern Appalachian National Forests, including the Cherokee, Nantahala, and Pisgah National Forests. This analysis showed the environmental benefits of the prior NEPA rules over time in this ecological subregion. In the aggregate, the process of vetting Southern Appalachian logging proposals in an Environmental Assessment ("EA") resulted in 5,909 acres being dropped from a final decision on those proposals. Of those, 2,326 of the acres spared from timber harvest were in the Cherokee, Nantahala, and Pisgah National Forests.

18.    From 2009 to 2019, the Cherokee National Forest completed 12 decisions authorizing commercial logging using Environmental Assessments ("EAs") under the then-applicable National Environmental Policy Act regulations. The amount of commercial logging in each of these decisions ranged from 29 acres to 872 acres, with a mean of 415 acres and a median of 374 acres. During that same period, the Cherokee National Forest also authorized a number of relatively small timber sales (typically under 70 acres) using Categorical Exclusions ("CEs), but did not authorize any logging projects using a more detailed Environmental Impact Statement ("EIS").

19.    Cherokee National Forest projects authorized under EAs changed considerably between proposal and final decision. Some projects grew in size based on requests from the public; others shrank or changed with substitutions. In the aggregate, EA-level projects on the Cherokee National Forest projects shrank by a little over 4%, but some projects shrank much more. For example, a logging project known as the "Dinkey" project shrank by 43% (from 751

to 428 acres) after members of the public objected to the inclusion of steep areas at risk of erosion.

20.    Similarly, from 2009 to 2019, the Nantahala and Pisgah National Forests completed 23 decisions authorizing commercial logging using EAs. The amount of commercial logging in each of these decisions ranged from 136 to 763 acres, with a mean of 321 acres and a median of 305 acres. During that same time period, the Nantahala and Pisgah National Forests also authorized a number of very small timber harvests under CEs, but did not complete any EISs for logging projects.

21.    Projects on the Nantahala and Pisgah National Forests also changed considerably between proposal and final decision. In the aggregate, the number of acres of commercial harvest included in EA-level projects shrank by over 20% net, from 9,244 proposed acres to 7,390 acres in final decisions.

22.    The results of this comprehensive analysis were timely provided to the Forest Service in comments on the Proposed Rule.

23.    The results of this analysis, showing the beneficial environmental effect of vetting logging proposals in EAs, are consistent with my own personal experience. I am personally familiar with all of the projects included in the aggregate analysis for Nantahala, Pisgah, and Cherokee National Forest.

24.    The EA process generally results in dropping only the most harmful, risky, or controversial sites for logging. In approximately two thirds of projects since 2009, MountainTrue did not oppose any of the proposed logging, and those projects did not change much (if at all) before a final decision. In contrast, MountainTrue strongly opposed portions of other logging projects because of their site-specific risks. In my experience, the Cherokee, Nantahala, and

Pisgah National Forests decide to drop or replace about half of the stands that MountainTrue has opposed, and they often add mitigation measures to address our concerns about other stands.

25.     For example, Cherokee National Forest dropped the entirety of the Big Creek project over steep slope concerns, decided not to log old-growth in the Clarke Mountain Project, and made changes in a proposed expansion of horse trails to protect endangered aquatic species in the Middle Citico Project. In both Clarke Mountain and Middle Citico, modification of the projects allowed the majority of actions to move forward, while the actions with the most potential for harm were forgone. The Offset Project was modified such that unroaded areas were not negatively impacted and the project has successfully moved forward.

26.     Similarly, Nantahala and Pisgah National Forest has modified projects on numerous occasions based on MountainTrue's input during the NEPA process. The following projects are examples of the types of modifications that have occurred based on information provided by MountainTrue. In the Haystack Project, one stand was dropped to protect old-growth forest and rare species habitat. The result was a project that went forward without harming old-growth forest resources. In the Upper Santeetlah Project, some stands were dropped from consideration for logging to protect old-growth forest and Carolina northern flying squirrel habitat. In the Fontana Project, approximately 80 acres of logging was removed based on comments from MountainTrue to protect cerulean warbler habitat. That project also moved forward and created habitat for golden-winged warbler without harming old-growth or rare species. During the Courthouse Project, 60 acres of timber harvest and over seven miles of attendant road construction were removed from the project because of the high potential for damage to soil and water resources. In the Brushy Ridge Project on Pisgah National Forest, information I provided during NEPA resulted in approximately 70 acres of white pine plantation being added to the project so that harvest could restore native species composition. In the

Thunderstruck Project on Nantahala National Forest, harvest proceeded after the Forest Service designed buffers around a culturally important ramp (*Allium trichoccum*) patch and sensitive seepages that I documented.

27.     The changes to these projects were the direct result of the then-applicable NEPA requirements—specifically, the development of an EA and the need to justify a "finding of no significant impact," or "FONSI." It is my belief that these projects would have caused significant harm without the improvements we obtained through the EA process.

