**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**BIG STONE GAP DIVISION**

| | |
|---|---|
| THE CLINCH COALITION, *et al.*,<br><br>   Plaintiffs,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, *et al.*,<br><br>   Federal Defendants,<br><br>and<br><br>AMERICAN LOGGERS COUNCIL, *et al.*<br><br>   Intervenor Defendants. | Case No. 2:21-cv-0003-JPJ-PMS |

**DECLARATION OF KATE WOFFORD**

I, Kate Wofford, hereby declare and state as follows:

1.      This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen and competent to testify. I submit this declaration in support of Alliance for the Shenandoah Valley ("ASV"), which is one of several organizations challenging new regulations promulgated by the United States Forest Service ("USFS") and the Council on Environmental Quality ("CEQ") purporting to implement the National Environmental Policy Act ("NEPA").

2.      I live in Sperryville, Virginia.

3.      I serve as Executive Director of ASV, and I have held this position since the organization's creation in 2018. ASV is a not-for-profit corporation founded by four conservation organizations: The Community Alliance for Preservation, Augusta County

1

Alliance, Shenandoah Forum, and Shenandoah Valley Network. It gained another partner—Scenic 340—in 2019. ASV is headquartered in New Market, Virginia, and it has more than 2,000 supporters and more than 400 active donors. I was the Executive Director of the Shenandoah Valley Network from 2009 to 2018.

4.      ASV's mission is to protect the forests, farms, streams, rivers, and communities of the Shenandoah Valley. We achieve this, in part, by providing accurate and timely information to community members and decisionmakers. ASV has supporters throughout the region who are interested in a Shenandoah Valley that is sustained by healthy forests, rural landscapes, clean streams and rivers, and thriving communities.

5.      To advance our mission, ASV engages in a variety of activities, including monitoring USFS management activities and commenting on proposed activities; enhancing public awareness of, and interest in, issues affecting the nearby George Washington National Forest (GWNF) and surrounding area; and providing leadership and a coordinating role in submitting community input to decisionmakers on projects that impact the region, including USFS projects. ASV also encourages its partner organizations and the communities it serves to participate in public decisionmaking. A core part of ASV's work is equipping people in our area with the knowledge and tools to have a say in the decisions that affect them, such as decisions by county boards of supervisors and federal agencies like the USFS.

6.      The GWNF plays a critical environmental, economic, and recreational role for the Shenandoah Valley and the surrounding region. Generations of Shenandoah Valley residents and visitors have enjoyed hunting, hiking, mountain biking, trout fishing, and getting away in this treasured resource. The GWNF also provides drinking water for more than 260,000 local

2

residents including the cities of Staunton and Harrisonburg, and supports the headwaters of drinking water supplies for 4.5 million people downstream.

7. Members within our partnership champion engagement in the GWNF, with some leading groups on hikes in the forest and plant walks. Lately, ASV has been working on creating a rail trail that would be connected to the GWNF. The national forest would serve as a backbone for the project—which will in turn, be a lifeline for communities in ASV's action area. It serves as a great example of compatible economic development that doesn't harm natural resources. Carefully managed, biodiverse public lands foster healthy communities and economies. These considerations are central to our organization's work.

8. A robust NEPA process is central to ASV's organizational activities, and ASV commented on the rulemaking for USFS's *Proposed Rule, National Environmental Policy Act (NEPA) Compliance*, 84 Fed. Reg. 27,544 (June 13, 2019), to advocate for the integrity of that process. ASV relies on the NEPA process to learn about and engage on USFS actions that affect the Shenandoah Valley and the GWNF, which ASV then relays to its supporters and the general public. As such, we are subscribed to NEPA notice lists, often referred to as "scoping notices," provided by the Forest Service. ASV also participates directly in the NEPA decisionmaking process by offering public comments, critiques, and additional information based on the Forest Service's draft Environmental Assessments ("EAs"), and in some cases by submitting pre-decisional objections if necessary.

9. For example, ASV was involved in the Mt. Storm to Valley 500 kV Electric Transmission Line Replacement Project. This project was an effort by Dominion Energy to replace existing transmission lines across the GWNF, a process that requires approval from the USFS. ASV used the NEPA process to learn more about the project, and submitted comments on

