**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | |
|---|---|
| THE CLINCH COALITION, *et al.*, | ) |
| | ) |
|    Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FOREST SERVICE, *et al.*, | ) |
| | ) |
| | ) Case No. 2:21-cv-0003-JPJ-PMS |
|    Federal Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| AMERICAN LOGGERS COUNCIL, *et al.* | ) |
| | ) |
|    Intervenor Defendants. | ) |
| | ) |

**DECLARATION OF LARRY WINSLETT**

I, Larry Winslett, declare as follows:

1.      My name is Larry Wayne Winslett. I live in Dahlonega, Georgia. This declaration is based on my personal knowledge, information, and belief.  I am over the age of eighteen (18) and suffer from no legal incapacity.

2.      I was raised in northeast Georgia, in Hart County, and I have been visiting the Chattahoochee National Forest for at least 40 years. I typically visit the Chattahoochee on a monthly basis.

3.      I enjoy the Forest for the peace and solitude that it provides, as well as for its natural beauty. I enjoy seeing the clean, cold streams and the diverse array of plant and animal species. Although I used to do quite a bit of strenuous hiking in the Forest, these days I primarily go on shorter hikes for the purpose of taking photographs.

1

4.      I have worked as a professional photographer for decades. My photographs have appeared in numerous exhibits and publications across the country, as well as in a book I co-authored, *Wildlflowers of Stone Mountain*. My photography focuses on nature, and particularly on places in the forests of northern Georgia.

5.      I also teach photography at the University of North Georgia, the Atlanta School of Photography, and the John C. Campbell Folk School.

6.      My business interests as a professional photographer and teacher rely, in part, on the health and beauty of the Chattahoochee National Forest, as well as various other forests across the southern Appalachians including the Nantahala National Forest in particular. I often lead photography outings to popular scenic locations on the Chattahoochee, and many of the prints I sell of my own photographs are images of the Forest. Approximately 30-40% of my business depends on national forest lands. At the time of this lawsuit's filing, approximately 50% of my business depended on national forest lands.

7.      When this case was filed, I had plans to visit the Chattahoochee and Chattooga rivers on the Chattahoochee National Forest during the fall season of 2021 and during the spring and fall seasons of 2022 to lead photography workshops and to hike. These workshops and visits were carried out as planned. Currently, I have plans to visit the Chattahoochee National Forest in the coming months, including visits to the Dick's Creek and Desoto Falls areas. I also have several plans to visit the Nantahala National Forest in 2025, specifically, on the Nantahala River. For these trips, I will be leading photography outings.

8.      My love of the Chattahoochee National Forest led me to Georgia ForestWatch. I have been a member of the organization for 15 years, and I currently serve as a volunteer district leader for the area of the Chattahoochee National Forest that is to the north and east of

2

Dahlonega. I understand from my colleagues at GFW that the Forest Service is developing a project in this part of the Forest that will go forward under CE 25.

9.      Georgia ForestWatch is a 501(c)(3) nonprofit public interest organization based in Dahlonega, Georgia. Our exclusive mission is to monitor national forests in Georgia and identify environmental threats to them. We do this by protecting our forests and streams through advocacy with both the public and the government. Indeed, Georgia ForestWatch was founded in 1986 in response to the Forest Service's publication of the first Forest Plan for the Chattahoochee National Forest.

10.      Our conservation legacy has always been rooted in public engagement with the NEPA process. To this effect, our organization is subscribed to NEPA lists, often referred to as "scoping lists," for the national forests in Georgia. This subscription entitles us to receive NEPA documents so that we can learn about Forest Service proposals and review and comment on them.

11.       As a volunteer district leader, I often visit areas of the forest that are the subject of Forest Service scoping notices and NEPA analyses to make observations and report what I learn about these locations to Georgia ForestWatch staff.  This information is then used to inform Georgia ForestWatch's public comments and other dialogue with the Forest Service about the impacts of the agency's proposals.

12.      Another aspect of my work as a district leader is to report more routine maintenance problems I see on the Chattahoochee National Forest to the Forest Service. For example, when I see roads washed out, culverts blocked, or trash in recreational areas, I let the agency know. It is important to have citizens' eyes and ears in the national forest, because the agency often doesn't know what is happening otherwise.

13.     To be clear, maintenance and litter problems are far from the only threats that the Chattahoochee National Forest faces. Indeed, one of the gravest threats comes from the Forest Service itself. When the Forest Service carries out projects like timber harvests and roadbuilding, my interests in the Forest are threatened. Specifically, places that I would previously go to photograph become places that I won't even visit—and in some cases, *can't* even visit due to closure orders in place while logging occurs in the area. When the Forest Service bulldozes a logging road, plant species that were present are destroyed, and erosion and sedimentation harm streams. When the Forest Service carries out a clear cut in a stand of trees, the landscape is far less visually appealing afterward. Also, these management activities often lead to an increase in the prevalence of invasive species. And when the Forest Service uses herbicide applications to control vegetation, native wildflowers decline which, in turn, greatly diminishes the beauty of an area. My students don't have interest in photographing the forest in these locations, and my customers don't want to buy photographs of them.

