**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| THE CLINCH COALITION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE, *et al.*, | ) | |
| | ) | Case No. 2:21-cv-0003-JPJ-PMS |
| Federal Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN LOGGERS COUNCIL, *et al.* | ) | |
| | ) | |
| Intervenor Defendants. | ) | |
| | ) | |

**DECLARATION OF MARK MILLER**

I, Mark Miller, declare as follows:

1.      My name is Mark Miller, and I live in Lexington, Virginia. This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen and competent to testify. I submit this declaration in support of the Virginia Wilderness Committee, which is one of several organizations challenging new regulations promulgated by the United States Forest Service purporting to implement the National Environmental Policy Act ("NEPA") ("Final Rule").

2.      The Virginia Wilderness Committee is a 501(c)(3) non-profit citizens' group with approximately 350 members and is headquartered in Lexington, Virginia.

3.      I am the Field Director of the Virginia Wilderness Committee, a position I started in 2024 after serving as the Executive Director since 2012. Prior to being Executive Director I

1

served on the Virginia Wilderness Committee's board of directors, first as Secretary and later as

Vice President. I have been with the organization since 1998. I am familiar with the Virginia

Wilderness Committee's mission and priorities. In addition to me, we have two other staff

members, a new full-time Executive Director and an Outreach Coordinator who works part-time.

4.      The mission of the Virginia Wilderness Committee is threefold: (1) to

permanently protect the best of Virginia's wild places for future generations; (2) to foster

understanding and appreciation of Wilderness; and (3) to promote enjoyment and stewardship of

our last remaining wildlands. Because the Forest Service manages the bulk of federal lands in the

state, our core mission focuses on issues impacting national forests. Specifically, the Virginia

Wilderness Committee focuses on issues impacting wildernesses and works to obtain wilderness

designations for national forests in Virginia. We have been quite successful in this work.

5.      Since its founding in 1969, the Virginia Wilderness Committee has worked

closely with the congressional delegation from Virginia to pass federal legislation under the 1964

Wilderness Act to provide permanent protection to outstanding wild areas on public land in

Virginia. The Virginia Wilderness Committee has been instrumental in passing legislation

designating all existing Wilderness areas in the George Washington and Jefferson National

Forests ("GWJNF") and in Shenandoah National Park. The organization's efforts have resulted

in the designation and protection of over 215,000 acres of Wilderness. Once designated,

Wilderness remains available for many recreation activities, including hunting, fishing,

birdwatching, camping, hiking, canoeing, and horseback riding, and its natural character is

preserved by prohibiting logging, roadbuilding, gas drilling, and other development. Because

wildlands in the Southern Appalachians are interconnected, we devote a significant share of our

2

efforts to ensuring that both designated Wildernesses, areas that are strong candidates to become so designated, and surrounding lands across Virginia are managed appropriately.

6.      Members and staff of the Virginia Wilderness Committee enjoy recreating in Wilderness and throughout the George Washington and Jefferson National Forests, as well as the Southern Appalachian national forests generally. They enjoy a variety of activities, including birding, hiking, mountain biking, trail running, camping, studying nature, fishing, and learning outdoor skills. Our members have strong professional, recreational, and aesthetic interests in preserving our national forests and other public lands, as well as the process by which land-management decisions are made. And for those of our members who are older and unable to hike and explore as they did when they were younger, the Forest still provides an important existence value.

7.      I personally visit areas of the GWJNF roughly 100 days each year, for both professional and personal reasons. I enjoy hiking, foraging, and nature study throughout the Southern Appalachian National Forests. I also help maintain trails in wilderness areas, including Rich Hole and Thunder Ridge. I particularly enjoy visiting the more remote areas in the national forest, such as Beartown Wilderness. Over the years, I have visited a great number of peaks, streams, ridges, coves, and slopes within these National Forests, by road and trail. I have hiked around 20,000 miles in national forests over the years and believe I have hiked every trail within the GWJNF. Currently I am continuing to visit these places and will return to them for as long as I am physically able of doing so.

8.      In addition to seeking Wilderness designations, the Virginia Wilderness Committee's focus on protecting the resources within our national forests involves participating in Forest Plan revision and development of projects implementing the Forest Plan. For over a

3

decade now, the Virginia Wilderness Committee has devoted a great deal of time and resources to working with the George Washington Stakeholder Collaborative ("GW Collaborative"), which is a diverse group representing a range of interests, including timber producers, game managers, and a variety of groups related to hunting, fishing, conservation, and recreation. We helped convene the GW Collaborative in 2010 with the goal of developing recommendations for the revision of the GW Forest Plan, which was underway. Though it was not easy and took a tremendous amount of commitment, hard work, and resources, members of the GW Collaborative were able to come together, compromise, and make recommendations for the Forest Plan, nearly all of which the Forest Service adopted in the 2014 revised Forest Plan. Since then, the GW Collaborative has continued to work together on implementation of the Forest Plan through projects. In fact, we began collaborating on the landscape-scale, multi-resource Lower Cowpasture Project in 2013 before the Forest Plan was released. For these efforts, the Forest Service awarded the GW Collaborative with the 2015 Partners and Community Engagement award. In addition, our collaborative work on the Lower Cowpasture project played a pivotal role in the Forest Service receiving over $1 million for project implementation through a Joint Chiefs award.

