**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| THE CLINCH COALITION, *et al.*, | ) | |
| | ) | |
|    Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE, *et al.*, | ) | |
| | ) | |
|    Federal Defendants, | ) | Case No. 2:21-cv-0003-JPJ-PMS |
| | ) | |
|  and | ) | |
| | ) | |
| AMERICAN LOGGERS COUNCIL, *et al.* | ) | |
| | ) | |
|    Intervenor Defendants. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF NICOLE HAYLER**

I, Nicole Hayler, declare as follows:

1.     My name is Nicole Hayler, and I live in Mountain Rest, South Carolina. This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen (18) and suffer from no legal incapacity.

2.     I have been the Executive Director for Plaintiff Chattooga Conservancy for approximately ten years. Prior to that, I worked as a program associate and development director. I was a founding member of the Chattooga Conservancy when it was created in 1994 and have worked for the Conservancy since that time; I am very familiar with its work and mission.

3.     I first visited the Chattooga River watershed as a college student, when I worked as a raft guide on the Chattooga River. Since that time, I have become a resident in the Chattooga River watershed and have spent many years living on a tract next to national forest lands where I

1

can readily enjoy all that the watershed has to offer. I am a whitewater kayaker, and I paddle on the Chattooga River regularly. I visit the national forests within the watershed to hike, take photographs, study nature, view wildlife, and to seek solitude and renewal. I will continue to explore and enjoy the watershed in my personal capacity for as long as I am able. For example, I will continue to visit the Woodall Shoals area of the Sumter National Forest on a regular basis. Woodall Shoals is one of the "put-ins" on the Chattooga River that I access for whitewater kayaking.

4.      The Chattooga Conservancy is a §501(c)(3) nonprofit public interest organization based in Mountain Rest, South Carolina. At present, we have approximately 650 members, many of whom live in the nearby urban centers of Atlanta, Georgia and Greenville, South Carolina. We do have some members who live in close proximity to the watershed and some who live as far away as Alaska and California. The connections that Chattooga Conservancy members have with the watershed vary and include interests in paddling, hiking, fishing, hunting, horseback riding, birding, and nature study.

5.      The mission of the Chattooga Conservancy is to protect, promote and restore the natural ecological integrity of the Chattooga River watershed ecosystems; to ensure the viability of native species in harmony with the need for a healthy human environment; and to educate and empower communities to practice good stewardship on public and private lands. At its core, this mission focuses on ensuring the integrity of forestlands throughout the watershed due to the outsized impact of logging on water quality and scenic attributes.

6.      The Chattooga River watershed is approximately 190,000 acres, about 70% of which are comprised of national forest land in North Carolina, South Carolina, and Georgia. The fact that this much of the watershed is located on public land makes it special among watersheds

in the eastern United States. The Chattooga River watershed includes lands in the Nantahala
Ranger District of the Nantahala-Pisgah National Forests; the Andrew Pickens Ranger District of
the Francis Marion-Sumter National Forests; and the Chattooga River Ranger District of the
Chattahoochee-Oconee National Forests.

7.    Because the watershed contains both privately owned and public lands, the
Chattooga Conservancy pursues our mission in different ways based on ownership status and the
tools available to us. A healthy watershed is dependent on sound ecological practices occurring
in both contexts. Protecting and restoring water quality is a primary concern for our organization
because of the Chattooga's status as a National Wild and Scenic River, which includes emphases
on providing water-oriented recreation opportunities in its unpolluted waters, and maintaining or
improving the condition of the soil, water, and watershed on public and private lands.  I have
been trained and certified in certain water testing methods including "Adopt-a-Stream" protocols
to obtain water sampling data, and I regularly conduct sampling throughout the watershed.

8.    The Conservancy also works to directly protect federally managed national forest
lands, which are critical to protect the overall integrity of the watershed. We invest significant
organizational resources into public education and outreach about proposed actions and decisions
affecting national forests. For example, we regularly hold public meetings to provide information
about and discuss United States Forest Service ("Forest Service") scoping notices and other
documents, such as environmental assessments ("EAs"), which the agency is required to produce
under the National Environmental Policy Act ("NEPA") for certain proposed actions. I am
subscribed to receive Forest Service scoping notices and intend to remain subscribed in the
future. We also produce an online and occasional paper newsletter to inform the public and our
members about issues affecting the watershed.

9. We also engage in a variety of direct stewardship activities that occur primarily on national forest lands, such as conducting water quality sampling throughout the watershed to document pollutant loads, coordinating trash pickups, and organizing non-native invasive species removal.

