**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| THE CLINCH COALITION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE, *et al.*, | ) | |
| | ) | |
| Federal Defendants, | ) | Case No. 2:21-cv-0003-JPJ-PMS |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN LOGGERS COUNCIL, *et al.* | ) | |
| | ) | |
| Intervenor Defendants. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF TIM MAHONEY**

I, Tim Mahoney, hereby declare and state as follows:

1. This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen and competent to testify. I submit this declaration in support of the Virginia Wilderness Committee, which is one of several organizations challenging new regulations promulgated by the United States Forest Service ("Forest Service") and the Council on Environmental Quality ("CEQ") purporting to implement the National Environmental Policy Act ("NEPA").

2. I live in Maurertown, Virginia adjacent to Little North Mountain in Shenandoah County. I am the President of the Board of the Virginia Wilderness Committee ("VWC").

Throughout my 40-years-long career prior to my role here, I worked on conservation initiatives and public lands for numerous organizations, private entities across the country, and with the federal government. I have worked on wilderness legislation for lands in 40 states, including many different national forests. Throughout my career, NEPA has been an essential tool for protecting special places and our natural, cultural, and historic resources.

3. The Virginia Wilderness Committee is a 501(c)(3) non-profit citizens' group based in Lexington, Virginia. Our core mission is to ensure meaningful protection of wildlands, including forests, across the state of Virginia. In practice, this mission is threefold: permanently protect the best of Virginia's wild places for future generations, foster understanding and appreciation of Wilderness, and promote enjoyment and stewardship of our last remaining wildlands. Our current membership fluctuates between 400-500 members. We achieve our mission through various advocacy and stewardship activities. Namely, we engage in the NEPA process to ensure that our region's national forest lands are managed in accordance with applicable laws, regulations, and broader environmental considerations. NEPA is critical to ensuring that wilderness-quality areas are not thoughtlessly degraded before they can be permanently protected.

4. I am deeply concerned about the Forest Service NEPA regulations categorically excluding so much of the agency's work in Virginia. I fear that these categorical exclusions will severely and permanently diminish my, and the Virginia Wilderness Committee's, ability to act as stewards for and to enjoy Virginia's wildlands and national forests more broadly.

5. Virginia is fortunate to have several wilderness areas and other special wild places. However, a wilderness—no matter how intact it is within its boundaries—that is surrounded by mismanaged forest is a poor circumstance. Accordingly, VWC monitors national forest management across the Jefferson and George Washington National Forests. This monitoring is central to our work in the state and commands a significant share of our organization's time and resources. Specifically, we conduct on-the-ground monitoring through our own members and in concert with local partner organizations.

6. Thanks to our robust network of members and partners, VWC has the ability to find forest advocates throughout the state with expertise on every area of the national forests. These advocates monitor forest and ecosystem conditions on a daily basis. They have expertise in ecology, botany, invasive species, birds, mammals, and more. VWC leverages the hard work that our members and partners do on the forest floor in stakeholder sessions with all order of forest users to better understand the myriad of needs for the forest and its management.

7. This wealth of knowledge becomes particularly important when the Forest Service proposes management activities—such as logging or roadbuilding—in a specific area. VWC reviews those proposals and uses the NEPA process to share our knowledge with the Forest Service so they are able to better structure projects and proposals.

8. One example of this is when the agency previously proposed projects that would harm certain species that VWC members are experts on. Specifically, our members have expertise about the Cow Knob Salamander, which is endemic to the high ridges along the Virginia-West Virginia border. One significant population lives in the Reddish Knob area of the George Washington National Forest. The salamanders face significant threats such

habitat loss and climate change across their range. Unfortunately, the Forest Service has used categorical exclusions to set controlled burns in the area and our volunteer leaders have seen habitat loss resulting from the burns. By contrast, through the EA process in numerous projects, we have successfully alerted the agency to these populations and advocated for alternatives that would better protect them. We were able to share valuable species data and information with the agency which allowed them to reevaluate their proposals to better comport with local realities and the law. If it weren't for VWC's members and partners, and the ability to share what they know with the agency, the agency would not be able to do its job. The agency needs VWC, just as VWC needs the agency.

9. This relationship is governed by NEPA. NEPA is the rulebook through which VWC evaluates whether a project is being fairly evaluated. It allows us to compare our knowledge of the project with what is being considered by the agency and then inform them of our concerns. Absent NEPA, we are left in the dark. NEPA requires, in part, that the Forest Service gathers and conveys information to the public, allows the public to speak, factors in such public involvement, and makes agency decisions accordingly.

