**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA**

THE CLINCH COALITION, *et al.*,                )
                                               )
   Plaintiffs,                            )
                                               )
v.                                             )
                                               )
UNITED STATES FOREST SERVICE, *et al.*,        )
                                               )
   Federal Defendants,                    )     Case No. 2:21-cv-0003-JPJ-PMS
                                               )
 and                                           )
                                               )
AMERICAN LOGGERS COUNCIL, *et al.*             )
                                               )
   Intervenor Defendants.                 )
                                               )
_____      )

**DECLARATION OF WALTER H. SMITH**

I, Walter H. Smith, hereby declare and state as follows:

1.      This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen and competent to testify. I submit this declaration in support of The Clinch Coalition ("TCC"), which I understand is one of several organizations challenging new regulations promulgated by the United States Forest Service ("USFS") and the Council on Environmental Quality ("CEQ") purporting to implement the National Environmental Policy Act ("NEPA").

2.      I live in Wise County, Virginia. I live next door to the Jefferson National Forest and regularly use the forest for recreation—including trail running, hiking, and mountain biking—and for work four to five days per week.

1

3.    TCC is a not-for-profit, community-based association of individuals whose mission is to protect and preserve the forest, wildlife, and watersheds of the Jefferson National Forest and surrounding communities for present and future generations. TCC is particularly focused on protecting and preserving the natural heritage, unique ecosystems, and environmental integrity of the Clinch Ranger District, as well as other extraordinary areas in the region such as the Mount Rogers National Recreation Area. I fully support TCC's mission.

4.    I have been a member of TCC for approximately nine years. I have served on TCC's Board of Directors since 2016 and have been the Vice-President of TCC's board since 2017.

5.    I am a biologist with particular expertise in the effects of land management on amphibians. I have a Ph. D. in Biological Sciences and I am an Associate Professor of Biology and the Chair of Natural Sciences at University of Virginia's College at Wise. I teach various courses on biology, ecology, zoology, and natural history.

6.    I have previously worked on USFS research projects related to fire management outside of Virginia, including in Alabama. I recently contracted with the Virginia Department of Conservation and Recreation-Division of Natural Heritage to conduct rare species surveys on the Clinch Ranger District of the Jefferson National Forest. That work tended to focus on the green salamander, which the USFS has listed as a sensitive species in this region. As part of that work, I also identified context variables related to green salamander habitat and considered opportunities for improving that habitat. I also research high-elevation salamanders such as the Weller's salamander and Yonahlossee salamander. This research includes several full-length peer-reviewed publications and peer-reviewed research notes, each related to examining the impacts of past habitat disturbance on these species.

2

7.      I regularly contribute to TCC's participation in the public NEPA process, which serves as the most important way that TCC achieves our core mission. Historically, nearly all the logging in the Clinch Ranger District has not been eligible for categorical exclusions and has thus proceeded under an Environmental Assessment ("EA"). To monitor upcoming projects, and the type of NEPA analysis accompanying them, TCC is subscribed to NEPA document lists, often called "scoping lists," that are provided by the Forest Service. When a proposed project implicates TCC's interests, we circulate information to our members and begin engaging the Forest Service. We tend to focus on projects on the Clinch Ranger District and Mount Rogers National Recreation Area of the Jefferson National Forest, as well as forestwide proposals. I review NEPA documents for these projects and provide feedback to TCC for inclusion in TCC comments. Additionally, I sometimes draft portions of TCC comments related to potential impacts on green salamanders, as well as design criteria and mitigation measures needed to protect green salamanders. I also review and draft comments related to potential ecological impacts and impacts associated with the use of prescribed fire. The following projects provide a few examples of TCC involvement in the NEPA process, to which I have contributed:

a.      I contributed to TCC's review of and comment on the USFS' proposed High Knob Viewshed and Habitat Improvement Project, which proposed to expand pollinator habitat by clearing trees around the High Knob observation tower. In response to the USFS' initial plan to categorically exclude this project from environmental analysis and documentation in an environmental assessment ("EA"), TCC provided comments pointing out that the project did not qualify for that exclusion because it would involve the use of herbicides, among other potential reasons. As a result, the USFS decided to prepare an EA for the project. I understand that the EA disclosed impacts to a locally rare

plant species (Large-leaf phlox) that were not mentioned in the scoping notice, which gave both TCC and the Virginia Department of Conservation and Recreation an opportunity to urge that the plant species be protected to the greatest extent possible.

