# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| THE CLINCH COALITION, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES FOREST SERVICE, *et al.*, | ) |
| | ) |
| Federal Defendants, | ) Case No. 2:21-cv-0003-JPJ-PMS |
| | ) |
| and | ) |
| | ) |
| AMERICAN FOREST RESOURCES COUNCIL, *et al.*, | ) |
| | ) |
| Intervenors-Defendants. | ) |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ALTER OR AMEND THE JUDGMENT**

In their opening brief, Plaintiffs explain at length the clear errors and manifest injustice associated with the Court's judgment. Specifically, dismissal leaves Plaintiffs unable to vindicate their legal rights until it is too late to prevent harm on the ground. In response, Defendants and Defendant-Intervenors repeat old arguments, suggesting that Plaintiffs are free to challenge site-specific projects in the future, but they fail to answer this simple problem: By then, the horse will have left the barn. For the sake of correcting clear errors, ensuring fundamental fairness, and promoting judicial economy, the Court should grant the requested relief under Rule 59.

I.  **Rule 59 Standard**

As Defendants understand, a Rule 59 motion is appropriate to "spar[e] the parties and the appellate courts the burden of unnecessary appellate proceedings." Dkt. 168 at 2 (quoting *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998)). Plaintiffs have raised several factual and legal issues where the Court misapplied the law, misapprehended Plaintiffs' arguments, or was misled as to the facts. In some cases, the error is difficult to characterize because the Court omitted to address the issue altogether. Each of these errors warrants relief.

As to the last category of error—failure to address issues raised by Plaintiffs—Defendants argue that such a failure cannot rise to the level of "clear error" because courts are not required to address each of the parties' arguments. To the contrary, a court errs when it "ignores unrebutted, significant evidence." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc). Or, as noted in Plaintiffs' opening brief, when it fails to "explain its analysis" of "crucial matters upon which [a plaintiff's] claim is based." *In re Steve A. Harris, Inc. v. Kenyon Oil Co.*, 63 F. App'x 668, 670 (4th Cir. 2003).

Defendants' arguments to the contrary are unavailing. Defendants argue that "a court need not 'specifically cite or otherwise discuss each contention advanced by the parties'" when

1

disposing of a motion." Dkt. 168 at 5 (quoting *Malbon v. Penn. Millers Mut. Ins. Co.*, 636 F.2d 936, 939 n. 8 (4th Cir. 1980). But this is true only to the extent that "the decision was obviously rendered in light of" the arguments at issue. *Malbon*, 636 F.2d at 939 n.8. If there is "any possible ambiguity" in whether the court considered the argument, it becomes "incumbent" on the disadvantaged party to take steps to clarify it, such as through a Rule 59 motion. *See id.* Here, the Court's opinion does not show that Plaintiffs' arguments were obviously considered. For example, as discussed further below, the Court did not consider Plaintiffs' argument that they are *presently* injured by the Rule's interference with their core missions. Instead, the Court held that Plaintiffs lack standing solely because they did not establish *future* site-specific harm, which shows that the Court did not apply the test for present organizational injury. *See* Dkt. 163 at 8.

Defendants also cite a recent concurring opinion for the proposition that "[d]istrict courts are not required to mechanically check off each argument or piece of evidence advanced by a party." Dkt. 168 at 5-6 (quoting *Platt v. Mansfield*, 162 F.4th 430, 448 (4th Cir. Dec. 22, 2025) (Quattlebaum, concurring). But the majority opinion in that same case is much more circumspect: It noted merely that a court "can be forgiven" if it fails to explicitly address every issue presented by the parties when there is a "time pressure associated with its ruling." *Platt*, 162 F.4th at 441 n. 7 (excusing a failure to specifically address an issue where the district court faced a nine-day window to rule on a request for emergency injunctive relief). Here, the Court's opinion was issued without similar time pressure, not in response to a request for emergency or preliminary relief. The failure to address dispositive factual and legal issues was thus clear error.