28.     During development of an EA, the public is given the opportunity to review and comment on the Forest Service's draft analysis and disclosure of environmental impacts. During this process, MountainTrue critiques the accuracy and completeness of the information being relied on by the Forest Service, submits information from its own investigations and scientific analyses, shows where projects may have unacceptable or unlawful impacts, and mobilizes, recruits, and trains its own members and other citizens to participate in these processes. MountainTrue is often able to show that Forest Service information or data is outdated or unreliable, and to provide additional information about ecological and social resources or public preferences. For example, in comments on recent projects, MountainTrue has identified populations of rare plants and wildlife, old-growth forests, and recreational resources of which the Forest Service was unaware. Providing this information to the Forest Service resulted in changes to those projects, including dropping stands from harvest and adding mitigation measures.

29.     Additionally, the EA process allows members of the public to suggest alternatives that can meet the Forest Service's project objectives with less harm to ecological and social values. For example, in the Stoney Creek Project on Cherokee National Forest, MountainTrue helped to develop a more suitable management prescription for a dry oak forest in old-growth

condition. Rather than logging the forest, a fuel reduction treatment and prescribed fire was accomplished, which has helped to maintain the forest canopy and make it more resilient to wildfire. A more suitable location was identified for logging which resulted in a net increase of timber harvest and a successful project.

30.    The requirement to develop EAs for logging projects also creates a strong incentive for the agency to engage the public early in meaningful—though time- and resource-intensive—collaborative project development. For example, collaborative project development was utilized for Cherokee National Forest projects only after the formation of the Cherokee National Forest Landscape Restoration Initiative committee. The committee identified the principle of managing the ecosystems of Cherokee National Forest to be within their "Natural Range of Variation" as the guiding principle for management, and then developed a consensus set of management activities to restore degraded ecosystems. Those consensus principles were then applied to project design in the Paint Creek and Meadow Creek Mountain Projects. Prior to the committee, Cherokee National Forest had proposed a succession of controversial and unsuccessful projects like the Big Creek Project and the Beaverdam Project. Conflict over those projects had surfaced during the EA process, where it became clear that the public had different expectations from the Forest Service for how these public lands should be managed. Collaboration was the solution to avoiding conflict and it has produced years of successful results on the North Zone of the Cherokee National Forest, but it would never have been utilized but for the need to avoid gridlock during the EA process.

31.    Finally, the EA process also culminates in the opportunity to file an informal predecisional "objection" to a project. In an objection, commenters can alert the Forest Service to legal or practical problems with a project that have not yet been resolved. The objection process has been important in recent projects, resulting in dropping risky stands or portions of stands and

improved mitigation measures. The Courthouse Project listed above is an excellent example of an objection process that resulted in a reduction of seven miles of risky road construction and 60 acres of logging on steep slopes. The Mossy Oak Project on Nantahala National Forest is another project in which 11 acres of old-growth forest was protected after the Objection meeting allowed for substantial dialogue of the issues between the Forest service and objectors.

32.    Despite improvements made during the EA process, risky proposals still sometimes move forward, causing significant harm, violations of law, or both. For example, a recent project on the Cherokee National Forest known as the "Hogback project" resulted in severe and unlawful erosion and long-term impairment of soil resources, and remediation costs have already run into the six figures for just one affected site. Similarly, on the Pisgah National Forest, the recent "Courthouse project" also resulted in severe erosion, prompting a citation by state regulators who documented sedimentation of a trout stream in violation of state law. These mistakes and failures highlight another important feature of the EA process: in successive projects, the agency must acknowledge prior mistakes and either change course or distinguish its new proposals. Indeed, in the Dinkey Project, the Forest Service abandoned 323 acres of commercial logging because of concerns over erosion on slopes similar to those where severe erosion had occurred in the nearby Hogback project.

33.    My personal experience of areas where projects have occurred is impacted by how the NEPA process and project implementation went. As part of my job duties, I visit timber sale areas both before and after logging is carried out. In this way, I visit nearly every logging site that MountainTrue engages on, and I will continue to do so for upcoming projects. I will inevitably feel the same sense of dismay that I have in the past when I see logging recklessly carried out. For example, I was very angry when I visited the Courthouse Timber sale area after it was logged to see that the concerns MountainTrue brought to the Forest Service were entirely

justified but were dismissed by the Forest Service during the planning process. MountainTrue warned the Forest Service about logging certain stands on steep slopes could lead to high erosion in the event of extreme precipitation. The Forest Service removed some of the stands from the project but kept others in. When I visited the project site after the stands were logged, I was devastated to see the damage I predicted done to the soil and streams in the area and the populations of rare plants identified before the project had disappeared.

34.     The Courthouse project was also a good example of why standard "best management practices," or "BMPs" cannot be counted on to account for site-specific risks that require analysis in EAs. The Forest Service often argues that its BMPs are effective, and that may be true on low-risk sites, but they are not always effective. The difference is in the site-specific risks that need additional mitigation (or just to be left alone). Finally, the Forest Service often does not even follow through with promised mitigation. For example, the Upper Santeetlah project was supposed to include 20 watershed improvement activities that were described as offsetting the negative impacts from logging and roadbuilding, but only 2 were completed. Meanwhile, all of the planned logging and roadbuilding activities were carried out.