3

the project's scoping announcement and a draft EA. Among other issues, the project had the

potential to affect the Cow Knob Salamander and several species of rare bees, including the

endangered rusty patch bumble bee; result in significant sedimentation and erosion from ground

disturbance and roadbuilding associated with the project, which would occur in the headwaters

of the North Fork of the Shenandoah River; and degrade viewsheds and recreational uses in the

vicinity.  During scoping, the USFS solicited comments on whether the project may qualify for a

categorical exclusion, and ASV explained to the USFS that the project did not. The USFS issued

a Draft EA for the project on December 23, 2020 and ASV jointly submitted comments with

another organization in January 2021, in which ASV re-raised many of the same issues

addressed in scoping comments that were not adequately addressed. Although this project was

far from perfect, it was improved because of the NEPA process, during which the USFS added

design criteria to address some of ASV's concerns. For example, ASV commented that building

taller and wider transmission line towers at different elevations could create significant visual

changes that impact the recreational experience of Forest users and the quality of life of those

communities on the edge of the Forest. ASV proposed design criteria to mitigate these changes,

such as darkening the new towers to reduce their visual impacts, and the USFS included several

such measures in the Final EA.

10.     I understand that the USFS's new NEPA regulations include several new and

revised categorical exclusions (CEs) that would all but eliminate public input for certain types of

USFS activities. I am very concerned that many of these CEs will cause serious harm to my

interests and ASV's interests.

11.     I am aware that one of the new CEs dramatically expands the USFS's ability to

issue special use permits (SUPs) without requiring NEPA analysis or giving the public an

4

opportunity to comment on that would-be EA analysis. This SUP CE could be used to approve

special uses on the GWNF that would have a significant effect on ASV and its supporters. For

example, the SUP CE expressly includes certain utility rights of way as an example of an

authorized use. This could be used to authorize projects like the Mt. Storm to Valley 500 kV

Electric Transmission Line Replacement Project in the future. ASV does not necessarily oppose

this sort of work; instead, ASV insists that we have an opportunity to learn more about such

proposals through EAs, and that we have opportunities to work with the USFS and project

developers to mitigate impacts such as those to viewsheds, streams, and recreation in the project

area. The SUP CE would not allow ASV the opportunity to suggest alternatives or mitigation

measures for similar projects in the future.  ASV for years has paid special attention to impacts

from energy development. One of ASV's predecessors, the Shenandoah Valley Network, worked

closely with the USFS and other stakeholders during revision of the GWNF forest plan because

we were very concerned about the possibility of fracking on the GWNF. I am similarly

concerned about the SUP CE, which I fear will authorize small-footprint uses that may

nevertheless have an outsized impact on resources like viewsheds and water bodies. Energy

development projects on public lands—ranging from fracking operations to industrial-scale wind

projects—often involve conflicts over things like siting that are difficult resolve. These conflicts

necessitate careful management that includes fully informed analysis and robust public

engagement. Specifically, I strongly believe that the public should have an opportunity to weigh

in on the environmental analyses for these kinds of uses of our public lands.

12.     I understand that another new CE allows the USFS to skip the NEPA process for

commercial timber harvest projects up to 2,800 acres in size that are developed in an undefined

setting of "collaboration" and have the nominal and vague purpose of "restoration." Substituting

5

collaboration for a formal NEPA process injures ASV and other stakeholders. Collaboration requires far more time and engagement, in a less structured format than the EA process. Moreover, it is not clear what level of collaboration this CE requires in the first place, nor is it clear how the Forest Service will determine which voices to include in the "collaboration." ASV is limited by staff capacity and budget constraints which, in turn, restrain our ability to engage in time and resource-intensive collaborative processes as often as we would like to. In turn, going forward, we may be excluded from the agency's efforts to satisfy the collaboration requirement writ large. Specifically, the collaborative process would require ASV to devote additional time and resources to tracking projects or rely more heavily on other groups in order to know collaboration may be upcoming so that ASV can ensure it has a seat at the table, and to take on the serious time commitments that collaboration can require. In any case, ASV is also injured because it is now forced to choose between forgoing its legal rights under NEPA or shouldering the burden of additional demands on organizational capacity to engage in the substitute collaborative process. As a practical matter, this would require ASV to fund expenditures outside its ordinary budget, such as hiring a new staff member, which ASV likely cannot do without undertaking a fundraising campaign. It is unreasonable for the USFS to expect community-based groups with limited staff capacity and resources to participate in undefined collaborative processes in order to weigh in on USFS decisionmaking.