14.     For example, since the Forest Service carried out its Brawley Mountain timber project, this site is not one that I would photograph though I formerly had. That project included extensive logging and construction of temporary roads, and even years later, the site is still quite ragged.

15.     Both in my individual capacity and as a district leader for Georgia ForestWatch, I review Forest Service scoping notices and NEPA documents to understand what the agency is proposing and how these proposals may impact my interests. I regularly submit public comments to the Forest Service for projects that I have concerns about. For example, for the Cooper Creek Project, I attended multiple public meetings that the agency held during development of the project, and submitted public comments on the Forest Service's draft EA. My comments

included concerns about the impact of timber harvests on Bryant Creek, which is a place I enjoyed visiting and photographing, and indeed, visited just this past weekend. I also expressed concern about the Forest Service's proposal to log in areas of the forest designated "unsuitable" for timber production under the Forest Plan, including in the Duncan Ridge roadless area. The Forest Service responded to my and other public comments by dropping a significant amount of timber harvesting from the Cooper Creek Project.

16. In my experience, the NEPA process, and in particular the Environmental Assessment (EA) process, is an essential tool for me and other members of the public to provide input to the Forest Service about projects that have the potential to degrade places on the Chattahoochee that are special to us—places that we rely on for our businesses, for recreation, and for solitude.

17. I understand that under the Forest Service's new NEPA regulations, the agency will be allowed to use a categorical exclusion (CE) for timber projects up to 2,800 acres. Nearly all timber projects proposed on the Chattahoochee National Forest in the past decade would fall under this new CE authority. By effectively eliminating the requirement for the Forest Service to prepare an EA for timber projects in the Southern Appalachians, these regulations threaten my interests in the Forest in multiple ways.

18. For one, Forest Service projects carried out under CEs pose a greater risk of harm to the beauty and ecological health of the Chattahoochee compared to projects carried out under EAs. In my experience with Georgia ForestWatch, we often find that the Forest Service has relied on outdated information about stands on the Forest to develop its proposals. Sometimes the Forest Service simply doesn't know what the conditions of the Forest are in certain places, and it doesn't have the resources to find out. A myriad of ecological harms, including

5

unnecessary logging, habitat fragmentation, and harmful impacts to native species and watersheds, occur when the Forest Service relies on outdated or inaccurate information. For example, for the Forest Service's Brawley Mountain project on the Chattahoochee National Forest, the agency relied on outdated information in an attempt to create habitat for two bird species—the golden-wing warbler and the cerulean warbler. These species' populations have been in decline in Georgia for many years, and there was only a dismal chance that logging areas of the forest to create suitable habit would actually entice the birds to come back. Yet the agency proceeded with its project anyway. Sure enough, populations of these birds have not returned to the Brawley Mountain area, and now the project area is heavily scarred by the timber harvest which took place there. Logging roads in the area continue to be sources of sedimentation, and many native plant species in the project area were lost. Moreover, the project area remains denuded of trees and has lost its natural beauty. These harms are likely to persist for decades into the future.

19.    Because of these risks, much of my volunteer work for Georgia ForestWatch, as well as the work of our other volunteers and staff, is to make sure that the Forest Service has accurate information about the places it is proposing to do work. We rely heavily on the EA process in order to do this. Draft EAs show us what the Forest Service *thinks* it knows about the likely impacts, which allows us to explain what it's missing. If the Forest Service no longer uses EAs for timber projects, our efforts will be hindered. For one thing, the typical 30-day public comment window during the scoping period from projects is not long enough for the public to provide rigorous feedback to the agency, especially for large projects covering thousands of acres. In addition, scoping notices provide much less information about what the agency is planning to do and what the effects may be. This makes it much more difficult for Georgia

ForestWatch and our members to provide the Forest Service with the kind of supplemental information that it needs to avoid unnecessarily harming forest resources. Without the information in EAs, we don't know what the agency is thinking or how to persuade it to do less harmful things.

20.    In contrast, the EA process provides a clear framework that facilitates effective public engagement. For one, when the Forest Service publishes an EA for a project, the public is entitled to a comment period. Under NEPA, the agency is required to consider these comments in making its decision, and to include its responses in the written record. NEPA also allows for a formal objection process when the agency fails to adequately respond to a public comment. There, too, the agency must explain its reasoning for how it responded to public concerns. Both of these features of the EA process are indispensable tools for monitoring the Forest Service's timber program in Georgia. If the agency claims that the public's concerns are unwarranted and a harmful impact is unlikely, then we can monitor for those impacts and, if they occur, bring them to the agency's attention to be mitigated and hopefully avoided in future projects.

21.    Both the information shared under the EA process as well as the opportunities for the public to hold the agency accountable are central to Georigia ForestWatch's mission. Indeed, informing the public about National Forest issues, preparing comments to the agency, and advocating for better protections on the forest lands we treasure are fundamental to our mission. Without these critical features of NEPA in place, our organization will be harmed.