9. Our goals in forest planning, project development, and monitoring implementation are to protect a number of ecological and social resources that are present on the national forests, including: old-growth forests; clean water; healthy and productive soil; native plants and animals; critical habitat for wildlife like black bear, migratory songbirds, and Appalachian salamanders; large unroaded areas; well-connected forest habitat throughout the Southern Appalachians; and opportunities for recreation, including for those seeking solitude in wilderness and other remote areas. The Forest Service does not have a complete inventory of

4

where and in what degree these values are found in different locations. Fortunately, many of our members have personal knowledge of specific areas where such resources exist and share that information with the Forest Service, particularly when the Forest Service is proposing logging projects or other projects in those areas. This often happens during our participation in the process of developing a "Environmental Assessment" ("EA") to comply with NEPA.

10.    On many occasions, the Forest Service has proposed activities in habitat that is rare, fragile, or simply inappropriate (ecologically and legally) for the proposed management. For example, inappropriate management leads to sedimentation in streams affecting trout and other fish, spreads invasive species, degrades native tree diversity, impacts recreation, and degrades wilderness characteristics. There are many areas in Virginia's national forests that have wilderness characteristics but lack the formal protection of wilderness. These are known as Mountain Treasures. The impacts of logging and roadbuilding in the Mountain Treasures is often overlooked until we bring it up. In many cases, the process of preparing an EA has enabled the Virginia Wilderness Committee to successfully argue for the protection of sensitive resources, as described below, in paragraph 13.

11.    The Virginia Wilderness Committee's participation in the EA process generally focuses on reviewing environmental impacts of proposed management actions on the specific locations within the forest and the biological communities they support. Our participation generally concerns the questions of where and how this work should (or should not) be done and whether the Forest Service has properly considered the impacts of its proposed actions, as well as possible mitigation measures and alternatives. We regularly analyze Forest Service project proposals down to the stand level. And where the Forest Service prescribes vegetation treatment that is unnecessary or which poses unnecessary risks to forest resources like old growth, water

quality, rare species, and habitat connectivity, we aim to provide analysis of these risks to the Forest Service.

12.    Our involvement in a project begins when we first hear that the Forest Service is considering or developing a project. We are subscribed to the NEPA list that the Forest Service maintains to keep track of who counts as "interested parties" who must be provided with NEPA documents. As a result, we usually learn about projects from a Forest Service scoping notice, although we sometimes hear about projects before scoping because of our relationships with Forest Service staff and other stakeholders. In a few instances, the Forest Service has held pre-scoping meetings to discuss a project concept. Once we become aware of a project that may implicate the Virginia Wilderness Committee's interests, we circulate the available information to our membership and others who may be interested. We also publish and circulate a newsletter twice per year to update our members on projects and other Virginia Wilderness Committee issues. These outreach efforts are critical to maintaining and increasing our membership, raising funds to continue operation, and fulfilling our mission. The frequency of these outreach efforts is primarily determined by our limited staff capacity and resources.

13.    On the GWJNF, the Forest Service produces an EA for a project or uses a Categorical Exclusion ("CE"). From 2009-2019, and to the best of my knowledge, through 2024, no projects were analyzed in an Environmental Impact Statement ("EIS"). The vast majority of logging was authorized using EAs, because the previous CEs only covered very small projects. The following projects provide a few recent examples of Virginia Wilderness Committee's involvement in the EA process:

   a.   In 2023, the Virginia Wilderness Committee submitted scoping comments on the Dunlap Creek Vegetation Management Project. The Virginia Wilderness Committee informed

the Forest Service that the project would overlap with old growth forest areas in the Southern Allegheny Cluster of Virginia's Mountain Treasures, and expressed concern about the extent of temporary roads proposed for the project. In 2024, we also submitted comments on the Draft EA for the Dunlap Creek project. We commented on the lack of adequate assessment of old growth stands in the project area, including discrepancies between Forest Service reports on the extent of old growth and on-the-ground conditions. The Draft EA also contained internal discrepancies regarding stream crossings that could damage water quality, and lacked information regarding the potential impacts on steep slopes and necessary NEPA documents assessing impacts to threatened and endangered species. As a result of our comments, the Forest Service conducted additional old growth surveys in the project area. Unfortunately, the Forest Service did not provide requested supporting documentation for the project alongside the Final EA, nor did the Forest Service make the relevant documents available in response to multiple requests before and after the publication of the Final EA. As a result, we filed an objection to the project—a process that is not available for projects authorized with CEs—and we will remain engaged through the remainder of the NEPA process and project implementation.

b. In 2022, the Virginia Wilderness Committee submitted comments on the Draft EA for the Archer Knob Project. Among other things, we were concerned that the project included the use of Forest Service roads that cross multiple braided channels of the Little Calfpasture River and Daniel Run without assessing potential water quality impacts. The Draft EA also did not consider impacts to the Archer Knob Potential Wilderness Area, Archer Knob Virginia Mountain Treasure, and Elliot Knob Virginia Mountain Treasure. As a result of comments, the Forest Service expanded their analysis of water quality