10. Finally, we engage in monitoring and oversight of Forest Service project proposals and implementation within the Chattooga River watershed. This involves monitoring the Forest Service's Schedule of Proposed Actions ("SOPA"), reviewing scoping notices and other more robust NEPA documents—such as EA's and Environmental Impact Statements ("EIS's"), submitting public comments and engaging in informal dialogue with agency staff, and participating in the Forest Service's pre-decisional objection procedures. In my capacity as executive director, I am directly involved in each of these areas of the Chattooga Conservancy's work, in addition to fundraising and other aspects of program implementation work.

11. The Chattooga River  is known as the crown jewel of the National Wild and Scenic River system in the southeastern United States. The river and its surrounding national forest lands are a mecca for recreational users across the Southeast; people visit the watershed to hike, hunt, fish, paddle, and for horseback riding—just to name a few uses.  The Chattooga River originates at the top of the Eastern Continental Divide, and the river's clean, cold and clear waters are a destination for large numbers of recreational users.

12. Due to its critical location in the landscape, the Chattooga River watershed is also a biological hotspot and serves as one of the most important refuges and migratory corridors for flora and fauna in the Southeast. Because of its robust biological diversity, an adequate understanding of individual areas of the watershed is dependent on local knowledge, scientific research, as well as the devotion of a great deal of time and attention to the complex natural

4

processes that are in place in each unique ecological area. For me personally, I have learned much about the distinctive and unique flora and fauna of the national forests in the Chattooga River watershed through visiting areas proposed for timber harvesting, road-building, prescribed fires, and other proposed management activities by the three ranger districts in the watershed. These field investigations determine, for example, tree, shrub and forest understory species; tree ages; forest types; habitat types; soil composition; presence of fungus (mushroom) species; visual identification of animals or evidence of animals; and presence and water quality of aquatic resources and riparian zone habitats. I also regularly visit areas of the watershed's national forests to assess and document the impacts of the U. S Forest Service's management actions after implementation.

13.     The Chattooga River watershed ecosystem is unique and biologically rich due largely to its great variation of elevations and landforms. From high elevation ridges and granite dome communities to moist coves and riparian forests, about a dozen different forest type habitats occur here, each with its own distinct combination of plants and animals, altogether possessing great diversity with origins in tropical, temperate and northern regions. Because of these diverse and nuanced ecological conditions, management in the watershed is not a 'one size fits all' endeavor. Unfortunately, we have all collectively experienced a loss in the way our national forests are managed, and the management practices that I have seen from the Forest Service recently are at an all-time low regarding conservation of biological diversity and other important natural resources on our public lands. The Forest Service engages in a variety of activities that have the potential to threaten my interests in the Chattooga River watershed, as well as the interests of other members of the Chattooga Conservancy.

5

14. One example of a harmful activity is the Forest Service's decision to issue special use permits to commercial entities, like outfitters and other vendors, in the watershed. I and the Conservancy want to see the watershed, and particularly the Wild and Scenic River corridor, protected for certain values like solitude and opportunities to employ self-reliance skills consistent with tenets of the Wild and Scenic Rivers Act. These values are at odds with permitting unbridled numbers of commercial outfitters to accompany large groups of people through the river corridor.

15. Such special use permitting is especially troubling because of the cascade of impacts it can have when used incrementally. For example, we are currently monitoring a project proposal that will allow large groups of guided hikes on a trail that lies within the Ellicott Rock Wilderness Area Extension (extension as per the Sumter Forest Plan, not yet fully protected by The Wilderness Act), on the border of Ellicott Rock Wilderness Area in South Carolina (the wilderness area spans across the borders of the three states in the watershed and includes land in the Sumter, Nantahala, and Chattahoochee National Forests). Should these special use permits be renewed annually and expanded under the Forest Service's new special use Categorical Exclusion ("CE 3"), as we suspect they will be, the area will risk losing its wilderness character, which makes it so special.  Further, the potential Wilderness Extension Area in South Carolina will be disallowed and discarded in the upcoming revision of the Sumter Forest Plan. As an organization deeply involved in the protection of wilderness, the Chattooga Conservancy is concerned about the cumulative impacts of such degradation on the area's long-term ability to receive permanent protection. In this way, relatively minor permits, when taken together, can lead to significant consequences for our organizational mission and goals. Consequences like these can only be fully understood through rigorous cumulative impacts analysis.

6

16.     The NEPA process is important for special use permitting. Use of categorical exclusions ("CEs") to issue permits results in unnecessary harm. Recently, the Forest Service proposed to issue a permit to a commercial race promoter for a 100-mile race on trails in the watershed. Because the decision was moving forward under a CE, the public did not have the opportunity to review the proposal, and the Forest Service did not have the obligation to analyze its effects or to consider alternatives. At the eleventh hour, news of the proposal began to spread on social media, and Conservancy staff realized that the race would bring a commercial race into the Wild and Scenic River corridor and even into a portion of the congressionally designated Overflow Creek Potential Wilderness Area. We had to drop everything else we were working on for several weeks to analyze the proposal ourselves, spread public awareness, and brief the Forest Service decision makers in meetings. As a result of our efforts, the Forest Service realized the illegality of permitting commercial race routes through special areas possessing certain protections, and the permittee developed an alternative that did not traverse the most sensitive areas. This outcome, however, was only possible because the Chattooga Conservancy did the work that the Forest Service would have done itself if it had used an EA. By contrast, with the new CEs in place, we are currently preparing to ramp up our Freedom of Information Act ("FOIA") submissions to make sure no special use permits slip through the cracks. The demand for special use permits has grown in recent years, and the Conservancy has invested considerable effort, as merited, in deflecting them as they arise. Shifting this body of work into the substantially more burdensome and less effective FOIA process will be crippling for our organization's limited resources.