10. Historically, for most logging and roadbuilding and some special use projects on the national forests in Virginia, the Forest Service complies with NEPA by preparing an Environmental Assessment ("EA"). We use the information provided in EAs to ground-truth areas and provide supplemental information as explained above. The EA process is key to VWC's ability to implement its mission on national forests.

11. I understand that one of the Forest Service's new CEs called CE 25 would allow the agency to categorically exclude from the requirement to prepare an EA for timber

projects up to 2,800 acres in size, so long as they claim a restoration purpose and are developed collaboratively. Virtually every timber project on Virginia's national forests in the last ten years has been smaller than 2,800 acres in size, which means the entire timber program could be categorically excluded so long as the Forest Service checks the boxes for restoration and collaboration.

12. The Final Rule's last-minute addition of a collaboration requirement does not lessen these concerns. In previous work on forests across the country, I participated in several collaborative efforts. In one instance on the Beaverhead National Forest in Montana, I even participated in a collaborative group formed around a categorical exclusion project. There, I cooperated with timber companies to mediate between public safety concerns, a rapid salvage harvest timeline, and remedial measures to mitigate environmental harms. We reached an agreed upon proposal and brought it to the Forest Service. They, however, completely ignored it and ultimately selected a project configuration which retained none of the negotiated conservation benefits. It is my understanding that this is common behavior for the Forest Service. I have no reason to believe that the agency would act any differently here on the Geroge Washington or Jefferson National Forests should a meaningless collaboration requirement take effect.

13. The Southern Appalachians are among the most biodiverse regions in the world. They contain complex watersheds, soil structures, and ecosystems. As VWC knows well, it takes time and effort to adequately understand how a seemingly small action can trigger a cascade of effects throughout the forest. It is critical that local organizations, like VWC, have a mechanism to reliably communicate with the agency—especially when the agency fails to do its due diligence to investigate a project itself.

14. I understand that the Forest Service has recently been experiencing significant budget and staffing shortages. I understand that these constraints can lead to, and even in some cases necessitate, shortcuts. However, when the chosen shortcut undermines the fact finding necessary for public involvement required by NEPA, then the Forest Service is not doing its job under the law. Categorical exclusions are, by definition, a shortcut. They are appropriate for minor projects where there is minimal variance between local, scientific knowledge and agency knowledge, and, in my experience, only where there is minimal public concern with a project. In other words, categorical exclusions are not appropriate for a nearly 2,800-acre logging project in the Southern Appalachians.

15. I am deeply concerned about CE 25. The NEPA process is responsible for improvements to many timber projects over the years and has equipped the Forest Service to avoid significant impacts, and shunting those projects into CE 25 would sidestep the very framework that has enabled many projects to avoid significant impacts in the first place.

16. The unique attributes of the Southern Appalachians necessitate careful management. Accordingly, the stakes of mismanagement are especially high in this region. Mismanaged projects threaten both the lands that are being logged as well as adjacent lands and waterways taken over by invasive species, impacted by run-off, clogged with sedimentation, and fragmentated by roads. For example, invasive species such as lady's thumb, garlic mustard, and tree of heaven tend to accompany poorly-planned timber and road building projects. Once invasive species take root, it is almost impossible to remove them. By this invasion, we are losing our natural forests. VWC's core purpose is to protect wild and natural lands. Mismanagement directly threatens immediate forest

visitors—including VWC members—and the creatures who live there, as well as forest visitors and wild residents for generations to come.

17. As proposed, these categorical exclusions will cut VWC out of the conversation. Categorical exclusions dramatically reduce the amount of time available to learn about a proposed project, meaningfully investigate it, and convey our findings to the agency. Our members have many responsibilities. For many, they do their best to monitor the forest in their *spare time*. Reducing the amount of time available for the public—and by extension our members—to engage in Forest Service project proposals—by relying on CEs instead of preparing EAs—will mean that VWC does not have enough time to familiarize ourselves with the project. Similarly, CEs contain a dearth of information about a specific project or area compared to EAs and relying on CEs will prevent us from helping the Forest Service avoid significant impacts to important areas. Cutting out time and information cuts out public opportunity, and by extension, deprives the Forest Service of critical information about the lands which they are tasked with stewarding.