      b.      I contributed to TCC's comments regarding the Nettle Patch Vegetation Management Project ("Nettle Patch Project"), which was a proposed major timber sale on the Clinch Ranger District. Although the likely impacts of the sale would have been unacceptable anywhere, they were particularly egregious because the project area and surrounding High Knob massif are part of an extremely valuable network of connected southern Appalachian forests that provide clean air, clean water, recreation, and critical habitat for an incredible diversity of wildlife. Of particular concern was the USFS proposal to conduct a virtual clearcutting in the rare northern hardwood forest across the upper elevations of High Knob, which would have been a tremendous loss of an important and rare ecosystem in this region. Through the NEPA process, TCC informed the USFS of the unacceptable impacts of the proposed action and the inadequate analysis supporting the agency's proposals. TCC then negotiated a settlement with the USFS that minimized the worst of these impacts and committed the USFS to continued monitoring through the implementation phase of the project. The NEPA process was critical to this outcome. In response to public input, the USFS reduced regeneration logging by 28 percent, reduced commercial thinning by 23 percent, reduced woodland commercial by 32 percent, and implemented numerous other design criteria to mitigate or eliminate adverse environmental impacts. I personally reviewed the project, drafted comment sections, and participated in a field trip with the USFS. I also provided information to the USFS regarding the green salamander and recommended design criteria and mitigation

4

measures that the agency incorporated into the project. TCC monitored implementation of this project to ensure it complied with the NEPA decision notice, and I still regularly visit the area for research and recreation.

c.    I also contributed to TCC's review of and comment on the USFS' proposed Turkey Cove Ruffed Grouse Habitat Improvement Project, in which the USFS proposed a variety of management activities and commercial timber harvest on the Clinch Ranger District. In addition to providing comments as part of the NEPA process, I attended in-person meetings with USFS and other stakeholders. TCC intends to monitor implementation of this project to ensure it complies with the NEPA decision notice, and I intend to participate in TCC's review.

d.    In 2019, TCC provided comments on the USFS' scoping notice for the proposed Ewing Mountain Vegetation Management Project to improve wildlife habitat and forest conditions within the Mount Rogers National Recreation Area. The comments highlighted that the scoping notice for the project was woefully general and failed to disclose the actions that the USFS is considering. After the Draft EA for the project was released in April 2021, TCC filed comments with concerns about: inconsistencies between expert recommendations and the planned project; high-risk areas for erosion and sediment that would impact important water resources, including critical habitat for the endangered candy darter and the municipal drinking water for Austinville, Virginia; and the potential spread of non-native invasive species. As that project moved forward, I was involved in TCC's review of it, and I am now working with Virginia's Department of Conservation and Recreation to understand the legacy of forest clearing in the area and how species have responded. I am particularly interested in the Mount Rogers National

Recreation Area because of salamander diversity in this part of the state and the presence of high-elevation endemic species like the Weller's salamander and Yonahlossee salamander.

e.      In 2021, the USFS issued a scoping notice for the Devils Hens Nest Vegetation Management Project in the Clinch Ranger District. I personally reviewed the Devils Hens Nest project and provided information to the USFS regarding known localities of the green salamander within the project area. I intend to remain engaged in the NEPA process for Devils Hens Nest as it progresses.

f.      In addition to the above ongoing projects, I plan to continue participating in the public NEPA process for the foreseeable future, as the USFS continues to propose new projects. For instance, I have heard rumors about potential project development in the Hunters Valley area of Scott County on the Clinch Ranger District. I have been surveying for Green Salamanders in the area and will continue to monitor for project developments as they become available.

8.      I am very concerned that the new NEPA regulations will injure my ability to participate in the NEPA process as a TCC member, which could have drastic consequences on the ground and greatly injure the public lands I enjoy for research and recreation. As a herpetologist and ecologist, I depend on the forests for my profession. Indeed, I use them on a weekly basis to conduct surveys and studies.  National forest lands are especially critical for salamander populations, in part, because of both ongoing and historical habitat loss that has occurred on private lands. Accordingly, undisturbed tracts of the national forests in Virginia are a critical refuge for these species, and poorly planned and executed projects will cause detrimental, long-lasting harm to them. I often survey areas of the forest which have been logged multiple

6

decades ago, yet I continue to find enduring impacts on salamander habitat viability. Put differently, once a site is logged, it takes decades to heal. It remains unknown how long, if ever, the healing cycle takes before local salamander populations are able to recover to their pre-disturbance condition.