## II.     Ripeness

As all parties acknowledge, the Court's ripeness holding turns on its acceptance of the proposition that promulgation of the CEs was merely "one step closer" to causing harm. *See* Dkt.

168 at 4; Dkt. 169 at 1-2. But as Plaintiffs' brief supporting the instant motion pointed out, there are no remaining project-level steps that would give Plaintiffs the opportunity to learn about, influence, or challenge those future projects. Dkt. 166-1 at 5-9. Defendants attempt to obfuscate, but cannot rebut, this essential fact.

      First, Defendants argue that the agency's current regulations, which deleted previous requirements to notice upcoming CEs in a Schedule of Proposed Actions, solicit scoping comments, and publish decisions, are "irrelevant to this action because courts apply the regulations in effect at the time of the agency's decision." Dkt. 168 at 2-3 (citing *S.C. Coastal Conservation League v. United States Army Corps of Eng'rs, Charleston Dist.*, 127 F.4th 457, 462 n.2 (4th Cir. 2025)). The case Defendants rely on, however, was analyzing the *merits* of an Administrative Procedure Act claim, and the Fourth Circuit simply accepted the parties' shared assumption that "the regulation in effect at the time of agency decisions" was controlling on the merits. *S.C. Coastal Conservation League*, 127 F.4th at 462 n.2. When it comes to ripeness, however, the Court's jurisdiction unequivocally turns on the facts "at the time of the district court's judgment." *Wild Virginia v. CEQ*, 56 F.4th 281, 293 (4th Cir. 2022). The fact that Plaintiffs no longer have "'ample opportunity'" to bring a legal challenge and prevent future injury, therefore, is plainly relevant to the Court's jurisdiction. *See id.* at 296 (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998)).

      Defendants next argue that the current regulations do not actually impair Plaintiffs' opportunity to challenge site-specific applications of the CEs, but their argument is deliberately misleading. Defendants devote more than a page of their brief to explain that the regulations require "final NEPA documentation" and that "the responsible official sign documentation" before using the CEs. Dkt. 168 at 3-4 (emphasis added). Defendants fail to note, however, that

3

such "documentation" is a purely *internal* procedure. The previous regulations required the Forest Service to sign a "decision memo," provide it to "interested or affected parties," and keep a "list of the people notified of the decision." 36 C.F.R. § 220.6(e), (f) (rescinded). The current regulations require merely that the analogous document, the "finding of applicability and no extraordinary circumstances," be signed. 7 C.F.R. § 1b.3(g)(2)(vi). The regulations do *not* require that the document be provided to the interested public. *See generally id.* § 1b.3(g). Nor do they require that the Forest Service keep a list of whom the decision was provided to, because there is no requirement to publish or circulate the underlying decision. *Id.*

Defendants' own citations underscore this difference. Defendants rely on the "timing" provision in 7 C.F.R. § 1b.3(j), which allows implementation of CEs "[o]nce the responsible official has signed the documentation." Dkt. 168 at 4 n.1. Nothing in this provision (or any other) would alert Plaintiffs that the decision has been signed until logs are being hauled away. In fact, comparison to parallel "timing" provisions elsewhere in the regulations makes this omission even more conspicuous. Unlike CEs, which allow the Forest Service to proceed after *signing* a document, implementation of projects under environmental assessments or impact statements must be preceded by *publication*. 7 C.F.R. §§ 1b.6(f); 1b.8(e). In sum, a document signed in secret does nothing to lessen the hardship to Plaintiffs of being excluded from the process.

Notably, neither Defendants nor Defendant-Intervenors dispute the well-established rule that a plaintiff need not wait until trees are cut before a court has jurisdiction to enjoin the harm. Because the Court's judgment violated this fundamental principle, it was clearly erroneous.

### III.  Standing

Defendants also fail to shore up clear errors in the Court's analysis of standing—errors occasioned by their own misstatements of law and mischaracterizations of fact.