35.     Projects developed under categorical exclusions ("CEs") do not have the same opportunities for improvement as those developed under EAs. When a CE is used, the public has only one short comment period (often 30 days, but with no minimum required length) to review the proposal, without the benefit of the agency's draft analysis, and to determine whether it is properly within the CE authority, whether it would be consistent with the Forest Plan, whether it would satisfy the requirements of other laws, and whether it unacceptably threatens water quality, old growth, recreation, or rare species and habitats. There is simply not enough time to do a proper analysis. The timing of when the CE is announced is also critical. If a proposal comes out in the autumn, MountainTrue cannot go into the field and document songbirds that

sing in the spring. Likewise, if a proposal comes out in the summer, it is impossible to do an accurate salamander survey. The input the public is able to provide on this short timeline would tend to be general and less specific, encouraging comments that are more focused on general opposition or support for the *purpose* of proposed projects rather than having the time to collect and provide site-specific information to make projects better. Lastly, if public concerns regarding these or other issues are not addressed, there is no opportunity to file an informal objection. Members of the public are forced to choose between accepting the project as-is or filing a lawsuit in federal court, which is often not a good option because it takes such a big commitment of resources, and the administrative record for a CE project would likely not include the site-specific information needed to show why the project was unlawful.

36.    Even with the relatively small CEs under prior regulations (less than 70 acres for live trees and less than 250 acres for salvage dead and dying trees), the CE process places a tremendous burden on MountainTrue and other members of the public. Without the benefit of a draft environmental analysis, members of the public cannot understand or evaluate a project's impacts unless they visit the sites and conduct their own independent investigations or hire someone else to do so.

37.    For example, consider the Camp Branch Salvage CE on Nantahala National Forest occurred on the slopes of Wayah Bald, a 5,500-foot mountain with high biological and scenic values. Although the project only included 221 acres, the short timeline and lack of analysis provided with the CE resulted in MountainTrue staff spending over 4 days in the field and two days in the office evaluating and communicating the risks of the project. It turned out that the project would have harvested old growth. The short timeline required staff to displace other responsibilities, including participating in the forest planning process for Nantahala and Pisgah National Forests. As another example, the recent BBQ CE was proposed inside of a

Natural Heritage Natural Area identified by the North Carolina Natural Heritage Program for its high concentration of rare species and high-quality natural communities. The reduced timeline of the CE again necessitated displacement of other scheduled work activities, including internal 10-year strategic planning efforts for MountainTrue. Field surveys discovered a rare plant population that had not been discovered or disclosed by the Forest Service and three landslides affecting the road system to be used in the project that were not disclosed by the Forest Service.

38.     In addition to participating in every consequential project in the recent past, MountainTrue anticipates participating in the development of, or attempting to influence the direction of, all consequential Forest Service projects in the coming years.

39.     The Forest Service proposes a logging project after an agency silviculturist "prescribes" particular stands for a specific level of harvest—e.g., "thinning" or "regeneration" harvests. Developing these prescriptions takes some time because it requires visiting many stands in a general project area.

40.     Once the Forest Service has sunk costs in the development of a project, it is much less likely that the prescribed stands will be abandoned. The Forests have limited capacity and staff, and they are expected to contribute to annual timber targets, which have increased dramatically in recent years. Wasted staff time makes it harder, if not impossible, for the agency to meet its performance targets.

41.     The Cherokee National Forest is currently surveying and prescribing stands in the West Flatwoods project area near South Holston Lake. This will result in a timber project proposal, probably next year, that will be less than 2,800 acres in size based on conversations with Forest Service staff to this point.

42.     I am personally familiar with the West Flatwoods project area. In recent years, I have spent several days on Holston Mountain, both for work and recreation. In the line of work, I

identified old-growth forest at Furnace Branch and helped to improve the outcome of the Stoney

Creek Project, as described above. I have also enjoyed hiking the trails on Holston Mountain,

including the Josiah Trail, which provides access to the exemplary old-growth forest at Big Oak

Branch. I have also surveyed the West Flatwoods area for restoration opportunities, and it has

some of the best opportunities to restore shortleaf pine/oak forests on Cherokee National Forest.

I intend to continue visiting the West Flatwoods area for hiking, bicycling, fishing, mushroom

hunting, nature study, and swimming. I hope to visit the West Flatwoods area in the spring to

hunt morels and fish the nearby South Holston River. Poor land management resulting from

hastily designed timber projects proposed under a CE would threaten all of those values by

harming water quality, removing healthy forests and spreading non-native invasive plants, failing

to manage for and restore native species appropriate to the site, building roads into the Flint Mill

Gap potential Wilderness Area, or damaging trail infrastructure. The NEPA EA process would

allow me and others to provide the Forest Service with valuable information that would improve

management in the area, such as dropping risky sites and potentially adding substitutes that could

assist in restoring native forest communities for the benefit of both wildlife and visitors.

43.     The Nantahala National Forest is currently developing a project they are referring

to as the "Northside project," which is located in Jackson, Macon, and Swain Counties, North

Carolina in the Cowee Mountains. This project was Scoped in August of 2024 and includes 366

acres of commercial logging and 2211 acres of total activities, including prescribed burns –

substantially than 2,800 acres in total.