13.     If ASV is required to track and participate in collaborative efforts in lieu of the NEPA process to learn about projects and provide input, ASV will likely have to forego other aspects of its work both on and off the national forest. For example, ASV works with communities to develop parks and green spaces, such as the rail trail mentioned above, and to support economic development related to tourism and agriculture in ways that are compatible

6

with the natural resources of the Shenandoah Valley. Similarly, ASV works with members of

several fast-growing communities in the Shenandoah Valley to assist members of those

communities in proactively developing visions for how their communities will grow, and to

assist them in communicating their visions with local government to ensure that their visions for

their communities are reflected in their municipalities' comprehensive plans. This partnership

work is deeply intertwined with our interests on the national forests. It is critical that community

growth happens sustainably and in a manner measured to minimize the burden on sensitive areas

of the GWNF. We will not be able to adequately engage in the research needed to make up the

difference under CEs, participate in collaborative groups, *and* continue this critical partnership

work. In other words, regardless of how we allocate our limited resources, our mission will

suffer. Because ASV's ability to do this full suite of work is constrained by staff capacity, the

cost of collaboration with the USFS as a substitute to NEPA means ASV will be forced to forego

some important work.

14.    In order to understand what is at stake from a logging or energy development

proposal, ASV will not be able to rely on information disclosed in EAs and will instead be forced

to offer input in the dark or to gather information on its own. For priority projects, ASV would

likely need to submit requests under the Freedom of Information Act or hire contractors to

provide information that otherwise would have been provided in an EA. This is a tremendous

hardship for a small organization like ASV, because it requires ASV to find time and financial

capacity to do the work that previously ASV could rely on the Forest Service to do while

completing an EA. This will be especially problematic because CE projects have a short window

for public comment during scoping—often only 30 days—which means ASV will need to gather

and submit facts in a fraction of the time it would otherwise have had. As a practical matter, this

7

is likely impossible. Moreover, the CE process lacks other key information and procedural safeguards. CEs do not consider the cumulative effects of the proposed action and other past, present, and reasonably foreseeable future actions; they do not consider alternatives to the proposed action, such as alternative locations that ASV might otherwise be able to propose; and they do not qualify for the USFS's pre-decisional review process under agency regulations.

15.     These changes will likely lead to on-the-ground harm that threatens ASV and its supporters' concrete interests. For example, projects authorized using the logging CE, CE 25, can have significant adverse environmental impacts—such as via sedimentation into municipal water supplies—even if they are well intentioned. I understand that the USFS treats municipal water supplies as a resource condition that *might* make a CE inappropriate, but the agency's regulations allow it to proceed with a CE even if municipal water supplies are present, so long as it believes the harm would be minimal. And while the Forest Service claims that its "best management practices" will reliably prevent such harm, meaningful analysis of how these practices will be implemented provides necessary assurance. Further, this analysis is imperative now more than ever. Concerns about water supplies are top of mind for community members, local business leaders, and ASV as our region has been experiencing drought for the past several years, and water resources are becoming increasingly precious. Accordingly, it is critical that the Forest Service conduct robust analysis of any and all possible impacts to the watershed before authorizing management activities such as logging or special use permits which can directly jeopardize both our supporters' recreation interests and their basic needs. Specifically, the GWNF is home to several important municipal watersheds for the Shenandoah Valley. Without the EA process supplying high quality information to the public, ASV will be responsible for developing facts in the limited time frame of scoping, or the undefined timeframe of collaboration, to

convince the Forest Service that effects to a municipal watershed are significant enough to make use of a categorical exclusion inappropriate. This is a burden that ASV should not have to bear.

16.     The USFS's new NEPA rules injure my concrete interests and the interests of ASV supporters in preserving the GWNF and the Shenandoah Valley. I personally enjoy hiking, camping, and mountain biking all over the GWNF, including on the Massanutten Trail and at Sherando Lake. I plan to return often for as long as I am physically able. In my personal capacity, I am concerned that these places will be harmed due to truncated environmental review via CEs, which will lead to worse outcomes on the ground.

17.     In my capacity as Executive Director of ASV, I am concerned that these CEs injure ASV by depriving it of information to which it is entitled, which would ordinarily be disclosed in EAs, and by impairing ASV's ability to timely inform and seek input from its supporters and the interested public about USFS that affect the Shenandoah Valley and the GWNF. Sharing information with ASV supporters and the interested public about decisions that affect them, and how to affect those decisions in turn, is a core component of ASV's work, and ASV uses tools including social media, email, and blog posts to keep community members informed. As a practical matter, if ASV loses access to information about USFS projects that would be disclosed in EAs, ASV will be unable to carry out this work without financial hardship, if at all, for the reasons discussed above.

18.     I am also concerned that these CEs injure ASV by requiring ASV to choose now between acquiescing to the burden of collaboration as a substitute for the NEPA process or foregoing its right to participate in land management decisions for so-called restoration projects.

9

19.     My personal interests discussed herein are fully represented by ASV's

participation in this lawsuit, and I support ASV bringing this challenge.

20.     A court decision vacating the USFS's new NEPA regulations will redress these

concerns.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on November 19, 2024.

Kate Wofford

10