22.    These unnecessary harms to forest resources like rare species, clear mountain streams, and stands of mature trees will negatively impact my personal interests in the forest. Specifically, they will impact my ability to carry out aspects of my photography business on the Chattahoochee and Nantahala National Forests.

23.     By allowing the Forest Service to use CEs for virtually all timber projects on the Forest, the agency will be able to move from scoping to a project decision and implementation in a matter of weeks or months. This is problematic for me because I plan trips to specific locations on the Forest for my photography classes months, and sometimes well over a year, in advance. For example, when this case was filed, I was already scheduling trips to locations on the Forest during the spring of 2022. Right now, I am already scheduling trips to locations on the Forest for the spring and fall seasons of 2025. Under its new NEPA rules, the Forest Service could develop and implement a timber project or prescribed burn in area where I have already scheduled a trip, and I may only get a few weeks' notice. This will result in cancellations that will harm me financially. When the Forest Service abides by the normal EA process, I have ample time to prepare and plan around scheduled projects—in addition to having an opportunity to engage with the comment period to steer harmful logging away from areas I enjoy photographing.

24.     It goes without saying that I prefer to photograph beautiful and ecologically in-tact areas—as do my clients. On a fine scale, logging and road building leave long lasting scars on the landscape which can interrupt photography opportunities for long periods of time. On a broader scale, even a small logging project carried out in a remote area of the forest can affect a vista tens of miles away. I particularly enjoy photographing scenic mountain landscapes that capture the many ridges, valleys, and features of the forest. Logging projects planned under CEs without analysis of and input about public concerns (like, for example, impacts to scenic vistas) will be detrimental to the existence of such uninterrupted views, and therefore, my photography business.

25.     These concerns are not merely conjectural. Many of my most beloved areas for photography and recreation are in locations deemed "suitable" for timber production by the

8

Chattahoochee Forest Plan, such as the Cooper Creek Area. This means that the Forest Service intends to do logging project after logging project in those areas over the long term. Just because an area is deemed "suitable," it is by no means devoid of beauty or ecological importance. In my time at Georgia ForestWatch, I have found precious old growth, rare species, and incredible vantage points for both intimate and landscape photographs in so-deemed "suitable" areas. Given the fine scale that these attributes occur in the southern Appalachians, EAs are indispensable for ensuring that the agency takes a close look at every proposal. This is critical not only for Georgia ForestWatch and my photography business, but also for the agency itself. Without a meaningful analysis, the Forest Service is not able to make informed, reasoned decisions. As history has borne out, the agency is bound to miss critical details about landscape conditions and community uses of the forest when it lacks input from the people who depend on the forest's integrity for their livelihoods. Without the safeguards provided by EAs, I and Georgia ForestWatch are nearly defenseless to widespread project implementation in these invaluable areas.

26.    These harms will not be lessened by the fact that the Forest Service's new 2,800-acre timber harvest CE is limited to "restoration" projects that are developed through collaboration. In my experience, the Forest Service refers to all of its timber harvest projects on the CONF as restoration. In the Cooper Creek Project, for example, the agency wanted to "restore" early successional habitat by logging hundreds of acres in an unroaded area of the Forest. Calling the project "restoration" was just a way for the agency to dress up a project that was intended to meet timber harvest quotas.

27.    Nor will the availability of collaborative processes protect my interests in the Forest in a way that approximates the protection afforded by the EA process under NEPA. Participating in collaborative processes with the Forest Service is a huge time commitment, and

9

in the past, the agency hasn't used collaborative processes to meaningfully consider impacts, alternatives, and other concerns presented to it by Georgia ForestWatch. So "collaboration" is not a replacement for the legal requirement under NEPA that the agency consider these things and respond to public concerns. The Forest Service's new NEPA rules put a very heavy burden on members of the public: either we must participate in time-consuming collaboration, which likely will not make a difference, or we will lose the ability to influence and comment on a project altogether.

28.     For example, I participated in the Forest Service's "collaborative process" for the Foothills Project on the Chattahoochee National Forest during that project's initial development phase. Meetings held by the Forest Service were difficult to attend because they were spread out across a large geographic area and were held early in the evening on weeknights. This meant that for many people, attending a meeting meant taking time off from work, which was simply not possible. Overall, it was a significant time commitment for me to attend meetings and ultimately the collaborative process appears to have been a waste of time. To date, the Forest Service has simply ignored many of the concerns that I and other members of Georgia ForestWatch raised during these meetings. And this was a collaborative process for a large-scale EA. For a CE project, I expect that the outcome would be even worse.

29.     For all of these reasons, the Forest Service's implementation of its new NEPA regulations will harm my interests in the Chattahoochee National Forest which will cause me personal harm as well as economic harm by way of impacts to my photography business.

30.     This injury would be redressed by an order from this Court vacating the Final Rule.

31.     Georgia ForestWatch represents my interests in this matter.

32.     I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this _18TH_ day of _Novcmber_ 2024.

Larry Winslett

11