7

impacts from road repair and construction in the Final EA, including recommendations for improving stream crossings on certain roads. We plan to remain engaged through the remainder of the NEPA process for this project.

c.  In 2019, the Virginia Wilderness Committee submitted scoping comments on the Piney River Vegetation Project. Among other issues, we pointed out that the Forest Service had proposed management in the Mt. Pleasant Inventoried Roadless Area (IRA). The Forest Service was grateful that we flagged this important issue and dropped proposed management in the IRA. This mistake was apparently made because of errors/missing data in the mapping files used by the Forest Service to develop the project.

d.  In 2019, we filed scoping comments on the Eastern Divide Insect and Disease Phase II project. Among other issues, we explained why this project did not qualify for the Farm Bill Insect and Disease Infestation Categorical Exclusion, working with two experts to complete fieldwork and analyze the proposal and related gypsy moth science. The Forest Service eventually acknowledged this and agreed to prepare an EA. In 2020, we filed comments (with other organizations) on the Draft EA, which was woefully lacking in information and analysis and could not support a Finding of No Significant Impact. We again relied on an expert in forest health and forest disturbance ecology. In addition to other problems, the District had failed to conduct stand exams to identify the management needs of the project. Instead, the project had played out in reverse. First the Forest Service wrote a logging plan. Then after it had decided where it wanted to log and how much, the Forest Service worked backwards to generate a "Purpose and Need" theory to justify the logging. Not surprising, this "reverse engineering" of the project led to major problems. For example, we pointed out in our comments that the Forest Service

had not accurately estimated sediment loading into Dismal Creek, which provides habitat for the endangered candy darter. After realizing that it had failed to account for roads in the area, the Forest Service re-modelled sediment and realized that that sedimentation impacts from the proposal would have been impermissibly high. As a result, the Forest Service was forced to drop units in order to reduce sedimentation into Dismal Creek. Unfortunately, the Forest Service failed to address other problems we highlighted in our comments. Specifically, the Forest Service was still proposing intense regeneration logging in areas set aside in the Forest Management Plan to protect drinking water for the nearby Town of Pulaski. The proposed logging violated the Forest Plan and common sense. Additionally, in the many years of project development and analysis, the Forest Service had not surveyed for existing old growth forest within the proposed logging units, violating both NEPA and the NFMA. Consequently, we and other organizations filed an informal objection, which provided the opportunity for us to discuss and resolve the remaining issues with the Forest Service. This process was productive and we finalized a settlement with the Forest Service in February 2021 and withdrew our objection in March 2021 as a result. That project is now being implemented in a way that minimizes the risk of significant impacts but I do not believe any of these improvements would have been secured had the Forest Service moved forward with its original plans to authorize the project using a CE.

e.  The Virginia Wilderness Committee also remains engaged on a variety of proposed projects that are still undergoing NEPA analysis, including: Mad Lick Forest Resiliency and Restoration Project (submitted scoping comments in 2024) and Forestwide Maintenance of Open and Semi Open Lands, Roadside Corridors, and Utility Rights-of-

9

Way project (project put on hold after we submitted scoping comments in 2019). We plan to stay involved in these projects as they proceed through the NEPA process.

14.     In summary, the GWJNF proposes 2 or 3 timber projects per year on average that move forward using EAs, and VWC is involved with most or all of them to some degree, often providing instrumental input to improve them and reduce harmful impacts.

15.     The improvements to the projects described above are a direct result of the Virginia Wilderness Committee's participation in the NEPA process. Specifically, these improvements were possible because we utilized information and analysis in EAs to verify, critique, and supplement the Forest Service's analysis by conducting on-the-ground surveys and scientific analysis of soil, water, and ecological impacts, and by providing detailed comments and suggestions for alternatives. Our ability to provide timely and rigorous feedback to the Forest Service is directly influenced by the amount and quality of the information and analysis provided to us by the Forest Service during the NEPA process. Compared to the CE process, the EA process allows us to be far more effective at identifying errors and oversights in the Forest Service's plans, thereby decreasing the risk of unnecessary environmental harm.

16.     Given our reliance on the NEPA process to fulfill our organizational mission, the Virginia Wilderness Committee has been involved in the Forest Service's process to develop the Final Rule. In 2019, we signed on to comments containing a comprehensive analysis of Forest Service projects completed between 2009 and 2019 in the Southern Appalachian National Forests, including the GWJNF. This analysis showed the environmental benefits of the NEPA process under the previous Forest Service rules. Overall, for projects for which an EA was completed, the NEPA process resulted in roughly 5,000 acres of commercial timber harvests being dropped from final decisions in the Southern Appalachians. Of those, over 1,500 of the

10

acres spared from timber harvest were on the GWJNF—a reduction of over 12% compared to the commercial harvest acreage proposed at the outset of the NEPA process.