17.     The Forest Service's timber management program, which includes timber harvests, road building, prescribed burning, and use of herbicides, is another example of an

7

activity that threatens the interests of Chattooga Conservancy members. Nearly every recent timber project proposed and implemented by the Forest Service in the Chattooga watershed fell under 2,800 acres. Additionally, nearly all road construction has occurred in 2 mile or under projects. Despite these relatively small sizes, such projects can be extremely detrimental to the Conservancy's interests when they are poorly conceived, analyzed and recklessly carried out. As a matter of historical fact, the negative environmental impacts from the Forest Service's timber program is the main reason why the Chattooga Conservancy was formed in 1994. In the 1990s, the Forest Service was engaged in heavy commercial harvests within the watershed; this involved clear-cutting stands, followed by prescribed burning and then replacing the watershed's native hardwood forests by establishing pine plantations, including large numbers of non-native loblolly pine trees. The Forest Service is now engaged in ongoing efforts to remove these loblolly pines. Sadly, the cumulative effects of recent removal projects billed as "ecological restoration" have caused additional detrimental environmental impacts to native trees, sensitive species, soils, and to aquatic ecosystems.

18.    Even more than logging itself, roadbuilding from harvesting activities in Southern Appalachian forests has been shown to be the primary source of erosion and sedimentation in streams and creeks—a process which smothers aquatic organisms. Further, roads leave a scar on the landscape which is nearly impossible to heal within a human lifetime. They fracture ecosystems, act as vectors for spreading invasive species, and disrupt the feeling of wildness and solitude that members of the Chattooga Conservancy cherish when in the forest. Temporary roads are no different—especially when heavy logging equipment is run over them. When a temporary logging road is created and compacted, the land disturbance has very similar negative impacts as permanent roads do for soils, native plant communities, species sensitive to road

8

densities (such as black bear), water quality and associated hydrology, and noxious weed spread. Though deemed temporary, in my experience, the Forest Service oftentimes uses the temporary road prism for more entries into the landscape for the next timber management treatment—such as thinning, additional tree harvest, herbicide applications, and fire lines for prescribed burning or fire suppression. In short, temporary roads leave a lasting footprint of land disruption and its negative environmental impacts on our national forests.

19.     Commercial timber harvests, prescribed burning, and the use of herbicides also have a profound visual impact on the landscape. All of these activities have both threatened and caused negative effects on the aesthetic beauty and ecological health of the Chattooga River watershed, and will continue to do so as long as the Forest Service continues to develop projects in the same manner, which in turn harms the interests of Chattooga Conservancy members in this special place.

20.     The NEPA process, and particularly the process of developing a project under an EA, is vital to the Chattooga Conservancy's work to protect the watershed from harmful logging and associated activities. We are enthusiastic participants in the NEPA process for Forest Service projects with the potential to impact our interests; for any given project, our participation typically consists of reviewing and scrutinizing scoping notices, submitting scoping comments, communicating with the public about the Forest Service's proposal by sending newsletters, composing social media posts, convening public meetings, reviewing draft EAs, conducting pertinent research into the EA's assertions and analysis, submitting responsive public comments, critiquing mistakes in EAs, developing and submitting alternatives that would cause less harm, and participating in the administrative objection process.

9

21.     For example, the Forest Service's White Pine Project on the Andrew Pickens Ranger District of the Sumter National Forest encompasses approximately 1,952 acres of national forest land, with potential impacts to popular recreation areas used by the public for horseback riding, mountain biking, hiking, and scenic enjoyment, and could also affect streams, soils, rare stands of old growth timber, and adjacent private landowners. The Conservancy held a large public meeting at the Long Creek Community Center where we provided information to the public about the agency's proposal and held a Q&A session about the project.  As the result of public comments during the NEPA process as well as our participation in the administrative objection process, Forest Service decision-makers became more fully aware of potential negative impacts to horse trails, stands of old growth adjacent to proposed treatment areas, populations of special native plant communities, and water resources, such that the Forest Service made some adjustments to the final Decision Notice to reduce some of its negative impacts.