18. To be sure, wild, natural, and immensely valuable places exist across the forests—even in areas deemed "suitable" for logging under existing forest plans. I visit places in the forest which may seem "ordinary" almost weekly and plan to continue doing so for as long as I am able. To me, they are invaluable treasures. I would enjoy seeing them mature and increase in biodiversity if only given the chance.

19. This goes double for de facto roadless areas. These places—regardless of whether they benefit from a formal roadless designation—serve as a critical fabric in the tapestry of the forest. They provide corridors for wildlife to comfortably exist within and move through in the face of climate change.

20. I live adjacent to the Big Schloss area which is one of the largest inventoried roadless areas not only on the George Washington National Forest, but in all of the eastern national forests. It stitches together the headwaters of the Shenandoah River, which is the life blood of the county. To me, it is invaluable to have a place where bears, screech owls, and coyote—as well as lichen and fungi—exist and can be viewed. The area is so intact specifically because it has been spared the rampant road construction and development that have occurred elsewhere in the forest. For these reasons, I am especially dismayed by the categorical exclusion, CE 24, which purports to authorize roadbuilding of up to 2 miles without localized consideration of its impacts. The Jefferson and George Washington Forests ought to see roads put to bed, not recklessly expanded. CE 24 practically assures more road building without the analysis necessary to minimize harms from those roads—analysis that would typically be completed in an EA.

21. These harms are especially likely to occur because the Forest Service is unable to maintain the roads it already has. Poorly maintained roads cause incredible problems of erosion and downstream siltation. They choke out wildlife and alter watershed integrity for decades. Indeed, it is the roads, more than anything, that not only cause in erosion, but are conduits for invasive plants. They are where the fabric of the forest is torn apart, and will not be capable of mending for generations.

22. In the wake of climate change, these concerns will only be exacerbated. When promulgating CE 24, the Forest Service, to my understanding, entirely failed to consider how the increased incidence of catastrophic weather events sparked by global warming will accelerate the damages of erosion. Evidence of such increases are not difficult to find: one need look no further than the effects of recent climate change fueled storms. For

example, in 2018 a flash flood travelled down Marshall Run and took out a Forest Service road in the Beech Lick Knob area. Sediment from the road flushed down into the North Fork of the Shenandoah River and ultimately flooded the community of Yankeetown. Soon after, the Forest Service repaired and reopened part of the road— leaving the situation poised to repeat itself. In this way, reckless Forest Service road construction directly harms the communities, like mine, which surround the forest.

23. Personally, given my proximity, I spend approximately 8 days a month in the national forests. I enjoy hiking and camping in the George Washington and Monongahela National Forests, in particular. I especially enjoy the Upper Cedar Creek Valley Area. Additionally, I lead hikes for members of VWC several times a year. I belong to a local hiking group based in Shenandoah County which regularly hikes in the Massanutten and Great North Mountain areas of the George Washington National Forest and occasionally hikes further south in Nelson and Rockingham counties. I will certainly make multiple trips to these places in 2025 and 2026. I believe that getting out into the woods is very helpful for supporting mental health and opening one's eyes to the world. I also rely on the forest for exercise and fresh air. These benefits are significantly greater in areas of the forest which are responsibly managed. To be sure, a well-managed forest need not be as majestic as the Grand Tetons to offer these abundant benefits. Rather, I simply need a beautiful, quiet spot where I can feel that nature is in charge. The Jefferson and George Washington National Forests offer this in spades, and I am keen to see them protected from reckless categorical exclusions. I plan to continue visiting these forests including the specific areas named herein for as long as I am able.

24. Moving forward with projects under CE 25 or CE 24 in the areas I routinely visit and plan to continue visiting would be extremely harmful. VWC and I would not have the time, information, nor person power to make sure the Forest Service does not cause significant impacts in these areas I cherish. Continued use of EAs to authorize projects in these areas better protects my interests and VWC's because it gives us a real opportunity to work with the Forest Service to avoid or mitigate impacts.

25. For these reasons, the Virginia Wilderness Committee and I oppose the new CEQ and Forest Service NEPA rules. If the changes are overturned, and NEPA remains how it has been for decades, my use and enjoyment of my home and its surrounding areas will be much greater, and I will be able to better serve in my role as President of the Board of Virginia Wilderness Committee.

26. The new rules do not provide the level of review or public participation required by NEPA. An order from this Court overturning the new rules would redress my injuries. The Virginia Wilderness Committee represents my interests in this proceeding.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on November 14, 2024.

Tim Mahoney