9. In addition, impacts from poorly planned logging compound across the forest. Logging or roadbuilding in one area can have significant impacts across the forest for a wide variety of species. One example of this occurs through the spread of invasive species. Such species, like Autumn Olive, tend to take over areas affected by timber harvesting and can rapidly spread across the forest. In addition to affecting the natural composition of the forest, thereby altering habitat that native species depend on, these invasive plants also sequester far less carbon than the native, mature forests they replace in the wake of logging operations.

10. For another example, there are rare and important ecosystems on the Clinch Ranger District, such as northern hardwood and mesophytic forest types that predominate in the cool, wet, northern slope-dominated area around High Knob. Research shows that such areas function as effective carbon sinks and will play an important role in climate resiliency, with the potential ability to support plants and animals in a changing climate. The need to protect these areas from adverse impacts of USFS management is paramount.

11. It is, therefore, essential that the agency understands the myriad effects which can stem from its actions. These individual and cumulative effects are not always apparent to the Forest Service—which is constrained by budgetary constraints, staffing shortages, and abundant staff turnover. The Forest Service needs the public's input to fully gauge the potential impacts stemming from its actions.

12.     I believe wholeheartedly that the public should have a say in how public lands are managed, particularly because local members of the public often have knowledge about the unique conditions and natural resources of a specific area that the land managing agency does not. I believe that limiting, or in some circumstances eliminating, the public's opportunity to provide informed comment on project proposals from the USFS will have many negative consequences.

13.     I understand that the new USFS NEPA regulations provide a categorical exclusion (CE 25) that allows the USFS to skip the EA process for "restoration and resilience" projects including logging up to 2,800 acres, that are developed with some sort of collaboration. CE 25 will allow the USFS to categorically exclude most if not all timber harvests in this part of the country, and nearly every project that TCC has ever worked on, from EA review.  I have grave concerns about shifting projects of this size out of the formal EA process and into CEs because I have seen how vital the EA process is in ensuring they avoid serious harm.

14.     There are key differences between EA projects and CE projects that will lead to on-the-ground harms if CE 25 projects go forward outside the EA process. The EA process allows the public and the USFS to see the whole landscape of a project, where a CE would shortcut the project and create blind spots for the Forest Service. For example, a project can be disqualified from using a CE by "extraordinary circumstances," but the rare and unique values in the High Knob area (such as the cool, wet microclimates and associated northern hardwood and mesophytic forest types which function as powerful carbon sinks) are not recognized as extraordinary circumstances. As a result, their presence in a project area would not disqualify a project from using CE 25, which means these important impacts can slip through the cracks. It is critical that the Forest Service consider and disclose potential impacts of management proposals,

8

and that the public have the opportunity to advocate for appropriate protection. The EA process carries a requirement that the agency respond to public comments and offers a formal objection process for when such responses are not satisfactory. The CE process lacks these mechanisms.

15.     Likewise, CE 25 projects could have serious impacts to water quality that will go overlooked. For example, in its comments and administrative objection to the Nettle Patch project, TCC highlighted the potential impacts on water quality from increased sedimentation into the Guest River, which Virginia had already identified as a 303(d) stream impaired by sedimentation. In its EA, the USFS needed to consider the cumulative impacts of past, present, and reasonably foreseeable sedimentation sources such as logging on private lands, illegal ATV use, the Nettle Patch project, and other nearby logging on federal and state lands. Furthermore, TCC also highlighted the USFS' error in considering impacts only occurring within the project area boundaries. The impaired Guest River was immediately downstream of the project area, which was drained by several tributaries of the Guest River. The USFS thus needed to consider the impacts of increased sedimentation from logging and associated ground disturbance into an impaired river outside the immediate project area. After considering all of the above sedimentation impacts, the USFS was compelled to remove proposed logging in around 75% of the project area. Without EA analysis of these cumulative impacts within the watershed, the USFS likely would have proceeded with the project as originally proposed, which would have had significant impacts. CEs do not require consideration of cumulative impacts. I am therefore very concerned that CE 25 would permit the USFS to proceed with damaging projects with unanalyzed and unmitigated significant cumulative impacts.