4

    a.  <u>Actual Injury to Plaintiffs' Core Missions</u>

Both Defendants and Defendant-Intervenors downplay the Court's failure to consider Plaintiffs' present injuries to their core organizational missions. None of their arguments provides a basis for declining to follow binding Fourth Circuit law.

First, Defendants argue that the Court did adequately address Plaintiffs' arguments that they have standing under *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections ("RNC")*, 120 F.4th 390 (4th Cir. 2024), and criticize Plaintiffs as merely seeking a more "detailed discussion" of an issue decided against them. Dkt. 168 at 5. To the contrary, the Court provided only one basis for its conclusion with respect to standing—that Plaintiffs had not established future site-specific injury. In so doing, the Court misunderstood Plaintiffs to "concede that the potential harm the CEs may cause are site specific." Dkt. 163 at 8. To be sure, Plaintiffs have pointed to future site-specific injuries, but those are not their only claimed injuries. Plaintiffs have also alleged *present* injuries that they have already suffered irrespective of whether the future site-specific harms materialize. *See* Dkt. 138 at 22-24; Dkt. 148 at 13.[1] The Court's failure to apprehend and address this distinct argument was therefore clear error.

Second, Defendants repeat their contention that *RNC* is not binding because it deals with elections, not NEPA. Dkt. 168 at 6 (citing *RNC*, 120 F.4th at 395). The Court has never accepted this argument and it is still dead wrong. *See* Dkt. 148 at 13 (replying to Dkt. 144 at 28).

---

[1] An *anticipated* injury becomes an *actual* injury when a plaintiff "reasonably incur[s] costs to mitigate or avoid a "substantial risk" of future injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (citing, inter alia, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010), in which "increased administrative costs" to monitor for and mitigate a "reasonable probability" of future site-specific harm was sufficient to establish standing even if the site-specific harm might never actually occur).

5

Defendant-Intervenors take a different tack, arguing instead that Plaintiffs' present injuries don't count because they involve information gathering. Dkt. 169 at 3 (citing *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("*Hippocratic Medicine*"). But Defendant-Intervenors misread the case they rely on. In *Hippocratic Medicine*, the Court held the plaintiff was trying to "spend its way into standing" by gathering information it would use to oppose an action it merely "dislike[d]." 602 U.S. at 394-95. This was not enough for standing because the challenged action itself was not an "impediment" to the plaintiff's "core business activities." *Id.* at 395. *See also RNC*, 120 F.4th at 396 (explaining that in *Hippocratic Medicine*, "the organizations expended resources only relevant to '*abstract social interests*' . . . , and not to their core mission") (emphasis added). In *RNC*, by contrast, the challenged actions impacted the plaintiffs' core mission of "organizing lawful voters and encouraging them to support [particular candidates]." *RNC*, 120 F.4th at 396-97. Because they reallocated resources to "'monitoring North Carolina's voter rolls'" so they could mitigate the harm to that core mission, *id.* at 411-12 (Diaz, Chief Judge, concurring and quoting the pleadings), the Fourth Circuit held the plaintiffs had been injured in their organizational capacities.

Therefore, the relevant distinction is whether an organization's core mission work has been impeded, not the precise means by which the organization attempts to mitigate that impediment (e.g., through information gathering or some other means). For example, in *Havens Realty Corp. v. Coleman*, the parent case for both *Hippocratic Medicine* and *RNC*, the Supreme Court held that expenditure of resources "to *identify* and counteract" the effects of the challenged action" was sufficient to create standing when it was necessary to counteract an impact to the organization's core mission. 455 U.S. 363, 379 (1982) (emphasis added). "[M]onitoring North

6

Carolina's voter rolls" in *RNC*, similarly, was enough to establish standing when needed to mitigate the impact of the challenged action to the plaintiffs' core mission.