44.     I am personally familiar with the Northside Project Area, particularly the

exemplary Spruce Bog at Alarka Laurel, the native brook trout population in Alarka Creek, and

the diverse natural communities and plant life on Huckleberry Ridge. I plan to continue

recreating in this area and a poorly planned project here could damage trout fishing in Alarka

Creek, unique biological values of the area, and the opportunity for remote recreation that currently exists there by building roads and harvesting timber in places and with methods that might damage those values. When I visit friends in the nearby Cowee Community, I often hike around Wolf Bald to enjoy the scenic views and observe the effects of prescribed fire on the vegetation.

45.     The stands currently being surveyed and prescribed in these areas, and in other areas where I am not aware of the work, will be proposed in projects in the near future.

46.     I am aware that local Forest Service decisionmakers, under direction from the Chief of the Forest Service, are required to use the minimum level of NEPA review required by law for all new projects. In other words, if a CE covers the proposal, the agency cannot use another more time-intensive process such as an EA.

47.     Because the Forest Service has been directed to use the new CEs when available, I was surprised when projects that I anticipated would proceed under the new CEs instead moved forward using EAs. For example, at the time this lawsuit was filed, the Pisgah National Forest was surveying and prescribing stands in the Lickstone Ridge project area, which is located in the headwaters of the West Fork of the Pigeon River, west of Shining Rock Wilderness in Haywood County, NC. I am personally familiar with the area and its high ridges that exceed 6,000' and the spruce and hardwood forests that cloak its slopes. I enjoy hunting, fishing, foraging, hiking and exploring in the area. A portion of the area was identified as potentially suitable for Wilderness designation early in the Pisgah Forest Plan Revision and is extraordinarily remote and rugged and has excellent opportunities for primitive recreation. I had specific plans to return to the Lickstone area at the time this lawsuit was filed and have, in fact, returned to the area as planned on several occasions to hike to the top of Cold Springs Knob and fish the Middle Prong for native brook trout. I was worried about this project moving forward under a CE because there

were a number of site-specific issues that needed analysis and consideration of alternatives, and a poorly planned timber project using a CE would have been unnecessarily harmful. Yet this project moved forward under an EA and I and my organization fortunately had a chance to weigh in on those site-specific issues. The final decision hasn't issued yet, but I am confident that it will be at least somewhat better than the initial proposal.

48.    At the time we filed this lawsuit, MountainTrue was shifting resources to deal with projects, like Lickstone, that we expected to move forward under the CEs. For example, MountainTrue filed Freedom of Information Act ("FOIA") requests for information they would normally obtain through the NEPA process.  We felt this was necessary due to imminent changes to the NEPA procedures applicable to projects of interest and our concern about being able to carry on our normal review of projects in the future. Even before the CEs were finalized, on July 28, 2020, MountainTrue filed a FOIA request with the Forest Service requesting documents related to five Forest Service projects: Crossover Project (on the Cheoah Ranger District); Lickstone Project (on the Pisgah Ranger District); Turkey Pen Project (on the Nantahala Ranger District); Northside Project; and Lover's Branch Project. After considerable time corresponding with the Forest Service and working with legal counsel, the Forest Service provided a response that was heavily redacted under the deliberative process privilege with respect to projects that are still in development.

49.    After filing this lawsuit, it became clear that the Forest Service was not using the new CEs whenever they were available, as the agency's written policies required. To understand where, why, and how the new CEs would be used, we reviewed other records obtained through a FOIA lawsuit by colleagues at Defenders of Wildlife. These records were eye opening. Although the Forest Service externally said it would use the new CEs whenever available, it was screening proposals to make sure that the CEs we challenged in this lawsuit were not used in this region

(or, apparently, for controversial projects anywhere). The documents were explicit in explaining that this screening process was put in place *because* of our lawsuit in this Court, because Forest Service officials believed that holding off on using the CEs would help them avoid losing the CEs in this case. It was also clear that local decisionmakers across the country have continued to ask for "exemptions" that would allow them to use the new CEs. Based on my review of the FOIA response, it is my belief that this lawsuit is the only bottleneck keeping the new CEs from being used to their full coverage. If the Forest Service prevails, it will begin using the CEs immediately in this region.

50.     With the exception of the so-called GAP project, all of the projects the Cherokee, Nantahala, and Pisgah National Forests are currently preparing will be under the 2,800-acre threshold for commercial logging created by the Final Rule, and they will be proposed as CEs rather than as EA-level projects. Even the GAP project is likely to take advantage of the new CEs because it will be implemented through a series of smaller site-specific decisions, which would each be smaller than 2,800 acres. Because these projects will be proposed under CEs, MountainTrue and its members will not have a meaningful opportunity to influence their development, as we would have had during the development of an EA. As an example, because the Crossover Project proceeded under an EA, I had the opportunity to survey the 1,200-acre proposal in the field. I documented and reported to the Forest Service 120 acres of old growth which were ultimately accounted for in an alternative considered in the EA. The original plan was also originally proposed to harvest in the Trail of Tears Corridor. Only in the alternative plan did it seem the Forest Service realize site-specific problems with where the project was slated to occur and adjusted accordingly. These positive changes were all able to occur because of the EA process.

51.     The Forest Service has a lot of staff turnover. New staff often lack awareness of local values and do not carry the relevant experience and institutional knowledge of the area, as evident by the Crossover Project example. As such, the Forest Service often depends on public involvement outside its own structures during the EA process to get necessary information from locals, groups like MountainTrue, academics, etc. to inform its project decisions. This level of public involvement is lost for CEs.