17. Our goal for reviewing EA and CE projects is essentially the same. We aim to review the proposal, communicate with members and partners about the project, complete fieldwork if necessary, analyze potential environmental impacts, and provide detailed comments to the Forest Service, all to make projects better. The EA process greatly facilitates these improvements during a project's development by providing a larger window for public involvement and greater volume of informational and analytical output from the agency. In most cases where information from the Forest Service suggests that we may want to provide comments, I visit areas of concern within the project area. Since many Forest Service roads are gated, I usually hike or ride a mountain bike to these units. For example, I visited the Dismal area of the Eastern Divide Phase 2 project, the Archer Knob project area, the Dunlap Creek area, as well as the Piney Ridge project area. This fieldwork can take a fair bit of time. Moreover, it is not entirely within my control how quickly I can do this. Sometimes I have to wait until the weather cooperates and it is safe to head into the woods. For example, ice and high winds can delay this work. At other times, I must wait to receive information from the Forest Service such as GIS files that show exactly where the proposed units are. For large landscape-scale project areas, we frequently work with partners or consultants who can help us review larger areas. For example, Wendy Hochstedler spent a summer in the North Shenandoah project area to inform our pre-scoping and scoping comments. Jessica Bier spent many days doing field review in the Eastern Divide Phase 2 project area and the Dunlap Creek project area. At times, we rely on expert help to review the proposal and provide a professional opinion. For example, Rose-Marie Muzika, Ph.D. provided extensive research and comments on the best available science

11

regarding gypsy moth and oak regeneration. The EA process enables us to provide more rigorous feedback to the Forest Service, which helps the Forest Service to supplement its analysis and modify the projects.

18.     In the rare circumstances where there are lingering problems with a project, we have another EA-based opportunity to ask the Forest Service for adjustments. Specifically, we can file a pre-decisional objection. The EA process provides the framework for us to resolve conflicts with the Forest Service throughout project development.

19.     Projects developed under CEs do not provide the same opportunities for the Virginia Wilderness Committee and other members of the public to analyze potential impacts, provide detailed feedback, and develop alternatives or mitigation strategies that can help the Forest Service achieve the goals of the project while avoiding unnecessary environmental harm. Without this input from the public, the Forest Service lacks the staffing and institutional knowledge to inform their project analyses effectively.

20.     For CE projects, the Forest Service provides significantly less information and analysis to the public. Whereas EAs provide Forest Service analysis of impacts to soil, water, biological communities, and cultural resources, the Forest Service provides none of this information for CE projects. Sometimes the scoping notice does not provide information about which stands (or even compartments) are being proposed for management. This information is critical because it enables us to hone our surveys and analysis on the areas of greatest concern, such as the locations of sensitive soils, rare species, unique biological communities, and threatened waterways. When using a CE for a project, the Forest Service also does not assess alternatives to their management proposal that might be less detrimental to important resources like old growth stands and watersheds.

21.     Under the Proposed Rule, if the Forest Service provides inadequate information in a scoping notice for a CE project, we must reach out to the Forest Service immediately in the hopes of obtaining at least some of the information that would typically have been provided in an EA. There is no guarantee, however, that the Forest Service will provide the requested information, and it can often take weeks or even months to get project information from the Forest Service. For that matter, the Forest Service may not have developed the information yet. Without it, however, we may lose our one and only opportunity to provide meaningful comments on the project. Because we are unable to object to projects throughout their planning and review when a CE is used, our only option then would be to challenge the finalized project in court.

22.     It is far more productive for us and the Forest Service if we can instead engage through comments on an EA. This allows us to resolve issues early. For example, the scoping notice for the Eastern Divide Insect and Disease Phase 2 project indicated that the Forest Service had completed some old growth surveying within the 1,366 acres proposed for regeneration harvest, but did not disclose where it had or had not occurred. It also did not commit that no old growth would be harvested once it was identified. That caused great concern as it meant that this large project area likely contained unidentified existing old growth that could be harvested. We needed the above information to (1) assess whether the project complied with the Forest Plan, and (2) determine the severity of impacts, which were likely to be significant. In the Fall of 2020 – after the Final EA had been released – we learned that the Forest Service still had not completed on-the-ground old growth surveys. In fact, only a few stands had been surveyed at all. Because the EA provided this information, we still had the opportunity to file an informal objection, and the Forest Service still had an opportunity to fix the problem. The Forest Service committed during our settlement discussions to complete those surveys and give the public time

13

to review the data before implementing the project. We reached a settlement agreement with the Forest Service and withdrew the informal objection. If the project had proceeded as a CE, the Forest Service would not have known where old growth existed and would almost certainly have logged old growth forest, which we believe would constitute a significant impact. The EA process is constructive, and unlike the CE process, it does not force the public into filing lawsuits to remedy issues that could have been addressed easily enough if an EA had been prepared.