22.     Unfortunately, though some improvements were made, there have been many negative impacts that have occurred from the project's ongoing implementation that are indicative of the typical risks associated with logging projects in the Southern Appalachians. This project hits especially close to home for me. I enjoy hiking from my residence through an old growth stand that is surrounded by the white pine plantations deemed suitable for logging. These white pine plantations are all around 60 years old, and during this time significant numbers of native hardwood trees and associated understory shrubs and wildflowers have regenerated within many of the plantations, giving an important head start for restoration of the native forest composition in the Chattooga watershed. However, logging methods for preventing collateral damage to the existing populations of native plants that have regenerated within white

pine plantations are not favored by Forest Service, and instead nearly all the stands are scheduled for clearcutting.  Clearcutting results in removing all growth, major soil disruption, forest habitat destruction, and threat of erosion and sedimentation into nearby streams during heavy storm events, which are typical in the temperate rainforest ecosystem of the Chattooga River watershed.

23.     Similarly, for the Southside Project on the Nantahala National Forest, the Chattooga Conservancy was heavily involved throughout the NEPA process with the goal of convincing the Forest Service to drop its plans for logging in several stands that included rare resources, including old growth and green salamander habitat. Both after the scoping notice and after the draft EA for this project were published, we hosted public meetings about the project that were attended by dozens of citizens. During these meetings, we helped members of the public understand what the Forest Service was proposing, how the agency had analyzed the potential impacts of its proposal in the EA, and what concerns we had about the adequacy of this analysis and the potential of the project to impact physical and biological resources within the Chattooga River watershed. To support our concerns, and to create a strong project record, the Conservancy invested considerable resources into visiting the sites and conducting old growth surveys. In particular, we discovered a stand of old growth on Brushy Mountain that was scheduled to be logged.  The Forest Service was unaware this stand existed in the project area, but finally agreed to visit the site. Ultimately, they admitted that the old growth met the Forest Service's official "Guidance for Conserving and Restoring Old-Growth Forest Communities on National Forests in the Southern Region."

24.     We also worked with partner organizations to make sure that the Brushy Mountain area was properly surveyed for rare green salamanders, which is a Federal species of

11

concern and state listed as endangered. While the Forest Service's draft EA disclosed that the area had historically contained green salamanders, it reported that none were found in its surveys. We realized that this was because the Forest Service was looking for the salamander in rock crevices at a time of year when they are foraging in trees. This basic misunderstanding of green salamanders' unique life cycle made us very concerned about the quality of the agency's analysis, so we coordinated with other groups and experts on further surveys, which showed that not only were green salamanders present, but that this was one of the strongest known populations, with breeding habitat directly within the area to be logged. During this process, the Forest Service begrudgingly conceded that green salamanders were present in the area but denied that they were within the stand to be logged. Then, after further surveys the Forest Service admitted that green salamanders were within the stand, but that they were not breeding. After a final survey, they admitted that this was indeed breeding habitat but decided to go forward with the logging, allegedly for the purpose of "restoring wildlife habitat."

25.    Despite its reluctant acceptance that the project included old-growth forest and green salamander breeding populations and their habitat, and despite major public opposition, the Forest Service decided to log the ancient trees and green salamander habitat anyway. The Forest Service also refused to abandon logging in an "exceptional" state-recognized rare habitat on the banks of the incomparable Whitewater River. Because the Forest Service doubled down on this very harmful project, the Chattooga Conservancy had to resort to litigation, which ultimately caused the Forest Service to drop the one stand beside the Whitewater River. I am grateful that this rare habitat has been saved. However, timber harvest activities have proceeded in the also-precious Brushy Mountain unit, which is where the green salamander habitat and old-growth forest is located. I feel indescribable sadness knowing that a rare, intact, old-growth ecosystem

12

with trees over 200 years old has been completely demolished. I value the destroyed stands for the exact attributes—specifically, old growth trees, green salamander habitat, rich soils giving rise to a complex assembly of fungus, deep woods habitat for neotropical migratory birds and other species—that are currently being destroyed. I have specific plans to return to the Brushy Mountain stand once logging is completed, though I know that I will be deeply discouraged and revolted by the aftermath. Although it would be painful, I desire to go right now to document the environmental damage and mourn what has been lost.  However, the Forest Service closed the area for 2 years to allow the logging to occur and, in my opinion, to prevent the public from being able to witness and document the destruction.

26.     In many ways, the Southside Project has felt like a preview of how I believe the agency will use its new categorial exclusions. The Forest Service treated public input as an inconvenient exercise in getting to the result that it wanted to achieve from the very start. The availability of a CE allows the Forest Service to completely bypass inconvenient public input and scrutiny, logging special places before anyone fully knows what stands will be lost. I am fearful of what will happen to other beloved areas of the forest, with rare and irreplaceable natural resources that serve as components of a healthy human environment, once the disputed categorical exclusions are being used, essentially removing public scrutiny—the only real check on these harms—and causing tragic outcomes.