16.     I am also concerned that many beloved areas of the forest will be swallowed up by CE 25 without the Forest Service so much as realizing that they exist. Many invaluable areas

9

in the Clinch Ranger District, which I have personally visited on numerous occasions, are not always protected by the Jefferson Forest Plan, and rather, are included in broad areas deemed "suitable" for logging. Important ecological impacts will slip through the cracks should a small, but critical area within the suitable base be included in a project area under CE 25. The Forest Service often does not know where sensitive resources are located, and it often includes such places in logging proposals. For example, the green salamander is recognized as a sensitive species by the USFS and requires mitigation such as buffers around its habitat where it exists within project areas. There are lots of areas on the Clinch Ranger District where green salamanders could be found, but records are incomplete and the public historically has played a key role in informing the USFS about salamander presence. If projects are shifted out of the EA process and into CEs, the public will not have a formal mechanism to warn the agency of impacts to the green salamander and the agency itself will lose the benefit of important information that it lacks.

17.     Critically, scoping does not provide a sufficient opportunity to raise this issue with the agency for two practical reasons. First, scoping notices tend to be highly general and do not provide enough information about where management will occur to enable me and others to perform meaningful field surveys, especially given the compressed timeline of scoping comment periods. Second, green salamanders and other amphibian species are seasonally active, which means that it matters when you go looking for them. Green salamanders in particular are generally active from April to October. For projects that are scoped outside that window, it would be functionally impossible for the public to provide the agency with useful information— information that would affect whether the project was eligible for a CE in the first place. These practical problems are true of all CE projects, not just CE 25.

18.     I understand CE 25 is supposedly limited to projects that have a primary purpose of restoration, but that is not a meaningful limitation in my experience. The USFS often cites restoration as a reason to create early successional habitat via intensive silvicultural methods like regeneration harvest (i.e., clearcuts or similar-looking harvests), which are favored by the Forest Service because they contribute more timber volume to meet the Jefferson National Forest's annual timber production targets. The Nettle Patch Project and the Turkey Cove Ruffed Grouse Habitat Improvement Project are two recent examples of projects that purported to have a restorative component but involved extensive logging. Because the agency's definition of restoration is expansive, there will almost always be a way for the USFS to justify logging as restoration.

19.     Even crediting some projects as being primarily for purposes of restoration, those projects still can have serious adverse impacts, such as the impacts to water quality, salamanders, and climate resiliency mentioned above. The same risk exists for restoration projects that do not involve timber harvest at all. For example, my dissertation explored the potential for unintended consequences to amphibians from management via prescribed fire. Many species are not fire-adapted and can be adversely affected by prescribed fire, even if restoring fire would have benefits at the landscape scale. In these circumstances, where there are both pros and cons to an action, the NEPA process is vital to make sure that the agency weighs them appropriately. Where the Forest Service uses a CE, it is only looking at the "benefit" side of the ledger—the "restoration" purpose. It is not thinking about the site-specific harms that will result.

20.     I also understand that CE 25 projects would have to be developed in collaboration, although it is not clear what that means. Collaboration can sometimes yield positive results, but it is no substitute for the EA process. My experience has been that USFS

personnel generally are enthusiastic about collaboration, but there are institutional limitations on how much collaboration can really occur. First, USFS personnel are busy and voluntary communication does not always happen, much less in a timely fashion. Second, as indicated above, we have experienced lots of personnel turnover on the Clinch Ranger District in recent years. During the Nettle Patch project, for example, TCC talked to and/or met with 2 District Rangers and 2 Acting District Rangers for the Clinch District about the project. This all occurred in under a year, from April 2017 through February 2018. Collaboration is often built on personal relationships and it is difficult to start over from square one every time a new District Ranger comes in. In fact, meaningful changes to the project were not made until TCC filed an informal objection, which the Forest Supervisor then resolved in settlement with us.