Here, too, Plaintiffs have established that the promulgation of the CEs injures their core organizational missions. Plaintiffs' shared core mission is evaluating Forest Service proposals, educating and organizing the public, providing informed feedback, and ultimately improving projects and protecting public lands. *E.g.*, Dkt. 138-17 ¶¶ 4-5 (explaining that organizing and responding to project proposals and to protect national forest lands was The Clinch Coalition's founding purpose and remains the "heart" of its mission). *See also* Dkt. 138-8 ¶ 2; Dkt. 138-6 ¶ 2; Dkt. 138-18 ¶ 3; Dkt. 138-7 ¶¶ 5, 7-8; Dkt. 138-11 ¶ 5; Dkt. 138-12 ¶¶ 5-6; Dkt. 138-13 ¶ 4; Dkt. 138-14 ¶ 9; Dkt. 138-16 ¶ 5. The primary way Plaintiffs achieve this mission is by working through the NEPA process, and the CEs deprive Plaintiffs of the opportunity to use that process to improve projects and protect the land for virtually all of the projects they care about. *E.g.*, Dkt. 138-17 ¶¶ 33-34; Dkt. 138-18 ¶¶ 23-26; Dkt. 138-15 ¶¶ 14-15, 25. *See also* 36 C.F.R. §§ 218.20; 218.24; 218.26 (requiring notice and comment opportunity only for projects proceeding under EAs or EISs, not CEs). To mitigate this impediment to their core missions, Plaintiffs have diverted significant resources to monitoring Forest Service activity through FOIA, among other means, *so that* they can continue to organize and advocate for the improvement of projects and protection of the land. Dkt. 138-7 ¶ 52; Dkt. 138-12 ¶¶ 48-49. This is exactly the kind of injury that the Fourth Circuit held to confer standing in *RNC*. *See* 120 F.4th at 396-97.

    b. <u>Imminent On-the-Ground Injuries</u>

Defendants also sidestep the Court's failure to address specific facts demonstrating, at the time of filing, that Plaintiffs' members would be injured by future on-the-ground impacts from the CEs. But Defendants' silence as to the key premises of Plaintiffs' argument cedes the issue.

7

First, Defendants do not disagree that the Court did not address the upcoming site-specific projects that were eligible for coverage under the CEs, projects in which Plaintiffs established they have concrete interests. And Defendants offer no reason to conclude that these projects were somehow less concrete than those the Court accepted as adequate site-specific examples in *Wild Virginia v. CEQ*, 544 F. Supp. 3d 620, 638 (W.D. Va. 2021). Nor do Defendants contest that post-filing facts are relevant (if at all) to mootness rather than standing. On those premises alone, Plaintiffs should prevail on this issue. Nevertheless, without explaining why their arguments should change the Court's analysis, Defendants focus on the "hold" that prevented these projects from moving forward under the CEs. Defendants argue that there was no hold and that the CEs are, in fact, in widespread use.[2] Dkt. 168 at 6-7. In support of that argument, Defendants can only cite to a chart they brought to oral argument. *Id.* at 7.[3] This document, however, is not in evidence. *See* Fed. R. Evid. 901. As a result, it cannot support a ruling for Defendants on summary judgment. *See* Fed. R. Civ. P. 56(c).

Even if Defendants' chart were properly before the Court, it does not contradict the evidence of the hold. As previously briefed, the hold was a procedural screening device. It allowed some projects to move forward, *e.g.*, Dkt. 138-7, Attch. 2 at 15 (explaining that some projects were getting "a green light"), but it was used to screen out projects that the Forest Service believed would increase the risk of the CEs being found unlawful in this case, *id.* at 5, 25, 56. For example, the agency screened out certain controversial actions, *e.g.*, *id.* at 50 (noting

---

[2] Defendants also characterize the documents explaining the hold—its own documents, produced through the Freedom of Information Act—as "heavily edited." Dkt. 168 at 6. These documents have been properly authenticated by one of Plaintiffs' declarants, who requested and reviewed the documents, and Defendants have not previously contested their veracity. The contents of these documents are undisputed facts in this case; it is a little late to object to them.
[3] Defendants' chart, though not in the digital record for this case, is provided as Exhibit 1 to this reply for ease of reference.