52.     The Final Rule includes two purported sideboards for the 2,800-acre CE: the project must be for a "restoration" purpose and be developed through a "collaborative process." Neither of these limitations eliminates the CEs' increased risk of harm to National Forests in Western North Carolina or the harm to MountainTrue and its members.

53.     First, the Forest Service often characterizes its timber projects as being intended for the purpose of "restoration," which is defined in agency policy as "the process of assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed." While we of course support the goals of ecological restoration—which, according to the Forest Service, is intended to restore ecosystem composition, function, structure, and connectivity—specific actions intended for the purpose of restoration can have profoundly negative impacts depending on site-specific factors. The problem is one of scale and specificity. The Forest Service sees the entire Southern Appalachian landscape as a whole as having been degraded by widespread historical logging and fire suppression. Because of that history, many areas of our forests are all roughly the same age and have fewer natural openings. Consequently, the Forest Service has made restoration of openings (so-called "early successional habitat" or "young forest habitat") its primary restoration goal. Such openings can be created through logging anywhere you find forests. At the landscape scale, all logging would be accomplishing "restoration" goals if the other dimensions of restoration—species composition, ecosystem function, and habitat

connectivity—are ignored. Where logging is proposed in sensitive, rare forest communities, or rare structural classes like old growth, the Forest Service often discounts these other important dimensions of ecological restoration and ecological integrity. Indeed, we have seen several recent projects in which the Forest Service proposed to harvest existing old growth to create young forest under the banner of "restoration." For example, in the Southside Project and Buck Project stand of trees that the Forest Service acknowledged had a minimum age of 130 years and which conservation organizations documented canopy trees frequently exceeding 180 years of age were proposed and approved for timber harvest, even though this age class is severely underrepresented on Forest Service holdings and at the landscape scale. Similarly, the Courthouse project, which caused severe erosion problems and violated state law, was another "restoration" project.

54.    Second, "collaboration" means very different things to different Forest Service staff, and it isn't defined in agency policy. Some projects that the Forest Service characterizes as including "collaboration" have not provided a meaningful opportunity for public input and have instead been used to astroturf harmful decisions. For example, the Buck project on the Nantahala National Forest was characterized as collaborative because it included two meetings with stakeholders. Yet this was the most controversial and harmful project in the Nantahala National Forest for a generation, with logging and road impacts to an area that is eligible for wilderness designation (and was actually being considered by the Forest Service for wilderness recommendation at the time the project was moving forward), as well as impacts to rare habitats, rare plants, and state-delineated Natural Heritage Natural Areas. The "collaborative" meetings did not give the attendees (much less the many members of the public who would have been angry at the destruction of wilderness resources and rare forest habitats) the ability to steer the project. The subsequent NEPA process, however, did provide such an opportunity. Site-specific

analysis, the resulting public outcry, and an informal objection convinced the Forest Service to drop some of the harmful stands and to defer a decision for the most controversial stands until after the separate wilderness recommendation decision was made.

55.     Other "collaborative" projects provide much more meaningful opportunities for public input, but even good collaboration comes at a cost. Good collaborative processes are much more time consuming for the public than reviewing EA. Collaborative processes require many meetings and field trips. The Crawley Branch project on the Pisgah National Forest is a good example. This project was authorized under a CE created by Congress for treatments, including timber harvest, needed to address the risk of insect and disease outbreaks. Along with many other members of the public, I attended meetings and field trips with site-specific conversations about where and how to harvest trees. I helped with GIS analysis to identify a suite of potential project areas and spent five field days visiting potential project areas with the collaborative group. I also attended meetings where the group chose Crawley Branch as the highest priority area in which to use the insect and disease CE to prevent a southern pine beetle outbreak, and then I spent five more days in the field with other MountainTrue staff mapping stream side zones, proposing boundary changes and additions to harvest areas, and mapping potential rare plant sites. In total, I spent approximately 11 days and more than 100 hours helping to make sure that the proposal would not include significant harm. And this project had only about 280 acres of proposed commercial harvest, with only around 170 acres ultimately harvested. If the project was scaled up to 2,800 acres, my time investment would have been much higher. It was critical that I spend this time, because I knew there would not be an EA prepared later, and I would therefore not have that later opportunity to review the project and provide site-specific input.

56.    Projects that move forward without an EA take more time and resources than providing input through the EA process, even (and especially) when they are developed using a collaborative process. When I review an EA, I can do so from my own office in a matter of hours. Occasionally there is a need for additional field work, but I am able to determine where the potentially problematic stands are located. Without an EA, I must spend my own time in the field helping the Forest Service identify good and bad places for logging from scratch, either in a good collaborative process or on my own initiative. While we are happy to help the Forest Service do good work, we simply don't have the resources to make these kinds of investments in every project.