23.     Another serious concern is that CE projects provide a single scoping period in which public comments are allowed. Again, it is all but impossible for an organization as small as the Virginia Wilderness Committee to gather the necessary information, analyze impacts, and write comments in a short window of time. Comparatively, for projects developed under EAs, we can use the window of time between scoping and publication of the draft EA to prepare surveys, conduct scientific analysis, and communicate with our members. This additional time allows us to develop a more comprehensive analysis of a project area, whereas under the limited timeframe for CEs, we must necessarily pick and choose which locations and resources within a project area to focus our analysis. It is not uncommon for projects developed under CEs to go through an entire 30-day scoping period during the time in between our Board of Directors meetings or between issues of our twice-per-year newsletter which we use to tell members about a project. Moreover, we cannot communicate with all of our members via email and our website. And even if the scoping period were long enough to do so, we do not have the capacity to start sending letters through the mail to members regarding every CE project. Yet we would need to do this because of the high stakes of having only one comment period and the shorter timeframe overall for any analysis. Otherwise, how can we inform all of our members about projects that

14

may directly impact their interests with enough time for them to provide meaningful input to the Forest Service?

24.     It is also worth noting that we are subject to the same seasonal restrictions as the Forest Service when it comes to some of the fieldwork we may need to do. For example, we cannot examine the extent of gypsy moth defoliation when leaves are off the trees in the Fall and Winter, and we cannot survey for the endangered rusty-patched bumble bees when the bees are underground for the winter. If projects are proposed under CEs during the wrong time of year, it could be impossible for us to provide critical input even if we had the capacity to visit the affected locations.

25.     If proposed today, almost all of the projects discussed above would likely be proposed under the Final Rule's CE for commercial logging projects that are less than 2,800 acres, with Archer Knob as the only exception. This is not a mere possibility. At the time this lawsuit was filed, the Secretary of the United States Department of Agriculture ("USDA") had issued an order requiring the Forest Service to use the minimum level of NEPA review allowed under law, meaning that the Forest Service would be required to use the new CEs for new projects where available. More recently, I am aware that the Chief of the Forest Service issued a similar directive to use the most "expeditious" form of NEPA review, including the new CE for logging up to 2,800 acres. We don't know precisely where a CE project will pop up first, but over time the Forest Service will use the new CEs throughout the GWJNF. Because of my frequent visits and penchant for visiting remote locations all over these forests, I will certainly see the impacts of these projects. My experience of the GWJNF will be harmed when I see impacts that could have been less harmful had the agency only used the EA process.

15

26. The Final Rule provides two limitations on the Forest Service's use of its new 2,800-acre timber harvest CE: (1) projects developed under this CE must be primarily for a "restoration" purpose, and (2) and they must be developed "collaboratively." Neither of these limitations ameliorates the increased risk of harm to forest resources on the GWJNF or the harm done to the Virginia Wilderness Committee and its members.

27. The Virginia Wilderness Committee has now collaborated with the Forest Service and the GW Stakeholder Collaborative on two landscape-scale, multi-resource projects. Both experiences achieved some positive outcomes—but in both cases, they were largely dependent on the EA process and the ways it acted as a backstop for collaboration.

28. First, from 2103 through 2015, the Virginia Wilderness Committee worked to help develop the Lower Cowpasture Restoration and Management Project. In addition to attending many meetings and field trips, we contributed to several rounds of pre-scoping comments and submitted scoping comments and comments on the Draft EA. Over that time, we highlighted many issues that the District addressed, including: ecological restoration, the need for a Draft EA, IRAs and Potential Wilderness Areas ("PWAs"), woody biomass removal, roads analysis, old growth, soil and water quality and aquatic habitat, management on steep slopes and erodible soils, non-native invasive species control, monitoring and adaptive management, and financial analysis. Because there were a few lingering issues that we were unable to resolve before the District Ranger left for fire duty in 2015, we filed an informal objection which was swiftly resolved upon his return. We withdrew our objection and the project moved into implementation. We and other stakeholders have stayed involved throughout implementation. Per the terms of our objection settlement, the Forest Service provides an annual update to the public and hosts an annual field trip that we attend.

16

29.     Second, from 2016 through 2020, the Virginia Wilderness Committee worked to help develop the North Shenandoah Mountain Restoration and Management Project. We attended many meetings and field trips related to the project. In addition, we and partners hired a consultant to complete extensive fieldwork in the approximately 100,000-acre project area. Based on this information, we contributed several rounds of pre-scoping comments. We also submitted scoping comments, comments on the Draft EA, and joined Stakeholder Collaborative comments. In our comments, we provided "lessons learned" from the Lower Cowpasture project, as well as suggested a process for developing the project collaboratively. We also provided site-specific information about conditions in the project area. Lastly, we flagged many issues for the Forest Service, including, for example: how to prioritize management based on the Ecological Departure Analysis completed by The Nature Conservancy; management in PWAs; logging on steep slopes and erodible soils; the need to control existing non-native invasive species; and protection of old growth, soil and water quality, and aquatic habitat. The Forest Service made many important changes in response to our comments. For example, after the Forest Service understood that its proposed logging in the Beech Lick Knob PWA without any analysis was unlawful, the agency completed the necessary analysis and confirmed that the management would not disqualify the area from future inventory and evaluation for wilderness. In short, because we had the opportunity to review and comment on a Draft EA, we were able to resolve important issues and avoid the need to challenge the project.