27.     Categorical exclusions bypass NEPA's many procedural safeguards, like EAs, that allow me to do my job. The information provided to the public in an EA is invaluable. It allows the public a window through which to monitor the agency's behavior. The Chattooga Conservancy is a small organization, and we attempt to cover a large geographical area; without the information and impacts analysis provided by the Forest Service in EAs, we would be unable

to carry out our organizational mission of advocating for protection of the watershed and informing the public to the same degree that we have historically. For example, with the Southside Project on the Nantahala National Forest, we first learned about the potential impacts to rare green salamanders in the Brushy Mountain area because information about a historical green salamander record at one specific location was disclosed in the Forest Service's EA. In the absence of this disclosure, the Chattooga Conservancy would have needed to contact North Carolina Wildlife Resources, research pertinent survey data, and send staff to verify the location of potential habitat; this is work that we would not have had the resources to carry out without abandoning other areas of our work for weeks or longer. In other words, it would not have been feasible for us to do. It was this disclosure in the EA that prompted the further surveys that found breeding populations of green salamanders in this unique site.

28.    In other cases, reviewing a Forest Service EA allows the Conservancy to point out areas of the Forest Service's analysis that are incomplete, inadequate, or simply wrong, which can lead directly to a risk of unnecessary environmental harm and misunderstanding by the public. For example, for the Forest Service's White Pine Project on the Sumter National Forest, the agency initially failed to disclose its biological evaluation (BE) for impacts to threatened and endangered species. It was only after I reviewed the agency's draft EA and specifically asked for the BE that it was made available to the public. Even then, the BE failed to disclose the locations of forest pest species within the project area, indicating that the Forest Service did not analyze the possible impacts of its project on encouraging or discouraging the spread of such noxious species. If the Forest Service were not required to analyze and disclose project impacts in an EA, we would not be able to adequately determine whether the agency was considering a full suite of potential environmental effects, as required by NEPA.

14

29.    This opportunity for public review is beneficial to both organizations like the Chattooga Conservancy and the Forest Service. While the Forest Service does not always appreciate the comments and criticisms offered by the Chattooga Conservancy, we often find that improvements are made to the agency's analysis or its projects based on our input. In my experience, the disclosure of information and opportunities for public input that are required by NEPA are essential to helping the Forest Service achieve better outcomes within the Chattooga River watershed.

30.    For example, concerning the Southern Appalachian Farmstead Project, on the Andrew Pickens Ranger District of the Sumter National Forest, the Forest Service proposed creating a tourist attraction on the banks of the Chattooga River at the historic Russell Farmstead site. The project proposal included approximately 20 acres of national forest land. This location is within the Wild and Scenic River corridor and, as disclosed in the project's EA, the river at this location contains a globally significant population of brook floater mussels. The proposal included building a visitor center and reducing riparian zone stream buffers to allow for plowing agricultural fields nearly right up to the water's edge, neither of which was consistent with either the Sumter Forest Plan or managing this area for Wild and Scenic River values. The project, as proposed, would have reduced stream buffers to 40 feet: 60 feet *below* the mandatory minimum of 100 feet. This would have risked smothering the entire brook floater population from excessive quantities of erosion and sedimentation. The Chattooga Conservancy provided feedback to the agency during the NEPA process expressing our opposition to this project proposal, advised concerned citizens about details and anticipated negative impacts disclosed in the EA, and ultimately, the project was abandoned.

15

31.     The Warwoman Project on the Chattahoochee National Forest is yet another example of the impact that environmental assessments under NEPA can have to improve Forest Service projects. There, through our analysis and feedback on the Forest Service's draft EA, we were successful in convincing the agency not to carry out timber treatments that would have necessitated building a road through the Windy Gap inventoried roadless area. The Forest Service listened to our criticism of this proposal and dropped the stands and road construction in question, thereby avoiding unnecessary harms to a special area of the forest.

32.     Even when the agency does not abide by our comments and recommendations, the Chattooga Conservancy has successfully ensured that bad projects can get dropped by leveraging information learned through an EA. For instance, in the Compartment 48 Timber Sale Project in the Andrew Pickens Ranger District of the Sumter National Forest, the Conservancy discovered a fundamental and significant inconsistency between the way the project was discussed in its EA and the agency's proposed course of action for implementation on the ground. When the Chattooga Conservancy learned this in the EA, we pointed out the discrepancy to the agency. Ultimately, we were forced to file a lawsuit challenging the agency's decision to proceed, which was counter to the EA for the project. After we received a favorable decision, the Forest Service agreed to abandon the sale. Without the information and analysis provided to the public in the EA, we would not have known how the agency planned to access the stands, what environmental risks were posed by different approaches, and how to hold the agency accountable for bad decision-making.