21.     Additionally, in our experience, a collaborative process is an inadequate substitute for the scientific analysis, public disclosure, and opportunities for comments and objections that are required under the EA process. This is true, in part because, it is not always clear what makes a project "collaborative" in the eyes of the Forest Service in the first place. For example, when initially discussing the Nettle Patch project, the Forest Service described it as one that would be developed "collaboratively." Ostensibly towards that goal, the Forest Service held a few public meetings and hosted a field trip related to the project. However, it was clear from the beginning that the Forest Service had already developed the project, including what management would occur and where. It did so without input from the public. The Clinch Coalition participated in the meetings, provided multiple rounds of comments, and met with staff on multiple occasions to discuss the project's development and our concerns. But the Forest Service did not use the information to shape or modify the project. Instead, it charged ahead with the project it had laid out from the beginning. The beneficial changes to the project came instead through the NEPA

12

and objection process. Because the Forest Service's so-called "collaborative" process did not use public input to shape the project, many of the same concerns that we raised in scoping comments and conversations with the Forest Service remained when the Final EA was released. As a result, we were forced to file an objection that finally led to drastic changes to the project. So if the Forest Service considered this project to be "collaborative" because of the public meetings and a field trip, it is clear that collaboration was inadequate to address our concerns and bring the project into compliance with the law. Rather, it was the NEPA process that finally achieved this. The Final Rule's collaboration requirement does not actually ensure the public will have meaningful opportunities for participation and opportunities to help the Forest Service develop projects. In the same vein, "collaboration," even if meaningfully undertaken, does not create an obligation for the Forest Service to consider or reply to our contributions. The EA process does. Specifically, under NEPA, the agency is required to consider and respond to comments received from the public even if it does not intend to incorporate the recommendations, or indeed, even if it squarely disagrees with them. Such a requirement offers the public assurance that the agency is actually hearing and understanding its concerns. If not, then the public has an opportunity to object and clarify those concerns, and the agency once again must respond to those objections in writing. In other words, the EA process gives the public an insight into the agency's behind the scenes thinking, which creates meaningful opportunities to engage going forward. Collaboration does not do this. Collaborative input instead tends to go into a black box, and the decision that comes out of that box is often very unsatisfactory.

22.    Collaboration is also considerably more time-intensive for organizations when compared to the typical NEPA process. For TCC, to truly collaborate with the USFS requires us to invest time and institutional capacity that is already in short supply. For example, TCC has

13

collaborated with the USFS in the past on trail assessment and maintenance projects throughout the Clinch Ranger District. However, TCC members are almost exclusively volunteers, many of whom maintain full-time jobs outside of the organization and have extensive external family and community obligations. As a result, effectively engaging our members in this collaboration has become much more difficult in recent years. Similar collaboration involving timber and habitat management projects – which involves much more detailed, complex, and time-consuming issues – would be even more restrictive within our organization's constraints. TCC has considered hiring someone temporarily to look into projects and participate in collaborative processes, but this will put a huge strain on the budget and will take funding away from other TCC projects and priorities on the forest.

23. Other new CEs are also very concerning, especially the new special use permit CE for uses that occupy up to 20 acres of National Forest and the new roadbuilding CE. Southwest Virginia is very vulnerable to impacts from forest fragmentation because the area is already a fragmented matrix within former coalfields. New roads and utility rights of way will lead to additional adverse impacts including cumulative impacts that need to be analyzed in NEPA documents. In addition, non-native invasive species (NNIS) like Autumn Olive tend to follow new road construction. The risks of fragmentation and NNIS infestation are serious everywhere on the Clinch Ranger District, and they would be a particularly big problem in areas that currently have relatively unfragmented habitat, like the Devils Fork watershed on the southern side of High Knob.

24. I have a concrete and personal stake in how public lands are managed. In addition to my belief that public input is critical to sound land management, I am personally affected by land management decisions on the Clinch Ranger District and the Jefferson National Forest

14

generally. I spend approximately 20-25 hours per week in the national forest, generally splitting that time equally between the scientific research and surveys I conduct and recreation. Specifically, I enjoy hiking, trail running, and mountain biking on the Clinch Ranger District. In particular, I visit the Nettle Patch project area on a weekly basis both recreationally and professionally to perform research on salamander road mortality. With TCC, I also lead guided hikes related to showcasing amphibian diversity on the Clinch Ranger District. I plan to continue these activities on the Clinch Ranger District and other parts of the Jefferson National Forest for many years to come. Forest Service projects will continue to be proposed in the areas I use for work and recreation. The proposed changes to the NEPA process will allow USFS to proceed with management projects causing short- and long-term adverse impacts to many natural resources in the national forest, thereby harming my scientific, recreational, and aesthetic interests.

25.     A court decision invalidating the new NEPA regulations will redress my concerns and protect my scientific, recreational, professional, personal, and aesthetic interests. TCC represents my interests in this proceeding.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on 18 November, 2024.

Walter H. Smith

15