8

a "no commercial element" limitation on logging projects during the hold), or use of the CEs in this region specifically, *e.g.*, *id.* at 42, 88 (declining to approve the use of the CEs within Region 8 because of this lawsuit). Put simply, the fact that the CEs have been used in some parts of the country or for some uncontroversial actions is not inconsistent with the existence of a screening process that was intended to deprive Plaintiffs of as-applied examples in this lawsuit.

To be clear, Defendants have given the Court no example of the Forest Service using the new CEs in Region 8 for any of the actions that Plaintiffs complain of in this case, and the chart does not make up for that failure. To begin with, the chart specifically disclaims to show that the Forest Service has been using the new, expanded "special use" CE in Region 8. *See* Ex. 1 (explaining that usage of CE 3 in Region 8 has been limited to 5 acres or less). And the chart's omissions are just as telling as its admissions: It does not purport to show that the Forest Service has used the roads or "restoration" CE for new road construction or commercial logging—the future harms that Plaintiffs are trying to prevent—anywhere that Plaintiffs have a demonstrated interest. Despite diligently reviewing FOIA responses, public notices, and agency web pages since the CEs were finalized, Plaintiffs are aware of zero projects in Region 8 in which the new CEs were used to authorize new road construction or commercial logging.[4] Defendants' insinuation that Plaintiffs could have already challenged site-specific projects in North Carolina or Georgia, *see* Dkt. 168 at 7, is therefore misleading and wholly unsupported by facts.

---

[4] In fact, only a single project has utilized any of the new CEs in the Southern Appalachian national forests, and that project did not authorize any of the harms Plaintiffs reasonably anticipate from the CEs. That project, the "ERFO Craig Creek Crossing Road Repair and Stream Restoration" project, was signed under the roads CE, but it did not involve any new road construction. It instead involved the rebuilding of 750 feet of existing road that had been damaged during a storm. The Court may take judicial notice of this project, documentation of which is publicly available at https://www.fs.usda.gov/r08/northcarolina/projects/archive/65457.

9

In summary, Defendants have provided no facts rebutting the documentary evidence showing that the Forest Service has screened the use of its CEs during the pendency of this case and *because of* this case. And such facts, if they existed, could at best have created an issue of fact requiring further discovery and trial. Thus, even if hindsight were relevant to assess Plaintiffs' standing, it would have been error to dismiss site-specific harms that were imminent at the time the case was filed without fact-finding regarding whether those projects did not move forward under the CEs because of Defendants' efforts to manipulate the Court's jurisdiction.

Second, Defendants bizarrely suggest that Plaintiffs' separate basis for Rule 59 relief—failure to consider the evidence that Plaintiffs' members will be imminently injured regardless of where precisely the CEs are used—is a "new argument." Dkt. 168 at 7. Little ink need be spilled here: Plaintiffs have briefed and argued these precise avenues of injury at every opportunity. *See* Dkt. 138 at 19 (explaining that "some of Conservation Groups' members will be harmed by the Covered Actions no matter where the CEs are used on their national forests," and citing specific examples supported in declarations); Dkt. 148 at 9 (same); Dkt. 162 at 6-7 (highlighting the same injuries again during oral argument).

### IV.  Conclusion

To correct a manifest injustice and avoid a waste of judicial resources, Plaintiffs ask the Court to correct the clear errors in its December 3 opinion and alter or amend the judgment. At minimum, Plaintiffs ask the Court to resolve the significant ambiguities in its opinion.

Respectfully submitted,

SOUTHERN ENVIRONMENTAL LAW CENTER

/s/ Sam Evans
Sam Evans
NC Bar No. 44992
sevans@selc.org

10

Abigal Hunt
NC Bar No. 62453
ahunt@selc.org

Alyson Merlin
NC Bar No. 58223
amerlin@selc.org

48 Patton Ave
Suite 304
Asheville, NC 28801-3321
(828) 258-2023

Kristin Gendzier
VA Bar No. 85076
kgendzier@selc.org

201 West Main St
Suite 14
Charlottesville, VA 22902-5065
(434) 977-4090

11