57.    The collaborative process is only as good as the people it involves. Unfortunately, I have seen the Forest Service curate its so-called collaboratives to only include voices that are aligned with what it already wants to do and excludes dissenting voices. Collaboration can create an echo chamber if not meaningfully open to representatives from the whole range of perspectives. I am aware of collaborative processes on nearby national forest where the entire collaborative consists of the Forest Service and one or two pro-logging groups and is closed to environmental advocates. Here locally, the Forest Service created a collaborative group during forest planning that was destined to fail because it was deliberately constituted to include stakeholders who explained that they would not work toward consensus with conservation groups. A different collection of people who were interested in working together came together organically and came to a consensus. The Forest Service, however, disregarded both groups and did what it wanted to do in the first place. The entire process felt like a huge waste of time. MountainTrue invested approximately 5,000 hours of staff time in the collaborative effort. This effort cost a significant portion of MountainTrue's budget, including a quarter of my program's budget. Had MountainTrue staff not been tied up in this doomed process, they could have spent

that time on non-native invasive plant removal, restoration projects, trail work, public education, and all of the other things MountainTrue does that make a tangible difference on the land. Then there are the voices that even with the best intentions would be effectively excluded by quick-turnaround projects imagined by CEs. Collaborative groups providing input to the Forest Service are necessarily limited in size and physically cannot include all of the people who will be affected or who might want to comment through NEPA. For example, many people in Western North Carolina get their drinking water from springs that originate on the National Forests. Without proper notification or opportunity to comment, people can have their water sources ruined by a logging project without a chance to inform the Forest Service about their spring. Yet it would be totally unreasonable to expect anyone who relies on a spring to commit to participating in a standing collaborative group just on the off chance that their local interest comes up. That is where the NEPA process and MountainTrue come in: we educate the public about projects based on information from EAs, and we relay that information to the Forest Service. CEs create a rushed timeline for both the public and Forest Service staff and special places, species, resources, and cultural histories can get missed. As another example, because of the EA process, bear hunters were able to comment on the Hickey Fork project to tell the Forest Service that an area they intended to log was the best bear habitat in the forest due to an abundance of white oak. If not for the chance to comment, the area would have been lost for both the bears and the bear hunters. It is not reasonable to think that a collaborative group, any more than the Forest Service itself, could be aware of all the different ways projects can cause site-specific impacts, at least without the effects analysis required for EAs.

58.    The Forest Service's proposed rule would have eliminated "scoping" for CEs, and I am glad that the final rule decided to keep the scoping requirement. But scoping does not alleviate the increased risk of harm to MountainTrue and its members. Scoping is left to the

discretion of the deciding official, which means that the Forest Service can pick and choose who it notifies about an upcoming project. And scoping doesn't require any specific amount of time for input. Furthermore, scoping simply doesn't provide the kind of information the public needs to understand a project and to understand whether the Forest Service is aware of relevant issues. Nor does it require an alternatives analysis, which cuts out one of the public's best ways of helping the agency avoid harm.

59.     In the Nantahala and Pisgah and Cherokee National Forests, the limiting factor on the size of projects that can be documented in an EA is staff capacity to prepare projects that won't have significant impacts. Preparing a project that avoids significant harm requires more than just foresters identifying stands with merchantable timber; it also requires botanists, archaeologists, wildlife biologists, hydrologists, fisheries biologists, and recreation specialists to prioritize locations for logging that will do the most good with the least harm. Without early and substantial involvement of the staff most familiar with the resources likely to be harmed by logging, projects are likely to include stands that would cause unnecessary harm. These harmful impacts are not necessarily indicative of a Forest Service desire to log sensitive areas (although some foresters do intentionally target older, healthier areas), but are often just mistakes. The NEPA process has always been the backstop for fixing those mistakes, because site-specific analysis and informed public input can point out errors and blind spots.

60.     Staffing on these forests has long been a bottleneck for good project development. As a result, members of the public sometimes spend their own time helping the Forest Service identify areas that may be good for logging without complicating factors, as well as areas that have rare habitats or old growth and should not be logged. For example, on behalf of MountainTrue, I spent approximately 17 days and over 160 hours helping the Pisgah National Forest develop the Twelve Mile project. The additional capacity from the public resulted in the

Twelve Mile project being much larger than typical projects, with 2,181 acres of commercial timber harvest approved, while still avoiding impacts to rare and exemplary habitats such as old-growth forests.

61.    The Final Rule would allow the Forest Service to log more acres with less analysis and less transparency and accountability. Having read the Forest Service's explanation for the new CEs, I know that this is the whole purpose—logging and other actions on more acres with the same low levels of capacity. This means that, without additional expert input from staff or the public, there will be more mistakes. As a practical matter, this means that I and other members of the public will either have to accept that many harmful stands will be included in projects and that those harms will not be analyzed and disclosed to the public, or alternatively that we will have to spend our own time and resources to make sure that projects avoid these harms from the outset. And we will have to make that choice early, before scoping, and therefore *before the Forest Service confirms it intends to use a CE*. Because if we wait until scoping (when the Forest Service would announce that it is using a CE), it will be too late. There is no way to do the necessary field work during a short scoping period. In other words, we will have to devote these resources to every project that might *potentially* be eligible for a CE (which is literally every project in this region), before we even know whether it will be particularly harmful or whether it will be approved using a CE or an EA.