30.     These examples demonstrate that a collaborative process is an inadequate substitute for the scientific analysis, public disclosure, and opportunities for comments and objections that are required under the EA process. As they demonstrate, collaboration and EA analysis can work tremendously well together, but collaboration alone is not enough. The Lower

17

Cowpasture project is a crystal-clear example of this. By all measures, this collaboration went well. But it was not in collaborative discussions that we and the Forest Service were able to dig into the details of a project and work out the limitations, mitigation, and sideboards needed to bring these projects into compliance with the law and make sure that important resources were protected. Instead, it is the NEPA framework for EAs that provides the opportunities to dig into all of this. Moreover, it is an EA, not "collaboration," that requires the Forest Service to share all project information with the public, to adequately analyze the impacts, to provide opportunities at meaningful times for the public to provide feedback, and to consider and respond to that feedback. We need this robust back-and-forth to protect resources like old growth, clean water, and wildlife habitat while also meeting the purpose and need of a project. In short, EA projects and the associated comment period provide the Virginia Wilderness Committee and public with the time needed for outreach, communication, research, fieldwork, and analysis, as well as the ability to present concerns and provide well-researched, detailed, thoughtful feedback on those issues. While meetings, calls, and conversations with the Forest Service and other stakeholders can be constructive, they in no way provide this to the Virginia Wilderness Committee and other members of the public.

31.     Beyond these glaring shortcomings, it is not even clear what the Forest Service means by collaboration since it is not defined. In our experience, it is not always clear what the Forest Service considers "collaborative." Moreover, there is frequently an underestimation of the time, effort, and resources it takes to form a successful collaboration. For example, the Lower Cowpasture project involved 9 public workshops and 3 field trips while developing proposed action. On the George Washington and Jefferson National Forests, only 2 Districts have experience with collaboration by virtue of having developed the Lower Cowpasture and North

Shenandoah Mountain projects. (And much of the Forest Service staff who developed the Lower Cowpasture project have retired or moved off of the GWJNF, including the District Ranger, Environmental Coordinator, silviculturist, and many staff members in the Supervisor's office who worked extensively on the project.) True collaboration is not a simple or straightforward task for a District to take on. They need training and resources to do it well. Things are even more complicated on the Jefferson National Forest where no stakeholder group exists that is analogous to the GW Stakeholder Collaborative. Nor have the Districts developed a truly collaborative project on the Jefferson in recent history.

32.     The learning curve to pull off a collaborative project is steep and it requires a great deal of time, energy, commitment, and resources from both the Forest Service and stakeholders. To pretend that Districts and the public can simply start this level of public engagement for all projects is wildly unrealistic. To count on this "collaboration" to ensure projects do not have significant impacts on our public lands is reckless.

33.     It has become clear in meetings and projects with the Forest Service that not all Forest Service line officers understand what true collaboration entails. In many instances, the agency seems to think that sharing information about a course of action they have already decided on at public meetings constitutes collaboration. While sharing information is certainly important and part of the process, it is only the start. To truly collaborate, the Forest Service needs to start reaching out to stakeholders well before settling on a course of action and generating information and analysis. Because once the Forest Service has invested time and resources into developing a project idea on its own, it is generally too late for stakeholders to influence the concept or geographic area for a proposal. At that point, only analysis and information about impacts and consideration of alternatives will be effective at prompting

19

changes. Ideally, the Forest Service and stakeholders would have several well-organized meetings with clear agendas to move through the process from beginning to end. Again, this takes time and resources. And if I have learned anything from what the Forest Service has told me in many meetings over the past few years, it is this: The Forest Service does not have enough staff time or money.

34.     Collaboration also requires that the Forest Service know what to do with the feedback it is soliciting from the public. Too often we see Districts hold public meetings and receive public comments only to ignore the feedback it is receiving. To collaborate, the Forest Service needs to know how to receive that feedback and then, critically, use it to shape the project. This sounds simple and it should be. But for the past several years, it has been clear that Forest Service staff are under significant pressure to meet climbing "timber quotas." And when stakeholder input gets in the way of doing that by requiring more analysis, dropping units where adverse impacts will occur, or adding mitigation, the stakeholder input is simply ignored. That is not collaboration. That is going through the motions, checking the boxes, and generally putting on a show of collaboration.

35.     This level of engagement for all projects would also greatly tax the public, including the Virginia Wilderness Committee. Our time, effort, and resources are also stretched thin. Given the small size of the Virginia Wilderness Committee (1 full-time and 2 part-time employees), we rely primarily on the efforts and expertise of volunteer members to engage on projects, and it can be difficult for those members to attend the many meetings and calls that are necessary for collaboration. This is particularly true for meetings that occur on weekdays, either during the workday or starting right after the end of the business day. Yet missing a meeting can mean missing the opportunity to participate in that topic. If participation poses this many

difficulties for passionate volunteers already working within an organization, it is even harder for other individuals who may be affected by and want to influence a project. When the GWJNF begins proposing its 2-3 projects per year under the new CEs instead of EA, the Virginia Wilderness Committee would need to hire an additional 1 or 2 staff members to be able to engage in all of these collaborations. We do not have the resources to do that. In that regard, we are in the same boat as the Forest Service. It will not serve any of us well to ignore these realities. The result of doing so means that true collaboration will not occur, but the Forest Service will charge ahead with damaging projects that injure the Virginia Wilderness Committee members' use and enjoyment of the GWJNF.