33.     As indicated by these examples, when the Chattooga Conservancy reviews an EA for a Forest Service project, we often learn new information about the forest's history, management and unique natural resources. Relying on this information, as well as our own

16

expertise about the watershed developed over multiple decades of research, advocacy, and personal experience, we conduct a detailed review of the Forest Service's analysis of how forest resources would be impacted by the proposed action. Although we always treat each project individually, our public comments to the agency tend to focus on a few different issues. First, we frequently express concerns that the Forest Service's project proposals are aimed at managing the national forests as a tree crop, with the intended outcome being to cultivate only a few desirable species. The result of this approach is to reduce  biodiversity in what is one of the most biologically diverse watersheds in the United States. More specifically, we often oppose the large-scale, intensive use of herbicides, prescribed burning, and commercial harvests that are the means by which the agency establishes, cultivates, and manages for "crop" timber production. As applied by the Forest Service, these activities usually come at the expense of maintaining a full and diverse assembly of Southern Appalachian hardwoods, herbaceous understory species, wildflowers, and the animal species that populate such a forest. We are also concerned that the Forest Service's approach to prescribed burning within the watershed is not consistent with the Chattooga watershed's natural fire return cycles. Many places within the watershed receive more than 100 inches of rain per year. The frequency and scale of prescribed burning that Forest Service usually proposes is simply out of sync with natural fire cycles, and it also threatens sensitive aquatic ecosystems, like those found in and near seeps.

34.    Second, we often express concerns that the Forest Service's project proposals do not provide sufficient protection for rare, existing old growth within the watershed. This is especially problematic because the Forest Service has not made an overarching decision to protect old growth in the agency's applicable forest plans. For example, the management plan governing the Nantahala Ranger District allows the harvest of old growth and does not even

17

require surveys for old growth by its staff. As a result, unless the public has time to conduct its own surveys and submit information and analysis through the EA process, the public may not even know that old growth is at risk until they are counting the rings on the stumps. The protection and restoration of ample, contiguous old growth stands is essential to maintaining migratory corridors for species that are and will continue to be impacted by climate change.

35. Third, we often criticize the Forest Service's management and expansion of its road system in individual projects. The road system within the watershed is already in excess of numerous wildlife species' tolerance for disturbance, as well as too big and poorly managed. The Forest Service has only a fraction of the funding that it needs to maintain existing roads, so the creation of new roads stresses the agency's transportation system even further, by adding to the backlog of unmaintained system roads. Unmaintained roads are ubiquitous in the watershed and they cause erosion, sedimentation, and habitat fragmentation, as well as create vectors for illegal off-road vehicle use and invasive plants.

36. And fourth, we often criticize the Forest Service's approach to managing the forests for rare and sensitive species. For example, the agency often proposes to simply draw buffers around the locations of habitat for the species it purports to protect, but this approach ignores the fundamental need for habitat connectivity and leads over time to a reduction in biodiversity across the watershed, essentially creating "shrinking islands" of unconnected habitat and a loss of population-level resilience. This eventually results in the same loss of biodiversity as if the rare habitat had been directly logged, just on a slower timeframe.

37. In 2019, the Chattooga Conservancy signed on to public comments that responded to the Forest Service's Proposed Rule for the rulemaking at issue. At the heart of these comments was a comprehensive analysis of Forest Service projects completed between 2009 and 2019 in

18

the Southern Appalachian National Forests, including the Chattahoochee, Sumter, and Nantahala. This analysis showed the environmental benefits of the NEPA process under the previous Forest Service rules.

38.     Specifically, this analysis showed that, on average, commercial logging for EA-level projects on the Chattahoochee shrank by around 8% during the EA process, from the initial proposal to the final decision; for EA-level projects on the Nantahala-Pisgah National Forests, commercial logging acreage shrank by around 20% during the EA process.

39.     The vast majority of Forest Service projects in the Southern Appalachians have fallen under the agency's 2,800-acre threshold for its new CE authorizing commercial logging without going through the EA process.

40.     The new CEs will remove almost every timber project from the EA process that has been critical to improving such projects. This change to the Forest Service's NEPA obligations will harm the interests of the Chattooga Conservancy and our members. First, because the agency would no longer be required to disclose to the public the presence of resources like water quality, old growth, and rare species, and furthermore, because the agency would not be required to conduct or disclose analysis of potential impacts to these resources, the Chattooga Conservancy will lose information that is critically important to our work of protecting the watershed. Our members rely on us to communicate with them about Forest Service projects that impact them. If we are kept in the dark, our members will be left out of the conversation entirely.