62.    To explain further why we would not be able to wait until scoping to invest substantial resources in anticipation of the potential use of the new CEs: In order to make sure that the agency understands the likely impacts of its proposals and reasonable alternatives, it will be necessary for MountainTrue to perform site visits, describe the resources and how they would be impacted, and show alternative locations for harvest that would cause less harm. However, the scale of the projects that will be proposed under the new CEs (up to 2,800 acres rather than 70 or

250 acres, as under current CEs) will make it impossible for MountainTrue to visit and catalog the resources present in those areas, and document the probable impacts of logging to substitute fully for the lack of an EA. Further, the Forest Service is less likely to be open to considering alternative locations for projects scoped as a CE because they consider alternative locations outside the scope of analysis necessary for CEs.

63.     Here's what that means from a practical perspective. We'll need to start field work before scoping. But to inform where we need to do field work, we'll have to start even sooner with FOIA requests to learn where the agency is preparing its next projects and what its timelines may be. When the agency answers those FOIA requests timely and fully, we will at best receive a less-useful version of the kind of information that we would have otherwise received in an EA. And to be clear, the Forest Service rarely responds to FOIA requests timely or fully. As described above, the last time MountainTrue attempted to get ahead of potential CE projects with FOIA requests, the information was heavily redacted.

64.     Further, obtaining and reviewing records pursuant to a FOIA request is a resource- and time-intensive process, and MountainTrue will have to divert staff time and funding to submit and review FOIA responses to obtain information that we would have normally accessed directly through the NEPA process. Agencies often take months, and sometimes years, to provide documents pursuant to a FOIA request. Once MountainTrue receives the records, it takes my staff significant time to review the thousands of pages provided. Agencies often provide voluminous non-responsive records through which MountainTrue staff must sift to find relevant information. Sometimes responsive records are not initially disclosed and MountainTrue must follow-up or appeal to obtain the documents requested. Sometimes the timeline is so slow that we are forced to litigate to obtain the records we have requested.  I am concerned that MountainTrue will not obtain information via FOIA in sufficient time to

meaningfully participate in the NEPA process. If MountainTrue has to resort to FOIA to obtain information we normally would have been given under NEPA, it will detrimentally impact the working of our organization as well as our mission.

65.    A shift to CEs for larger-scale projects previously analyzed in EAs will profoundly impact MountainTrue's staffing, budgeting, and ability to perform other important community work.

66.    MountainTrue engages in the NEPA process extensively, and this is an efficient way for us to influence Forest Service decisions. Our ability to achieve our mission is severely threatened by the Final Rule, limiting our effective use of the NEPA process to submit necessary information to federal agencies and mobilize communities to influence their decisions.  It would limit our ability to champion resilient forests, clean waters, and healthy communities by excusing the Forest Service from considering site-specific impacts and alternatives in an Environmental Analysis.

67.    MountainTrue relies on NEPA generally, and the EA process specifically, for information about projects. The analysis contained in a draft EA allows us to understand the consequences of logging in the proposed locations and any alternatives the agency has considered. This helps us fulfill our mission of making sure the interested public is aware of those consequences and can provide their own informed opinions and preferences so that the agency can appropriately balance the many demands and uses of our shared public lands. For example, after reading a draft EA and draft biological opinion, I can distill the information in those documents into an email to our members that explains the most important issues so that they, in turn, can participate in the project without investing hours of time reading the primary documents. Likewise, by reading the draft EA and Biological Opinion, I can evaluate if the best

available science and other pertinent information were considered and whether the assumptions made about impacts to sensitive resources were logical.

68.     MountainTrue also relies on the EA process to provide information to the Forest Service of which we and our members are aware, but of which the Forest Service is not aware. MountainTrue has a tremendous amount of data, experience, and information about ecological resources and public uses of local national forest lands. Until we see a project's draft analysis, we have no way of knowing what data and information the agency already has or what additional information will be relevant to the agency's decision.

69.     MountainTrue also relies on the EA process to make staffing decisions. MountainTrue's staffing levels and staff responsibilities were determined in reliance on the availability of information about Forest Service projects under NEPA. Currently, MountainTrue dedicates my position to reviewing EAs. I have many other duties and responsibilities including education and outreach to the public, helping to design restoration projects, treating non-native invasive plants, treating ash trees against emerald ash borer beetle, grant writing, fund raising, fee for service contract work, and administrative responsibilities. The burden on my time from responding to the proposed rule changes would be considerable and would displace other important duties. I estimate that the time investment in responding to CEs and the need to use the FOIA process to gain the necessary context to evaluate logging and development proposals would increase my project-review workload by 50% and would result in other important tasks going uncompleted. I expect that the proactive work I do to help the U.S. Forest Service accomplish its mission would suffer the most, followed by my fee for service, education, outreach, and fundraising efforts. This could result in thousands of dollars in lost revenue for MountainTrue annually. For example, in 2020, my position brought in over $20,000 in contract work alone.

70.     In addition to preventing adequate consideration of individual projects' impacts, the use of CEs to approve successive projects will also prevent adequate consideration of cumulative impacts. When we filed this lawsuit, every project in the Cherokee National Forest and the Nantahala and Pisgah National Forests in recent history, besides the Twelve Mile project discussed above, had been 872 acres or smaller. Those trends have continued, although two projects in development, Crossover and GAP, could eclipse that total. The new CE authorities will therefore cover the entire timber sale programs for these forests. The cumulative effects of these timber sale programs would therefore be omitted from any analysis and disclosure, such as the impacts of repeatedly conducting logging projects in rare and exemplary habitats and refugia, depletion of carbon stocks, and habitat connectivity in the face of a changing climate.