36.    Second, the Final Rule's limitation on the use of the 2,800-acre harvest CE to "restoration" projects changes very little because the Forest Service already characterizes timber harvests on the GWJNF as restoration. This is true even where the clear purpose of a project is to maximize timber harvest. In fact, I would be hard-pressed to think of any recent timber sale in which the Forest Service did not assert it was logging at least in part to "restore" forest structure and composition. We understand that forest management can help restore specific areas (specifically, outside of undeveloped "core" areas), and that ecological departure analysis highlights the need for additional early forest in many areas. And as part of the GW Collaborative, we support an increase in timber harvesting. But we anticipated that the proposed management would be balanced to prioritize other restoration needs also. It has been telling that for the past several years, projects have focused on "restoring" early succession habitat (ESH), the most profitable way to log. Less profitable logging techniques such as thinning occur in far fewer stands. This is true even though ecological departure analyses indicate that the need for management to open up the canopy in mid- and late-succession forest (e.g., thinning and

21

burning) far exceeds the need for regeneration logging to create early succession habitat. For example, the ecological departure analysis for the North Shenandoah Project indicated that oak forest within the project area needed approximately 67% more mid- and late-succession canopy to be opened up. In contrast, it called for only about 10% more early succession habitat. If restoration were the true goal, we would expect the proposed management to roughly track those ratios: 67% management to open up the canopy and 10% management to create early succession habitat. In reality, the ratios were nowhere near that, with much greater focus placed on creation of early succession habitat. Non-income-generating restoration work like timber stand improvement occurs even less.

37. Put simply, the restoration box can and will be checked by s the Forest Service simply inserting the word "restoration." This requirement does nothing to ensure the so-called restoration projects actually have ecological benefits and avoid significant harms.

38. When it comes to true restoration, it is also imperative that site-specific conditions be considered to determine whether proposed management would constitute ecological restoration at that particular site. For example, a stand that was logged 30 years ago may now be dominated in uncharacteristic red-maple forest; it may well constitute restoration for the Forest Service to log in that stand in an effort to achieve native, characteristic forest there. And certainly, logging an uncharacteristic pine plantation and doing other needed work to regenerate the stands in native pine forest could constitute restoration. However, that same management would not constitute restoration if the Forest Service proposed to instead, as it so often does, log a stand of valuable old growth forest to create early succession habitat (which can be created anywhere). In short, site-specific conditions matter; what constitutes restoration at one site constitutes damage at another.

39.     The proposed Dunlap Creek Vegetation Management Project is a perfect example of how the 2,800 acre timber harvest CE likely will be used. In that project, the Forest Service proposes a suite of activities that it says will move the project area toward the desired forest conditions described in the Forest Plan. In our 2024 draft EA comments, we explained that the project overemphasizes early successional habitat to the detriment of mature and old growth patches, particularly in stands that show old growth characteristics outside of the areas identified by Forest Service surveys. These on-the-ground conditions highlight why it is important for the Virginia Wilderness Committee and other members of the public to be able to check the Forest Service's work and suggest alternatives that would better serve the agency's stated purpose and need for the project while avoiding significant impacts. The choices of where and how intensively to log are extremely consequential for the forest and its users.

40.     When this lawsuit was filed, we were watching and anticipating upcoming projects that would have been under the eligibility thresholds for the new CEs. Specifically, we were extremely concerned that the Forest Service would use the 2,800 acre timber harvest CE to sidestep a NEPA process that the agency has already said its sees as cumbersome. In an October 2020 public meeting for the Oak and Woodland Restoration Project, Forest Service personnel explained that they wanted to shorten environmental review for the project so they could respond to price volatility in the timber market when selling trees. The 2,800 acre timber harvest CE would have allowed the Forest Service to skip an EA for this project altogether and categorically exclude all of the proposed work on an annual basis—1,800 acres of commercial timber harvest annually— with room to spare. At the time this lawsuit was filed, it appeared virtually certain that the Forest Service would shunt this project into this new CE for two reasons. First, the Forest Service had sunk costs that would be hard to abandon. Second, the USDA order in place

23

at the time required the Forest Service to use the minimum level of NEPA review. Further, the Forest Service had already explained in project documents and a public meeting that the agency considered this to be a collaborative restoration project. This project, and therefore the use of CE 25, would have affected me personally. The project would have been implemented in areas that I visit and planned to return to again (and, in fact, have returned to in the past three years). Ultimately, after this lawsuit was filed, the agency canceled the Oak and Woodland Restoration project, but there are always more projects on the horizon. For example, as explained above, VWC remains engaged in the Dunlap Creek Project in a way that would not be possible if the project proceeded under an EA. I visit the project area—both for work and for recreation by walking among the old growth stands—once a year on average.  Today we are watching for upcoming projects that will be under those thresholds. If the new CEs are used to authorize these upcoming projects, we will not have the same ability to improve them.