41.     The Chattooga Conservancy does not have a realistic way to acquire this information by alternative means. We would of course continue scanning the Forest Service's Schedule of Proposed Actions (SOPA) to learn about upcoming projects, but the SOPA doesn't

19

provide information about what exactly the Forest Service plans to do and what resources may be present. Likewise, the Forest Service's "scoping" process does not provide sufficient time nor information for us to understand what resources may be impacted. To begin with, the Forest Service sometimes conducts "scoping" for CEs only internally and does not circulate any notice whatsoever to the public. Even when it does scope proposals externally, those notices lack the information that would be provided in an EA, such as the type of forest present, impacts to species, the proximity to sensitive soils and aquatic ecosystems, impacts to unroaded areas, the presence of old growth or rare species, and the cumulative impacts of logging with other stressors. Additionally, the scoping process by definition does not consider location alternatives. In order to gather this type of information without the benefit of having an EA, the Chattooga Conservancy would be completely overwhelmed. We have only two full-time and four part-time staff.. In sum, these CEs will strain our resources and prevent us from carrying out our most fundamental activities. Our work on the national forest—and necessarily, in turn, our ability to achieve our mission in the Chattooga Watershed will be broadly undermined.  Even if we reallocated nearly all of our resources to monitoring scoping notices and reviewing FOIA documents, we still would not be able to make up the difference—we simply don't have the resources to assemble all of the information that is normally included in a Forest Service EA, which the agency normally produces using an interdisciplinary team of staff and consultants. As a result, our ability to hold the Forest Service accountable for ill-conceived  project proposals, and to help the agency make improvements, would be severely diminished or extinguished. In this way, CEs affect the Chattooga Conservancy doubly: first, they lead to worse outcomes on our national forests which harms our organizational mission and priorities, and second, CEs undermine our ability to adequately engage in projects in the first place. This is an unacceptable

outcome. Agencies which use taxpayer dollars to manage public resources must be subject to a more meaningful and serious degree of transparency, public oversight and accountability.

42.     Moreover, the virtual elimination of the requirement for the Forest Service to prepare EAs for projects within the watershed also means that the pre-decisional objection process will no longer be available to the Chattooga Conservancy for these projects. This is yet another lost opportunity for us to provide the agency with feedback about proposals (and a point of leverage to negotiate for improved outcomes) that can be used to steer projects away from unnecessary or unintentional harm to forest resources.

43.     Ultimately, by allowing the Forest Service to develop practically all of its timber projects in the watershed using CEs, the new CEs will result in increased and unnecessary environmental harm. The public's ability to hold the Forest Service accountable and to correct the agency's erroneous assumptions and analysis will evaporate, and the result will be increasingly reckless projects. Trees will be marked to be cut and roads will be bulldozed without the Chattooga Conservancy having the opportunity to point out the instances in which these planned actions are based on incorrect information or a lack of understanding about the potential impacts to soil, water, and biological systems.

44.     The fact that the Forest Service's NEPA rules would limit use of the 2,800-acre timber harvest CE to "restoration" projects that are developed "collaboratively" in no way lessens the negative impact of this regulatory change on the interests of the Chattooga Conservancy and its members. Simply put, the Forest Service's previous efforts at stakeholder "collaboration" for projects in the watershed have not been meaningful, and they are certainly not an adequate substitute for a requirement that the agency analyze and disclose site-specific impacts to forest resources like old growth, rare species, sensitive soils, and aquatic ecosystems.

21

45.    For development of the Foothills Project on the Chattahoochee National Forest, the Forest Service invited public "collaboration." Participating in this process required a massive investment of time and resources for the Chattooga Conservancy; we traveled all over north Georgia to attend roundtable discussions, field trips, and public meetings, most of which were held during the week, either during or shortly after the workday ended. For our members who live in the Atlanta area, there was simply no way for them to take enough time off of work to participate in this collaborative process at all. But more importantly, the collaborative process for Foothills was not useful; it was just a show. Specifically, the public was not able to meaningfully analyze the project proposal because the agency did not provide the collaborative group with site-specific details about where and how logging was being proposed. These omissions indicated fatally flawed methodology on the agency's part and were indicative of what is to come with the widespread use of CEs. Simply put, it is impossible to accurately and effectively understand what is happening in a room when the lights are off. Further, even for those issues where the project's subsequent EA did more meaningfully represent the situation, the preceeding collaborative process still proved ineffective. For instance, the Chattooga Conservancy and other members of the public raised issues at the beginning of the Foothills Project's development process about sensitive habitat included in the project footprint, but our input was consistently ignored by the agency all the way through to the Forest Service's final EA and Decision Notice, despite many hours of collaborative meetings. "Collaboration," as practiced by the Forest Service, does not require the agency to seriously consider issues and concerns raised by the public; the NEPA process for developing a project under an EA *does* require this.

46.    The Chattooga Conservancy has had similar experiences participating in other recent collaborative processes, such as for the White Pine Project on the Sumter National Forest.

In this experience too, "collaboration" did not result in the Forest Service meaningfully considering a suite of concerns that were raised about project impacts.