71.     MountainTrue and its members take climate change very seriously. MountainTrue and its members are working across Western North Carolina to confront and mitigate the threats of climate change, including efforts to protect our region's carbon sinks by monitoring timber sales and advocating for protective forest management, and to facilitate the movement of wildlife populations under climate pressure by preserving and restoring habitat connectivity.

72.     Climate change directly and profoundly impacts the interests of MountainTrue's members and my own personal interests. The Forest Service's cumulative contributions to climate change (or carbon storage) affect the degree to which I am able to enjoy the national forests. Trees are the most effective known carbon capture device, and mature forests keep massive amounts of carbon out of the atmosphere. On the other hand, logging, especially in the moist, productive forests where Forest Service timber projects are disproportionately located, causes climate-warming pollution. As the atmosphere warms, there is a clear trend towards more extreme rainfall events in the Southern Appalachians. The principle is simple: warm air holds more moisture than cool air, and has more to release in rainfall. The increased intensity in

rainfall is leading to more frequent flood and landslide events that erode soils, destroy roads and trails, harm water quality, and threaten fish and wildlife populations. The flooding and landslides caused by Hurricane Helene are horrifying examples of what this can look like, and they overlapped the footprint of the smaller, but very destructive and deadly Tropical Storm Fred.

73.    Concurrently, droughts are also becoming more intense, as seen in the fall of 2016 when the region went more than 60 days without rain and more than 70,000 acres burned in wildfires. Conservation biologists predict that extremes like floods and droughts will stress many native species and will likely lead to extinctions. Simultaneously, extreme weather events will continue to damage and destroy infrastructure, housing, and people's lives. Climate change is a huge threat to the quality of life of not only everyone in this region, but everyone on the planet. In this region's forests, road washouts after increasingly heavy precipitation adds to sedimentation and water pollution concerns as well as making access to the forests more challenging. Wildlife like many species of insects and birds depend on predictable seasons and weather patterns struggle to adopt, while a warmer climate leaves many plant species vulnerable to pests and diseases that were formerly kept at bay by colder temperatures.

74.    Furthermore, the Forest Service's response to a changing climate also affects my enjoyment of the national forests. The better the Forest Service is able to maintain and repair its road and trail infrastructure, the less risk there is to downstream communities and fish habitat from road washouts. The more the Forest Service manages forests for widely spaced, large trees, the greater the sequestration of carbon, and the greater the resilience to wildfire. The more the Forest Service prevents forests from being fragmented by new roads, the greater the north to south and low to high connectivity will be within our forests, which will allow native species to migrate as the climate changes and potentially avoid extinction. The more the forests can be managed as a complex web of intact, robust ecosystems, the more resilient they will be to

climate change. I have spent my life exploring and protecting these forests and want to see them thrive for the rest of my life and for the generations that come after me. I want to see the Forest Service steward the forests with this long-term view and poise the forests as much as possible to adapt to and mitigate climate change.

75.     While any single timber sale, individually, may not have significant impacts on carbon stocks or habitat connectivity, the effects of such projects add up over time. Removing the entire timber sale program from environmental review ensures that significant cumulative effects on carbon storage and habitat connectivity are never properly considered in deciding where and how much to harvest. Likewise, the more roads the Forest Service builds, the less able it is to meet its maintenance obligations with its chronically strained budgets. This is a cumulative impact of road construction that would be missed if the Forest Service builds roads using the new CE.

76.     Finally, Hurricane Helene raises an example of another key difference between the EA process and the use of CEs. As explained above, the Nantahala and Pisgah National Forests have yearly objectives for logging, also touted as "young forest creation." If the Forest Service conducts logging projects using CEs, it will not have to consider the cumulative effect of logging combined with natural disturbance. If it uses EAs, however, it will need to consider those cumulative effects. This is very important because Hurricane Helene toppled millions of trees and created large quantities of young forest. In some watersheds, up to half the forest was blown down. Failure to account for the combined effect of storms and logging will cause the Forest Service to log more than is justifiable and degrade the ecological integrity at the watershed and landscape scale. Notably, the Forest Service has existing CEs that expedite salvage logging after storms and wildfires.

77. MountainTrue's interests will be harmed if the Final Rule is allowed to stand and the Forest Service ceases to use EAs to inform the public and agency decisionmakers about direct, indirect, and cumulative effects, to consider alternatives suggested by the public, and to gather information about informed public preferences. Without this important and long-effective process, MountainTrue will also be unable to inform the public about how their uses of the forest will be affected, solicit their feedback, and mobilize them to influence the agency decision. Ultimately, the agency will engage in worse decision-making, harming the mountains, rivers, and forests that MountainTrue cares about.

78. MountainTrue relies on the NEPA process to engage in the decision-making processes and to influence decisions that affect it and its members. MountainTrue and its members, therefore, will suffer concrete and particularized injuries to interests that are imminent now that the Final Rule has taken effect.

79. The injury to MountainTrue and its members would be redressed by an order from this Court vacating the Final Rule.

I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this __18th__ day of November 2024.

_____
Josh Kelly