41.     Moreover, the notion that "restoration" projects can nonetheless have significant impacts is wrong. Even a well-intentioned restoration project allowed under the Forest Plan can significantly damage forest resources. For example, a restoration project involving logging in steep areas on highly erodible soil types may cause pulses of sedimentation to wash into a nearby stream providing critical habitat to the endangered candy darter. A timber sale that leaves a network of temporary roads administratively deemed "in storage" may nonetheless lead to massive influx of non-native invasive species and unauthorized vehicle use. These impacts may well be significant. The fact that restoration was the objective does not mean an activity will not have significant impacts. The same is true even if the above projects were developed collaboratively. As a result, the 2 limitations of the 2,800-acre CE are inadequate to ensure there will not be significant resource damage.

24

42.     We are also extremely concerned that cumulative impacts will no longer be considered under the Final Rule. Specifically, we worry that the 2,800-acre CE would allow multiple logging projects in an area without ever considering the cumulative impacts of doing so. For example, forests are tremendous carbon sinks. If the Forest Service is permitted to bypass the consideration of climate impacts from logging projects across the GWJNF (or across the Southern Appalachian Mountains, or across national forests throughout the country), the Forest Service's logging program will have adverse significant impacts on the climate, which it will never consider or disclose for the projects authorized under CEs.

43.     The Virginia Wilderness Committee will be harmed if the Final Rule is allowed to stand and the Forest Service ceases to use EAs (or EISs) to inform the public and agency decisionmakers about direct, indirect, and cumulative effects, to consider alternatives suggested by the public, and to gather information about informed public preferences and concerns. Without this important and long-effective process, the agency is likely to engage in poor decision-making and make choices that harm the forest resources that the exists to protect. As detailed above, we rely on the NEPA process to engage in the Forest Service's decision-making processes and to influence decisions that affect the Virginia Wilderness Committee and its members.

44.     In addition, the Virginia Wilderness Committee will be harmed because the Forest Service will no longer analyze and disclose for review the environmental impacts of proposals. To achieve our organizational mission of protecting forest resources, we will thus have to shift scarce organizational resources to preparing much more analyses of impacts to soil and water. This would prevent us from engaging in other organizational activities such as maintaining trails, working on community outreach on wilderness legislation, and updating the Virginia Mountain

Treasures. In addition to analysis, we will also need to spend additional time and resources to simply obtain the basic information that would have been supplied in an EA. This will likely require the Virginia Wilderness Committee to file more requests for information under the Freedom of Information Act ("FOIA"). For example, the scoping notice for the Eastern Divide Phase II project came out on May 8, 2019. Within one week, we had determined the documents we needed to evaluate this proposal and filed a FOIA request seeking project file documents related to gypsy moth and old growth. We received responsive documents on June 19, 2019, five days before comments were due. This left almost no time to review and analyze the agency's information or complete additional fieldwork. The only reason we were able to provide meaningful comments was that we had preemptively begun doing fieldwork months before this in case we wound up needing it. This preemptive approach, including routine filing of FOIA requests, will be our only option if logging projects are now forced to proceed under the 2,800-acre CE (or other new CEs), because the single scoping period will be our only chance to weigh in. This does not just hurt the Virginia Wilderness Committee. Our informed comments help the Forest Service comply with its duties under the law. For example, what did our comments for the Eastern Divide Phase II project tell the Forest Service? Our analysis, including days of fieldwork and expert review, showed that this project did not qualify for the Farm Bill Insect and Disease CE and that the best available science did not even support the theory of management. What did our comments on the resulting Draft EA show? They showed that the Forest Service had vastly underestimated sediment loading into the Dismal Creek, which contained habitat for the endangered candy darter. As a result, the Forest Service conducted sediment modeling that led the agency to drop units to reduce sedimentation. Had this project proceeded under the new 2,800-acre CE, the Forest Service would have proceeded with this project as scoped and the

26

project would have had significant impacts. In truth, the Forest Service needs us to have the NEPA framework for EAs as much as we need it. The Forest Service cannot comply with its many obligations without help. And the public needs EAs to provide that help.

45.     In a nutshell, the Final Rule will force the Virginia Wilderness Committee and other members of the public to either accept that (1) harmful management will be included in projects and that those harms will not be analyzed and disclosed to the public, or (2) we will have to spend our own time and resources to make sure that projects avoid these harms from the outset, before scoping. This will be true for every project that might potentially be eligible for a CE (which is almost every project in this region), before we even know whether it will be particularly harmful or whether it will be approved using a CE or an EA, because if we wait for the scoping notice we will not have time to obtain information through FOIA or field work to inform our comments. And, moreover, the Virginia Wilderness Committee does not have the resources to step into the shoes of the Forest Service by doing its own information gathering, groundwork, environmental analysis, and advocacy before every project is scoped. The practical result of the Final Rule will be unacceptable, unlawful harm to forest resources and the Virginia Wilderness Committee's interests.

46.     The Virginia Wilderness Committee and its members rely on the NEPA process to engage in the Forest Service's decision-making process. Consequently, the Virginia Wilderness Committee and its members will suffer concrete and particularized injuries to interests that are imminent now that the Final Rule has taken effect.

47.     The injury to the Virginia Wilderness Committee and its members would be redressed by an order from this Court vacating the Final Rule.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

Executed this __19__ day of November 2024.

_____
Mark Miller

28