47.    Similarly, the requirement that the 2,800-acre CE be limited to "restoration" projects is likewise meaningless. Simply put, this is "greenwashing": the Forest Service has been describing its timber projects in the watershed as "ecological restoration" for years, even when the agency's primary motivation appears to be harvesting timber and then regenerating tree crops. Indeed, we have learned that "restoration" projects in the watershed are often designed to meet agency timber quotas. In any case, even if a project has a restoration-based purpose, it can still cause a great deal of environmental harm. As described above, the agency is currently implementing projects designed to remove species like loblolly pine and white pine and replace them with planted species the Forest Service deems more appropriate for the sites being harvested. Yet despite using the language of "restoration," the long-term goal for these newly planted forests is to establish monocultures to eventually harvest. Furthermore, even assuming the projects will have some restoration benefits, they have already had negative impacts associated with heavy equipment, road construction and chemical herbicide use on a large scale, including harm to water quality, and they will continue to have those harms in the future. To put it simply, even the best-intentioned restoration timber projects can have negative tradeoffs.

48.    For "restoration" projects that include timber harvesting, road building, and prescribed burning, the Forest Service routinely asserts that by implementing "best management practices" (BMPs), the agency can ensure that environmental impacts like erosion and sedimentation are kept to a minimum. Yet in many cases, such as with the Loblolly Pine Removal and Restoration Project on the Andrew Pickens District of the Sumter National Forest

23

in South Carolina, BMPs simply don't work as intended. Under this broad project umbrella, for example, the Forest Service is clearcutting loblolly pine trees and replacing them with predominantly short leaf pine trees. Although the Forest Service characterizes these clearcuts as "ecological restoration" of native tree species, they involve significant tradeoffs for restoring other environmental values. The Chattooga Conservancy is currently monitoring the multi-year implementation of the Loblolly Project to call out adverse effects to our public lands. So far, we have received numerous reports of erosion and sedimentation problems, as well as areas slated for logging that contained no loblolly trees, which we subsequently verified through site visits. More generally, the water quality of some streams in proximity to these intensive harvests has been impacted from erosion and sedimentation observed to have originated from clearcut areas. The Chattooga River watershed contains mountainous terrain and many zones of predominantly micaceous (and very erodible) soils, where annual precipitation can exceed 80-100 inches, and heavy storm events are normal. Even if these timber projects are well intentioned, the pace and scale of the ground disturbance from timber sales' clearcuts and skid roads is causing cumulative negative impacts on soil structure and stability, and consequently negative impacts to a number of our streams. In other words, the efficacy of BMPs are easily strained to the point of failure under these circumstances, especially when considering the increased prevalence of climate change fueled super storms which have repeatedly struck the Southern Appalachians, most recently during Hurricane Helene.

49.     In sum, the Forest Service's new 2,800-acre CE will be used to authorize projects that individually and cumulatively promote the liquidation of native forests to cultivate tree crops, exacerbate problems with non-native invasive species, erode soil, release carbon into the atmosphere, disrupt critical habitats, destroy ecosystem connectivity with detrimental effects to

biodiversity, and cause  sources of erosion and sedimentation into aquatic ecosystems within the watershed—just to name a few effects. I will personally be harmed by these projects, because I will be on the front lines watching before and after. It will be especially hard for me to see harms that I know could have been avoided if the Forest Service had just listened to me and others who know the watershed as it should have, through the EA process.

50.    As an organization, the Chattooga Conservancy will be harmed by the Forest Service's implementation of the Final Rule. The Conservancy relies on the NEPA process to engage in the decision-making processes that affect our members and we will suffer imminent, concrete and particularized injuries to our interests from the Final Rule's implementation. Our mission centers, in part, on raising public awareness about issues in the Chattooga River watershed. Critically, this involvement is effective because it empowers and enables the public to comment and engage on relevant projects. What good does awareness do if there is no mechanism to leverage what you know, and how you feel about it? Moreover, even with burdensome staffing and budget changes, the Chattooga Conservancy will not be as effective at informing the public and achieving other aspects of our mission.  Without being able to rely on the EA process to provide the public with detailed information about what the agency wants to do and where, the Chattooga Conservancy will have no choice but to spend excessive staff time on inadequate alternatives  such as deciphering SOPAs and submitting Freedom of Information Act requests. Indeed, we have already begun investing additional time into monitoring to ensure that no projects fall through the cracks. In this way, we are harmed in an ongoing way by the lack of assurance that an EA will be provided for all major logging in the watershed. Without question, this reallocation of limited organizational resources will harm the Conservancy's

ability to carry out the full range of work necessary to fulfill our organizational mission and goals.

51.     These injuries to the Chattooga Conservancy and its members would be redressed by an order from this Court vacating the Final Rule.

52.     I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 19th day of November 2024.

_____
Nicole Hayler

26